**PBGC**
Protecting America's Pensions

**Pension Benefit Guaranty Corporation**
1200 K Street, N.W., Washington, D.C. 20005-4026

AUG - 8 2006

**Via E-mail and Federal Express**

Anne H. S. Fraser, Esq.
1320 19th Street, N.W., Suite 200
Washington, D.C. 20036
Counsel for the ABA Plan

J.P. Hendrickson, Esq.
McDermott Will & Emery L.L.P.
227 West Monroe Street
Chicago, Illinois 60606
Counsel for Sara Lee Corp.

Michael A. Lawson, Esq.
Skadden, Arps, Slate, Meagher & Flom
300 South Grand Avenue
Los Angeles, California 90071
Counsel for Interstate Bakeries Corp.

Kent B. Magill, Esq.
Vice President and General Counsel
Interstate Bakeries Corporation
12 East Armour Boulevard
Kansas City, Missouri 64111

James R. Kettering, Jr.
President
Kettering Baking Company
729 Coleman Avenue
Fairmont, West Virginia 26554

Re:   **American Bakers Association Retirement Plan**

Dear Ms. Fraser and Messrs. Hendrickson, Lawson, Magill, and Kettering:

I write to advise you that the Pension Benefit Guaranty Corporation ("PBGC") has completed its review of the status of the American Bakers Association Retirement Plan (the "Bakers Plan" or the "Plan") under the provisions of Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1301–1461. This process was initiated by Interstate Bakeries Corporation ("Interstate") and Kettering Baking ("Kettering"), two companies that contributed to the Plan on behalf of their employees. They asked PBGC to resolve a disputed question: Under ERISA, is the Bakers Plan classified as (1) a multiple-employer plan (a unitary pension plan supported by multiple employers) or (2) a so-called aggregate of single-employer plans (a group of separate pension plans with common features and common management)? Kettering and Interstate maintain that the Bakers Plan is exactly what its name suggests it is: a unitary pension plan supported by multiple employers.

For the reasons set forth, we conclude that Kettering and Interstate are correct, that the Bakers Plan is, and indeed always has been, a multiple-employer plan.

## BACKGROUND

In 1979, PBGC issued a letter determining that, based on the facts disclosed and representations made at that time by the Trustees of the Plan and their advisors, the Bakers Plan was an "aggregate of single-employer plans" under ERISA ("1979 Determination"). (For sake of clarity, we will refer to the alleged separate plans within the aggregate as "Employer Subplans" or "Subplans" in contrast to the "Bakers Plan.") Thus, Kettering and Interstate ask PBGC to revoke its 1979 Determination.

The Trustees of the Plan oppose this request, as does another contributing employer, Sara Lee Corporation ("Sara Lee"). Sara Lee forthrightly acknowledges that it remains interested in this issue because of the money. Late in 2004, the Plan's actuary advised the Trustees that the Plan would need to increase its contributions and income by at least $30 million to satisfy the minimum funding rules of section 412 of the Internal Revenue Code. *See* Letter from Robert D. Krinsky to American Bakers Association dated November 4, 2004, at 1. For the first time in the Plan's history, employers would be called upon to pay more than their agreed-upon contributions in the form of a special assessment.

In light of the Plan's funding crisis, Sara Lee pulled most of its employees and retirees out of the Bakers Plan in 2005 and placed them into a separate plan maintained only by Sara Lee. According to the Plan actuary's calculation, at the close of 2004, the Bakers Plan covered about 6,500 participants, and had benefit liabilities, on a plan termination basis, of $232 million, but only $122 million in assets. When Sara Lee withdrew, it took 3,600 (or 55 percent) of the participants and $119 million (or 52 percent) of the liabilities. Under the Trustees' arithmetic, however, because Sara Lee was allegedly sponsoring a Subplan within the Bakers Plan it was entitled to take more than $98 million (or more than 80 percent) of the Plan's assets.

The numbers would be much different if the Bakers Plan is classified as a multiple-employer plan. In that case, section 414($l$) of the Internal Revenue Code and the implementing regulations, as applied, would permit Sara Lee to take no more than $71 million in assets. Also, under ERISA, Sara Lee would be classified as a "substantial employer" (because it was responsible for more than 10 percent of required employer contributions to the Plan over a two/three-year test period). 29 U.S.C. § 1301(a)(2). Substantial employers who withdraw from underfunded multiple-employer plans may be required to post a bond or other security to cover a share of the plan's benefit liabilities in the event the plan terminates within five years. 29 U.S.C. § 1363.[1] In light of Sara Lee's potential exposure, it is understandable why Sara Lee supports the Trustees' position. Sara Lee offers an additional argument, that some employers relied on the theory reflected in the 1979 Determination, and that PBGC should, in the event it revokes the Determination, do so on a prospective basis only.

By the same token, Interstate has a strong interest in establishing that the Bakers Plan is a multiple-employer plan. If the Plan actuary's liability allocation and arithmetic are correct, the

---

[1] Withdrawing employers also remain liable for a share of the plan's underfunding if it terminates within five years. 29 U.S.C. § 1364.

alleged Interstate Subplan has benefit liabilities, on a plan termination basis, of $65 million and *negative assets* of $4 million, and the resulting $69 million in liability is much more than the $40 million that Interstate maintains would be its share of the liabilities if the Bakers Plan is classified as a multiple-employer plan.

If Sara Lee gets the full $98 million it wants, Interstate will be left as the largest contributing employer in a rump plan with only $24 million in assets and more than $113 million in liabilities.[2] The Plan maintains one, unitary, funding standard account to compute the total benefit underfunding, and, under the contribution rules of ERISA and the Code, the contributing employers are liable for the full amount of all contributions the Plan needs to fund all plan benefits. *See* 26 U.S.C. § 412(c)(11); 29 U.S.C. § 1082(c)(11).

The opposing sides (Trustees/Sara Lee *vs.* Kettering/Interstate) each assert that their respective positions are supported – if not dictated – by PBGC's 1979 Determination. The Trustees solicited that determination to help insulate certain contributing employers from the impact of statutory vesting and funding requirements that would become effective in 1976 under ERISA, which had been signed into law on Labor Day 1974. *See* 29 U.S.C. §§ 1053, 1061, 1081, 1088. Among other things, ERISA compelled pension plans to give participants who satisfied age and service conditions a legally protected, "vested" right to a pension upon retirement. *See* 29 U.S.C. § 1053. The new law also required that such promised benefits be paid for. ERISA (and a counterpart provision in the Internal Revenue Code, administered by the Internal Revenue Service) established funding requirements, and employers would be held liable, and also subject to excise taxes, if a plan's contributions and investment earnings were not sufficient to satisfy the new rules. *See* 26 U.S.C. §§ 412, 413(c), 4971; 29 U.S.C. § 1082. Finally, in the event of plan termination (and, under Title IV of ERISA as then in effect, plans could be terminated, for any reason, at the election of the plan administrator – in this case, the Trustees themselves) contributing employers could be held liable for the shortfall between the value of plan assets and the cost of pension benefits that were guaranteed by PBGC. *See* 29 U.S.C. §§ 1341, 1362, 1364.

PBGC advised the Trustees in 1979 – and the Trustees acknowledged – that whether or not a plan in which two or more employers participated, like the Bakers Plan, would be treated as one multiple-employer plan was not a function of what the settlors wanted it to be. Rather, the plan's status depended entirely upon how its features measured against the relevant standard. Under that standard, the Bakers Plan failed to explicitly establish separate Employer Subplans. Thus, if the Trustees intended to restructure the Bakers Plan so that it would be an aggregate of Subplans after 1976, the fact that the pre-ERISA version of the Plan did not explicitly refer to individual Employer Subplans, account balances, or employer-by-employer actuarial valuations, would not, by itself, affect the status of the Plan. PBGC insisted, however, that the Trustees needed to demonstrate that the Bakers Plan's pre-ERISA structure and organization provided

---

[2] On July 20, 2005, the Plan, Sara Lee and Interstate entered into a "standstill agreement" pursuant to which Sara Lee agreed to accept a limited transfer of $71 million in Plan assets. The parties further agreed that no action would be taken with respect to the disputed portion of remaining Plan assets – $27 million – to allow PBGC to review this case.

Page 3 of 17

reasonable notice to affected parties that the settlors had intended to effectively restrict the possibility of one employer's contributions from being used to pay the benefits of another employer's retirees. If that preliminary inquiry was satisfied, then explicit rules and strict operational limits would be needed thereafter to avoid multiple-employer plan status going forward.

This goal would require changes to the Plan's structure (which was governed by a written instrument, the Plan document) as well as the Plan's day-to-day operations. As the PBGC's 1979 Determination noted, a defined benefit pension plan subject to ERISA (and the Internal Revenue Code) is presumed to be one plan *unless* specific safeguards were established and followed.

The Trustees took immediate advantage of the 1979 Determination, as it allowed them to transfer two underfunded Subplans to PBGC. The premium forms that the Plan subsequently filed with PBGC similarly referenced the alleged "aggregate" status of the Bakers Plan, and the Trustees later amended the Plan document to include a special section stating that the 1979 Determination had confirmed that the Plan was merely an aggregation of Employer Subplans.

Almost all of the factual premises recited in PBGC's 1979 Determination have now been challenged. Interstate and Kettering submitted documents and position papers asserting that the Bakers Plan never maintained the system of accounts and records that were required to maintain separate plans for each employer. To the contrary, they assert that the Plan indiscriminately mixed contributions from all employers and made no attempt to maintain "separate accounts" for each employer and its particular employees. Put another way, Interstate and Kettering contend that the elaborate system of checks and balances described to PBGC in the late 1970s never existed. Kettering and Interstate ask PBGC to revoke the 1979 Determination. The Plan Trustees and Sara Lee filed rebuttal arguments with PBGC. They did not rebut most of the specific facts identified in the Kettering-Interstate filings. They argue, however, that the Trustees were entitled to do what they did (or did not do) and could still rely upon the 1979 Determination.

PBGC has reviewed all the submissions, as well as the 1979 Determination, the reasoning behind it, and the key plan document that was submitted to PBGC as the foundation for that ruling. For the reasons set forth below, PBGC is compelled to revoke the 1979 Determination. The record, as a whole, establishes that the Bakers Plan is, and always has been, a unitary multiple-employer plan.

## A.    The Applicable Legal Standard

The factors that PBGC and other ERISA agencies use for determining the "single versus aggregate" status of a pension plan have not changed since 1979. PBGC continues to apply a fact-specific analysis to resolve the issue:

> Our determination as to the nature of an entity – whether it is a
> single plan or an aggregate of single plans – is based on its

structure and how it actually operates on an ongoing basis. We
look to the documents governing the entity and to relevant
evidence of how it has operated and continues to operate. Such
evidence may include the reasonable expectations and intent of the
parties.

The availability of funds held by an entity to provide benefits is a
central factor in our analysis. Restrictions on the use of such funds
indicate that the entity may be an aggregate of single plans. For
example, if separate accounts are maintained for each contributing
employer, it may be possible to restrict the use of assets from each
separate account to pay only the benefits of the employee-
participants of the employer maintaining the account. If the
evidence shows that payments are effectively restricted, by
whatever means, so that there is a minimal risk of funds
attributable to the contributions of one employer being used to pay
the benefits of another employer's employee-participants, then the
entity is an aggregate of single plans. (1979 Determination at
1–2.)

This is the standard that PBGC applied to the Plan in 1979 and has consistently applied
before and after that determination. *See* PBGC Op. Ltrs. 79-3 (February 12, 1979); 79-14
(October 17, 1979); 84-2 (January 17, 1984); and 85-2 (January 14, 1985). Moreover, PBGC's
statutory interpretation has been uniformly adopted by every court that has addressed the issue of
distinguishing between one, multiple-employer, plan and an aggregate of single-employer plans.
*PBGC v. Potash*, No. CIV-79-130B(E), 1986 WL 3809 (W.D.N.Y. March 26, 1986); *PBGC v.
Artra Group, Inc.*, No. 90-C-5358, 1993 WL 225370 (N.D. Ill. June 23, 1993); *Nowell v. Central
Serv. Ass'n*, 106 F. Supp. 2d 888 (S.D. Miss. 2000). This standard is based on PBGC's long-
standing interpretations of the terms "plan" and "multiple-employer plan." In a regulation first
proposed in 1977 and in effect from 1980 to 1996, PBGC defined the term "plan" as a single
plan – which includes a multiple-employer plan – "if on an ongoing basis, all of the plan assets
are available to pay benefits to employees who are covered by the plan and their beneficiaries."[3]
To the same effect, current PBGC regulations define the term "multiple-employer plan" as "a
single-employer plan maintained by two or more contributing sponsors that are not members of
the same controlled group, under which all plan assets are available to pay benefits to all plan
participants and beneficiaries." 29 C.F.R. § 4001.2 (2005).

PBGC's 1979 Determination begins with the premise that after 1974, the rules set forth
in ERISA would treat any pre-existing pension plan as a unitary entity unless two conditions
were met. First, there must be at least some evidence that the plan had been established and

---

[3] Reporting and Notification for Reportable Events, 42 Fed. Reg. 59285, 59286 (proposed
November 17, 1977); Reporting and Notification Requirements for Reportable Events, 45 Fed.
Reg. 55636, 55636-37 (Final Rule, August 20, 1980) (codified at 29 C.F.R. § 2617.2 (1980),
*superseded in relevant part by* 29 C.F.R. § 4001.2).

operated as a group of subplans, rather than a single entity. To that end, the test looks at the pre-ERISA plan document ("the documents governing the entity") and pre-ERISA plan practice ("relevant evidence about how [the plan] operated and continues to operate"). The second part of the test outlines what needs to be done in the future to avoid single-plan status. These requirements are more exacting as they demand that a plan effectively eliminate the risk of cost shifting among employers.

### B.     The Status of the Bakers Plan Before ERISA Became Law in 1974

According to the record before PBGC in the late 1970s, the Bakers Plan was established in 1961 by a group of unrelated companies (the "Founder Companies") engaged in food manufacturing and related activities. While the Founder Companies were unrelated – and some were business competitors – they had one thing in common. They were all members of the American Bakers Association (the "Association"). Various member companies contributed to collectively-bargained pension plans on behalf of their unionized workers. (This type of plan, sponsored by multiple employers who bargain with a union, is now called a "multiemployer" plan. *See* 29 U.S.C. § 1301(a)(3).) The multiemployer plans did not, of course, give pension coverage to employees not represented by unions. The Founder Companies therefore established the Bakers Plan to cover their non-union workers.

While the new pension arrangement was not itself collectively bargained, key features of the Bakers Plan mimic those used by multiemployer plans. *See generally* Michael G. Kushner, *Multiemployer Plans – Special Rules*, Tax Mgmt. Portfolios, No. 359–4th, §§ I.A., I.B. (2005). This is most apparent in the contribution and benefit accrual provisions of the plan document. Each employer agreed that it would contribute between $2 and $5 per week per employee. Upon retirement the employee would receive a monthly benefit of $27 multiplied by the contribution level paid in his last year of employment. A worker whose employer contributed $2 a week would receive a monthly benefit of $54, while the employees of a $5-a-week company would receive $135 a month.[4]

Several aspects of this arrangement warrant comment. First, retiree benefits bore no relation to a worker's pre-retirement pay, which is the most common accrual structure in white-collar plans. Moreover, benefits paid to retirees were not directly matched against the amount of employer contributions, either for an individual retiree or for all retirees of a given employer. This concept is best illustrated by the deal struck with the Founder Companies. As long as a Founder Company remained a member of the Association, it had an absolute right to remain in the Plan; the governing documents provided the Trustees with no mechanism to ensure that benefits payable to the Company's retirees and current workers did not exceed the value of contributions. Thus, benefit costs were not segregated on an employer-by-employer basis, so cost shifting could occur. If one looks at the other side of the balance sheet, it is apparent that

---

[4]  The versions of the governing plan document in effect between the creation of the Bakers Plan in 1961 and March 1976 were submitted to PBGC as part of the 1979 Determination record. Representatives of the Plan also described to PBGC the contribution and accrual rules in effect during that period.

assets and asset gains could also be spread across the universe of employers. This would occur, for example, whenever an employer withdrew from the plan before its employees had accrued at least 25 years of service. The employees of the withdrawn employer forfeited all benefits, and the employer got no contribution refund.

The pre-ERISA structure was not consistent with the contemporaneous, detailed, and precise accounting requirements necessary to establish a "plan within a plan" structure that would satisfy an auditor. It is equally clear that there was no system in place whereby the actuaries for the Bakers Plan could perform the gain and loss analysis required to verify whether the many alleged employer Subplans were being funded on an adequate basis. We also note that the materials submitted to PBGC before 1979 did not include any plan documents or other contemporaneous writings to support the notion that the Bakers Plan was an "aggregate of subplans" from 1961 through 1973.

The absence of internal restrictions is not at all surprising. The contributing employers would obtain no financial benefit from establishing such an expensive and cumbersome account system. The employers participated in the Bakers Plan on a strictly voluntary basis, and all employers paid a uniform rate for uniform coverage, so no employer was subject to a competitive disadvantage due to pension costs. Moreover, employers were protected from unexpected pension liabilities: an employer's financial exposure was expressly limited to a weekly payment of an agreed-upon amount. If a shortfall occurred, no harm could come to the employer, who was free to drop out of the arrangement whenever it deemed that advisable. And the Trustees did not need to be concerned about potential cost shifting. Pre-ERISA law gave them great latitude to reduce or eliminate benefits in the event that income and outflows needed to be recalibrated after an employer withdrawal.

C.    **The Terms of the Pre-ERISA Plan Document Before ERISA's New Rules Took Effect**

When the Trustees first approached PBGC for a ruling, the Plan was governed by a document drafted in 1973 (the "1973 Plan Document"). It was apparent from the face of the 1973 Plan Document that no mention was made of separate employer accounts, employer-specific actuarial valuations, or allocation of investment gains (or losses) among employers. When seeking the 1979 Determination, the Trustees and their counsel urged PBGC to focus on provisions of the 1973 Plan Document relating to (1) the calculation and levy of a surcharge on new employers entering the Plan, to avoid actuarial deficiencies (Article 10.04); and (2) the Trustees' right to deprive plan participants of some or all of their pension benefits if their employer was expelled from the Bakers Association or otherwise halted contributions (Articles 16.04 and 14.02). These provisions, it was said, demonstrated that the settlors wanted to ensure that each contributing employer paid the full cost – or nearly so – of paying benefits to its employees. From this, the Trustees reasoned that the Founder Companies clearly intended to create a Subplan for each employer, and that this expectation should continue even though the newly-enacted provisions of ERISA seemed to prohibit many of the Plan's past practices, such as forfeiting employees' benefits if the employer withdrew after fewer than 25 years of participation.

PBGC's 1979 Determination cited these provisions and accepted the Trustees' arguments about settlor intentions. In retrospect, PBGC's application of the legal standard was simply wrong. As suggested above, the forfeiture feature is exactly the sort of rule that would be invoked when a plan did not keep separate accounts and wanted to limit future expenditures if an employer broke ranks. In any event, the forfeiture rule applied only after an employer was already gone and after a crude historical recalculation indicated that assets would not cover liabilities. *See* 1973 Plan Document Articles 14.01, 14.02. By definition, a negative balance was proof positive that cost shifting had occurred before the employer had withdrawn from the Plan. The 1973 Plan Document implicitly recognized that fact and provided that a withdrawn employer could elect to contribute to the Bakers Plan the amount necessary make up any such plan asset insufficiency.

The provision that allowed the Trustees to impose a "contribution surcharge" on certain new employers, Article 10.04 of the 1973 Plan Document, actually undermines the Subplan theory. In theory, an actuarial surcharge could be imposed whenever a new employer joined the Plan, or an existing employer added new groups of workers to the Plan. At first glance, language that authorizes "a surcharge . . . above the regular weekly Rate . . . to avoid an actuarial deficiency" suggests that an actuary was doing tests to check whether contributions covered pension costs. The Plan actuary now admits, however, that the surcharge was no substitute for a full actuarial valuation of the sort required to effectively prevent cost shifting among employers.

### D.    Developments After 1979

The current Plan document represents that the Bakers Plan is – for purposes of Title IV of ERISA – an association or aggregate of separate plans. The document also represents that PBGC's 1979 Determination authorized this special status. Article 13.01 of Plan. The Plan document further states that each participating employer's contribution will be used only to provide benefits for its own employee-participants. Article 13.02 of Plan. In addition, the Trustees represent that the Plan has consistently maintained records on an employer-by-employer basis so as to permit a retroactive (post-withdrawal) reconstruction of each employer's "account."

In practice, however, the Plan is governed by a single plan document and a single Board of Trustees appointed by participating employers. The Trustees engage a single actuary and other professionals. Benefits and contributions under the Plan are determined in accordance with a single set of actuarial assumptions. Significantly, Plan assets are pooled in a single trust and one custodial account and are not segregated by employer. Thus, all employer contributions are paid to, and all benefit payments and administrative expenses are paid from, that single account.

The Trustees now maintain that the Plan is a "hybrid" plan: an aggregate of single-employer plans for purposes of the pension plan termination insurance program under Title IV of ERISA, but one multiple-employer plan for purposes of the minimum funding requirements of

ERISA and the Internal Revenue Code.  29 U.S.C. § 1082; 26 U.S.C. §§ 412, 413(c)(4).[5]  Thus, for minimum funding purposes, the Plan has always performed only one, Plan-wide, annual actuarial valuation and contribution calculation.  *See* Plan Participation Agreement, ¶ 13.

Until very recently, separate actuarial valuations of the Plan assets and liabilities attributable to a particular employer were to be performed only when an employer terminated participation in the Plan, *see* Article 11.02 of current Plan document, or upon an employer's request.  *See* Participation Agreement, ¶ 13.  In some cases, those terminations were consummated as single-employer plan terminations in accordance with Title IV of ERISA, as "sufficient" or standard terminations.  That is, the employer's allocable share of Plan assets was sufficient to pay PBGC-guaranteed benefits attributable to the employer, or, after the law changed in 1987 to require satisfaction of all benefit liabilities for a standard termination, to satisfy all attributable benefit liabilities.  *See* 29 U.S.C. § 1341(a), (b).  Under the terms of the Plan Document as amended after 1973, when an employer terminates participation, the Plan is required to retroactively calculate the employer's allocable share of the commingled Plan assets based on the employer's contribution history and the Plan's investment return on contributions, less administrative expenses.  Accordingly, if the allocable assets are insufficient to satisfy benefits payable to the employer's employee-participants, the employer is required to make up the difference.  If there is a surplus, it reverts to the employer.  *See* Article 11.01 – 11.02 of the current Plan document.  These provisions, however, were not consistently followed.

For instance, the Trustees represent that benefits payable to a terminated employer's Plan participants have been funded by purchasing annuities with the employer's allocable share of Plan assets.  In the case of several participating employers, including two terminations that occurred in the late 1970s, Sanitary Baking Company and Wilson Baking, PBGC stepped in as statutory trustee because the employers had insufficient allocable Plan assets to pay PBGC-guaranteed benefits.  (Those terminations were the impetus for the Plan's original request to PBGC that led to PBGC's 1979 Determination).  In other cases, however, where the employer has simply ceased operations and apparently liquidated, the Plan has continued to pay pensions to participants out of assets left "abandoned" in the Plan.  According to the Trustees, there are eight such "inactive" employers.

Through the late 1990s, favorable investment experience led the Plan to become nearly fully funded on an ongoing basis – calculated on the basis that the Plan is one, multiple-employer plan for minimum funding purposes.  Because employer contributions to a fully-funded defined benefit pension plan are not tax deductible, *see* 26 U.S.C. § 404, to preserve the tax deductibility of employer contributions, the Trustees increased benefits under the Plan as a whole on a number of occasions.  In 1992, Kettering, one of the smaller participating employers, requested that it be excluded from benefit increases.  The rationale for Kettering's request was

---

[5]  In 1988, the law was changed so that any plan maintained by more than one employer and established after 1988 was required to conduct separate annual valuations for each employer.  *See* 26 U.S.C. § 413(c)(4).  The Bakers Plan opted to be treated as a "grandfathered" multiple-employer plan and continued to conduct only one, Plan-wide, actuarial valuation on an annual basis.

that, in 1990, the Plan actuary had performed a separate valuation of its obligations under the Plan – also at Kettering's request – and determined that Kettering had significant unfunded attributable liabilities. Counsel for the Plan rejected Kettering's request to be excluded from Plan-wide benefit increases, advising Kettering's counsel that "the Plan is designed and intended to function as a single unit." Further, Plan counsel stated: "To the extent the experience of each employer were separately determined, the Plan would effectively be 'deconstituted' into a group of single employer plans." Letter from Anne Fraser to Robert Struble dated June 2, 1992. We will return to this document, in greater detail, in view of its unusual significance.

When PBGC issued its 1979 Determination, there were 23 unaffiliated employers with 93 separate plant locations participating in the Plan. Over the years, however, the number of participating employers declined greatly, due to consolidation in the baking industry. By 2004, only seven employers remained in the Plan. Of those seven employers, Sara Lee and Interstate collectively accounted for more than 95 percent of the Plan's participants. By 2004, the Plan as a whole, according to the Plan's actuary, had become significantly underfunded, largely as a result of lower interest rates, the stock market decline, and necessary benefit increases.

Near that time, several other events occurred that precipitated Interstate's request to PBGC to revisit the issue whether the Bakers Plan is an aggregate of single-employer plans or one multiple-employer plan for purposes of Title IV. On September 22, 2004, Interstate and a number of its subsidiaries filed for Chapter 11 bankruptcy protection in the Western District of Missouri Bankruptcy Court. Interstate remains in bankruptcy as of this writing. In December 2004, Interstate requested access to Plan records and an actuarial valuation of the Plan assets and liabilities attributable to Interstate, to assess its obligations with respect to the Plan. At nearly the same time, Sara Lee, which is not in bankruptcy, also requested an actuarial valuation. Sara Lee also indicated that it intended to spin off or withdraw a substantial portion of benefit liabilities and assets of the Plan – attributable to approximately 3,600 of its 4,610 employees covered by the Plan – to a stand-alone plan sponsored by Sara Lee. In addition, because of the impending need to assess quarterly contributions, the proposed Sara Lee withdrawal/spin-off, and funding issues in general, the Trustees had independently begun conducting an employer-by-employer study in the Fall of 2004. Thus, for the first time in the Plan's history, the Plan actuary conducted an employer-by-employer valuation of all of the Plan's assets and liabilities by retroactively creating separate "accounts."

According to the Plan actuary's calculations, as of October 1, 2004, four of the seven active participating employers, including Interstate, had negative asset balances, i.e., benefit payments and administrative expenses with respect to those employers exceeded those employers' contributions and investment experience on contributions. The Plan actuary produced two different sets of calculations. Under one set of calculations, the asset balances of terminated employers *were not* reallocated among the active and inactive employers. Out of 33 "terminated employers" identified in that set of calculations, 12 had negative asset balances and 21 had positive balances. And two out of eight "inactive employers" had negative asset balances. In approximate numbers, Interstate had a negative balance of $4.2 million and Kettering had a negative balance of $300,000. Sara Lee, on the other hand, had a positive balance of $108 million. Under the second set of calculations, in which the Plan actuary

assumed that asset balances for "terminated employers" *were* reallocated among "active" and "inactive" employers, the approximate balances were: Interstate, negative $4 million; Kettering, negative $280,000; and Sara Lee, positive $111 million.

On June 24, 2005, Interstate requested that PBGC revisit its 1979 Determination and determine that the Bakers Plan is a multiple-employer plan. Kettering likewise asserts that the Plan is a multiple-employer plan. The Plan and Sara Lee maintain that the Plan is an aggregate of single-employer plans. On July 6, 2005, the Plan actuary issued the results of its employer-by-employer valuation of the assets and liabilities of the Plan discussed above. Based on the Plan actuary's calculations, which assumed that the Plan was an aggregate of single-employer plans, the Plan would have been required to transfer approximately $98 million of the Plan's $122 million in assets to complete the withdrawal or spin-off of Plan assets and liabilities requested by Sara Lee. On the other hand, if the Plan were treated as one, multiple-employer plan, in accordance with § 414(*l*) of the Internal Revenue Code,[6] the Plan would have been required to transfer only $71 million in Plan assets to the Sara Lee plan.

## LEGAL ANALYSIS

Some 25 years later, the parties now dispute whether the Bakers Plan ever complied, or even intended to comply, with the core tenets of PBGC's 1979 Determination. *See supra,* pp. 4 – 5. In particular, Interstate/Kettering report that, since 1979, the Trustees and their professional advisors have regularly filed documents with the Department of Labor and the Internal Revenue Service, and distributed documents to contributing employers, stating that the Bakers Plan is not an aggregate of single-employer plans.[7] In fact, Interstate and Kettering contend that the Trustees repeatedly stated that they were running a multiple-employer plan, and did so for the stated purpose of benefitting from financial and administrative advantages available to multiple-employer plans. Exhibits attached to Interstate's filing with PBGC included numerous forms filed by or on behalf of the Bakers Plan with the Internal Revenue Service, accounting records, and documents and correspondence produced by the Plan's actuaries and attorneys. The Kettering submission quoted lengthy extracts from correspondence produced by the Plan's legal counsel and actuary. The Trustees have not challenged the authenticity of these exhibits and PBGC has therefore taken them into account as evidence in formulating this determination. A review of these submissions and exhibits has led us to conclude as follows:

---

[6] Section 414(*l*) of the Code governs the valuation of plan assets and liabilities in a plan spinoff or merger. *See also* 29 U.S.C. § 1058.

[7] Interstate also points to language in the Summary Plan Description ("SPD") distributed by the Trustees to the Plan participants and beneficiaries. *See* 29 U.S.C. §§ 1022(a), 1024(b)(1). The SPD plainly states that "there is no separate account maintained for each Employer's contributions and no separate annual valuation for each Employer's contributions." SPD at 34.

### (1)    Official Representations of Multiple-Employer Plan Status to Federal Agencies.

The Plan administrator annually signed and filed Form 5500s with the Internal Revenue Service and the Department of Labor. Those forms are signed "under penalties of perjury and other penalties." The Plan consistently checked a box indicating that the Plan was a multiple-employer plan. The Trustees concede this fact, and state that the Plan reported itself as a multiple-employer plan because the Form 5500 does not have a box that allows a plan to describe itself as an aggregate of single-employer plans. There is no "aggregate of singles" box precisely because the instructions to the Form and long-standing IRS guidance advised plans and their professionals that, whenever separate plan status is asserted,

> . . . a funding standard account must be established and maintained for each of the plans. Furthermore, each of the single plans is a separate plan for purposes of section 6058 of the Code and section 301.6058-1 of the regulations. *Accordingly, a separate Form 5500 (including a separate Schedule B) must be filed for each of the single plans.* (Rev. Rul. 81-137, 1981-1 C.B. 232; emphasis added.)

At all relevant times, the Bakers Plan was represented by qualified and experienced professional advisors, and we therefore cannot credit the assertion that they provided their clients with patently incorrect advice about how to file the fundamental ERISA reporting form.

### (2)    Actuarial Certifications of Multiple-Employer Plan Status Filed with the IRS.

While a plan administrator is required to sign and file the annual Form 5500, the statute and implementing regulations specify that the enrolled actuary for each defined benefit pension plan must prepare and sign a "Schedule B" that lists, among other things, the values of plan assets and benefit liabilities, the amount of plan contributions, a checklist of "certain actuarial assumptions," and a fairly detailed computation of the charges and credits to the plan's funding account. 29 U.S.C. § 1023(d); 29 C.F.R. § 2520.103–1(b). By signing the Schedule, the actuary affirms that (1) the information is "complete and accurate" and (2) "in my opinion each assumption, used in combination, represents my best estimate of anticipated experience under the plan." The signatory must also provide the enrollment number assigned to him by the Joint Board of Actuaries, the federal entity that establishes "reasonable standards and qualifications for persons performing actuarial services." *See* 29 U.S.C. §§ 1241, 1242.

There is no dispute that the enrolled actuaries who prepared and signed the Schedule B attachments to the Form 5500s stated that the Plan had one funding standard account and one pool of assets and benefit liabilities. All contributions received from all employers were commingled and identified as contributions to the Bakers Plan, not to any individual Employer Subplan. Consistent therewith, the detailed schedules of actuarial gains and losses attached to

the Schedule Bs plainly show that all gains or losses from expected investment returns, mortality, employee turnover, and so forth were spread over the Plan as a unitary entity.

The Plan has always performed only one, Plan-wide, annual actuarial valuation and contribution calculation for minimum funding purposes. And despite the significant changes to the minimum funding requirements since ERISA was first enacted, in particular the deficit reduction contribution and quarterly contribution requirements enacted in 1987, the Plan never modified the method by which it calculated and charged employers for funding contributions. Indeed, when the law changed in 1988 by requiring multiple-employer plans to perform separate employer-by-employer valuations, the Bakers Plan maintained that it had "grandfathered" multiple-employer plan status (as was its right, 26 U.S.C. § 413(c)(4)(B)) and continued to perform only one Plan-wide annual actuarial valuation.

If the Bakers Plan is not "one plan" the standards of practice would have compelled an actuary to prepare a Schedule B for each alleged Subplan. *See* Rev. Rul. 81-137, *supra*. The actuaries did not do so, which means that they had reached a professional judgment that it was a unitary plan. We regard this unbroken chain of reports as persuasive evidence that the Plan always operated an on ongoing basis as one, multiple-employer plan in which all plan assets have been available to pay all plan benefits.

### (3)    Statements Made by Plan Actuaries and Attorneys to Employers.

In addition to the information gleaned from the Form 5500s and Schedule Bs, the Plan's professionals addressed various written statements to contributing employers about the Plan's funding and operation. While there are many examples, it will suffice to quote communications from the attorney and the actuary to James Kettering, the President of Kettering. In a letter dated June 2, 1992, as we have previously noted, the Plan's counsel explained:

> Benefit increases are determined according to the experience of the Plan as a whole. Because the Plan is designed and intended to function as a single unit, I would consider it imprudent to place the overall operation and favorable tax qualification of the Plan in jeopardy by permitting a separate participating employer to be treated as a separate unit for purposes of application of any benefit increases. To the extent the experience of each employer were separately determined, the Plan would effectively be "deconstituted" into a group of single employer plans, and would no longer enjoy the benefits of aggregated investment of contributions, favorable tax qualification and centralized management. In short, the basic objectives of the Plan would be frustrated and it is possible that the Plan would not be able to continue operation in its present form.

It is not possible to reconcile this language with the Trustees' factual representations on which PBGC's 1979 Determination was based, i.e., that each employer would fund its own

Page 13 of 17

Subplan within the Plan, so that assets contributed by one employer were not used to pay benefits to retirees who worked for another employer; and that employers would not need to concern themselves with the overall condition of the Plan. Here, the employer is advised that the Plan cannot maintain separate accounts, that employers could not obtain favorable tax qualification for employer Subplans, and that the Plan could not allow individual employers to avoid benefit increases leading to potential liability for unfunded benefit obligations.

On November 3, 2005, the Plan's enrolled actuary sent a letter to Mr. Kettering. According to Mr. Kettering (in a letter to PBGC counsel dated November 25, 2005), the actuary's letter was generated in response to Mr. Kettering's complaint that, if the Plan had been structured to create many individual plans, there was no way the Kettering "Subplan" could have a negative account without plan-wide cost sharing. The actuary wrote:

> There was another factor that may have caused underfunding. The plan was established . . . to mirror the bakery union multi-employer plan. It was set up so that there would be no separate actuarial valuations for each employer so long as they [sic] were actively contributing to the plan. Initially, all employers paid the same contribution per dollar of benefit as they do in a multi-employer collectively bargained plan. It was then feared that some employers with very old groups would join the plan . . . . A system of surcharges was then developed so that an employer whose group averaged over age 40, when they joined the plan, or when they raised benefits, would pay something more . . . .
>
> Although this system was meant to approximate equity among employers, it was never intended to come up with the same contribution rates that would have resulted from full actuarial valuations for each employer . . . .

Several aspects of this position are noteworthy. The first four sentences report that the Plan was established, drafted, and operated like a multiemployer pension plan – and multiemployer plans, by definition, constitute one plan where all assets and liabilities are shared without restrictions or distinctions among employers.[8] The next two sentences confirm that the Plan made no attempt to "track" the accounts of any employers who helped start the Plan. Since most major employers enjoyed this "grandfathered" status, no true segregation could be effected. While new employers might be subjected to a "surcharge," the amount was arbitrary, temporary, and in no way "intended to come up with the same contribution rates that would have resulted from full actuarial valuations . . . . "

The actuary's letter then explains how negative accounts could arise:

---

[8] PBGC agrees that the wording of the pre-ERISA plan document appears to follow the template used in many pre-ERISA multiemployer pension plans.

> Equity by employer was achieved if an employer terminated by
> going through the same procedure that we went through for
> Kettering Baking, by looking at contributions made, benefits paid
> and adjusted for investment income and administrative expense
> and measured against the liability at termination.
>
> This system was presented and thoroughly explained to the
> Pension Benefit Guaranty Corporation after ERISA passed. That
> resulted in an addendum to our plan that basically blessed our
> method.

We note: (1) the letter acknowledges that, on a day-to-day basis, no separate accounts were maintained; (2) negative account balances can result only if assets and benefit payments are pooled (i.e., an employer with no assets in its account must borrow assets from other employer accounts in order to issue benefit checks); and (3) PBGC's 1979 Determination did not "bless" the Plan's post-ERISA failure to maintain separate accounts or separate actuarial valuations necessary to create an "aggregate of single-employer plans." That question falls squarely within the authority of the Internal Revenue Service.

**(4)     The Content of the Plan's Certified Financial Statements.**

Under ERISA, the administrator of an employee benefit plan must have prepared by an independent auditor, and must file with the ERISA agencies a certified financial statement of the plan's assets and liabilities. 29 U.S.C. § 1023(a)(3)(A). Although the certified financial statement for the Bakers Plan for the years ending September 30, 2003, and September 30, 2004, describes the Plan as "a group of single-employer defined benefit pension plans," it fails to account for any of the Plan assets and liabilities on an employer-by-employer basis. In fact, nowhere does the Bakers Plan's auditor, Bond Beebe, even mention the segregation of employer assets and liabilities required for aggregate of single-employer plan status. Rather, the financial statement merely lists the Bakers Plan's assets and liabilities, taken as a whole, over the two-year span.

**(5)     In Operation, the Plan Did Not Abide by the Representations on Which
          PBGC's 1979 Determination Was Premised.**

In 1979, PBGC determined that the Bakers Plan was an aggregate of single-employer plans based largely on representations made by the Trustees as to how the Plan would operate going forward. The key representations were that, despite the commingling of all Plan assets in and payment of all benefits from a single account, the Plan could effectively minimize the risk of cost shifting among employers by: (1) the system of actuarial surcharges and valuations performed to avoid an actuarial deficiency whenever an employer joined the Plan, added a group of participants, or otherwise increased its contribution rate and therefore its employees' benefit accrual rate; and (2) maintaining the data necessary to retroactively create separate accounts, and true up any funding deficiency or surplus, when an employer terminates participation in the Plan.

As discussed above, in operation, the Plan did not fully abide by these representations, and the measures the Plan did take did not effectively prevent cost shifting among participating employers on an ongoing basis. In operation, the system of actuarial surcharges, which was intended to prevent an actuarial deficiency related to a particular employer's adverse age and service demographics, was a perfunctory calculation based only on the average age of the relevant group of participants. No attempt was made to track employer-by-employer account balances on an ongoing basis to adjust employer contributions and prevent cost shifting. Indeed, according to the Plan actuary, the accountants for the Plan never kept asset or liability records by employer. *See* Letter from Robert D. Krinsky to John P. Hendrickson dated November 3, 2003, at 1.

Additionally, despite the Trustees' prior representations to PBGC, it appears that the Plan has not consistently treated the withdrawal of a participating employer as a plan termination or retroactively created a separate account for each such employer and trued up any funding deficiency or surplus. The evidence shows that the Plan currently treats eight employers as "inactive." These employers have simply ceased participation or ceased operations and abandoned their attributable assets and allocable liabilities to the Plan. Under one set of employer-by-employer calculations produced by the Plan actuary, two of those inactive employers had a negative asset balance and six had a surplus. And out of 33 "terminated employers," 12 had a negative asset balance and 21 had a surplus. In another set of such calculations, the Plan actuary reallocated the asset deficiencies and surpluses of the terminated employers among the active and inactive employers. Thus, contrary to the Plan's prior representations in 1979, the Plan has not been and is not being maintained to prevent cost shifting among participating employers. And no retrospective valuation or reallocation of Plan asset deficiencies or surpluses can change that.

Finally, while the terms of the Plan and intentions of the parties were relevant to PBGC's determination of the status of the Plan shortly after the passage of ERISA in 1979, they are not controlling today, in light of the evidence as to how the Plan actually operated over the years since then. The only sure guide to intent is conduct. That conduct cannot be disputed, and leads the agency inescapably to the conclusion that the Bakers Plan is a multiple-employer plan.

## Conclusion

PBGC has determined that the Bakers Plan is a multiple-employer plan. In light of the exigencies of this matter, the agency has further decided to make this determination effective immediately upon its date of issuance. *See* 29 C.F.R. §§ 4003.1(c), 4003.22(b). Thus, there is no obligation for any party aggrieved by this determination to exhaust its administrative remedies with respect to this determination, either by seeking reconsideration by PBGC, or by filing an administrative appeal.

Sincerely,

Date: August 8, 2006

Terrence M. Deneen
Chief Insurance Programs Officer