**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SARA LEE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06–CV–0819–HHK |
| | ) | |
| AMERICAN BAKERS ASSOCIATION | ) | |
| RETIREMENT PLAN; and BOARD OF | ) | |
| TRUSTEES OF THE AMERICAN BAKERS | ) | |
| ASSOCIATION RETIREMENT PLAN; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

**MOTION FOR SUMMARY JUDGMENT OF DEFENDANT
PENSION BENEFIT GUARANTY CORPORATION**

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules of the U.S. District Court

for the District of Columbia 7 and 56.1, the Pension Benefit Guaranty Corporation ("PBGC")

hereby moves for Summary Judgment.  For the reasons detailed in the accompanying

Memorandum of Points and Authorities, PBGC respectfully requests that the Court grant

judgment in PBGC's favor on Counts I and II of Plaintiff Sara Lee Corporation's Second

Amended Complaint, and Counts I and II of the Third-Party Complaint for Declaratory and

/ /

/ /

/ /

/ /

Injunctive Relief, Counterclaim, and Cross-Claim filed by American Bakers Association

Retirement Plan and the Board of Trustees of the American Bakers Association Retirement Plan.


Dated: April 4, 2007                          Respectfully submitted,
         Washington, D.C.


                                               /s/ Marc S. Pfeuffer
                                              ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
                                              Chief Counsel
                                              CHARLES L. FINKE
                                              Associate Chief Counsel
                                              MICHAEL P. MORA
                                              PAULA CONNELLY (D.C. Bar No. 389055)
                                              Assistant Chief Counsels
                                              MARK BLANK (D.C. Bar No. 968388)
                                              MARC S. PFEUFFER (D.C. Bar No. 484209)

                                              PENSION BENEFIT GUARANTY CORP.
                                              Office of the Chief Counsel
                                              1200 K Street, N.W.
                                              Washington, D.C.  20005
                                              Tel. No. (202) 326-4020, ext. 4903
                                              Fax No. (202) 326-4112
                                              E-mail: pfeuffer.marc@pbgc.gov and
                                              efile@pbgc.gov

                                              Attorneys for Pension Benefit Guaranty Corp.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARA LEE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06–CV–0819–HHK |
| | ) | |
| AMERICAN BAKERS ASSOCIATION | ) | |
| RETIREMENT PLAN; and BOARD OF | ) | |
| TRUSTEES OF THE AMERICAN BAKERS | ) | |
| ASSOCIATION RETIREMENT PLAN; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## PBGC'S MOTION FOR SUMMARY JUDGMENT

Date:   April 4, 2007

ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
MICHAEL P. MORA
PAULA CONNELLY (D.C. Bar No. 389055)
Assistant Chief Counsels
MARK BLANK (D.C. Bar No. 968388)
MARC S. PFEUFFER (D.C. Bar No. 484209)

PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C.  20005
Tel. No. (202) 326-4020, ext. 4903
Fax No. (202) 326-4112
E-mail: pfeuffer.marc@pbgc.gov and
efile@pbgc.gov

*Attorneys for Pension Benefit Guaranty Corp.*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   I.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO PBGC . . . . . . . . . . 8

       A.    THE COURT'S ANALYSIS IS LIMITED TO WHETHER
             PBGC'S DETERMINATION IS ARBITRARY AND CAPRI-
             CIOUS, BASED ON THE ADMINISTRATIVE RECORD . . . . . . . . . . . . . . . 8

       B.    WHERE JUDICIAL REVIEW IS BASED ON THE
             ADMINISTRATIVE RECORD, SUMMARY JUDGMENT IS
             ESPECIALLY APPROPRIATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

       C.    THE PROCEDURES PBGC UTILIZED IN THIS INFORMAL
             ADJUDICATION WERE ENTIRELY SUFFICIENT . . . . . . . . . . . . . . . . . . . 11

       D.    PBGC'S DETERMINATION IS THOROUGHLY REASONABLE
             AND COMPLETELY SUPPORTED BY THE ADMINISTRATIVE
             RECORD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# TABLE OF AUTHORITIES

## Federal Cases Cited

*Agomo v. Fenty*,
        2007 WL 265897 (D.C. Cir. Feb. 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*AT&T v. FCC*,
        448 F.3d 426 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Auer v. Robbins*,
        519 U.S. 452, 461 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Board of Regents of State College v. Roth*,
        408 U.S. 564, 577 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Caldewell & Santmyer, Inc. v. Glickman*
        55 F.3d 1578 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*C&E Servs., Inc. of Washington v. DC Water & Sewer Auth.*
        310 F.3d 197 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Citizens for the Scenic Severn River Bridge v. Skinner*,
        802 F. Supp. 1325 (D. Md. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Cleveland Bd. of Educ. v. Loudermill*,
        470 U.S. 532 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Cook v. PBGC*,
        652 F. Supp. 1085 (S.D.N.Y. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*DeMelo v. OPM*,
        2005 WL 1901537 (Fed. Cir. Aug. 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Doolin Security Savings Bank v. FDIC*,
        53 F.3d 1395 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Evangelical Lutheran Church in Am. v. INS*,
        288 F. Supp. 3d 32 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Gillian v. England*,
        2005 WL 3213900 (D.D.C. Nov. 1, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Girling Health Care v. Shalala*,
    85 F.3d 211 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Greater Boston Television Corp. v. FCC*,
    444 F.2d 841 (D.C. Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Hughes v. Jacobson*,
    525 U.S. 432 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Islamic Am. Relief Agency v. Gonzales*,
    2007 WL 445936 (D.C. Cir. Feb. 13, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Kennecott Greens Creek Min. Co. v. MSHA*,
    2007 WL 420125 (D.C. Cir. Feb. 9, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mineral Policy Ctr. v. Norton*,
    292 F. Supp. 2d 30 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Mistick PBT v. Chao*,
    440 F.3d 503 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 18

*Mount Royal Joint Venture v. Kempthorne*,
    2007 WL 489221 (D.C. Cir. Feb. 16, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 18

*NTEU v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*OXY USA, Inc. v. FERC*,
    64 F.3d 679 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*,
    329 F. Supp. 2d 600 (E.D.N.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*PBGC v. Artra Group, Inc.*,
    1993 WL 225370 (N.D. Ill. June 23, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11, 14

*PBGC v. LTV Corp.*,
    496 U.S. 633 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11

*PBGC v. Potash*,
    1986 WL 3809 (W.D. N.Y. March 26, 1986) . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11, 14

*R.D. ex rel. Kareem v. District of Columbia*,
    374 F. Supp. 2d 84 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Shays v. FEC*,
    424 F. Supp. 2d 100 (D.D.C. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Space Age Eng'g, Inc. v. United States*,
    4 Cl.Ct. 739 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Vermont Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## United States Code Cited

Title 5
    Sections 551 *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    Section 555 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    Section 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Title 26
    Section 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Title 29
    Sections 1301-1461 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1301(a)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 1302(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    Section 1321 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1322 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1341(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1341(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1341(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    Section 1342(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 1361 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**Other Authorities Cited**

C.F.R. 29
      Section 2615.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      Section 2617.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
      *Section 4001.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 13
      Section 4003.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

45 Fed. Reg. 55,646 (Aug. 20, 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10 A.C. Wright A. Miller & M. Kane,
      Federal Practice & Procedure: Civil 2d Section 2733 (1983) . . . . . . . . . . . . . . . . . . . 10

**Miscellaneous**

PBGC Opinion Letter (Feb. 12, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

PBGC Opinion Letter (Oct. 17, 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

PBGC Opinion Letter (Jan. 17, 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

PBGC Opinion Letter (Jan. 14, 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

PBGC 2006 Annual Management Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Authorities chiefly relied upon are marked with an asterisk.

# INTRODUCTION

This lawsuit is about what *kind* of pension plan the American Bakers Association Retirement Plan (the "ABA Plan" or the "Plan") is under Title IV of the Employee Retirement Income Security Act ("ERISA").[1]  Because the ABA Plan has more than one participating employer, it must be classified as either an "aggregate of single-employer plans" or a "multiple-employer plan."  This classification has significant financial consequences for the Plan's participating employers.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal government agency that enforces the statutory provisions governing this question, conducted a thorough informal adjudication and concluded on August 8, 2006 (the "2006 Letter"), that the ABA Plan is and always has been a multiple-employer plan.  In doing so, the agency reversed a determination that it had issued with respect to the ABA Plan some 27 years earlier, which PBGC concluded in 2006 was "simply wrong."[2]  Because PBGC's determination, far from being arbitrary and capricious, is thoroughly reasonable and completely supported by the administrative record, PBGC is entitled to summary judgment.

# STATUTORY BACKGROUND

PBGC is a federal agency and wholly owned United States government corporation.[3] PBGC administers the nation's pension plan termination insurance program established by

---

[1]  29 U.S.C. §§ 1301-1461 (2000 & Supp. III 2003).

[2]  AR 1570 (2006 Letter at 8).

[3]  29 U.S.C. § 1302(a).

1

Title IV of ERISA, which protects participants in private sector defined benefit pension plans.[4] When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes trustee of the plan and pays participants their benefits, up to the statutory limits.[5]

PBGC guarantees the pension benefits of more than 44 million participants in more than 30,000 pension plans, and is the trustee of more than 3,500 failed pension plans.[6]  The pension insurance program acts as a backstop for American workers, providing retirement income for more than one million workers whose pension plans have failed.[7]  PBGC is self-financed, and obtains its revenues exclusively from four sources: (i) premiums paid by employers sponsoring ongoing plans; (ii) investment income; (iii) the assets in terminated plans; and (iv) recoveries, if any, from employers whose underfunded plans have terminated.

Title IV establishes the exclusive means of terminating a covered pension plan.[8]  An employer may voluntarily terminate a pension plan in a "standard" termination if the plan's assets are sufficient to pay all of its promised benefits, or may initiate a "distress" termination of an underfunded plan if the employer meets certain criteria relating to financial condition.[9]  And

---

[4]  *See generally PBGC v. LTV Corp.*, 496 U.S. 633, 636-69 (1990).

[5]  *See* 29 U.S.C. §§ 1321, 1322, 1361.

[6]  *See* PBGC 2006 Annual Management Report, *http://www.pbgc.gov/docs/ PBGCAMR.pdf*, at 6.

[7]  *Id.*

[8]  29 U.S.C. § 1341(a)(1); *see also Hughes v. Jacobson*, 525 U.S. 432, 446 (1999).

[9]  29 U.S.C. §§ 1341(b), (c).

PBGC may "involuntarily" terminate a plan if, for example, it determines that absent termination, the agency's long-run loss may increase unreasonably.[10]  As trustee, PBGC takes over the plan's assets and liabilities and provides the statutorily guaranteed benefits.  When guaranteed benefits exceed the plan's assets, PBGC makes up the difference with its insurance funds.

A pension plan that has more than one participating employer and is not maintained pursuant to a collective-bargaining agreement may be classified either as a "multiple-employer plan" or an "aggregate of single-employer plans."[11]  This distinction is important in applying the statutory provisions governing funding, plan termination, and termination liability, among other things.  PBGC's regulation defines "multiple-employer plan" as "a single-employer plan maintained by two or more contributing sponsors that are not members of the same controlled group, under which all plan assets are available to pay benefits to all plan participants and beneficiaries."[12]  There is no statutory or regulatory definition for the term "aggregate of single-employer plans," but it has been consistently interpreted to mean a pension plan to which more than one employer contributes, where the funds attributable to the contributions of each employer are maintained in separate accounts or effectively restricted so that they are only used to pay the benefits of the employee-participants of the employer maintaining the account or restricted funds, and not the benefits of another employer's employee-participants.[13]

---

[10]  29 U.S.C. § 1342(a).

[11]  A plan maintained pursuant to collective-bargaining agreement(s) between one or more unions and more than one employer is a "multiemployer plan."  29 U.S.C. § 1301(a)(3)(B).

[12]  29 C.F.R. § 4001.2.

[13]  *See* AR 216 – 17 (1979 Letter); *PBGC v. Potash*, 1986 WL 3809 (W.D.N.Y. Mar. 26, 1986) at *1; *PBGC v. Artra Group, Inc.*, 1993 WL 225370 (N.D. Ill. June 23, 1993) at *2;

3

PBGC has issued a number of Opinion Letters throughout its history addressing whether a particular pension arrangement constitutes a multiple-employer plan or an aggregate of single-employer plans, focusing on whether the plan's assets were available to pay the benefits of all plan participants, *i.e.*, regardless of which sponsoring employer or employers they worked for.[14] Under PBGC's regulation on Administrative Review of Agency Decisions, PBGC may reconsider any of its determinations, either upon request or on its own initiative.[15]

## STATEMENT OF FACTS

### The 1979 Letter

The American Bakers Association (the "ABA") established the ABA Plan in 1961.[16] After the ABA asked PBGC to determine whether the ABA Plan constituted a multiple-employer pension plan or an aggregate of separate pension plans, PBGC issued a determination on June 21, 1979 (the "1979 Letter").[17]

---

PBGC Op. Ltrs. 79-3 (Feb. 12, 1979) (*http://www.pbgc.gov/oplet/79-3.pdf*); 79-14 (Oct. 17, 1979) (*http://www.pbgc.gov/oplet/79-14).pdf*); 84-2 (*http://www.pbgc.gov/oplet/84-2.pdf*) (Jan. 17, 1984); 85-2 (*http://www.pbgc.gov/oplet/85-2.pdf*) (Jan. 14, 1985).

[14] *See, e.g.,* PBGC Op. Ltrs. 79-3 (Feb. 12, 1979) (*http://www.pbgc.gov/oplet/79-3.pdf*) ("If [the plan's] funds are available for payment to any participant or beneficiary, the entity is a single [multiple-employer] plan."); 79-14 (Oct. 17, 1979) (*http://www.pbgc.gov/oplet/79-14.pdf*) ("The availability of funds held by an entity to provide benefits is a central factor in our analysis."); 84-2 (Jan. 17, 1984) (*http://www.pbgc.gov/oplet/84-2.pdf*) (same); 85-2 (Jan. 14, 1985) (*http://www.pbgc.gov/oplet/85-2.pdf*) (same).

[15] 29 C.F.R. § 4003.1(c)(1).

[16] Second Amended Complaint at ¶ 10; Third-Party Complaint, Counterclaim, and Cross-Claim ("Third-Party Complaint") at ¶ 22.

[17] AR 216 (1979 Letter).

4

Based on the facts and representations supplied by ABA Plan Trustees ("Trustees") and their advisors, PBGC determined in the 1979 Letter that the ABA Plan was an aggregate of single-employer plans. PBGC stated that in making such a determination, it focused on the pension plan's structure and how it actually operated on an ongoing basis — the same factors that PBGC weighs in applying the same test today.[18] The agency stressed that a "central factor" in its analysis was the availability of funds to pay the benefits of employees of various employers.[19] Citing the language of the ABA Plan's provisions and the arguments made by the Trustees about the intent of the settlors, PBGC concluded that the ABA Plan was an aggregate of single-employer plans.[20]

### The 2006 Letter

On June 24, 2005, counsel for Interstate Bakeries Corp. ("IBC"), one of the ABA Plan's contributing sponsors, asked PBGC to reconsider whether the Plan constituted a multiple-employer pension plan or an aggregate of single-employer plans.[21] IBC stated that the ABA Plan had not been operated as an aggregate of single-employer pension plans in the years since PBGC issued the 1979 Letter, and urged PBGC to "revisit its earlier conclusion."[22] Consistent with the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, which governs the agency's decision-making processes, PBGC conducted an informal adjudication to reconsider the 1979 Letter.

---

[18]  *Id*.

[19]  AR 217.

[20]  AR 217–219.

[21]  AR 339.

[22]  AR 340.

On November 2, 2005, PBGC wrote to all interested parties, advising them that the agency intended to revisit its determination in the 1979 Letter and requesting that each interested party submit any written statement or documents that it would like PBGC to consider in the agency's decision-making process.[23]  PBGC received materials from the ABA Plan, Sara Lee, IBC, and Kettering Baking Company.[24]

After careful consideration of the legal standards and the materials submitted by the parties, PBGC issued its determination letter on August 8, 2006 (the "2006 Letter").  Stating that the agency's application of the legal standard in the 1979 Letter was "simply wrong," PBGC concluded in the 2006 Letter that the ABA Plan "is, and indeed always has been, a multiple-employer plan."[25]

PBGC reviewed the legal standard for determining the "single versus aggregate" status of a pension plan, finding that it had not changed since 1979 and had been uniformly adopted by every court to address the issue.[26]  The agency reviewed the status of the ABA Plan before ERISA became law in 1974, and tracked developments through and after PBGC issued the 1979 Letter.

PBGC found that since 1979, the assets in the Plan have been available, *and in fact have been used*, to pay benefits to all Plan participants regardless of their employers.  The materials

---

[23]  AR 427.

[24]  *See* AR 429 – 1439.  *See also* AR 1540 – 41, 1555 – 1561 (correspondence from ABA Plan representatives referenced in Kettering Submission, AR 429 – 439).

[25]  AR 1563, 1570 (2006 Letter at 1, 8).

[26]  AR 1566 – 67 (2006 Letter at 4-5).

submitted to PBGC by several of the parties, which were largely unrebutted, showed that the ABA Plan had never maintained the system of accounts and records that would have been required to maintain separate plans for each employer.[27]  The Trustees and their advisors had regularly filed documents with the Department of Labor and the Internal Revenue Service stating, expressly, that the ABA Plan was a multiple-employer plan.  Thus, it could not be an aggregate of single-employer plans.  Documents were also distributed to contributing employers and plan participants (including the Summary Plan Description) indicating that there were no separate accounts maintained for each employer's contributions.   Correspondence by the ABA Plan's legal counsel and actuaries, as well as filings and accounting records, repeatedly stated that the ABA Plan operated as a multiple-employer plan, citing the financial and administrative advantages of doing so.  Based on the entire record, PBGC concluded that the ABA Plan was, and remains, a multiple-employer plan.

**The Current Lawsuit**

On May 3, 2006, Sara Lee filed this action, and subsequently filed a First and Second Amended Complaint.  (PBGC was added as a party defendant by the Second Amended Complaint.)  Sara Lee asserts that PBGC's determination in the 2006 Letter that the ABA Plan is a multiple-employer pension plan is arbitrary and capricious, both on the merits, and because it purportedly will result in a significant financial benefit to PBGC.[28]  Accordingly, Sara Lee asks the

---

[27]  AR 1566, 1573 (2006 Letter at 4, 11).

[28]  Second Amended Complaint at ¶¶ 44, 45.

Court to declare the 2006 Letter to be arbitrary, capricious, and incorrect as a matter of law; and to reverse the 2006 Letter and enjoin PBGC from rescinding the 1979 Letter.[29]

On November 30, 2006, the ABA Plan and the Trustees filed a Third-Party Complaint, Counterclaim, and Cross-Claim.  In the Cross-Claim against PBGC, the ABA Plan and the Trustees assert that the 2006 Letter conflicts with the governing plan documents; was based on erroneous information; and was reached in violation of the due process clause of the Fifth Amendment due to PBGC's purportedly inadequate decision-making process.[30]  The ABA Plan and the Trustees ask the Court to declare what type of plan the ABA Plan is, or alternatively to rescind the 2006 Letter based on PBGC's alleged violations of procedural due process.

## ARGUMENT

## I.   THIS COURT SHOULD GRANT SUMMARY JUDGMENT TO PBGC

The Court's review in this matter is limited to PBGC's administrative record, and must assess whether the agency's determination was arbitrary and capricious.  Accordingly, summary judgment is an especially appropriate vehicle.  The administrative record reveals that, far from being arbitrary and capricious, PBGC's determination is fully supported by the record and thoroughly reasonable.

### A.   THE COURT'S ANALYSIS IS LIMITED TO WHETHER PBGC'S DETERMINATION IS ARBITRARY AND CAPRICIOUS, BASED ON THE ADMINISTRATIVE RECORD.

The standards governing judicial review of agency action under the Administrative Procedure Act are well established.  As the D.C. Circuit reiterated very recently in *Mount Royal*

---

[29]  *Id*. at p. 18, Prayer for Relief under Counts I and II, ¶¶ (1), (2).

[30]  Third-Party Complaint at ¶¶ 69, 76.

*Joint Venture v. Kempthorne*, a reviewing court must affirm agency action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[31]  The *Kempthorne* court recited the familiar precepts:

> "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  Rather, we will reverse an agency decision only if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*[32]

Particularly where the agency's analysis "requires a high level of technical expertise," as this matter does, the court "must defer to the informed discretion of the responsible federal agencies."[33]  And perhaps most important, "[a court's] standard of review under the arbitrary and capricious test is only reasonableness, not perfection."[34]

In the two previous cases in which a court reviewed a PBGC determination of whether a pension plan constituted a multiple-employer plan or an aggregate of single-employer plans, both

---

[31]  5 U.S.C. § 706(2)(A), cited in *Mount Royal Joint Venture v. Kempthorne*, 2007 WL 489221 (D.C. Cir. Feb. 16, 2007) at *5.  *Accord Islamic Am. Relief Agency v. Gonzales*, 2007 WL 445936 (D.C. Cir. Feb. 13, 2007) at *2.

[32]  2007 WL 489221 at *5.

[33]  *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 377 (1989) (internal quotation marks omitted).

[34]  *Kennecott Greens Creek Min. Co. v. MSHA*, 2007 WL 420125 (D.C. Cir. Feb. 9, 2007) at *6.

courts confined their review to the administrative record and applied the arbitrary and capricious standard.[35]  This Court should do the same.

### B.    WHERE JUDICIAL REVIEW IS BASED ON THE ADMINISTRATIVE RECORD, SUMMARY JUDGMENT IS ESPECIALLY APPROPRIATE.

Courts in this Circuit repeatedly have recognized that where judicial review is based on an agency's administrative record, summary judgment is an "especially appropriate" vehicle to resolve the case.[36]  As the Fifth Circuit has explained:

> The explanation for this lies in the relationship between the summary judgment standard of no genuine issue as to any material fact and the nature of judicial review of administrative decisions . . . .  [T]he administrative agency is the fact finder.  Judicial review has the function of determining whether the administrative action is consistent with law — that and no more.[37]

Thus, "review of the administrative record [under the arbitrary and capricious standard] is primarily a legal question which is readily resolved by summary judgment."[38]

---

[35]  *See PBGC v. Artra Group, Inc.*, 1993 WL 225370 (N.D. Ill. June 23, 1993) at *1; *Potash*, 1986 WL 3809 at *3 & n.2.

[36]  *Mineral Policy Ctr v. Norton*, 292 F. Supp. 2d 30, 36 (D.D.C. 2003).  *Accord Shays v. FEC*, 424 F. Supp. 2d 100, 109-110 (D.D.C. 2006); *Gillan v. England*, 2005 WL 3213900 (D.D.C. Nov. 1, 2005) at n.2; *R.D. ex rel. Kareem v. District of Columbia*, 374 F. Supp. 2d 84, 89 n.6 (D.D.C. 2005); *Evangelical Lutheran Church in Am. v. INS*, 288 F. Supp. 2d 32, 39 (D.D.C. 2003).

[37]  *Girling Health Care v. Shalala*, 85 F.3d 211, 215 (5th Cir. 1996), quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure:* Civil 2d § 2733 (1983) (internal quotations and footnotes omitted).

[38]  *Citizens for the Scenic Severn River Bridge v. Skinner*, 802 F. Supp. 1325, 1332 (D. Md. 1991).  *Accord Pamlico-Tar River Found. v. U.S. Army Corps of Eng'rs*, 329 F. Supp. 2d 600, 607 (E.D.N.C. 2004).

In both previous cases in which a court reviewed a PBGC determination of whether a pension plan was a multiple-employer plan or an aggregate of single-employer plans, the courts resolved the matter through summary judgment.[39]  This Court should do the same.

### C.   THE PROCEDURES PBGC UTILIZED IN THIS INFORMAL ADJUDICATION WERE ENTIRELY SUFFICIENT.

In a case like this, where PBGC lawfully reached the determination in the 2006 Letter through informal adjudication, the Supreme Court has made clear that only the APA's "minimal" procedural requirements contained  in 5 U.S.C. § 555 apply.[40]  These mandate only that the agency conclude the matter within a reasonable time and give prompt notice and a brief statement of the grounds for a denial of any application or request.  "[C]ourts are not free to impose upon agencies specific procedural requirements that have no basis in the APA."[41]

Here, PBGC solicited and received written submissions (hundreds of pages) from the affected parties, carefully considered them, and issued a 17-page determination.  The agency's decision-making process was entirely adequate.

Although the ABA Plan makes a half-hearted attempt to invoke the Due Process Clause of the Fifth Amendment, the only interest the Plan asserts — that the 2006 Letter "subjects the Plan

---

[39]  *Artra*, 1993 WL 225370; *Potash*, 1986 WL 3809.

[40]  *PBGC v. LTV Corp.*, 496 U.S. 633, 655 (1990).

[41]  *Id.* at 654, citing *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) ("Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them.").

to uncertainty and has exposed the Plan and its Trustees to litigation"[42] — is plainly insufficient to invoke the Fifth Amendment's procedural protection of property interests. The Supreme Court and the D.C. Circuit have emphasized that a protected property interest exists only where a statute or other explicit rule or understanding "secure[s] certain benefits and . . . support[s] claims of entitlement to those benefits."[43] A "unilateral expectation" simply does not constitute "a legitimate claim of entitlement."[44] The ABA Plan's hope that it would avoid uncertainty and litigation simply is not protected. Even if the Fifth Amendment did apply, however, PBGC provided all of the process that would be due — notice and an opportunity to be heard.[45]

**D.   PBGC'S DETERMINATION IS THOROUGHLY REASONABLE AND COMPLETELY SUPPORTED BY THE ADMINISTRATIVE RECORD.**

PBGC determined in the 2006 Letter that the ABA Plan is a multiple-employer plan. In reaching this decision, the agency solicited and carefully considered the extensive submissions of the affected parties. Through detailed analysis, PBGC concluded that in every significant way, the ABA Plan had always been operated as one, unitary plan with many contributing sponsors, rather than an aggregate of separate plans whose separate assets funded only their own participants' benefits. PBGC's interpretation and application of its regulation defining "multiple-employer

---

[42]  Third-Party Complaint at ¶¶ 75, 76.

[43]  *Board of Regents of State College v. Roth*, 408 U.S. 564, 577 (1972); *accord C&E Servs., Inc. of Washington v. DC Water & Sewer Auth.*, 310 F.3d 197, 200 (D.C. Cir. 2002)("the Constitution's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits") (internal quotations omitted).

[44]  *Roth*, 408 U.S. at 577.

[45]  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 545 (1985); *Mathews v. Eldridge*, 424 U.S. 319, 334-35 (1976).

plan" is entitled to substantial deference,[46] and its administrative record fully supports this determination.

The legal standard is well established for determining whether a pension plan with more than one participating employer is a multiple-employer plan or an aggregate of single-employer plans. As PBGC noted in the 2006 Letter, PBGC's regulation explicitly defines "multiple-employer plan" as "a single-employer plan maintained by two or more contributing sponsors . . . under which *all plan assets are available to pay benefits to all plan participants and beneficiaries*."[47] This is the standard that PBGC has articulated for more than 25 years in Federal Register publications and Opinion Letters: the "central factor" in the analysis is the availability of all plan assets to pay benefits to any participant or beneficiary, and the way that the plan is

---

[46] *See, e.g., Auer v. Robbins*, 519 U.S. 452, 461 (1997); *AT&T v. FCC*, 448 F.3d 426, 431 (D.C. Cir. 2006); *NTEU v. Chertoff*, 452 F.3d 839, 859 (D.C. Cir. 2006); *Mistick PBT v. Chao*, 440 F.3d 503, 511 (D.C. Cir. 2006).

[47] AR 1567 (2006 Letter at 5), quoting 29 C.F.R. § 4001.2 (2006) (emphasis added). This language was first published in 1980 as part of the definition of "plan" (*see* n.48, *infra*), and previously was codified at 29 C.F.R. §§ 2617.2 and 2615.2. In 1996, the identical language was used to define the term "multiple-employer plan," codified at 29 C.F.R. § 4001.2.

structured and actually operates on an ongoing basis is dispositive.[48]  The court decisions on the issue are similarly uniform.[49]

Applying this standard, the evidence in the administrative record makes clear that throughout the ongoing operation of the ABA Plan, individual employers' contributions have always been available to pay the benefit liabilities of other employers.  As the ABA Plan forthrightly stated in its 2005 submission to PBGC: "The [ABA Plan's] assets are held in trust in a single custodial account and are not segregated by employer; contributions are paid to and all benefits and administrative expenses are paid from one consolidated account."[50]  And as PBGC found in the 2006 Letter, this was also evident from the Form 5500s, Schedule Bs, and certified

---

[48]  *See* 45 Fed. Reg. 55,646 (Aug. 20, 1980) ("'Plan' means a single plan . . . if, on an ongoing basis, all of the plan assets are available to pay benefits to employees who are covered by the plan and their beneficiaries"); PBGC Op. Ltrs. 79-3 (Feb. 12, 1979) (*http://www.pbgc.gov/oplet/79-3.pdf*) (Our conclusion . . . is based on [the plan's] structure and how it actually operates on an ongoing basis.  * * * If [the plan's] funds are available for payment to any participant or beneficiary, the entity is a single [multiple-employer plan]."); 79-14 (Oct. 17, 1979) (*http://www.pbgc.gov/oplet/79-14).pdf*) ("The availability of funds held by an entity to provide benefits is a central factor in our analysis."); 84-2 (*http://www.pbgc.gov/oplet/84-2.pdf*) (Jan. 17, 1984) (same); 85-2 (*http://www.pbgc.gov/oplet/85-2.pdf*) (Jan. 14, 1985) (same).

[49]  *See Artra*, 1993 WL 225370 at *2 (the determination is based on "how the plan actually operate[s]," and the critical question is "whether the contributions of the individual employers were available to satisfy the benefit liabilities of other employers"); *Potash*, 1986 WL 3809 at *3 (the agency's decision, although overturned, "properly set forth the applicable standards" for determining the type of plan, which centered on "the availability *vel non* of all Fund assets to pay all participants' benefits on an ongoing basis").

[50]  AR 869 (ABA Plan Submission at 7).  *See also* AR 487 (IBC Exhibit 1, 2001 ABA Summary Plan Description distributed to Plan participants and beneficiaries at 34) ("there is no separate account maintained for each Employer's contributions and no separate annual valuation for each Employer's contributions").

financial statements that the ABA Plan filed,[51] and the negative account balances attributed to some employers when the assets of other employers were "borrow[ed]" in order to issue benefit checks.[52]

Indeed, not only has the ABA Plan kept no separate accounts, it apparently has kept no records of assets or liabilities on an employer-by-employer basis, either. As the ABA Plan's actuary stated in November 2003: "The accountants to the Plan have never kept asset records by employer. We have never kept liability records by employer."[53] Moreover, in November 2004, the actuary bluntly admitted in a letter that the Plan "has always operated as one Plan."[54] The actuary was advising the Trustees that an additional $30 million in contributions would be required, and that the Trustees would have to decide how the 2005 quarterly contributions required of all participating employers "are best allocated among the employers."[55]

Instead of keeping separate accounts and individual records of assets and liabilities, the actuaries, when requested, apparently would perform "time consuming calculations" to "calculate the liabilities [of a particular employer] and estimate the assets allocated to them."[56] And the Plan

---

[51] AR 1574, 1577 (2006 Letter at 12, 15). *See, e.g.,* AR 1090 (Exhibit 11 to ABA Submission).

[52] AR 1577 (2006 Letter at 15); *see also* AR 1303 (Sara Lee Submission at 4) (negative account balances may be attributable to "isolated loans").

[53] AR 733 (IBC Submission at Exhibit 19) (Letter of ABA Plan actuary Robert Krinsky to John P. Hendrickson (Nov. 3, 2003)).

[54] AR 491 (IBC Submission at Exhibit 2) (Letter of ABA Plan actuary to Trustees (Nov. 4, 2004)).

[55] *Id.*

[56] *Id.*

15

consistently represented itself to be a multiple-employer plan, checking the box so indicating on the annual Form 5500 it filed with the Department of Labor and the Internal Revenue Service.[57]

But perhaps the clearest explanation of the Plan's nature is found in a 1992 letter from the ABA Plan's counsel to a participating employer. Although the Plan emphasized that one hallmark of its status as an aggregate of single-employer plans is that each participating employer has discretion to control its own contribution rate,[58] on a number of occasions the Trustees increased benefits under the Plan as a whole in order to preserve the tax-deductibility of contributions.[59] When one employer asked to be excluded from such an increase, the ABA Plan refused.[60] Explaining this rejection, counsel for the ABA Plan stated that "the Plan is designed and intended to function as a single unit," and "[t]o the extent the experience of each employer were separately

---

[57] AR 1092 (ABA Plan Submission at Exhibit 11) (2003 Form 5500).

[58] AR 865 (ABA Plan Submission at 3) ("Participating Employers make weekly pension contributions for their employees at a rate chosen by each employer"); AR 871 (*Id*. at 9) ("An employer has always been free to contribute any weekly amount in excess of the $2.00 minimum . . . .").

[59] AR 1136 (ABA Plan Exhibit 12 at 21, 2004 Actuarial Valuation) ("In a multiple-employer plan, the Trustees have no control over the contributions received since they depend on economic conditions. Action is limited to establishing benefits so that the maximum allowable deduction levels are not exceeded under a reasonable employment level assumption, and to taking prompt action whenever the limits are exceeded. * * * *In the past, when anticipated contributions exceeded the maximum [tax] deduction, the benefit level was increased to support the level of contributions*.") (emphasis added); AR 762 (IBC Exhibit 21) (2003 Actuarial Valuation) (same). As explained in the 2006 Letter, subject to certain statutory limits, employer contributions to a tax-qualified pension plan are tax deductible. *See* AR 1571, 2006 Letter at 9; 26 U.S.C. § 403.

[60] AR 1557 (Letter from Anne Fraser to Robert Struble (June 2, 1992)).

16

determined, *the Plan would effectively be 'deconstituted' into a group of single-employer plans*."[61]

Finally, as the 2006 Letter noted, the ABA Plan performed separate actuarial valuations of the Plan's assets and liabilities attributable to a particular employer only when an employer terminated participation in the ABA Plan, and even then, employers were not always required to "true up" if the allocable assets were insufficient to pay benefits.[62]  As noted in the 2006 Letter, in several cases (in which employer withdrawals were thought to entail plan terminations), PBGC stepped in as statutory trustee because there were insufficient allocable assets to pay PBGC-guaranteed benefits.[63]  In other instances, employers simply ceased participation and abandoned their assets and liabilities to the Plan.[64]

Based on all of these factors, PBGC revoked its 1979 Letter and determined that the Plan was a multiple-employer plan.  In this case, just as in *Cook v. PBGC*, early in the agency's history, PBGC was faced with assessing the nature of a complex pension plan, and "made an initial erroneous determination based on information then available and working with a newly enacted statute."[65]  In this case, just as in *Cook*, PBGC initially determined that the plan was an aggregate of single-employer plans, but later "continued [its] efforts to interpret ERISA in light of

---

[61]  *Id.* (emphasis added).  *See* AR 1572 (2006 Letter at 10).

[62]  AR 1571 (2006 Letter at 9); *see also* AR 487 (SPD at 34), *supra* n. 50 (there is "no separate annual valuation for each Employer's contributions").

[63]  AR 1571 (2006 Letter at 9).

[64]  AR 880 (ABA Plan Submission at 18); 1578 (2006 Letter at 16).

[65]  652 F. Supp. 1085, 1091 (S.D.N.Y. 1987).  In *Cook*, PBGC made the initial determination in 1976; in this case, it was in 1979.

the influx of documents it received from the [parties]."[66]  Ultimately, in the 2006 Letter, PBGC

concluded that its 27 year-old determination was "simply wrong."[67]  Because the agency supplied

a "reasoned analysis" indicating the reason for the change, it is entirely adequate.[68]

      Finally, the allegation that the 2006 Letter is arbitrary and capricious because PBGC

purportedly has a conflict of interest[69] may be easily dismissed.  As an initial matter, since the Plan

is ongoing, it represents *no* current liability to PBGC, and thus, the 2006 Letter does not present a

"significant financial benefit" to PBGC.  Even if it did, however, the well-recognized presumption

of governmental good faith applies to administrative proceedings.[70]  Moreover, as the Fourth

---

[66]  652 F. Supp. at 1091.

[67]  AR 1570, (2006 Letter at 8).

[68]  *See Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 34 (1983) (agency changing course must "present an adequate basis and explanation"); *Greater Boston Television Corp. v. FCC*, 444, F.2d 841, 852 (D.C. Cir. 1970) ("[a]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed"); *Kempthorne*, 2007 WL 489221 at *9 (court rejected company's complaint that agency decision regarding mining interests was arbitrary and capricious because agency had made a "complete about face," noting that the agency had obtained new information about "the importance of the resource values" of Montana mines); *OXY USA, Inc. v. FERC*, 64 F.3d 679, 690-91 (D.C. Cir. 1995) (upholding agency action despite change in position over the course of nine years).

[69]  Second Amended Complaint at ¶ 45 (alleging that PBGC will enjoy a "significant financial benefit" as a result of the 2006 Letter).

[70]  *See, e.g., DeMelo v. OPM,* 2005 WL 1901537 (Fed. Cir. Aug. 10, 2005) at *2 (party must show "'well-nigh irrefragable proof' to overcome the 'strong presumption in the law that administrative actions are correct and taken in good faith'") (citation omitted); *Caldwell & Santmyer, Inc. v. Glickman,* 55 F.3d 1578, 1581 (Fed. Cir. 1995) (a party can overcome the presumption that the government acts in good faith only if it shows that the government had a "specific intent to injure it"); *Space Age Eng'g, Inc. v. United States*, 4 Cl.Ct. 739, 744 (1984) (inferences and allegations alone fail to fulfill the "clear and convincing proof" required to show impropriety on the part of the government).

18

Circuit made clear in *Doolin Security Savings Bank v. FDIC*, the mere fact that an administrative

or adjudicative body may derive a financial benefit from a decision does not taint the decision:

> The FDIC's interest in maintaining the fund appears no greater than the interests of
> many agencies that adjudicate penalty or fee determinations in their own
> administrative proceedings.  Presumably all agencies inherently have some level of
> 'institutional bias,' but such an interest does not render all agencies incapable of
> adjudicating disputes within their own proceedings given the strong public interest
> in effective, efficient, and expert decisionmaking in the administrative setting.[71]

---

[71]  53 F.3d 1395, 1407 (4th Cir. 1995).  *See also Agomo v. Fenty*, 2007 WL 265897
(D.C. Cir. Feb. 1, 2007) ("Appellants' argument is tantamount to arguing that all judges
employed by the District are biased in civil suits in which the District is a party, simply over
concern that the District may fall into a budget deficit.  Appellants have not suggested, nor is
there any evidence, that the salaries of the individual hearing examiners or judges are contingent
upon findings of liability, or that their salaries are directly affected in any way by the state of the
District's budget.")

# CONCLUSION

Because PBGC's determination in the 2006 Letter was entirely reasonable and fully supported by the administrative record, the Court should grant summary judgment enforcing it.

Dated: April 4, 2007                                    Respectfully submitted,
       Washington, D.C.


                                        /s/ Marc S. Pfeuffer
                                       ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
                                       Chief Counsel
                                       CHARLES L. FINKE
                                       Associate Chief Counsel
                                       MICHAEL P. MORA
                                       PAULA CONNELLY (D.C. Bar No. 389055)
                                       Assistant Chief Counsels
                                       MARK BLANK (D.C. Bar No. 968388)
                                       MARC S. PFEUFFER (D.C. Bar No. 484209)

                                       PENSION BENEFIT GUARANTY CORP.
                                       Office of the Chief Counsel
                                       1200 K Street, N.W.
                                       Washington, D.C.  20005
                                       Tel. No. (202) 326-4020, ext. 4903
                                       Fax No. (202) 326-4112
                                       E-mail: pfeuffer.marc@pbgc.gov and
                                       efile@pbgc.gov

                                       Attorneys for Pension Benefit Guaranty Corp.

20

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARA LEE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06–CV–0819–HHK |
| | ) | |
| AMERICAN BAKERS ASSOCIATION | ) | |
| RETIREMENT PLAN; and BOARD OF | ) | |
| TRUSTEES OF THE AMERICAN BAKERS | ) | |
| ASSOCIATION RETIREMENT PLAN; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT
## OF PBGC'S MOTION FOR SUMMARY JUDGMENT[1]

---

[1] Although PBGC submits a statement of undisputed material facts as required by the procedural rules, there should be no focus on any alleged factual disputes.  The Court will be reviewing PBGC's decision based on the agency's administrative record to determine whether it is arbitrary and capricious.  As the D.C. Circuit has made clear, "any [question] pertaining to merit of the administrative decision is to be determined exclusively on the administrative record . . . . Consequently, *we must reject appellant's contention that summary judgment became improper by reason of issues of material fact which he tendered for trial*." *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977) (emphasis added).  Thus, the issue for this Court "is not whether there are contested fact questions in the underlying administrative record, but rather the legal question whether the agency action was arbitrary and capricious or not supported by substantial evidence." *Castillo v. Army & Air Force Exchange Service,* 849 F.2d 199, 203 (5th Cir. 1988).  *Accord Nexen Petroleum U.S.A. v. Norton*, 2004 WL 722435 (E.D. La. Mar. 31, 2004) ("there are no material facts essential to the Court's resolution of this action because the basis for the Court's review is the agency's administrative record, and the Court need not and may not 'find' underlying facts").

-1-

1.    The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States government corporation established under 29 U.S.C. §1302(a) to administer and enforce the defined benefit pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, ("ERISA"). 29 U.S.C. §§ 1301-1461 (2000 & Supp. III 2003).

2.    A defined benefit pension plan that has more than one participating employer and is not maintained pursuant to a collective-bargaining agreement constitutes either a "multiple-employer plan" or an "aggregate of single-employer plans." *See* 29 U.S.C. § 1301(a)(15); 29 C.F.R. § 4001.2.

## The ABA Plan

3.    The American Bakers Association Retirement Plan (the "ABA Plan" or the "Plan") was established effective October 1, 1961, and has been amended from time to time. Second Amended Complaint at ¶ 10; Third-Party Complaint for Declaratory and Injunctive Relief, Counterclaim and Cross-Claim ("Third-Party Complaint") at ¶ 22.

4.    The ABA Plan is a defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321.

5.    The Board of Trustees of the ABA Plan ("Trustees") is the Named Fiduciary with respect to the ABA Plan. Second Amended Complaint at ¶ 8; Cross-claim at ¶ 10.

6.    Sara Lee Corporation ("Sara Lee"), Interstate Bakeries Corporation ("IBC"), Harris Baking Company, Kettering Baking Company ("Kettering"), Lewis Brothers Baking Company, the American Bakers Association, and Jenny Lee Bakery, Inc. are contributing

sponsors of, and participating employers in, the ABA Plan.  Third-Party Complaint at ¶¶ 12-18;

Answers of Sara Lee, IBC, Harris Baking and ABA at ¶¶ 12-18.

     7.     The assets of the ABA Plan are held in trust in a single custodial account and are

not segregated by employer.  Employers' contributions are paid into, and all benefits and

administrative expenses are paid from, one consolidated account.  Administrative Record ("AR")

869 (ABA Plan Submission at 7); AR 487 (IBC Exhibit 1, 2001 ABA Summary Plan Description

("SPD")) ("there is no separate account maintained for each Employer's contributions and no

separate annual valuation for each Employer's contributions").

### PBGC's Initial Review of the ABA Plan

     8.     On June 21, 1979, after the ABA asked PBGC to determine the Plan's status,

PBGC issued a determination (the "1979 Letter") that the Plan was an aggregate of single-

employer pension plans.  AR 216 (1979 Letter).

     9.     No affected party sought reconsideration or judicial review of the 1979 Letter, and

no court has reviewed it.

     10.     On a number of occasions after the 1979 Letter was issued, the Trustees increased

benefits under the Plan as a whole in order to preserve the tax-deductibility of contributions.  AR

1136 (ABA Plan Exhibit 12 at 21, 2004 Actuarial Valuation); AR 762 (IBC Exhibit 21) (2003

Actuarial Valuation).

     11.     On June 2, 1992, the Trustees, via counsel, refused a request by Kettering to be

excluded from a benefit increase, stating that the ABA Plan was "designed and intended to

function as a single unit," and "[t]o the extent the experience of each employer were separately

determined, the Plan would effectively be 'deconstituted' into a group of single-employer plans." AR 1557 (Letter from Anne Fraser to Robert Struble (June 2, 1992)).

12.    The ABA Plan actuary stated in November 2003 that Plan accountants "never kept asset records by employer," and "never kept liability records by employer."  AR 733 (IBC Submission at Exhibit 19) (Letter of ABA Plan actuary Robert Krinsky to John P. Hendrickson (Nov. 3, 2003)).

13.    According to the ABA Plan actuary, throughout the Plan's history, the actuary would, on occasion, calculate the liabilities attributable to a particular participating employer and estimate the assets allocable to that employer; but the actuary performed these duties only when specifically requested.  AR 491 (IBC Submission at Exhibit 2) (Letter of ABA Plan actuary to Trustees (Nov. 4, 2004)).

14.    The actuary did not routinely perform separate actuarial valuations of the Plan's assets and liabilities attributable to a particular employer, but instead performed such valuations only when an employer terminated participation in the ABA Plan.  AR 1571 (2006 Letter at 9); *see also* AR 487 (SPD at 34).

15.    When an employer has terminated participation in the ABA Plan, the Trustees have not consistently required additional contributions when allocable assets were insufficient to pay benefits; in several cases the plan ascribed to such an employer was terminated by agreement and PBGC was appointed as statutory trustee.  AR 1571 (2006 Letter at 9).

16.    Several participating employers in the ABA Plan have ceased participation and abandoned their assets and liabilities to the ABA Plan.  AR 880 (ABA Plan Submission at 18); 1578 (2006 Letter at 16).

-4-

17.     Throughout the ABA Plan's history, the Plan's representatives consistently represented it to be a multiple-employer plan, regularly checking the box so indicating on the annual Form 5500 filed with the Department of Labor and the Internal Revenue Service.  AR 1092 (ABA Plan Submission at Exhibit 11) (2003 Form 5500).

18.     From time to time, the ABA Plan has attributed negative "account balances" to certain participating employers when the assets of other employers were used to issue benefit checks to their employee-participants.  AR 1577 (2006 Letter at 15); AR 1303 (Sara Lee Submission at 4) (negative account balances may be attributable to "isolated loans").

19.     Throughout the ABA Plan's history, all assets of the ABA Plan have been available to pay benefits to all plan participants and beneficiaries.

### Recent Events

20.     On September 22, 2004, IBC and a number of its affiliates filed petitions for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, in the United States Bankruptcy Court for the Western District of Missouri.

21.     On November 4, 2004, the ABA Plan actuary stated that the Plan "has always operated as one Plan," and advised the Trustees that an additional $30 million in contributions would be required in order to meet the minimum funding requirement with respect to the Plan pursuant to ERISA and the Internal Revenue Code.  AR 491 (IBC Submission at Exhibit 2) (Letter of ABA Plan actuary to Trustees (Nov. 4, 2004)).

22.     On November 2, 2005, PBGC advised the Trustees, Sara Lee, IBC, and other interested parties, that the agency was revisiting the determination embodied in the 1979 Letter.  AR 427 (PBGC letter (Nov. 2, 2005)).  Each party was invited to submit any written statement or

documents that it wanted PBGC to consider in its decision-making process.  *Id.*  At the request of counsel for the ABA Plan and the Trustees, PBGC extended the submission deadline from November 18, 2005 to December 2, 2005.  AR 1443.

23.    On December 2, 2005, PBGC received written submissions, in response to its invitation, from the Trustees (on their own behalf and on behalf of the ABA Plan), IBC, Sara Lee, and Kettering.  AR 429 – 1439.

24.    On May 3, 2006, Sara Lee brought this civil action against the Plan and the Trustees.  Complaint for Declaratory and Injunctive Relief.

25.    On August 8, 2006, after reviewing the submissions of the parties, PBGC issued a new letter revoking the 1979 Letter and setting forth PBGC's determination, made immediately effective, that the Plan was, and always has been, a multiple-employer plan.  AR 1563.

Dated: April 4, 2007
       Washington, D.C.

Respectfully submitted,

 /s/ Marc S. Pfeuffer
ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
Chief Counsel
CHARLES L. FINKE
Associate Chief Counsel
MICHAEL P. MORA
PAULA CONNELLY (D.C. Bar No. 389055)
Assistant Chief Counsels
MARK BLANK (D.C. Bar No. 968388)
MARC S. PFEUFFER (D.C. Bar No. 484209)
PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C.  20005
Tel. No. (202) 326-4020, ext. 4903
Fax No. (202) 326-4112
E-mail: pfeuffer.marc@pbgc.gov and
efile@pbgc.gov
Attorneys for Pension Benefit Guaranty Corp.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SARA LEE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06–CV–0819–HHK |
| | ) | |
| AMERICAN BAKERS ASSOCIATION | ) | |
| RETIREMENT PLAN; and BOARD OF | ) | |
| TRUSTEES OF THE AMERICAN BAKERS | ) | |
| ASSOCIATION RETIREMENT PLAN; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of April 2007, a copy of the foregoing Pension Benefit

Guaranty Corporation's Motion for Summary Judgment; Memorandum in Support of Motion;

Statement of Undisputed Material Facts in Support of Motion; and Proposed Order were served

electronically or by overnight courier on the following:

1.      M. Miller Baker
        Sarah E. Hancur
        McDermott Will & Emory LLP
        600 13th Street, N.W.
        Washington, D.C. 20005-3096

        Michael T. Graham
        McDermott Will & Emory LLP
        227 West Monroe Street
        Chicago, IL 60606-5096
        Roger Pascal
        Sonia Macias Steele
        Schiff Hardin LLP

6600 Sears Tower
Chicago, IL 60606-6473

*Attorneys for Plaintiff Sara Lee Corp.*

2.    Edward J. Meehan
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Avenue
Washington, D.C. 20005-2111

Carol Connor Flowe
Arent Fox, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339

Amanda S. Williamson
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606

*Attorneys for Third-party Defendant Interstate Brands Corp.*

3.    Edward R. Mackiewicz
Paul J. Ondrasik, Jr.
Ryan T. Jenny
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036

Anne H.S. Fraser
Law Office of Anne H.S. Fraser
1320 19th Street, N.W.
Suite 200
Washington, D.C. 20036-1637

*Attorneys for Defendants/Third-party Plaintiffs American Bakers Association Retirement
Plan and Board of Trustees of the American Bakers Association Retirement Plan.*

4.      James Hamilton
        Bingham McCutchen LLP
        2020 K Street, N.W.
        Washington, D.C. 20006

        *Attorney for Third-party Defendant American Bakers Association*

5.      Jeffrey S. Jacobovitz
        Schiff Hardin LLP
        1666 K Street, N.W.
        Suite 300
        Washington, D.C. 20006

        *Attorney for Third-party Defendant Lewis Brothers Bakeries, Inc.*

6.      Lonie A. Hassel
        Groom Law Group
        1701 Pennsylvania Avenue, N.W.
        Washington, D.C. 20006-5805

        *Attorney for Third-party Defendant Harris Baking Co.*

7.      James R. Kettering, Jr.
        President
        Kettering Baking Co.
        729 Coleman Avenue
        Fairmont, WV 26554

        *On behalf of Third-party Defendant Kettering Baking Co.*

/ /

/ /

/ /

/ /

/ /

/ /

/ /

-3-

8.      Bernard Baker
        President
        Jenny Lee Bakery, Inc.
        620 Island Avenue
        McKees Rocks, PA 15136

        *On behalf of Third-party Defendant Jenny Lee Bakery, Inc.*

                            /s/ Marc S. Pfeuffer
                            MARC S. PFEUFFER (D.C. Bar No. 484209)
                            PENSION BENEFIT GUARANTY CORP.
                            Office of the Chief Counsel
                            1200 K Street, N.W.
                            Washington, D.C. 20005-4026
                            Tel. No. (202) 326-4020, ext. 4903
                            Fax No. (202) 326-4112
                            E-mail: pfueffer.marc@pbgc.gov and
                            efile@pbgc.gov