IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARA LEE CORPORATION, on its own behalf and on behalf of its employee-participants in the American Bakers Association Retirement Plan, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 06-CV-0819-HHK |
| AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES  OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan; and PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) ) ) ) ) ) | Judge Henry H. Kennedy, Jr.

Magistrate Judge John M.Facciola |
| Defendants. | ) ) | |
| AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan, | ) ) ) ) ) ) | PLAINTIFF SARA LEE CORPORATION'S RESPONSE IN OPPOSITION TO THE MOTION FOR SUMMARY JUDGMENT OF PENSION BENEFIT GUARANTY CORPORATION |
| Third Party Plaintiffs, Counterclaimants, and Cross-Claimants, | ) ) ) ) ) | |
| v. | ) ) | ORAL ARGUMENT REQUESTED |
| SARA LEE CORPORATION, | ) ) | |
| Respondent, | ) ) | |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) | |
| Cross-Defendant, and | ) ) | |
| KETTERING BAKING COMPANY, INTERSTATE BRANDS CORPORATION, LEWIS BROS. BAKERIES, INC., HARRIS BAKING COMPANY, INC., AMERICAN BAKERS ASSOCIATION, and JENNY LEE BAKERY, INC., | ) ) ) ) ) ) | |
| Third Party Defendants. | ) | |

Plaintiff and Respondent Sara Lee Corporation ("Sara Lee"), by its attorneys and

pursuant to Fed. R. Civ. P. 56 and Local Rules of the U.S. District Court for the District of

Columbia 7 and 56.1, submits its response in opposition to the motion for summary judgment of the Pension Benefit Guaranty Corporation ("PBGC"), and in support states:

## INTRODUCTION

In its summary judgment motion, the PBGC suggests to this Court that its determination on the structure and nature of the American Bakers Association Retirement Plan ("ABA Plan") issued on August 8, 2006 ("2006 Determination")—that the ABA Plan is and has always been a multiple-employer pension plan and not an aggregate of single-employer pension plans for any purpose—involved the routine review of an administrative determination made by a disinterested agency. Nothing could be further from the truth. The PBGC's motion ignores the "elephant in the room" in this case—the PBGC itself and the significant financial benefit it reaped by reversing its own 1979 determination that the ABA Plan is an aggregate of single-employer pension plans ("1979 Determination"). In fact, the PBGC may be the *most* interested party in the case, because by reversing its 1979 Determination, it will likely be spared from paying potentially $60 million or more in unfunded benefit liabilities (the vast majority of which reflect guaranteed benefits)[1] that has been run up by Interstate Brands Corporation ("IBC"), through the PBGC's statutory role as the benefit guarantor under the Employee Retirement Income Security Act of 1974, as amended ("ERISA").

The ABA Plan was originally adopted in 1961, before ERISA was enacted. At that time, the ABA Plan was then made up of approximately 90 different participating employers, whose primary intent in creating the Plan was to minimize administrative costs for small baking companies that would otherwise have been unable to offer a defined benefit pension plan, while ensuring that each employer's contributions to the Plan would be used only to pay the benefit liabilities for its own employee-participants. Maintaining individual employer liability was necessary because the employers participating in the ABA Plan were competitors in the baking

---

[1] Because Sara Lee believes that virtually all of the unfunded benefit liabilities will be subject to the PBGC's guarantees under ERISA. Therefore, references to "unfunded benefit liabilities" will be references to unfunded guaranteed benefits as well.

industry, and none of them wanted or could afford to pay benefit liabilities for their competitors' employee-participants.

After ERISA was enacted in 1974, the PBGC had to determine how this type of benefit arrangement fit under ERISA's reticulated provisions. In 1975, after reviewing the ABA Plan's structure and administration, the PBGC determined that the ABA Plan qualified as an aggregate of single-employer pension plans. In 1978 and 1979, after further considering the ABA Plan's structure and administration—including the fact that the Plan was maintained through a single trust for all employers and that a single annual valuation was conducted for the Plan as a whole and not for each employer—the PBGC issued the 1979 Determination, in which it concluded that the Plan was an aggregate of single-employer plans.

The ABA Plan and all its participating employers relied on the 1979 Determination for the next 27 years. In fact, the 1979 Determination was incorporated into the ABA Plan's governing document so that there would be no confusion as to the Plan's status and structure. During the 27-year period following the 1979 Determination, each employer who agreed to participate in the ABA Plan executed a Participation Agreement contractually acknowledging the ABA Plan's structure as an aggregate of single-employer plans. Each employer that ceased its participation in the ABA Plan (with the exception of two very small employers who abandoned their funds in the Plan) submitted their individual plans to the PBGC as standard, single-employer plan terminations under ERISA Section 4044.[2] To qualify as a standard termination, a participating employer must first satisfy any delinquent contributions and then either (i) possess a positive balance under the ABA Plan that allows for a reversion or (ii) satisfy any delinquent contributions and gross up any unfunded benefit liabilities for future benefit payments under the ABA Plan. If a participating employer did not have sufficient funds to satisfy its delinquent

---

[2] The statutory term, "standard termination," was introduced in 1986 by the Single-Employer Pension Plan Amendments Act ("SEPPAA") to describe a plan termination in which all of the plan's "benefit commitments" are satisfied. In light of amendments made by the Pension Protection Act of 1987, the PBGC now requires all of the plan's "benefit liabilities" to be satisfied. In the interest of simplicity, this brief in several places uses the term standard termination to encompass also the predecessor to standard terminations, i.e., a pre-SEPPAA "sufficient" (for guaranteed benefits) termination.

contributions and unfunded benefit liabilities, it would have had to pursue a distress or involuntary termination under Title IV of ERISA, in which the PBGC would have been required to determine whether to undertake its statutory obligation to guarantee the plan's benefit liabilities. Notably, during this period, the PBGC never questioned the ABA Plan's structure, even though it received notice of and approved the standard, single-employer plan terminations and conducted an audit of one of the single-employer plan terminations by a participating employer in the ABA Plan.

The ABA Plan continued to operate as an aggregate of single-employer plans for Title IV purposes without question until 2005, when IBC—one of the Plan's largest participating employers—began to question how the ABA Plan operated. Importantly, IBC's interest in the ABA Plan's structure coincided with its financial distress and the filing of a Chapter 11 bankruptcy in 2004. About this same time, Sara Lee was considering to transfer some of the assets and benefit liabilities attributable to its employee-participants in the ABA Plan to another pension plan sponsored solely by Sara Lee.[3] Due to Sara Lee's request, the Board of Trustees of the ABA Plan ("ABA Plan Trustees") actuarially calculated each participating employer's assets and benefit liabilities in the ABA Plan. Effective October 1, 2004, the ABA Plan's actuary determined that Sara Lee's single-employer plan was significantly overfunded, and that IBC maintained significant unfunded benefit liabilities—to the tune of approximately $60 million.

Understanding that this level of underfunding would severely impact its ability to reorganize through bankruptcy, IBC began to consider alternatives that would lessen, or even eliminate, this significant liability on its balance sheet. This is where the PBGC re-entered the picture. On May 24, 2005, IBC began to send feelers to the PBGC to determine if the PBGC was interested in reviewing the ABA Plan's structure. *See* AR 0276-0279.[4] After several communications between IBC and the PBGC, on June 24, 2005, IBC formally requested the

---

[3] Even after the transfer of certain of its employee-participants from the ABA Plan to the Sara Lee plan, Sara Lee would remain a participating employer under the ABA Plan (albeit with fewer employee-participants).

[4] References to "AR[No.]" are to the administrative record filed by the PBGC on April 4, 2007.

PBGC to revisit the issue of whether the ABA Plan was an aggregate of single-employer plans. *See* AR 0339-0341. IBC submitted to the PBGC that it was unaware of the amount of its underfunding, due in large part to the fact that the ABA Plan did not conduct annual valuations for each participating employer. IBC glossed over the fact that in 2003, it executed a new Participation Agreement with the ABA Plan, in which it contractually acknowledged the fact that the ABA Plan was structured as an aggregate of single-employer plans and that IBC had the right annually, at its own cost, to request the Plan's actuary to compute its assets and benefit liabilities under the Plan. Notably, IBC never requested such valuations.

After considering IBC's request, in which it was acknowledged that IBC maintained a severely underfunded liability in its single-employer plan, the PBGC decided it was time to "revisit" the 1979 Determination—27 years after-the-fact. Undoubtedly, the PBGC understood that if the ABA Plan continued to qualify as an aggregate of single-employer plans, it would likely be required to "guarantee" IBC's unfunded benefit liabilities in the ABA Plan since IBC was already in bankruptcy and likely would not be able to reorganize through bankruptcy without pursuing a distress or involuntary termination of its single-employer plan under the ABA Plan. In addition, IBC would likely be unable to satisfy any meaningful portion of the resulting liability to the PBGC. In that case, under Title IV of ERISA, the PBGC's liability for IBC's underfunding was more reality than possibility. One way for the PBGC to avoid IBC's unfunded benefit liabilities was to "revisit" the ABA Plan's structure—for if the Plan was a multiple-employer plan, IBC's liability would be shared by existing employers in the Plan, not the PBGC. On November 1, 2005, the PBGC issued a very vague request that any party could submit a position statement as to the ABA Plan's structure and that the PBGC would consider the issue.

Only four parties submitted position statements, and none was permitted by the vague structure of the review to rebut or comment on the positions taken by the various other parties. After taking over 8 months to consider the ABA Plan's structure, not surprising due to its need to assess its significant self-interest, the PBGC issued the 2006 Determination and found that the ABA Plan "is, and indeed always has been a multiple-employer plan." Rather than allow the

parties aggrieved by the 2006 Determination to seek an administrative appeal (which is how such a finding typically is challenged), the PBGC employed a little used Federal regulation to cut-off administrative review and force any aggrieved party, including Sara Lee, to challenge the 2006 Determination in this Court. Such a decision denied the aggrieved parties the opportunity to rebut the PBGC's findings at the agency level and submit additional documentation and evidence supporting their positions.

The PBGC now seeks to have this Court review its 2006 Determination based on an administrative record of its own making, which excludes many documents that supports Sara Lee's claims. Had the parties known that the PBGC would use such a limited review process, Sara Lee (and likely the ABA Plan Defendants) definitely would have submitted far more information with its position statement than it did. However, in an effort to deny Sara Lee and other parties the chance to do so, the PBGC unilaterally cut off administrative review.

In this motion, the PBGC (and IBC through its joinder) requests this Court to apply a deferential standard of review based on a review of a limited administrative record in order to uphold its decision based on a truncated administrative review process.[5] As discussed below, this Court should deny the PBGC's motion for summary judgment because it is incorrect as a matter of law and premature—the aggrieved parties, including Sara Lee, should be permitted to pursue discovery to ensure all relevant documents are considered when reviewing the PBGC's reversal of over 27 years of ABA Plan administration. Contrary to the PBGC's motion, the Court should employ a *de novo* standard of review because Sara Lee's claim arises under ERISA, and not the Administrative Procedures Act ("APA"). Regardless of the standard of review, however, the PBGC's motion fails because the ABA Plan's governing documents

---

[5] IBC's and the PBGC's shared common financial interest in the determination of the ABA Plan's structure may well have affected or influenced the procedures followed in this case. In fact, only one day after the PBGC issued the 2006 Determination, IBC filed an adversary complaint in its bankruptcy action, seeking to enforce the PBGC's Determination (which on its face was self-enforcing). A copy is attached as Exhibit 1. The fact that IBC would have the foresight to prepare a lengthy adversary complaint and file it only hours after the Determination was issued begs the question of whether IBC received the PBGC's Determination before the PBGC made the Determination public for all other parties. This may be an additional reason why the PBGC hopes to evade Sara Lee's discovery requests in this case.

unambiguously state that the Plan is to be an aggregate of single-employer plans and not a multiple-employer plan. Additionally, the governing plan documents also state that the contributions of each participating employer are to be used to pay benefits only for its own employee-participants, not the employee-participants of competitor employers. Further, the Participation Agreements each employer executed when agreeing to participate in the ABA Plan specifically stated that the ABA Plan was to be structured as an aggregate of single-employer plans.

Moreover, contrary to the PBGC's arguments, it is premature for the Court to consider whether the ABA Plan was administered as an aggregate of single-employer plans because the parties have not been permitted to engage in discovery. Through a Freedom of Information Act request (the "FOIA Request"), Sara Lee has received more than 3,000 pages of documents— twice the number contained in the PBGC's administrative record—many of which are relevant to this case, yet not a part of the PBGC's administrative record. Included in these FOIA documents is evidence that virtually all employers terminating their participation in the ABA Plan did so through standard, single-employer plan terminations, and not through multiple-employer plan withdrawals. This fact was completely ignored by the PBGC in its 2006 Determination. Rather than respond to Sara Lee's discovery requests, the PBGC has decided to hide behind its limited administrative record, which does not contain many documents that Sara Lee received from the PBGC through its FOIA Request that directly relate to the administration of the ABA Plan and favor Sara Lee's position. In addition, the Court should deny the motion because, as discussed above, the administrative process used and the administrative record created by the PBGC in this matter is flawed and incomplete. When *all* documents relevant to the PBGC's 2006 Determination and the ABA Plan's structure are considered, there will be no doubt that the ABA Plan indeed has been administered as an aggregate of single-employer plans throughout its existence consistent with the governing plan documents. The Court should therefore deny the

PBGC's motion for summary judgment and permit the parties to engage in discovery to allow all relevant evidence to be uncovered and produced to the Court.[6]

## ARGUMENT

### I.    THE PBGC'S 2006 DETERMINATION SHOULD BE REVIEWED UNDER A DE NOVO STANDARD OF REVIEW

The threshold question that this Court must address prior to reviewing the PBGC's 2006 Determination is what standard of review the court should evoke in examining the challenged action. The PBGC argues that its 2006 Determination as to the nature and status of the ABA Plan—which reversed 27 years of the ABA Plan and PBGC practice—should be reviewed by this Court under the arbitrary and capricious standard as set forth in the Administrative Procedures Act ("APA"). *See* PBGC Mot. at 9. The PBGC fails, however, to recognize that the instant action was brought under ERISA and not the APA and, in any event, that the argument fails for the reasons discussed below.

On the one hand, ERISA is a "comprehensive and reticulated statute, 'the product of a decade of congressional study of the Nations' private employee benefit system.'" *Mertens v. Hewitt Associates*, 508 U.S. 248, 251 (1993). Courts have been reluctant to alter ERISA's enforcement scheme as the detailed nature of the scheme is strong evidence of Congressional intent. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). On the other hand, the APA provides in pertinent part that an "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *See* 5 U.S.C. § 704. The APA directs a reviewing court to set aside an agency's determination upon a finding that the determination was either: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (2) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court. *See* 5 U.S.C. § 706. In determining whether a given set of facts are subject to trial *de novo*, the courts look to the

---

[6] Sara Lee also joins in the arguments raised by the ABA Plan Defendants in opposition to the PBGC's summary judgment motion filed in the ABA Plan Defendants' Memorandum in Opposition to the PBGC's Motion for Summary Judgment, filed on May 24, 2007.

agency's organic statute. *PBGC v. United Airlines, Inc.*, 436 F.Supp.2d 909, 918-19 (N.D. Ill. 2006). Here, ERISA is the PBGC's organic statute.

ERISA Section 4003(f) specifically provides jurisdiction to Federal courts for reviewing an action by the PBGC. *See* 29 U.S.C. §1303(f). Sara Lee filed this case pursuant to ERISA Section 4003(f), which provides in pertinent part that:

> any person who is a fiduciary, employer, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest, or who is an employee organization representing such a participant or beneficiary so adversely affected for purposes of collective bargaining with respect to such plan, may bring an action against the corporation for appropriate equitable relief in the appropriate court.

29 U.S.C. § 1303(f)(1). This section of ERISA by its express terms is the exclusive means for challenging PBGC action under Title IV of ERISA. *See* ERISA § 4003(f)(4), 29 U.S.C. § 1303(f)(4). Moreover, the United States District Court for the District of Columbia is the "appropriate court" for purposes of Sara Lee's ERISA § 4003(f) challenge to the PBGC's abuses because the ABA Plan is administered here. *See* ERISA § 4003(f)(2)(C); 29 U.S.C. § 1303(f)(1)(2)(C). Indeed, as discussed below, the APA itself dictates that the instant case is to be decided under ERISA with the Court applying a *de novo* standard of review. By providing for judicial review as well as an adequate remedy, ERISA Section 4003(f)'s express terms remove this type of action from the purview of the APA. *See United Airlines, Inc.*, 436 F.Supp.2d at 918-19.

In *United Airlines, Inc.*, the Northern District of Illinois recently reviewed an analogous case, in which the PBGC made an *ex parte* determination as to the status of a plan. In *United Airlines, Inc.*, the PBGC decided that a pension plan was so underfunded that it needed to be involuntarily terminated. After making that determination, the PBGC filed suit in order for the court to declare its right to implement a decision to involuntarily terminate a pension plan. In that case, the PBGC argued that its decision should be reviewed under the deferential arbitrary and capricious standard. However, the Northern District of Illinois looked to ERISA and ruled

that ERISA mandates a *de novo* standard of review with respect to involuntary termination actions by the PBGC. 436 F.Supp.2d at 922.

In so ruling, the court noted that ERISA Section 4042 provides for judicial review of the PBGC's determination with respect to the involuntary termination of a pension plan under ERISA as well as an adequate remedy with respect to the same. *Id.* The court also noted that its review of whether a plan should be involuntarily terminated necessarily required the court to review issues beyond those required to be reviewed by the PBGC when making its determination. *Id.* at 919. Finally, the court found that the PBGC's interests do not necessarily align with their duties to plan participants and contributing employers. *Id.* at 921-22. After weighing these factors, the Northern District of Illinois concluded that deferential review of the PBGC's termination determination would be inconsistent with the court's role as a "substantial safeguard for the rights of parties other than PBGC" under ERISA. *Id.*; *see also Rettig v. PBGC*, 744 F.2d 133, 155 (D.C. Cir. 1984); *Ass'n. of Flight Attendants—CWA, AFL-CIO v. PBGC*, 2006 U.S. Dist. LEXIS 1318 (D.D.C. Jan. 13, 2006).

Like ERISA Section 4042, Section 4003(f) of ERISA affords aggrieved parties the right to seek redress against the PBGC in the Federal courts. An aggrieved party may seek "appropriate equitable relief" under ERISA § 4003(f) to redress an inequity suffered as a result of a decision or determination issued by the PBGC. It is difficult to imagine how a reviewing court could provide "appropriate equitable relief" under Section 4003(f) if the court were shackled to the administrative record developed by the aggrieving party under an arbitrary and capricious standard of review. Indeed, the process of crafting "appropriate equitable relief" by its very nature compels a reviewing court to weigh all of the facts and circumstances of a particular case against equitable principles in fashioning the relief appropriate under the circumstances. *See, e.g.*, *District of Columbia v. Pace*, 320 U.S. 698, 701-703 (1944). This is particularly true in this case where the inequity is the manner with which the PBGC derived its position, including the PBGC's "stacking of the deck" in developing an administrative record

that excludes evidence favorable to Sara Lee and other similarly situated parties (including the

ABA Plan Defendants).

Notably, the PBGC included in its administrative record only just over 1,500 pages of

documents it claims are related to its 2006 Determination. However, on August 18, 2006, Sara

Lee through counsel submitted its FOIA Request to the PBGC for certain documents in the

PBGC's possession related to the ABA Plan generally and the PBGC's 2006 Determination

specifically. *See* Graham Aff., Ex. A.[7] Over the course of 8 months, the PBGC produced to Sara

Lee over 3,000 pages of documents, which the PBGC admits are related to the ABA Plan and the

2006 Determination. *See* Graham Aff., Ex. B.[8] Included in the documents produced but not

contained in the PBGC's administrative record filed with this Court, as discussed more fully

below, are copies of documents related to numerous standard single-employer plan terminations

by former participating employers and several Form 5500 annual reports for the ABA Plan that

support Sara Lee's position that the ABA Plan is, and has always been, administered as an

aggregate of single-employer plans. For some puzzling reason, the PBGC has failed to include

those documents in its administrative record filed in this Court.

Like the court in *United Airlines, Inc.*, this Court is now called upon to review an action

taken by the PBGC to safeguard the interests of parties other than the PBGC. This is particularly

important in this case because the PBGC, in light of its compelling self-interests, as explained

above: (i) failed to provide adequate procedures for the collection of relevant information; (ii)

failed to create a full and complete administrative record; (iii) failed to properly notify all parties

with an interest in the PBGC's determination; (iv) failed to provide an administrative review

procedure under which interested parties could appeal the PBGC's determination or provide

---

[7] A copy of Sara Lee's FOIA Request to the PBGC is attached as Exhibit A to the Affidavit of Michael T. Graham ("Graham Affidavit" or "Graham Aff."), which is attached hereto as Exhibit 2.

[8] A copy of the various response letters enclosing the FOIA documents are attached as Exhibit B to the Graham Affidavit. Sara Lee's counsel have filed an administrative appeal of the PBGC's partial denial to produce certain documents with the PBGC's General Counsel, which remains pending. A copy of the FOIA appeal is attached as Exhibit C to the Graham Affidavit.

additional relevant information; and (v) failed to protect the interests of the Plan's participating employers in favor of protecting its own self-interest.

In fact, ERISA Section 4003(f) is like ERISA Section 4042 in that 4003(f) provides both judicial review of an action by the PBGC as well as a remedy to an aggrieved party. Moreover, ERISA Section 4003(f) is the remedial provision under which an aggrieved party must seek redress against the PBGC with respect to a termination decision under ERISA Section 4042. Thus, it would be a bizarre result if a court were permitted to invoke the *de novo* standard of review when reviewing a PBGC determination made under ERISA Section 4042, but not when reviewing that same determination in a challenge brought directly under ERISA Section 4003(f)—the remedial provision under which a party may challenge a 4042 determination. Such a result highlights the Supreme Court's position that Congressional intent is clear on the point that the remedial scheme under ERISA should not be altered in the absence of extraordinary circumstances. *Russell*, 473 U.S. at 147.

The PBGC argues that because two courts in previous cases reviewing PBGC determinations similar to that which is currently before the Court applied the arbitrary and capricious standard of review, this court should apply such a standard. *See* PBGC Mot. at pp. 9, 10, citing *PBGC v. Artra Group, Inc.*, 1993 U.S. Dist. LEXIS 8440 (N.D. Ill. Jun. 23, 1993) and *PBGC v. Potash*, 1986 U.S. Dist. LEXIS 30987 (W.D.N.Y. 1986). However, it is unclear from the courts' opinions whether the parties in the cases cited by the PBGC challenged the courts' application of the arbitrary and capricious standard. Importantly, both the *Artra Group* and *Potash* decisions predate the decision in *United Airlines*. Moreover, in the *Artra Group* case, the PBGC afforded Artra Group an administrative appeal prior to bringing an enforcement action in Federal court—a right that the PBGC expressly denied Sara Lee and other participating employers and the ABA Plan in the instant case. *See* 1993 U.S. Dist. LEXIS 8440 at *2. Even so, the *Potash* court, in applying the arbitrary and capricious standard, specifically stated that "the narrow scope of review under the arbitrary and capricious standard does not shield the agency's decisions from an in-depth, searching and careful consideration by this Court or prevent

reversal of such where there has been a clear error of judgment." *See Potash*, 1986 U.S. Dist. LEXIS 30987 at *7 (internal citations omitted). Therefore, even if the APA applies, as discussed in detail below, such a "clear error of judgment" is present in this case even if measured against an arbitrary and capricious standard—although a *de novo* review by this Court is appropriate under ERISA.

Moreover, the PBGC's Determination should be reviewed *de novo* because the PBGC's review of the ABA Plan's structure has not been consistent over time. As discussed above, in 1975 and 1979, after reviewing the ABA Plan's governing documents and administrative practices, the PBGC each time determined that the ABA Plan qualified as an aggregate of single-employer plans. Now, for the first time in 2006 and without any new evidence or any significant changes in the ABA Plan's administrative practices, the PBGC completely changed course and found that the ABA Plan was a multiple-employer plan. It is well established that courts should not defer to an agency's interpretation of a statute or regulation where the agency's interpretation has been inconsistent, that is, where it has flip-flopped. *Akzo Nobel Salt, Inc. v. Federal Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000); *Wise v. Ruffin*, 914 F.2d 570, 580 (4th Cir. 1990); *Advance Foundry Co. v. Kaufman*, 1996 U.S. Dist. LEXIS 22551, *18 (S.D. Ohio Mar. 25, 1996); *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1296 (D.C. Cir. 1995). Given PBGC's inconsistency, as well as its clear financial stake in its recent change of position, the Court should review the 2006 Determination *de novo*, without any deference to the PBGC's new position.

The APA was not meant to act as a shield to protect ill-advised misadventures of agencies—such as the PBGC's in this case. To the extent the APA could be used in such a fashion, ERISA's express terms override the APA. Because Congressional intent is unambiguous on this point, the Court should review Sara Lee's challenge to the PBGC's 2006 Determination under the *de novo* standard of review and, in any event, deny the PBGC's motion for summary judgment.

## II.    THE 2006 DETERMINATION AND THE PBGC'S ADMINISTRATIVE RECORD SUFFER FROM SEVERE PROCEDURAL DEFECTS

The PBGC submits that the Court should review its 2006 Determination under a very deferential arbitrary and capricious standard and should only review the administrative record compiled by PBGC in undertaking such a review.  The PBGC supports its position seeking summary judgment upon a foundational argument that the procedure followed by the Corporation was "thoroughly reasonable" and "entirely adequate." *See* PBGC Mot. at 1, 11, 18. The facts of this case demonstrate that, far from being "thoroughly reasonable" or "entirely adequate," the procedure followed by the PBGC was highly irregular and severely flawed. Indeed, the facts demonstrate that the PBGC reverse-engineered its procedural process by charging towards a predetermined reversal of position, arbitrarily and intentionally ignoring and excluding pertinent evidence that did not fit together with its desired conclusion.  Based on these inequities, even if the arbitrary and capricious standard of review is employed, the Court should allow the parties to engage in discovery to insure that all relevant documents related to the ABA Plan's structure and administration are considered.

Upon a *prima facie* showing of bad faith or an incomplete record, a reviewing court may go beyond the purported administrative record in reviewing an agency's decision.  *See* PBGC Mot. at 6; *see also Citizens to Preserve Overton Park*, 401 U.S. 402, 420 (1971); *PBGC v. LTV Steel Corp.*, 119 F.R.D. 339, 341-343 (S.D.N.Y. 1988).  As shown below, the PBGC clearly has acted in bad faith and has withheld material in its possession from inclusion in its proffered administrative record.  Based on the PBGC's failures, the novelty of the administrative process used and the incomplete record produced, there exists substantial evidence that the administrative review and administrative record created are severely flawed and driven solely by the PBGC's own self-interest.

Motivated by its desire to avoid a potential $60 million (or greater) unfunded benefit liabilities exposure, the PBGC is attempting to shift this liability to the ABA Plan and Sara Lee (whose single-employer plan under the ABA Plan is significantly overfunded) from IBC, the party who ran its business into bankruptcy and created the unfunded benefit liabilities by failing

to adequately fund its single-employer plan.  In doing so, the PBGC excluded from the administrative record documentation *that the PBGC had in its possession* that directly contradicts its predetermined position regarding the status of the ABA Plan.  Stated another way, the PBGC shaved the edges of the proverbial "square peg" in an attempt to fit the peg in a "round hole," and is now asking this Court to declare a clean fit without permitting the parties adversely affected to present all relevant evidence bearing on the matter.

Examples of the PBGC's questionable actions are abundant.  For example, the PBGC proclaims that it provided all affected parties with adequate notice and an opportunity to be heard.  *See* PBGC Mot. at p. 12.  This position is not supported in reality as the PBGC directly notified only a few of the participating employers.  *See* AR 0427.  Moreover, the PBGC conducted its inquiry under a cloak of ambiguity and uncertainty.  Indeed, as discussed in detail below, the ABA Plan notified the PBGC that it was uncertain as to the scope and procedure of the PBGC's inquiry and, therefore, did not know what information it should provide the PBGC. *See* AR 0887.   Rather than clarify the scope of inquiry and allow the few affected parties who actually received notice of the inquiry to supplement their initial responses, the PBGC chose to close the administrative review procedure altogether, without allowing Sara Lee or any other party the opportunity to rebut the "findings" made in the 2006 Determination or supplement its administrative record with evidence undercutting the PBGC's decision.  *See* AR 1579.  Finally, the PBGC's heavy-handed action also took away the opportunity for the affected parties to seek an administrative appeal of the 2006 Determination and, instead, directed them to file suit in this Court in order to challenge or rebut the 2006 Determination.  *See* AR 1579.

Having successfully prevented the aggrieved parties from having an "opportunity to be heard," the PBGC next established an "administrative record" in an attempt to mute Sara Lee's and the other aggrieved parties' position by excluding documentation clearly supportive of their claims.  First and foremost, as discussed in further detail below, the PBGC excluded from the administrative record documentation establishing that the PBGC itself treated numerous employer terminations from the ABA Plan as standard single-employer plan terminations

throughout a period beginning in 1977 and running into 2000. Additionally, as discussed below, the PBGC excluded from the administrative record Form 5500 annual reports that it had at all relevant times in its possession clearly establishing that the ABA Plan reported itself as an aggregate of single-employer plans. Further, documentation evidencing the PBGC's own audit of a single-employer plan termination under the ABA Plan in 1998 was omitted—which should have allowed the PBGC the opportunity to view how the ABA Plan was operated as an aggregate of single-employer plans.

These are but three examples of the manner with which the PBGC has attempted to "stack the deck" in its favor to support its predetermined reversal of the 1979 Determination that the ABA Plan was an aggregate of single-employer plans. The PBGC's exclusion of these and other relevant materials that were produced to Sara Lee in response to its FOIA Request clearly indicates that the PBGC's administrative record filed with this Court is flawed and that the parties should be permitted to engage in discovery to expose all of the facts relevant to the issue of the ABA Plan's nature and structure. If the parties are permitted to take discovery in this case, it is likely that other examples of the PBGC's mischief will be discovered behind the PBGC's "curtain" of the filed "administrative record."

The PBGC seeks to minimize its inherent conflict of interest in this case by arguing that there is no conflict because "the [IBC] Plan is ongoing, it represents no current liability to the PBGC, and thus, the 2006 letter does not present a 'significant financial benefit' to PBGC." *See* PBGC Mot. at p. 18. This statement is disingenuous at best. The PBGC is clearly an interested party and is operating under a conflict of interest in this case.

As an initial matter, the IBC Plan remains an ongoing concern *only so long as* the PBGC's 2006 Determination is upheld. Through the 2006 Determination, the PBGC in its motion treats the ABA Plan as a multiple-employer plan. Under that designation, the ABA Plan would be treated as a single plan with more than one participating employer. As such, the termination of IBC from participation under the ABA Plan would be treated as a withdrawal rather than a plan termination. A withdrawal would place the burden of IBC's unfunded benefit

liabilities on the other participating employers, including Sara Lee, in contravention of the ABA

Plan's express terms and intent, rather than the PBGC. By reversing the 1979 Determination, the

PBGC has effectually served to transfer its statutory duty to "guarantee" participants' benefits to

Sara Lee and the other participating employers—as discussed below, in contradiction of the

parties' intent in adopting the ABA Plan.

Moreover, contrary to the PBGC's arguments, the approximately $60 million unfunded

benefit liabilities created by IBC that the PBGC is seeking to avoid is "significant" when

measured with respect to the PBGC's $18.88 billion underfunded status. *See* PBGC Annual

Mgmt. Rep. (2006); *see also, Pilots*, 436 F.Supp. at 924. The PBGC's self-serving proclamation

aside, there exists a clear and express conflict in the PBGC's 2006 Determination. In fact, as

introduced above, the PBGC and its significant claim against IBC is the proverbial "elephant in

the room" in this case—the presence of which the PBGC and IBC would prefer the Court ignore.

Perhaps recognizing the folly of its "no conflict" position, the PBGC quickly retreats to a

secondary position that the PBGC enjoys a presumption of "good faith" in its handling of the

administrative proceeding and that, in any event, the fact that it will derive a financial benefit

from the 2006 Determination does not taint that determination. *See* PBGC Mot. at p.18. This

good faith presumption that the PBGC cites may be rebutted and, due to the improprieties

discussed herein, Sara Lee should have an opportunity to further develop the record to establish

such a rebuttal. Sara Lee does not suggest that the PBGC's clear conflict of interest *de facto*

reverses its 2006 Determination. Rather, Sara Lee submits that the PBGC's placement of its own

financial desires over that of the aggrieved parties impermissibly shaded the PBGC's handling of

the administrative proceeding—a proceeding that is marred with irregularities and clear instances

of self-interest. Due to the irregularities in the administrative proceeding as established below,

the PBGC's Motion for Summary Judgment should be denied and Sara Lee as well as any other

affected parties should be permitted further discovery in this case.

III.   **UNDER ANY STANDARD OF REVIEW, THE ABA PLAN IS, AND ALWAYS HAS BEEN, AN AGGREGATE OF SINGLE EMPLOYER PLANS**

The PBGC's 2006 Determination reversing its 1979 Determination is not only incorrect but wholly arbitrary and capricious because it is (i) contrary to law, (ii) contrary to the ABA Plan's governing documents, (iii) contrary to the intent of the ABA Plan's participating employers, (iv) contrary to the experience and operation of the ABA Plan—not only for the 27 years since the PBGC's 1979 Determination, but also the entire 45-year history of the Plan, and (v) most astonishingly, contrary to the PBGC's own treatment of the ABA Plan since the PBGC's inception. In fact, the ABA Plan's governing documents, as written, are sufficient to determine that the ABA Plan qualifies as an aggregate of single-employer plans and not a multiple-employer plan under the PBGC's own standards.

A.   **Legal Standard for Qualifying as an Aggregate of Single-Employer Plans**

The term "aggregate of single-employer plans" is undefined in the text of ERISA or the abundant regulations that have been promulgated under its authority. The term was devised informally by the PBGC to distinguish an arrangement where single-employer plans are collectively administered for cost efficiency reasons from a "multiple-employer plan." A "multiple-employer plan" is defined in PBGC regulations as "a single-employer plan maintained by two or more contributing sponsors that are not members of the same controlled group, under which all plan assets are available to pay benefits to all plan participants and beneficiaries." 29 C.F.R. § 4001.2 (2005).

Since its inception, the PBGC has applied the following standard to distinguish between an aggregate of single-employer plans and a multiple-employer plan:

> Our determination as to the nature of an entity—whether it is a single plan or an aggregate of single plans—is based on its structure and how it actually operates on an ongoing basis. We look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate. Such evidence may include the reasonable expectations and intent of the parties.
>
> The availability of funds held by an entity to provide benefits on an ongoing basis is a central factor in our analysis. Ongoing restrictions on the use of such funds indicate that the entity may be an aggregate of single plans . . . . If the evidence shows that payments are effectively restricted, by whatever means, so that there is

a minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants, then the entity is an aggregate of single plans.

45 Fed. Reg. 55636, 55637 n.2 (1980)[9] (included in comments to the final version of 26 C.F.R. § 2617.2 (recodified as 26 C.F.R. § 2615.2)); *see also* PBGC Op. Ltr. 79-3, PBGC Op. Ltr. 79-14, PBGC Op. Ltr. 84-2, PBGC Op. Ltr. 85-2.[10]

The significance of this determination lies in the consequence of the distinction. Upon discontinuance by an employer in an aggregate of single-employer plans and the resulting plan termination, that employer is entitled to a reversion in the event of a surplus attributable to that employer's contributions. In the event of underfunding, the discontinuing employer must fully fund its liability under the Plan in order to undergo a standard single-employer plan termination or continue the plan. If the employer is unable to fully fund its liability, it must try to qualify for a distress or involuntary termination by the PBGC. With a multiple-employer plan, a discontinuing employer is generally not liable for any underfunding in the plan, but is also not entitled to a reversion of any surplus. *See PBGC v. Artra Group*, 972 F.2d 771, 772 (7th Cir. 1992).

With respect to the ABA Plan, the PBGC applied the standard set forth above in 1979 and determined that the ABA Plan is an aggregate of single-employer plans. *See* AR at 1390-93. Twenty-seven years later, the PBGC opportunistically and selectively reapplied this standard to the ABA Plan under the guise that the agency is now older and wiser. *See* PBGC Mot. at 17. However, the fundamental structure of the ABA Plan and the clear expressed intent of the parties has not changed since 1979, or since the Plan's initial creation in 1961. What has changed is the PBGC and in particular its financial obligations. As a result, "the decision appears to be an *ad hoc* determination geared towards reaching a given result in spite of the absence of support for such." *PBGC v. Potash*, 1986 U.S. Dist. LEXIS 30987 at * 7 (W.D.N.Y 1986).

---

[9] A copy of 45 Fed. Reg. 55636 is attached as Exhibit 3.
[10] Copies of PBGC Opinion Letters 79-3, 79-14, 84-2 and 85-2 are attached as Exhibits 4 through 7, respectively.

**B.    The ABA Plan's Governing Documents Unambiguously State the Parties' Intent that the ABA Plan is an Aggregate of Single-Employer Plans**

The structure of the ABA Plan is fundamentally and organically determined by the terms of its governing plan documents.  For this reason, the PBGC's determination of whether an entity is an aggregate of single-employer plans has been resolved, on several occasions, exclusively by reference to a plan's governing documents.

The PBGC has opined that *"[w]here the plan document is clear as to intent of the parties, we will generally be guided by such express intent*." *See* Ex. 7, PBGC Op. Ltr. 85-2 (emphasis added).  Indeed, the lone United States Court of Appeals case to have reviewed a PBGC determination of aggregate plan status noted that while the PBGC Board of Appeals considered the plan documents, the accounting practice of the plan, and the treatment of other employers who withdrew from the plan, the "Board concluded that *the terms of the plan documents alone were sufficient evidence of single [plan] status*." *Artra Group*, 972 F.2d at 773, 775.  Other courts have likewise relied exclusively upon the plan document's terms to determine whether a plan is an aggregate of single-employer plans or a multiple-employer plan. *See, e.g., Nowell v. Central Serv. Assoc.*, 106 F. Supp. 2d 888, 894-95 (S.D. Miss. 2000).

The PBGC's determination standard looks first to the governing plan documents, and only when the terms of the plan documents are not clear or silent does the PBGC's examination then focus on the plan's actual practice.  *See* Ex. 6, PBGC Op. Let. 84-2 ("The first step in our analysis of the Fund is to review the documents under which the Fund was administered . . . .  As these documents do not clearly reveal whether all of the plan assets are available to pay all benefits on an ongoing basis, we must examine evidence of the Fund's actual practice."); *see also* Ex. 4, PBGC Op. Ltr. 79-3; Ex. 7, PBGC Op. Ltr. 85-2 ("We emphasize that . . . the document shows a clear intent on the part of the participating employers that the Plan was to be an aggregate of single plans.").  Courts reviewing PBGC determinations employ the same methodology of examining, first and foremost, the terms of the plan document.  *See Potash*, 1986 U.S. Dist. LEXIS 30987 at *6-10.

Indeed, in *Artra Group*, the PBGC itself argued in its summary judgment brief that "*[t]he key indicator determining whether a plan is a single-employer plan is the language of the governing plan documents.*" *See* Graham Aff., Ex. D at 7 (emphasis added). Like the plan in *Artra Group*, the relevant ABA Plan documents all clearly and unequivocally indicate that the ABA Plan was established and intended to operate as an aggregate of single-employer plans.

The provisions of the ABA Plan are unambiguous that the intent of its structure was to be an aggregate of single-employer plans for purposes of PBGC termination and premium rules under Title IV of ERISA. Specifically, Article XIII of the ABA Plan specifically states that the ABA Plan is intended to be an aggregate of single-employer plans:

> 13.01  Association of Single Employer Plans. This Plan constitutes an association of single employer plans designed to give the cost savings and other benefits of a tax-qualified prototype plan, the administration in common of all the associated plans (including, but not limited to, actuarial, legal, accounting, and computerized record-keeping services) and the handling of the receipt, investment and distribution of their funds through the medium of a single trust and the use of investment managers or advisers and pension consultants. That the Plan is, and is to be treated as, "an aggregate of separate plans rather than a single pension plan" is recognized by the Pension Benefit Guaranty Corporation for plan termination purposes (see Exhibit A attached hereto).[11]

*See* AR at 1378. In addition, like the single-employer plan in *Artra Group*, the ABA Plan specifically restricts the availability of funds attributable to the contributions of one employer to pay the benefits of another employer's employee-participants:

> 13.02  Each Single Employer Plan to Provide Funds For Its Participants. Subject to the Plan's actuarial assumptions that the stated contribution amounts will produce the stated benefit amounts, *it is the fundamental concept and intent of this Plan that the contributions of each separate employer will be used only to provide benefits for Participants (and Beneficiaries thereof) by reason of such Participants' employment by such employer;* and only contributions by such employer will be used to provide benefits for such Participants (and Beneficiaries).

*Id.* (emphasis added). Just as the PBGC found in its 1979 Determination, the fact that participating employers' contributions are available only to pay the benefits of their own

---

[11] A copy of the PBGC's 1979 Determination that the ABA Plan qualified as an aggregate of single-employer pension plans is attached to and incorporated in the ABA Plan's governing document as Exhibit A. *See* AR 0980-0983.

employee-participants under the ABA Plans' unambiguous terms exempts the ABA Plan from

the definition of "multiple-employer plan" because benefits under this Plan *are not* "available to

pay benefits to all plan participants and beneficiaries." 29 C.F.R. § 4001.2 (2005).

Consistent with Section 13.02 of the ABA Plan, the ABA Plan's termination provisions

in Article XI provide that, in the event the entire ABA Plan is terminated or a participating

employer discontinues its participation in the ABA Plan, *only assets attributable to each*

*terminating employer may be used to pay benefits for that employer's employees.* See AR 1371-

74. In addition, like *Artra Group*, if a Participating Employer fails to make its required

contributions, the ABA Plan cannot continue for that Participating Employer's employee-

participants:

> 11.02  Partial Termination of Plan. *If any Participating Employer shall*
> *discontinue its participation in the Plan by any one or more of the following*
> *actions:* a) **The termination of such Participating Employer's contribution . . .**
> **then the Plan shall be terminated with respect to such Participating Employer**
> **and with respect to the Participants and Beneficiaries of Participants whose**
> **participation in the Plan is attributable to employment with such Participating**
> **Employer,** . . . the portion of the assets of the Fund attributable to the participation
> in the Plan of Participants and Beneficiaries of Participants with respect to whom
> the Plan is terminated shall be determined in accordance with the provisions of
> Section 11.01 [which controls the total termination of the Plan].

AR 1373 (emphasis added). In the event that a participating employer discontinues contributions

or otherwise seeks to terminate its single-employer plan, the ABA Plan specifically provides that

such a participating employer's employee-participants will cease to accrue benefits under the

Plan. *Id.* Notably, here, IBC has failed to continue payment of its required contributions under

the ABA Plan and, therefore, its single-employer plan would be required to (i) be discontinued

under the ABA Plan if it does not satisfy the ABA Plan Trustees' funding requirements or (ii) be

terminated under Title IV of ERISA.

The PBGC has previously determined that restating a plan to include express provisions

restricting the availability of one employer's contributions to pay the benefits of another

employer's participants transformed what was previously a multiple-employer plan into an

aggregate of single-employer plans. In reviewing plan document provisions, the PBGC declared:

> It seems clear that at least upon adopting the restated plan it was the intent of the parties that [the plan] be an aggregate of single plans. We emphasize that all participating employers adopted the restated plan during the year 1977, and the document shows a clear intent on the part of the participating employers that [the plan] be an aggregate of single plans. Section 5.3 of the amended plan document provides that benefits of an employer's employees be conditioned on "the sufficiency of plan assets in the event the Employer terminates this Plan." Clearly, this provision relates to the withdrawal from the Plan by an employer, characterizes such event as the termination of the employer's plan and limits benefits of employees of such terminating employer to the asset balance of the terminating employer.

Ex. 7, PBGC Op. Ltr. 85-2. As discussed above, ABA Plan Section 13.02 is equally clear—in fact, even more clear—than the terms of the plan in PBGC Op. Ltr. 85-2.

Moreover, the intent of the participating employers in the ABA Plan to maintain an aggregate of single-employer pension plans is supported by the "Participation Agreements" executed by each employer. The ABA Plan defines a Participation Agreement to mean "the contract by which an Employer agrees with the Board to participate in the Plan and *agrees to be bound by its terms and provisions of the Plan,* and to make contributions to the Fund on behalf of certain of its Employees." *See* AR 1322 (emphasis added). Paragraph 13 of the ABA Plan's current Participation Agreement specifically provides that, by agreeing to participate in the ABA Plan, an Employer expressly acknowledges that the ABA Plan is an aggregate of single-employer plans for purposes of plan terminations:

> Company acknowledges that prior to adopting the ABA Plan it has reviewed and understands *and accepts the nature of the Plan* as a multiple employer plan sharing a common administrative structure and single actuarial valuation, and further acknowledges *and accepts that for purposes of Pension Benefit Guaranty Corporation termination and premium rules the ABA Plan is treated as an association of single employer plans.* Company may request a separate actuarial valuation of its participation in the ABA Plan at any time from the Plan's actuary at Company's own expense.

*See* AR 1012 (emphasis added).

The PBGC's 2006 Determination is incorrect and arbitrary and capricious because it is contrary to law and completely disregards the ABA Plan's unambiguous terms. Moreover, the PBGC's position in this case is completely at odds with its position taken in *Artra Group* as well as other PBGC opinion letters, including PBGC Op. Ltr. 85-2. The PGBC's desire to reach its

predetermined conclusion in the 2006 Determination that the ABA Plan is a multiple-employer plan would require it to render meaningless—solely by fiat—the above-referenced provisions of the ABA Plan. That is why the PBGC chose to completely ignore the ABA Plan's unambiguous terms in reaching its 2006 Determination. Moreover, the PBGC's arguments and positions asserted in this case effect a complete reversal of its prior expressions and positions that the terms of the governing plan document should be the primary determinate of aggregate plan status. The PBGC does so without any principled explanation of this reversal or guidance concerning the new standard it applied. These actions are both wrong as a matter of law as well as the height of arbitrary and capricious decision-making.

The reason the plan document is so significant is that the plan fiduciaries—the ABA Plan Trustees—who are charged with the duty of administering the ABA Plan are required to follow the Plan's terms. ERISA Section 404(a) provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV." *See* 29 U.S.C. § 1104(a). Consequently, if the organic structure of the ABA Plan established in the plan documents requires that all of the plan assets not be available on an ongoing basis to pay all benefits, then the experience of the ABA Plan as it has been administered must follow this structure, unless ERISA requires otherwise. If the ABA Plan Trustees fail to follow the ABA Plan's terms, the remedy is not for the PBGC to invalidate the ABA Plan's structure and intent, but for a breach of fiduciary duty claim to be alleged (similar to that filed by Sara Lee in Counts II and III of its Second Amended Complaint).

Importantly, the PBGC has no authority or power to alter the express terms of a plan's governing documents, which clearly evidence the intent of the ABA Plan and its participating employers. Moreover, this Court should not countenance in the name of administrative deference the PBGC's attempt to rewrite the ABA Plan's unambiguous terms and reconfigure the ABA Plan into a multiple-employer plan. A fundamental tenet of ERISA requires that

employee benefit plans be "established and maintained pursuant to a written instrument" and that this written instrument describe the formal procedures by which the plan can be amended. 29 U.S.C. § 1102(a)(1), (b)(2). The ABA Plan's amendment procedures are set forth in Section 10.01, which gives the ABA Board of Trustees the authority to amend the ABA Plan's terms, not the PBGC. *See* AR 0964. In recognition of ERISA's written instrument requirement, courts have consistently refused to rewrite the terms of a plan document. *See Kolentus v. Avco Corp.*, 798 F.2d 949, 956 (7th Cir. 1986) (finding "[w]e may not alter the express termination provisions [of the pension plan] in the guise of contract interpretation."); *Coleman v. Nationwide Life Insurance Co.*, 969 F.2d 54, 58-59 (4th Cir. 1992) (refusing to alter the terms of an insurance contract funding an ERISA-covered plan under an equitable estoppel theory because "[u]se of estoppel principles to effect a modification of a written employee benefit plan would conflict with ERISA's emphatic preference for written agreements.").

In sum, as the PBGC has consistently argued to other courts (and, apparently, only when the argument supports its own bottom line), the key indicator of whether the ABA Plan is an aggregate of single-employer plans rests with the terms of the ABA Plan's governing documents. As discussed above, the ABA Plan's terms unambiguously state that the intent of the ABA Plan and its adopting participating employers is, and has always been, for the ABA Plan to be an aggregate of single-employer plans, so that each participating employer would only be required to pay for the benefits of their own employee-participants and not the employee-participants of their competitors.[12] Therefore, given the unambiguous nature of the ABA Plan's terms and the fact that the ABA Plan's governing documents should be given meaning as expressing the clear

---

[12] Because of the inadequacies of the Administrative Record and the process employed by the PBGC in rendering the 2006 Determination, Sara Lee seeks the denial of the instant motion so that discovery may proceed. However, should the Court agree that the ABA Plan's governing terms control in this case, the Court may enter judgment for Sara Lee *sua sponte*. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) ("district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Athridge v. Rivas*, 141 F.3d 357, 361 (D.C. Cir. 1998) (same); *see also W.C. & A.N. Miller Cos. v. United States*, 173 F.R.D. 1, 3 (D.D.C. 1997) (court may grant summary judgment *sua sponte* where there is already pending a summary judgment, but no cross-motion, because court already engaged in determining whether a genuine issue of material fact exists and parties given opportunity to present evidence).

intent of the participating employers that the ABA Plan is an aggregate of single-employer plans, the PBGC's motion for summary judgment should be denied.

    **C.**    **Contrary to the 2006 Determination, There Are Questions of Fact as Whether the ABA Plan Was Consistently Administered As An Aggregate of Single-Employer Plans Since Its Adoption**

Aside from the clarity of the ABA Plan's terms that the participating employers intended the ABA Plan to be an aggregate of single-employer plans, the ABA Plan Trustees have administered the ABA Plan as an aggregate of single-employer plans over time. In its 2006 Determination, the PBGC found otherwise, focusing on relatively minor practices of the ABA Plan Trustees to find that the ABA Plan "is, and indeed always has been, a multiple-employer plan." *See* AR 1563. Specifically, the PBGC, as well as participating employer IBC, contend that since the 1979 Determination, the ABA Plan Trustees have regularly filed documents with the Department of Labor (Form 5500s) and distributed documents to participating employers (informal letters) that state the ABA Plan is not an aggregate of single-employer plans. Moreover, the PBGC attaches new significance that the ABA Plan did not maintain separate accounts for each participating employer's contributions and that no separate annual valuation was performed for each participating employer's assets and liabilities in the ABA Plan.

However, each of these reasons allegedly supporting the PBGC's reversal of the 1979 Determination either misstate the facts, or attempt to distort the reasons supporting the 1979 Determination. As discussed below, the ABA Plan has been consistently administered as an aggregate of single-employer plans, and the sole difference in the facts facing the PBGC prior to its determinations in 1979 and 2006 is the fact that IBC is in bankruptcy and faces a potential underfunding of its own single-employer plan of over $60 million. In sum, it is that difference— together with the PBGC's current financial obligations and the fact that the PBGC would likely be left guaranteeing IBC's unfunded benefit liabilities in the face of IBC's decision to cease its contributions to the Plan—that caused the PBGC to reverse the 1979 Determination.

## 1.    *Employers Executed Participation Agreements Acknowledging that the ABA Plan was an Aggregate of Single-Employer Plans*

As discussed above, the intent of the parties in adopting and maintaining a plan is the key indicator of whether a group of plans will qualify as an aggregate of single-employer plans. Here, there can be no doubt that each of the participating employers, and the ABA Plan Trustees, intended the ABA Plan to be an aggregate of single-employer plans.

In its 1979 Determination, the PBGC noted that "since the inception of the [ABA Plan] in 1961, each employer that enters the Fund, that increases its contribution rate, or that adds a new unit has been required to sign a separate Participation Agreement. This agreement states that ***the employer's participation in the Fund is only with respect to its own employees***." *See* AR at 1391 (emphasis added). In addition, Paragraph 13 of the ABA Plan Participation Agreement reinforces the parties' intent by requiring each employer, including IBC, to acknowledge, prior to adopting the ABA Plan, that "it has reviewed and understands and accepts the nature of the [ABA] Plan as a multiple employer plan sharing a common administrative structure and single actuarial valuation, and further acknowledges and accepts that for purposes of Pension Benefit Guaranty Corporation termination and premium rules the ABA Plan is treated as an association of single employer plans." *See* AR 1315. Moreover, as discussed at length above, the ABA Plan's governing document specifically requires that the contributions for each participating employer only be used to pay for the benefits of that employer's employee-participants and not for the employee-participants of any other employer. *See* AR 1378.

Notably, IBC suggests in its position statement to the PBGC that it was shocked to learn in 2004 that it maintained a negative balance for its single-employer plan and that the ABA Plan could assess it with a $6.8 million special assessment (in addition to its $1.3 million annual contribution) to meet an additional minimum funding requirement. *See* AR 0445. However, IBC had the means at its disposal to avoid such a "shock." The Participation Agreements it signed with the ABA Plan—including one as recent as May 2, 2003—gave IBC the right, at its own cost, to have the ABA Plan's actuary determine the funding status of its own single-employer plan on an annual basis. IBC chose not to exercise this right. *See* AR 1011-1014.

In fact, IBC's alleged ignorance of the ABA Plan's status is further undercut by its request in 1999 that the ABA Plan add an "uncapped service benefit" feature so that it could add as new participants to its plan a group of approximately 400 long-tenured union employees in Charlotte, North Carolina. This feature was limited solely to IBC's employee-participants and required IBC to pay a large, additional surcharge to its contributions because of the "uncapped service" feature. Notably, no other participating employer elected this benefit feature. Moreover, in 1999, the ABA Plan did not know that IBC would shut down its Charlotte facility in 2005; a substantial portion of IBC's unfunded benefit liability is attributable to this group because of the uncapped nature of their benefit and their short tenure of participation in the ABA Plan. *See* AR 0873. In sum, throughout its participation in the ABA Plan, IBC chose not to monitor its funding status under the ABA Plan, and thus ran up severe levels of underfunding that it now seeks to push off to other participating employers including Sara Lee—in contravention to the ABA Plan's unambiguous terms and its agreement in the Participation Agreements. *See* AR 0876, 0886.[13]

2.    ***The PBGC Was on Notice of the ABA Plan's Status as an Aggregate of Single-Employer Plans Due to Employer Terminations as Standard Single-Employer Plan Terminations As Well As Its Audits of the Plan***

In the 2006 Determination, the PBGC was dismissive of the circumstances surrounding participating employer terminations as a basis for finding the ABA Plan is not an aggregate of single-employer plans. Specifically, the PBGC suggests that by permitting two participating employers to abandon their single-employer plans without the required gross-up for the amount of underfunded liability, the ABA Plan permitted contributions from other participating employers to be used to pay for the benefits of the employee-participants of these abandoned employers. However, the PBGC's arguments are not only inconsistent with its own prior determinations, but they also misstate the facts related to such terminations under the ABA Plan.

---

[13] Unlike IBC, Sara Lee and its predecessors routinely requested a separate valuation study for its contributions to and benefit liabilities under the ABA Plan. Not surprisingly, Sara Lee has maintained a well-funded single-employer plan under the ABA Plan while IBC, which chose not to pay for such valuations, did not and ultimately has maintained severe unfunded benefit liabilities in its single-employer plan. *See* AR 0876.

ERISA Section 4044 provides the rules for allocating the assets of a defined benefit pension plan (available to provide benefits) among the participants and beneficiaries when the plan is terminating as a single-employer pension plan. *See* 29 U.S.C. §1344. Under an aggregate of single-employer plans, when an employer ceases its participation in a plan and undergoes a Title IV termination, its assets in the plan are allocated to pay benefits only for its own employee-participants, as the ABA Plan's terms require here. In that circumstance, the cessation is carried out as a standard single-employer plan termination. ERISA Section 4063 governs the withdrawal of an employer from a multiple-employer plan. *See* 29 U.S.C. § 1363. When an employer withdraws from a multiple-employer plan, withdrawal liability is assessed only if the employer is a "substantial employer" within the meaning of ERISA Section 4001, 29 U.S.C. § 1301(a)(2), or has made contributions to the plan within the five years preceding the termination of the plan as a whole. *See* 29 U.S.C. 1363, 1364. The employer's contributions to the plan are not allocated to its own employee-participants, because all assets of the plan are available to pay the benefits of any employee-participant. When a participating employer withdraws from a multiple-employer plan, no termination documents—whether a standard, single-employer plan termination or requests for a distress or involuntary termination—are filed with the PBGC. *See* 29 U.S.C. § 1363.

Here, the PBGC completely disregarded evidence that the overwhelming majority of employers leaving the ABA Plan terminated their plans as standard, single-employer plan terminations under Section 4044(a) and submitted such termination documents to the PBGC, which fact itself proves that the ABA Plan was an aggregation of single-employer plans and not a multiple-employer plan. The ABA Plan succinctly explained its administrative history related to employer withdrawals and plan terminations in its position statement to the PBGC:

> In practice, upon the termination of a Participating Company since ERISA, the benefits payable to the terminated employer's participants have been funded by purchase of annuities with the terminating company's assets, and the [ABA] Plan's liability to such participants is thus extinguished. Clearly, no liability for such participants is intended to remain with the [ABA] Plan or the employers who continue to operate the ABA Plan.

> Employer terminations have occurred under PBGC rules numerous times since 1976, each time in consultation with the PBGC and in accordance with the rules and regulations governing single-employer plans. All of the recent terminations have been "sufficient" terminations under PBGC rules, since those rules came into effect, although in several cases terminating employers have been called upon to contribute additional assets in order to make the [ABA] Plan sufficient for termination purposes. See, e.g., Ex. 16 [[14]]. (Form 500s and other PBGC filings for these companies can be provided on request. The [ABA] Plan has aggressively pushed employers to initiate contact with PBGC and to follow PBGC's filing, notice and timeliness requirements and continues to do so). . . .

*See* AR 0879-0880.

In fact, as the ABA Plan explained in its submission, there have been many terminations by participating employers since the 1979 Determination, and each of these terminations (with the exception of the two very small employers discussed above) were treated *by the PBGC* as standard, single-employer plan terminations under ERISA. *See* AR 0886-0887. Moreover, the PBGC itself possessed several hundred pages of documents related to the process by which the ABA Plan's withdrawing employers terminated their relationship with the ABA Plan by submitting standard, single-employer plan terminations to the PBGC.

As discussed above, after the 2006 Determination, Sara Lee submitted a FOIA Request to the PBGC related to the ABA Plan's administration. *See* Graham Aff., Ex. A. In the PBGC's multiple document productions to Sara Lee through the FOIA Request, the PBGC produced documents *in the PBGC's possession* that evidenced at least *nine* additional participating employer terminations from the ABA Plan that were treated as standard, single-employer plan terminations by the PBGC. Specifically, the PBGC produced documents to Sara Lee on the following terminations (which were *not* included in the PBGC's administrative record) that were *treated by PBGC as standard, single-employer plan terminations*:[15]

---

[14] *See* AR 1187-1212, which includes the documents submitted to the PBGC for Gulf Coast Snacks' single-employer plan termination under the ABA Plan.
[15] Copies of the documents produced by the PBGC on these various standard single-employer plan terminations are attached as Exhibits E through K to the Graham Affidavit, respectively.

| Employer | Proposed Month of Termination |
|---|---|
| Lloyd J. Harris Pie Company and Flowers Industries, Inc. | December 1977[16] |
| Beaver Valley Industries, Inc. and Chef's Supply, Inc. | July 1982 |
| Fasano Pie Company | March 1983[17] |
| Boge's Bread (Division of U.S. Bakery) | August 1987 |
| Holsum Baking Company | September 1987 |
| Oven Fresh/April Hill (Grocer's Baking Company) | September 1988 |
| Community Shops, Inc. | August 2000 |

The failure of the PBGC to include in its administrative record the documents related to these standard single-employer plan terminations is troubling, in that these terminations were *handled by the PBGC as if the ABA Plan was an aggregate of single-employer plans*. This fact supports the position that the PBGC knew all along that since 1979 the ABA Plan had been administered as an aggregate of single-employer plans. Notably, the PBGC does not—and cannot—cite to any ABA Plan language or acts of the ABA Plan Trustees that would prove that such terminations were treated as if the ABA Plan were a multiple-employer plan. That is because no such evidence exists. Instead of including all related information in its administrative record, the PBGC chose instead to "cherry pick" the documents in its possession related to the ABA Plan's administration and limit its administrative record to those documents solely supporting its decision to reverse the 1979 Determination. Such a decision begs the question of what additional documents have not been produced to the parties and to this Court by the PBGC, related to the question of whether the ABA Plan has been administered as an aggregate of single-

---

[16] The termination of Flowers Industries, Inc. was accomplished through a plan to plan merger. *See* Graham Aff., Ex. F.

[17] It appears from documentation produced by the PBGC through Sara Lee's FOIA Request that the PBGC may have assumed trusteeship of the termination of the Fasano Pie Company in the ABA Plan, either through a distress or involuntary termination. *See* Graham Aff., Ex. G. Further information is necessary to determine the exact nature and circumstances of the termination, which Sara Lee will be able to request if the Court allows discovery to go forward. Should it be determined that the Fasano Pie termination was either a distress or involuntary termination where the PBGC accepted trusteeship of that single-employer plan, that fact would completely undercut the PBGC's 2006 Determination that the ABA Plan was a multiple-employer plan, as the PBGC would not and could not treat such a cessation of participation in the ABA Plan as a plan termination if the ABA Plan were a multiple-employer plan.

employer plans since the 1979 Determination.  At a minimum, these facts reveal that the PGBC's determination was highly irregular and severely flawed.

The PBGC's suggestion that the ABA Plan "has not consistently treated the withdrawal of a participating employer as a plan termination or retroactively created a separate account for each such employer and trued up any funding deficiency or surplus," is simply fiction.  *See* AR 1578.  In the 2006 Determination, the PBGC based its conclusion that the ABA Plan was not administered as an aggregate of single-employer plans in part because the ABA Plan treated eight employers as "inactive" and two of these "inactive" employers had a negative asset balance in the ABA Plan's trust.  *See* AR 1578.  However, the PBGC's reference to these two employers was inaccurate and incomplete.  As pointed out in the ABA Plan submission to the PBGC, in the two situations where an "inactive" employer left a negative balance, the participating employer went out of business and vanished, abandoning its liabilities in the ABA Plan.  *See* AR 0880.  Because the single-employer plan sponsors were unavailable or refused to file the necessary termination forms or documents with the PBGC, the ABA Plan "continued to pay pensions to participants out of assets left abandoned in the [ABA Plan]."  *Id.*  Put another way, the ABA Plan Trustees utilized their discretionary authority and determined that it was in the ABA Plan's interest not to waste plan assets to track down these small participating employers and instead decided to use other abandoned plan assets to pay the benefits for these two employers' employee-participants so that they would not be paid by participating employers remaining in the ABA Plan—which payment would have violated the intent and clear language of Plan Section 13.02 of the ABA Plan.

The PBGC's analysis of these facts is completely misguided, because these facts actually demonstrate that the ABA Plan was operated so as to prevent the use of employer's contributions to fund another employer's obligations ***on an on-going basis***, and only in the exceptional circumstance where employers had abandoned their plans did the ABA Plan apply abandoned (rather than employer-specific) assets to pay these benefits as a cost-saving measure to the ABA

Plan, not as its standard operating procedure. In essence, the PBGC has mistakenly interpreted the exception to be the rule.

Further, the PBGC twisted the evidence related to the ABA Plan's actuarial calculations to suggest that, contrary to the ABA Plan's prior representations in 1979, the ABA Plan has not been maintained to prevent cost-shifting among participating employers. *See* AR 1578. If the PBGC had any confusion over its interpretation of the ABA Plan's actuarial calculations—which its analysis proves it did—the PBGC could have requested the ABA Plan to provide it with additional information related to these issues. In fact, in its submission, the ABA Plan specifically referenced that:

> In closing, *please be advised that the officials and consultants to the [ABA] Plan have substantial information and records covering the past 45 years of operations that may have some bearing on the PBGC's consideration of the issues. We are prepared to submit affidavits from each consultant on items the PBGC might view as important,* **but because of the scope and procedure pertaining to this inquiry have not been formally defined, we have elected not to produce evidence in the form appropriate to a court of law***.* The foregoing information is in the nature of a proffer that we are prepared to substantiate by sworn testimony if necessary, and to supplement in any way that might be helpful.

*See* AR 0887 (emphasis added).

The PBGC ignored this proffer, and instead chose to reverse the 1979 Determination based on a flawed reading of the ABA Plan's actuarial reports without thoroughly analyzing the actual operation of the Plan. Moreover, the PBGC included in its administrative record only those documents related to three withdrawals and subsequent plan terminations by participating employers—specifically the standard, single-employer plan terminations of Sanitary Baking Company (terminated in August 1975), Wilson Baking Company (terminated in April 1976) and Gulf Coast Snacks (terminated in January 1997). Notably, the very fact that these employers left the ABA Plan through the filing of standard, single-employer plan terminations with the PBGC supports Sara Lee's position that the ABA Plan was administered as an aggregate of single-employer plans for purposes of plan terminations after 1979. In fact, in 1998, the PBGC even audited one of the standard, single-employer plan terminations submitted by one of the ABA

Plan's participating employers—Gulf Coast Snacks, Inc.  In response to Sara Lee's FOIA Request, the PBGC produced to Sara Lee almost 100 pages of documents related to its audit of Gulf Coast Snacks' termination from the ABA Plan, which was submitted as single-employer plan termination.[18]  Importantly, most of these documents were excluded in the PBGC's administrative record filed in this case.[19]  The administrative record, therefore, reveals as patently false the PBGC's assertion that its determination was "entirely reasonable and fully supported by the administrative record."  PBGC Mot. at 20.

In sum, the fact that virtually all employer terminations from the ABA Plan have been handled as standard, single-employer plan terminations *by the PBGC itself* defeats the PBGC's position that the ABA Plan has not been administered as an aggregate of single-employer plans. Moreover, the PBGC's failure to include all relevant documents in the administrative record is an additional reason that this Court should deny the PBGC's motion for summary judgment and permit the parties to engage in discovery to determine the full extent of the administrative record and to uncover all evidence relevant to the PBGC's 2006 Determination.  Only then will the Court be able to determine how the ABA Plan was administered on an ongoing basis.

### 3.  *The Form 5500s Submitted to the IRS Over the Years Included a Footnote That the ABA Plan was Not a Multiple-Employer Plan for Purposes of Plan Terminations*

In the 2006 Determination, the PBGC also relied on annual reports the ABA Plan filed with the IRS on Form 5500 to support the position that the ABA Plan was a multiple-employer plan.  Specifically, the PBGC cites the fact that the ABA Plan checked the "multiple-employer plan" box on the Form 5500s to support its position that the ABA Plan held itself out as a multiple-employer plan.  However, the PBGC's arguments are factually incorrect because (i) there is no "aggregate of single- employer plans" box on Form 5500 which the ABA Plan could have selected; and (ii) generally, when the ABA Plan submitted a Form 5500 with the "Multiple-

---

[18] A copy of the documents produced to Sara Lee related to the PBGC's termination audit of Gulf Coast Snacks, Inc. is attached as Exhibit O to the Graham Affidavit.

[19] Notably, the ABA Plan in its submission to the PBGC during administrative review included a few pages related to the PBGC's termination audit of Gulf Coast Snacks.  *See* AR 1182-1186.  However, the PBGC excluded mention of this audit in its 2006 Determination.

employer plan (other)" box checked, a footnote was appended explaining that the ABA Plan is an aggregate of single-employer plans for Title IV purposes.

As an initial matter, the PBGC's analysis on this matter as set forth in the 2006 Determination is not only inconsistent with the administrative record, it is conspicuously myopic. Form 5500 annual reports are but one of several categories of forms that employee benefit plans file with government agencies. The ABA Plan's submission to the PBGC prior to the 2006 Determination specifically pointed out that determination letter filings submitted to the IRS were accompanied by letters setting forth a detailed description of the ABA Plan's structure as an aggregate of single-employer plans for purposes of Title IV. AR 0873-75, 1033-36. Yet, the PBGC chose to arbitrarily disregard this evidence without explanation.

Moreover, the PBGC's 2006 Determination arbitrarily disregarded information on the ABA Plan's Form 5500s that directly contradicts its analysis. As the ABA Plan submitted in its position statement to the PBGC, the ABA Plan and its participating employers have followed a consistent procedure with respect to the filing of the Form 5500 annual report, reflecting its nature as an aggregate of single-employer plans. From 1976 through 1999—a period of 23 years, the ABA plan required each participating employer (or its controlled group) to file a separate Form 5500 to which the Schedule B reflecting the actuarial valuation of the whole ABA Plan was attached, with a standard explanation of the structure of the ABA Plan. Specifically, in these Form 5500-Cs or Form 5500C/Rs, when checking the "Multiple-employer plan (other)" box on the first page of the form, the participating employers footnoted the box, and at the bottom of the first page included the following statement: "Individual employer contributions are available to pay benefits to all Participants except on termination of each employer's contributions pay benefits [to] only that employer's employees." *See* AR 1084-1089.

The ABA Plan submitted as an exhibit to the PBGC with its position statement the Form 5500-C for the American Bakers Association—a participating employer in the ABA Plan—for the 1983 plan year as an example of the footnote explaining the checking of the "multiple-employer plan" box. In addition, in response to Sara Lee's FOIA Request, the PBGC produced

to Sara Lee the Form 5500-C of the American Bakers Association for the 1980 plan year and the

Form 5500-C/R for Gulf Coast Distributors, Inc.—a former Participating Employer in the ABA

Plan. *See* Graham Aff., Ex.L.[20]  In each of these Form 5500s, the same footnote was included,

which explained that the ABA Plan was an aggregate of single-employer plans for purposes of

plan terminations. *Id.*  Notably, the PBGC failed to include any of these Form 5500s (other than

the exhibit submitted by the ABA Plan) in its administrative record, and failed to address (or

even refer to) the footnotes provided by the ABA Plan in its 2006 Determination.

      For the year 2000 and thereafter, the Department of Labor and IRS published changes in

the Form 5500.  As a result of these changes, the ABA Plan's method changed where each Form

5500 was not footnoted to explain the ABA Plan's nature.  Rather, the ABA Plan Trustees filed a

single Form 5500 for the ABA Plan as a whole with separate Schedule T demonstrations for each

participating employer under each separate participating employer's tax identification number.

Separate employers no longer filed separate Form 5500s.  *See* AR 0875; Graham Aff., Ex. M,

N.[21]  These separate Schedule T demonstrations should have placed the agency receiving them

on notice that each participating employer was contributing funds to the ABA Plan only to fund

the benefits of their own employee-participants at termination, and not the benefits of other

participating employers' employee-participants. *Id.*, AR 1090-1111.  Notably, the PBGC chose

not to refer to these facts in its 2006 Determination—rather, the PBGC ignored them and focused

instead on the mere checking of a box, even where that decision was explained further elsewhere

on the form.  This aspect of the PBGC's 2006 Determination is therefore flawed, and should be

rejected.

    **4.**     *The Lack of Separate Accounts Relied Upon By the PBGC in its 2006*
         *Determination Was Resolved in its 1979 Determination*

      The PBGC relies heavily on the fact that the ABA Plan has always maintained a single

trust and did not segregate each participating employer's contributions into a separate account or

---

[20] Copies of the 1980 and 1996 Form 5500s produced by the PBGC on Sara Lee's FOIA Request are attached as Exhibit L to the Graham Affidavit.
[21] Copies of the ABA Plan's Form 5500 for the 1999 and 2003 plan years are attached as Exhibits M and N to the Graham Affidavit, respectively.

trust to support its 2006 Determination. *See* AR 1570-1571. The reason the PBGC has provided to this Court to support its claim that its 1979 Determination was incorrect is that the agency was young and inexperienced in 1979 and is now, presumably, older and wiser. *See* PBGC Mot. at 17. However, this argument is devoid of any substantive analysis demonstrating why the 1979 Determination, in which the PBGC found that creating multiple accounts would be administratively and actuarially impracticable, should suddenly be reversed. In fact, the PBGC's reliance on this fact to reverse its 1979 Determination is disingenuous, as the PBGC was well aware prior to the 1979 Determination that the ABA Plan, and its participating employers, had no intention of maintaining separate accounts or separate trusts for each employer. If separate accounting were required, the ABA Plan notified the PBGC in 1978 that the ABA Plan would terminate and cease to exist for the eligible employee-participants. *See* AR 0175.

Prior to the 1979 Determination, the ABA Plan and the PBGC faced a factual situation almost identical to that which presently exists. At that time, after the passage of ERISA, the PBGC was faced with a decision as to how to consider the ABA Plan—whether it was a multiple-employer plan or an aggregate of single-employer plans. On October 30, 1975, ABA Plan representatives met with Henry Rose, then-General Counsel of the PBGC, as well as other PBGC representatives, to discuss the ABA Plan's nature as well as two plan terminations in process when ERISA was adopted. *See* AR0004-0007. On December 31, 1975, the PBGC issued a letter to the ABA Plan concluding that the Plan was an aggregate of single-employer plans. *See* AR0022.[22] On September 11, 1976, the ABA Plan Trustees approved a restated plan document that conformed to ERISA with an effective date of October 1, 1976. *See* AR 0866, 0087-0156. Based on this new governing document, the assets contributed by participating employers that continued the ABA Plan were restricted and could not be used to pay benefits for

---

[22] The PBGC included in its Administrative Record a lengthy internal memorandum addressing this issue dated December 22, 1975, in which the PBGC's analysis underlying its finding that the ABA Plan was an aggregate of single-employer pension plans is discussed. *See* AR 0010-0019. Notably, this 1975 Determination is never discussed or cited to by the PBGC in its 2006 Determination, its motion for summary judgment or IBC's joinder in that motion.

a terminating employer that refused to contribute sufficient funds to match their liabilities under the ABA Plan. *Id.*

On March 14, 1978, the PBGC notified the ABA Plan that due to a newly proposed regulation, which included a new definition of what constituted a single-employer plan, the ABA Plan should not rely on the PBGC's December 31, 1975 letter that the ABA Plan constituted an aggregation of single-employer plans. *See* AR0158-0159. On April 25, 1978, representatives of the PBGC and ABA Plan met again to discuss the nature of the ABA Plan. *See* AR 0163. On July 6, 1978, counsel for the ABA Plan prepared a memorandum discussing the issues addressed at the April 25 meeting. *See* AR 0164-0175.

During this meeting, the PBGC and ABA Plan discussed whether it was possible for the ABA Plan to have separate minimum funding accounts for each employer. The ABA Plan responded that it would not be administratively feasible because it "would require some 90 such accounts to be maintained under the plan each year – the cost would be prohibitive." *See* AR 0171. The memorandum continued by stating that "[t]he thought of some 90 separate accounts to be analyzed actuarially and audited each year proved to be a horrifying thought to all of the ABA people present—even Bob Krinsky [the ABA Plan's auditor]." *Id.* In addition, the parties discussed ways in which it would be required that each individual participating employer pay in any insufficiency of their liabilities at the time of a withdrawal or termination. *See* AR 0172. Counsel for the ABA Plan specifically summarized that in the meeting, "***[i]t became apparent that a guiding motive of the PBGC position was to avoid possible liability by the PBGC.***" *See* AR 0173. After at least one more meeting of the parties in October 1978 to discuss these issues, the PBGC finally determined effective June 21, 1979, that the ABA Plan was an aggregate of single-employer plans. *See* AR 0212-0125. Thereafter, the 1979 Determination was added to the ABA Plan as Exhibit A and relied upon by participating employers that adopted the ABA Plan.

The issues facing the PBGC prior to 1979 are almost identical to those it confronted prior to the 2006 Determination: (i) the ABA Plan's use of a single trust account and a single, annual

actuarial valuation rather than requiring separate accounts and valuations for each participating employer; (ii) the ABA Plan's requirement that each participating employer's contributions be used solely to pay for the benefits of their own employee-participants, and not the other employee-participants of competing participating employers; and (iii) the ABA Plan's insistence that a terminating participating employer gross-up any unfunded benefit liabilities and delinquent contributions that exist at termination or pursue its single-employer plan for, what is now, a distress or involuntary termination to the PBGC. The only difference that existed in 2006 is that IBC was in bankruptcy and carried over $60 million in unfunded benefit liabilities that, once it or PBGC terminated IBC's single-employer plan, either IBC or the PBGC would be required to fund those liabilities. At its very essence, the PBGC's sole issue in reviewing the ABA Plan was its own possible "liability" for guaranteeing IBC's liabilities—similar to the concerns the PBGC had prior to 1979.

In fact, in its own prior determination on this exact issue, the PBGC opined that the establishment of separate accounts was not sufficient, on its own, to create an aggregate of single-employer plans. *See* PBGC Op. Letter No. 85-2 n. 4 ("in view of the express intent of the plan document, we conclude that the funding method employed is not determinative of [a plan's] structure. We interpret certain . . . statements in the actuarial reports and correspondence in this case to the effect that the plan was being treated as a single plan as relating to the actuarial approach used in determining the basis for an employer's contributions and not to whether the actual contributions made by an employer could be used to pay benefits of employees of another employer.").

In sum, prior to the 1979 Determination, the PBGC was on notice that the ABA Plan would not be able to create separate accounts and conduct separate annual valuations for each participating employer in the ABA Plan and the PBGC determined that the ABA Plan qualified as an aggregate of single-employer pension plans anyway. It is completely disingenuous for the PBGC now to base its reversal of the 1979 Determination on the fact that the ABA Plan did not segregate accounts and the "fact" that the corporation is now "older and wiser." Rather, the

PBGC has stacked the deck against Sara Lee, the ABA Plan and other participating employers adversely affected by the 2006 Determination in a singular effort to deny these parties the right to discover all of the facts relevant to the issues presented by the 2006 Determination. Rather than rubber stamp the PBGC's self-serving decision, this Court should find that the PBGC suffered from a direct conflict of interest in issuing the 2006 Determination, based on IBC's severe unfunded contributions and benefit liabilities and the PBGC's ultimate statutory duty to guarantee IBC's liabilities on termination. Thus, the Court should deny the PBGC's summary judgment motion and permit the parties to engage in discovery to allow all relevant issues and facts to be properly evidenced for this Court to determine the ABA Plan's status.

### 5.    *The PBGC Has Declared That Its Determination in this Matter is Retroactive, Yet Does Not Require That Any Prior Terminations Be Reopened and Treated Consistent With This Reversal of Position*

Notably, the PBGC in the 2006 Determination concluded that the ABA Plan "is, and indeed always has been, a multiple-employer plan." *See* AR 1563. However, nowhere in the 2006 Determination did the PBGC address how this conclusion will affect the ABA Plan's prior administration as an aggregate of single-employer plans or whether the PBGC intended to revisit each and every participating employer termination that has occurred since 1979 (or even 1961), which were treated by the ABA Plan and the PBGC as standard, single-employer plan terminations and not multiple-employer withdrawals.

It must be noted that prior to 1979, the ABA Plan stated to the PBGC that if the ABA Plan would be considered a multiple-employer plan, the ABA Plan would cease to exist because participating employers would not want to potentially fund the benefit liabilities of their direct competitors. *See* AR 0180. Interestingly, the two parties that will benefit the most by the 2006 Determination are IBC—the party initiating the review of the 1979 Determination, and the PBGC itself.

If the ABA Plan is a multiple-employer plan, IBC will succeed in shifting a portion of its separate unfunded benefit liabilities to the ABA Plan as a whole or to other participating employers—its direct competitors, like Sara Lee. In that instance, the amount of IBC's unfunded

benefit liabilities—at least $60 million, but probably more—will pass on to the participating employers in the ABA Plan that presently have positive account balances.  IBC's liabilities will amount to a forfeiture of assets contributed by these participating employers with positive account balances, and will defeat their intention to pay only the benefits for their own employee-participants and not for those of their competitors.  Put another way, these participating employers, like Sara Lee, that have properly paid their contributions to the ABA Plan and have not dumped unfunded benefit liabilities into the Plan will not get the benefit of the bargain they made when executing their Participation Agreements—that their contributions to the ABA Plan would only be used to pay the benefits of *their own* employee-participants.  In addition, IBC will receive a windfall because it will not be required to live up to its contractual obligation to gross-up the ABA Plan for the amount of its own unfunded benefit liabilities—which is due to its own negligence or fault—as all prior terminating employers have been required to do under the ABA Plans' unambiguous terms.  Notably, this is exactly the concern the ABA Plan had in 1975 when it approached the PBGC when Sanitary Baking Company was terminating under the Plan.  Fast forward to 2006—the only change is that the PBGC faces a significant financial obligation to guarantee IBC's unfunded benefit liabilities when IBC's single-employer plan terminates when the 1979 Determination is left undisturbed.

   To the extent the remaining participating employers are not in bankruptcy, each will be liable for a share of IBC's unfunded benefit liabilities proportionate to their participation in the ABA Plan.  In that instance, as the largest remaining employer, Sara Lee will effectually become the "guarantor" of all unfunded benefit liabilities for IBC's employee-participants—a role it or its predecessors never considered possible when they agreed to participate in the ABA Plan because Sara Lee and IBC are direct competitors in the baking industry.  Put another way, by reversing the 1979 Determination (and trampling on its own precedent in the process), the PBGC has "transferred" its statutory obligation as the guarantor of unfunded benefit liabilities to Sara Lee and others, not withstanding the ABA Plan's express terms and the intent of the parties.

In addition, if the 2006 Determination is upheld, long-settled employer plan terminations would have to be re-opened, reverted assets would have to be recovered, public financial statements would have to be restated, tax liabilities would have to be recomputed and tax documents refiled. *See* AR 0887. In addition, for any termination that occurred through distress or involuntary terminations, the question exists whether the PBGC would be obligated to return monies that would otherwise have been received by the creditors of those employers if the employer would only have had to withdraw from the multiple-employer plan rather than terminate a single-employer plan. Further, because numerous employees received benefit distributions that were permissible only because their plan terminated, and there would have been no plan termination if the ABA Plan were a multiple-employer plan per the 2006 Determination, distributions to individual employee-participants of former employers may have to be reconsidered as "in-service" distributions that would impact the deferred tax status of the participants' accounts, adversely impacting retirees that rely on these payments for their livelihoods. In addition, such technical violations may require the IRS to disqualify the ABA Plan retroactively back to 1979—which would yield unthinkable tax consequences for participants, former employers and their creditors alike. In sum, legal and financial chaos for both the participating employers (other than IBC) and remaining participants will ensue.

Notably, the PBGC has failed to address any of these issues created by its reversal of the 1979 Determination because it was solely concerned with achieving its own cost savings by issuing the 2006 Determination and failed to consider how such a retroactive application of its decision will result in an administrative morass. Therefore, should the PBGC's determination be upheld, it would be financially and administratively prudent for the Court to limit such a finding to the ABA Plan's administration prospectively with respect to new liabilities, so that participating employers, like Sara Lee, are not required to fund the benefit liabilities of its financially bankrupt competitors—which was the intent of the ABA Plan from its inception.

## CONCLUSION

For the foregoing reasons, Plaintiff-Respondent Sara Lee Corporation respectfully requests that the Court deny the PBGC's motion for summary judgment and permit the parties to conduct discovery on the 2006 Determination.  Should the Court determine that the PBGC's 2006 Determination is incorrect as a matter of law, Sara Lee Corporations requests that the Court *sua sponte* enter judgment as a matter of law on Count I of its Second Amended Complaint in its favor and against the PBGC, and seeks such additional relief as the Court deems appropriate.

Dated:  May 24, 2007

Respectfully Submitted,

SARA LEE CORPORATION

By:    /s/ Michael T. Graham
      One of Its Attorneys

M. Miller Baker (DC Bar No. 444736)
Sarah E. Hancur (DC Bar No. 480537)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005-3096
Phone: 202.756.8000
Fax:        202.756.8087
Email: mbaker@mwe.com
      shancur@mwe.com

Michael T. Graham
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois  60606
Phone: 312.372.2000
Fax:        312.984.7700
Email: mgraham@mwe.com

Attorneys for Plaintiff-Respondent Sara Lee Corporation