IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARA LEE CORPORATION, on its own behalf and on behalf of its employee-participants in the American Bakers Association Retirement Plan, <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan; and PENSION BENEFIT GUARANTY CORPORATION, <br><br> Defendants. | Case No. 06-CV-0819-HHK <br><br> Judge Henry H. Kennedy, Jr. <br><br> Magistrate Judge John M. Facciola |
| AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan, <br><br> Third Party Plaintiffs, Counterclaimants, and Cross-Claimants, <br><br> v. <br><br> SARA LEE CORPORATION, <br><br> Respondent, <br><br> PENSION BENEFIT GUARANTY CORPORATION, <br><br> Cross-Defendant, and <br><br> KETTERING BAKING COMPANY, INTERSTATE BRANDS CORPORATION, LEWIS BROS. BAKERIES, INC., HARRIS BAKING COMPANY, INC., AMERICAN BAKERS ASSOCIATION, and JENNY LEE BAKERY, INC., <br><br> Third Party Defendants. | **PLAINTIFF SARA LEE CORPORATION'S STATEMENT OF GENUINE ISSUES OF MATERIAL FACT IN DISPUTE IN SUPPORT OF ITS OPPOSITION TO THE PBGC'S MOTION FOR SUMMARY JUDGMENT** |

Plaintiff and Respondent Sara Lee Corporation ("Sara Lee"), by its attorneys and pursuant to Rule 7(h) of the Local Rules of the United States District Court for the District of Columbia, submits its statement of genuine issues of material fact in support of its opposition to the motion for summary judgment of the Pension Benefit Guaranty Corporation ("PBGC" or the "Corporation"), and in support states:

1.   The Pension Benefit Guaranty Corporation ("PBGC") is a wholly-owned United States government corporation established under 29 U.S.C. § 1302(a) to administer and enforce the defined benefit pension plan termination insurance program created under Title IV of the Employee Retirement Income Security Act of 1974, *as amended*, ("ERISA"). 29 U.S.C. §§ 1301-1461 (2000 & Supp. III 2003).

RESPONSE: Not disputed.

2.   A defined benefit pension plan that has more than one participating employer and is not maintained pursuant to a collective-bargaining agreement constitutes either a "multiple-employer plan" or an "aggregate of single-employer plans." *See* 29 U.S.C. § 1301(a)(15); 29 C.F.R. § 4001.2.

RESPONSE: Not disputed.

### The ABA Plan

3.   The American Bakers Association Retirement Plan (the "ABA Plan" or the "Plan") was established effective October 1, 1961, and has been amended from time to time. Second Amended Complaint at ¶ 10; Third-Party Complaint for Declaratory and Injunctive Relief, Counterclaim and Cross-Claim ("Third-Party Complaint") at ¶ 22.

RESPONSE: Not disputed.

4.   The ABA Plan is a defined benefit pension plan covered by Title IV of ERISA. *See* 29 U.S.C. § 1321.

RESPONSE: Not disputed.

5.   The Board of Trustees of the ABA Plan ("Trustees") is the Named Fiduciary with respect to the ABA Plan. Second Amended Complaint at ¶ 8; Cross-claim at ¶ 10.

<u>RESPONSE</u>: Not disputed.

    6.    Sara Lee Corporation ("Sara Lee"), Interstate Bakeries Corporation ("IBC"), Harris Baking Company, Kettering Baking Company ("Kettering"), Lewis Brothers Baking Company, the American Bakers Association, and Jenny Lee Bakery, Inc. are contributing sponsors of, and participating employers in, the ABA Plan. Third-Party Complaint at ¶¶ 12-18; Answers of Sara Lee, IBC, Harris Baking and ABA at ¶¶ 12-18.

<u>RESPONSE</u>: Not disputed.

    7.    The assets of the ABA Plan are held in trust in a single custodial account and are not segregated by employer. Employers' contributions are paid into, and all benefits and administrative expenses are paid from, one consolidated account. Administrative Record ("AR") 869 (ABA Plan Submission at 7); AR 487 (IBC Exhibit 1, 2001 ABA Summary Plan Description ("SPD")) ("there is no separate account maintained for each Employer's contributions and no separate annual valuation for each Employer's contributions").

<u>RESPONSE</u>: Not disputed insofar as the statement implies that the contributions of participating employers, once received by the ABA Plan, are held in trust in a single custodial account under the ABA Plan for purposes of investment and the payment of plan expenses. This statement is disputed insofar that it implies that no genuine issue of material fact exists regarding whether the ABA Plan assets are restricted and cannot be used to pay benefits for a terminating employer. The ABA Plan submission that PBGC relies on in making this statement indicates that participating employers make contributions to the ABA Plan for their respective employees only, that the contributions of an individual participating employer will be used to pay benefits earned under the ABA Plan by the employer's own employees, that the ABA Plan records are maintained on an employer-by-employer basis, and that the ABA Plan's governing document unambiguously states that the ABA Plan was established and is maintained as an aggregate of single-employer plans. AR 868-871 (ABA Plan Submission at 6-9).

## PBGC's Initial Review of the ABA Plan

8. On June 21, 1979, after the ABA asked PBGC to determine the Plan's status, PBGC issued a determination (the "1979 Letter") that the Plan was an aggregate of single-employer pension plans. AR 216 (1979 Letter).

RESPONSE: Not disputed.

9. No affected party sought reconsideration or judicial review of the 1979 Letter, and no court has reviewed it.

RESPONSE: Not disputed insofar as the statement implies that no affected party sought reconsideration or judicial review of the 1979 Letter until IBC's requested review in 2005, and that, prior to this action, no court has reviewed the 1979 Letter.

10. On a number of occasions after the 1979 Letter was issued, the Trustees increased benefits under the Plan as a whole in order to preserve the tax-deductibility of contributions. AR 1136 (ABA Plan Exhibit 12 at 21, 2004 Actuarial Valuation); AR 762 (IBC Exhibit 21) (2003 Actuarial Valuation).

RESPONSE: Disputed inasmuch as the portion of the administrative record cited by the PBGC to support its statement is nothing more than general boiler plate language that is not tailored to the ABA Plan or meant to document the manner with which contributions were made to the ABA Plan.

11. On June 2, 1992, the Trustees, via counsel, refused a request by Kettering to be excluded from a benefit increase, stating that the ABA Plan was "designed and intended to function as a single unit." and "[t]o the extent the experience of each employer were separately determined, the Plan would effectively be 'deconstituted' into a group of single-employer plans." AR 1557 (Letter from Anne Fraser to Robert Struble (June 2, 1992)).

RESPONSE: This statement is disputed inasmuch as it takes out of context the message being communicated by the ABA Plan's legal counsel and is misleading insofar as it ignores the fact that, throughout the June 2, 1999 letter, counsel notes that a participating employer's funding liability is determined per employer at termination from participation under the ABA Plan; that the PBGC approved the concept of a "surcharge" regime rather than individual annual valuations

for each participating employer; and that the ABA Plan was "designed and intended to function as a single unit" so as to enjoy the "benefits of aggregated investment of contributions, favorable tax qualification, and centralized management" – a design approved by the PBGC and benefits that are central to the concept of an "aggregate of single-employer plans" (*i.e.*, the reason for implementing an aggregate of single-employer plans design is to lower the cost to employers in providing retirement benefits to their employees by way of centralized administration and asset investment rather than having each employer incur administrative and investment costs, while at the same time providing that each employer ultimately is responsible for funding its employees' benefits). *See* AR 1555-1558.

> 12. The ABA Plan actuary stated in November 2003 that Plan accountants "never kept asset records by employer," and "never kept liability records by employer." AR 733 (IBC Submission at Exhibit 19) (Letter of ABA Plan actuary Robert Krinsky to John P. Hendrickson (Nov. 3, 2003)).

**RESPONSE**: This statement is disputed insofar as it implies that the ABA Plan was administered such that employer contributions were used to fund the benefits of employee-participants other than those its own employee-participants. To the contrary, the exhibit on which the PBGC relies in making this statement clearly and unambiguously states that both the IRS and the PBGC approved the ABA Plan design as an aggregate of single-employer plans after meetings with the trustees of the ABA Plan to discuss the same. *See* AR 733-734. Moreover, the exhibit that the PBGC cites clearly and unambiguously states that the "concern about using one employer's money to fund another's benefits was ameliorated by the fact that a reconstructed valuation was done whenever an employer terminated…" *Id.* at 734. *See also* AR 1555-1558.

> 13. According to the ABA Plan actuary, throughout the Plan's history, the actuary would, on occasion, calculate the liabilities attributable to a particular participating employer and estimate the assets allocable to that employer; but the actuary performed these duties only when specifically requested. AR 491 (IBC Submission at Exhibit 2) (Letter of ABA Plan actuary to Trustees (Nov. 4, 2004)),

**RESPONSE**: This statement is disputed inasmuch as the PBGC completely mischaracterizes the contents of the letter upon which its relies in making this statement. In fact, the ABA Plan actuary acknowledges in the letter that valuations regarding the funding liabilities of an individual participating employer were determined upon the termination of that employer from participation under the ABA Plan. *See* AR 491; *see also* AR 733-734, 555-1558. Moreover, in describing the procedural aspects of terminating the ABA Plan, the actuary indicated that each individual participating employer's funding liability would need to be determined and, further, that each individual participating employer would need to approach the PBGC regarding the termination and its associated liabilities – a practice that is consistent with the termination of a single-employer plan. *Id.* at 492. In fact, the PBGC treated each of the terminations under the ABA Plan by the following participating employers as standard, single-employer plan terminations:

| **Employer** | **Proposed Month of Termination** |
|---|---|
| Lloyd J. Harris Pie Company | December 1977 |
| Flowers Industries, Inc. | December 1977 |
| Beaver Valley Industries, Inc. | July 1982 |
| Chef's Supply, Inc. | July 1982 |
| Fasano Pie Company | March 1983 |
| Boge's Bread (Division of U.S. Bakery) | August 1987 |
| Holsum Baking Company | September 1987 |
| Oven Fresh/April Hill (Grocer's Baking Company) | September 1988 |
| Community Shops, Inc. | August 2000 |

*See* Graham Aff., Ex. E-K.

14. The actuary did not routinely perform separate actuarial valuations of the Plan's assets and liabilities attributable to a particular employer, but instead performed such valuations only when an employer terminated participation in the ABA Plan. AR 1571 (2006 Letter at 9); *see also* AR 487 (SPD at 34).

**RESPONSE**: This statement of fact is in conflict with the PBGC's statement of fact 13 and as such a material issue of fact is present by the PBGC's own admission. In any event, this

statement is disputed to the extent it implies that actuarial valuations of the ABA Plan's assets and liabilities attributable to a particular employer were "only" performed when an employer terminated participation in the ABA Plan inasmuch as such valuations were also performed at the request of participating employers as well as the trustees when determining the individual employer's liabilities for planning purposes, at that employer's own costs. *See* AR 1011-1013.

> 15. When an employer has terminated participation in the ABA Plan, the Trustees have not consistently required additional contributions when allocable assets were insufficient to pay benefits; in several cases the plan ascribed to such an employer was terminated by agreement and PBGC was appointed as statutory trustee. AR 1571 (2006 Letter at 9).

**RESPONSE**: Not disputed.

> 16. Several participating employers in the ABA Plan have ceased participation and abandoned their assets and liabilities to the ABA Plan. AR 880 (ABA Plan Submission at 18); 1578 (2006 Letter at 16).

**RESPONSE**: Not disputed.

> 17. Throughout the ABA Plan's history, the Plan's representatives consistently represented it to be a multiple-employer plan, regularly checking the box so indicating on the annual Form 5500 filed with the Department of Labor and the Internal Revenue Service. AR 1092 (ABA Plan Submission at Exhibit 11) (2003 Form 5500).

**RESPONSE**: This statement is disputed insofar that it implies that the ABA Plan's representatives consistently represented the Plan to be a multiple-employer plan for plan termination purposes, or that such representatives did so by "regularly checking the box so indicating on the annual Form 5500." The PBGC has in its possession the Form 5500-C of the American Bakers Association for the 1980 plan year and the Form 5500-C/R for Gulf Coast Distributors, Inc.—a former Participating Employer in the ABA Plan. *See* Graham Aff., Ex. L. Each of these Form 5500s contains a footnote explaining that the ABA Plan is an aggregate of single-employer plans for purposes of plan terminations. *Id.* Each of the Form 5500s was

excluded from the administrative record filed by the PBGC. The PBGC did include in the administrative record a Form 5500 for Plan Year 1983, which was submitted by the ABA Plan with its position statement. *See* AR 01085-1089. In addition to checking the "Multiple-employer plan (other)" box on the first page of the 1983 Form 5500, the Participating Employers footnoted the box, and at the bottom of the first page included the following statement: "Individual employer contributions are available to pay benefits to all Participants except on termination of each employer's contributions pay benefits [to] only that employer's employees" – the same footnoted statement included in the Form 5500s discussed above. *Id.*

> 18.  From time to time, the ABA Plan has attributed negative "account balances" to certain participating employers when the assets of other employers were used to issue benefit checks to their employee-participants. AR 1577 (2006 Letter at 15); AR 1303 (Sara Lee Submission at 4) (negative account balances may be attributable to "isolated loans").

**RESPONSE**: Not disputed.

> 19.  Throughout the ABA Plan's history, all assets of the ABA Plan have been available to pay benefits to all plan participants and beneficiaries.

**RESPONSE**: This statement is disputed insofar that it implies that the ABA Plan was administered such that employer contributions were used to fund benefits of individuals other than its own employees. To the contrary, both the IRS and the PBGC approved the ABA Plan design as an aggregate of single-employer plans after meetings with the trustees of the ABA Plan to discuss the same. *See* AR 733-734. Moreover, the "concern about using one employer's money to fund another's benefits was ameliorated by the fact that a reconstructed valuation was done whenever an employer terminated ...." *Id.* at 734. *See also* AR 1555-1558.

### Recent Events

> 20.  On September 22, 2004, IBC and a number of its affiliates filed petitions for protection under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101 *et seq.*, in the United States Bankruptcy Court for the Western District of Missouri.

**RESPONSE**: Not disputed.

21.     On November 4, 2004, the ABA Plan actuary stated that the Plan "has always operated as one Plan," and advised the Trustees that an additional $30 million in contributions would be required in order to meet the minimum funding requirement with respect to the Plan pursuant to ERISA and the Internal Revenue Code. AR 491 (IBC Submission at Exhibit 2) (Letter of ABA Plan actuary to Trustees (Nov. 4, 2004)).

**RESPONSE**: This statement is disputed inasmuch as the PBGC completely mischaracterizes the contents of the letter upon which its relies in making this statement. In fact, the ABA Plan actuary acknowledges in the letter that valuations regarding the funding liabilities of an individual participating employer were determined upon the termination of that employer from participation under the ABA Plan. *See* AR 491; *see also* AR 733-734, 555-1558. Moreover, in describing the procedural aspects of terminating the ABA Plan, the actuary indicated that each individual participating employer's funding liability would need to be determined and, further, that each individual participating employer would need to approach the PBGC regarding the termination and its associated liabilities – a practice that is consistent with the termination of a single-employer plan. *Id.* at 492. In fact, the PBGC treated each of the terminations under the ABA Plan by the following participating employers as standard, single-employer plan terminations:

| Employer | Proposed Month of Termination |
| --- | --- |
| Lloyd J. Harris Pie Company | December 1977 |
| Flowers Industries, Inc. | December 1977 |
| Beaver Valley Industries, Inc. | July 1982 |
| Chef's Supply, Inc. | July 1982 |
| Fasano Pie Company | March 1983 |
| Boge's Bread (Division of U.S. Bakery) | August 1987 |
| Holsum Baking Company | September 1987 |
| Oven Fresh/April Hill (Grocer's Baking Company) | September 1988 |
| Community Shops, Inc. | August 2000 |

*See* Graham Aff., Ex. E-K.

    22.    On November 2, 2005, PBGC advised the Trustees, Sara Lee, IBC, and other interested parties, that the agency was revisiting the determination embodied in the 1979 Letter. AR 427 (PBGC letter (Nov. 2, 2005)). Each party was invited to submit any written statement or documents that it wanted PBGC to consider in its decision-making process. *Id.* At the request of counsel for the ABA Plan and the Trustees, PBGC extended the submission deadline from November 18, 2005 to December 2, 2005. AR 1443.

**RESPONSE**: This statement is disputed insofar that it implies that no genuine issue of material fact exists regarding whether the PBGC provided notice to all interested parties and whether the notice actually provided was otherwise adequate. *See* AR 427. For example, at least three participating employers under the ABA Plan were not included in the PBGC's notice. *Id.* Moreover, the PBGC conducted its inquiry under a cloak of ambiguity and uncertainty prompting the ABA Plan to notify the PBGC that the Plan was uncertain as to the scope and procedure of the PBGC's inquiry and, therefore, was not entirely certain as to what information it should provide the PBGC. *See* AR 0887.

    23.    On December 2, 2005, PBGC received written submissions, in response to its invitation, from the Trustees (on their own behalf and on behalf of the ABA Plan), IBC, Sara Lee, and Kettering. AR 429 - 1439.

**RESPONSE**: This statement is disputed insofar that it implies that no genuine issue of material fact exists regarding whether the PBGC provided adequate notice as to the scope and procedure of the PBGC's inquiry and, therefore, provided the parties who actually received such notice the opportunity to fully respond. In fact the PBGC failed to allow the parties to supplement their responses or to appeal the PBGC's 2006 Determination. *See* AR 1579.

    24.    On May 3, 2006, Sara Lee brought this civil action against the Plan and the Trustees. Complaint for Declaratory and Injunctive Relief.

**RESPONSE**: Not disputed.

25.   On August 8, 2006, after reviewing the submissions of the parties, PBGC issued a new letter revoking the 1979 Letter and setting forth PBGC's determination, made immediately effective, that the Plan was, and always has been, a multiple-employer plan.  AR 1563.

**RESPONSE**: This statement is disputed insofar that it implies that no genuine issue of material fact exists regarding the propriety of the PBGC's review of the status of the ABA Plan as well as whether the PBGC's action in conducting such a review was consistent with ERISA or the Administrative Procedures Act.


Dated:  May 24, 2007                            Respectfully Submitted,


                                                SARA LEE CORPORATION

                                        By:     /s/ Michael T. Graham
                                                One of Its Attorneys

M. Miller Baker (DC Bar No. 444736)
Sarah E. Hancur (DC Bar No. 480537)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005-3096
Phone: 202.756.8000
Fax:          202.756.8087
Email: mbaker@mwe.com
       shancur@mwe.com

Michael T. Graham
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois  60606
Phone: 312.372.2000
Fax:          312.984.7700
Email: mgraham@mwe.com

Attorneys for Plaintiff-Respondent
Sara Lee Corporation