# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SARA LEE CORPORATION, on its own behalf
and on behalf of its employee-participants in the
American Bakers Association Retirement Plan,

        Plaintiff,

v.

AMERICAN BAKERS ASSOCIATION
RETIREMENT PLAN; and BOARD OF
TRUSTEES  OF THE AMERICAN BAKERS
ASSOCIATION RETIREMENT PLAN, as
Administrator of the American Bakers Association
Retirement Plan; and
PENSION BENEFIT GUARANTY CORPORATION,

        Defendants.

Case No. 06-CV-0819-HHK

Judge Henry H. Kennedy, Jr.

Magistrate Judge John M. Facciola

AMERICAN BAKERS ASSOCIATION
RETIREMENT PLAN; and BOARD OF TRUSTEES
OF THE AMERICAN BAKERS ASSOCIATION
RETIREMENT PLAN, as Administrator of the
American Bakers Association Retirement Plan,

        Third Party Plaintiffs,
            Counterclaimants, and
            Cross-Claimants,

v.

SARA LEE CORPORATION,

        Respondent,

PENSION BENEFIT GUARANTY CORPORATION,

        Cross-Defendant, and

KETTERING BAKING COMPANY,
INTERSTATE BRANDS CORPORATION,
LEWIS BROS. BAKERIES, INC., HARRIS BAKING
COMPANY, INC., AMERICAN BAKERS
ASSOCIATION, and JENNY LEE BAKERY, INC.,

        Third Party Defendants.

**PLAINTIFF SARA LEE
CORPORATION'S
RESPONSE IN
OPPOSITION TO THE
PBGC'S MOTION FOR
PROTECTIVE ORDER**

Plaintiff and Respondent Sara Lee Corporation ("Sara Lee"), by its attorneys and pursuant to Rule 7 of the Local Rules of the United States District Court for the District of Columbia, submits its response in opposition to the motion for protective order of the Pension Benefit Guaranty Corporation ("PBGC"), and in support states:

## INTRODUCTION

On April 26, 2007, Sara Lee served its First Set of Requests for Production of Documents (the "Document Requests") on the PBGC, seeking documents in the PBGC's possession related to the administration of the American Bakers Association Retirement Plan (the "ABA Plan") and the PBGC's determination issued on August 8, 2007, related to the structure and nature of the ABA Plan ("2006 Determination"). In the 2006 Determination, the PBGC reversed 27 years of plan administration by deciding that the ABA Plan is and has always been a multiple-employer pension plan and not an aggregate of single-employer pension plans. The PBGC seeks a protective order related to the Document Requests, arguing that Sara Lee's challenge to the 2006 Determination in Count I of its Second Amended Complaint should be reviewed under a deferential standard based on the Administrative Procedure Act ("APA") and that the Court will be limited to the administrative record filed by the PBGC in reviewing the Determination. While the PBGC contends that the Court's review of the 2006 Determination involves the routine review of an administrative determination made by a disinterested agency, nothing could be further from the truth.

There are multiple reasons why the Court should permit Sara Lee and other interested parties to engage in discovery in this case. First, contrary to the PBGC's arguments, ERISA, not the APA, governs the standard of review in this case. Because Sara Lee seeks equitable relief through its claim under ERISA Section 4003(f), 29 U.S.C. § 1303(f), the APA dictates that this case is to be decided under ERISA with the Court applying a *de novo*, not an arbitrary and capricious standard of review. In fact, by providing for judicial review as well as an adequate remedy, ERISA Section 4003(f)'s express terms remove this case from the purview of the APA. *See PBGC v. United Airlines, Inc.*, 436 F.Supp.2d 909, 918-19 (N.D. Ill. 2006). Second, the

PBGC's flip-flopping of its determination from 1975 and 1979—when it determined the ABA

Plan was an aggregate of single-employer plans under the same facts—to 2006, when it now

finds that the ABA Plan "is, and indeed always has been" a multiple-employer plan, should not

be given deference due to the Corporation's unsupported shifting of position.

Third, even if the Court applies a standard of review other than *de novo*, Sara Lee should

be permitted to engage in discovery related to the 2006 Determination because the PBGC's

actions in reviewing and deciding the 2006 Determination easily meet the bad faith standard, and

the PBGC's administrative record is seriously flawed. While the PBGC would like this Court to

believe its 2006 Determination is a routine administrative ruling, the PBGC's motion fails to

inform the Court that it has a significant financial stake in the case. In fact, the PBGC may be

the *most* interested party in the case, since by reversing its prior determination in 1979 that the

ABA Plan qualifies as an aggregation of single-employer plans ("1979 Determination"), the

PBGC will save itself potentially $60 million or more in benefit guarantees required by ERISA.

Examples of the PBGC's misconduct in its administrative review process are abundant.

For example, the PBGC proclaims that it provided all affected parties with adequate notice and

an opportunity to be heard. However, this position is not supported in reality as the PBGC

directly notified only a few of the Participating Employers. *See* AR 427.[1] Moreover, the PBGC

conducted its inquiry under a cloak of ambiguity and uncertainty. Indeed, as discussed in detail

below, the ABA Plan notified the PBGC that the Plan was uncertain as to the scope and

procedure of the PBGC's inquiry and, therefore, was not entirely certain as to what information

it should provide the PBGC. *See* AR 0887. Rather than clarify the scope of inquiry and allow the

few affected parties who actually received notice of the inquiry to supplement their initial

responses, the PBGC chose to close the administrative review procedure altogether, without

allowing Sara Lee or any other party the opportunity to rebut the "findings" made in the 2006

Determination or supplement its administrative record with evidence undercutting the PBGC's

---

[1] References to "AR [no.]" are to the PBGC's administrative record filed with the Court on April 4, 2007.

decision. *See* AR 1579. Finally, the PBGC's heavy-handed action also took away the opportunity for the affected parties, including Sara Lee, to seek an administrative appeal of the 2006 Determination. Instead, the PBGC employed a little used Federal regulation that enabled it to end the review with only its *ex parte* decision and require all aggrieved parties to file suit in this Court to rebut or challenge the 2006 Determination. *Id.*

Having successfully prevented the aggrieved parties from having an "opportunity to be heard," the PBGC next established an "administrative record" that clearly mutes Sara Lee's and the other affected parties' position by failing to include documentation clearly supportive of their position. On August 18, 2007—after the 2006 Determination, Sara Lee, through counsel, made a Freedom of Information Act request (the "FOIA Request") to the PBGC, seeking documents related to the ABA Plan generally and the 2006 Determination specifically. Through three separate document productions over an eight-month period, the PBGC produced to Sara Lee over 3,000 pages of documents related to the ABA Plan and the 2006 Determination. While the approximate 1,500-page administrative record filed by the PBGC appears to be included in the production, there also are several hundred pages of documents that were produced *by the PBGC from its own files* that relate directly to the ABA Plan's administration and whether the ABA Plan qualifies as an aggregate of single-employer plans.

For example, as is discussed in detail below, the PBGC failed to include in the administrative record documentation establishing that the PBGC itself treated numerous employer terminations under the ABA Plan as standard, single-employer plan terminations throughout a period beginning in 1977 and running into 2000. Additionally, as is also discussed in further detail below, the PBGC failed to include in the administrative record Form 5500 annual reports that the PBGC had at all relevant times in its possession clearly establishing that the ABA Plan reported itself as being an aggregate of single-employer plans. Moreover, documentation evidencing the PBGC's own audit of a single-employer plan termination under the ABA Plan in 1998 was omitted from the administrative record—which documents should have allowed the PBGC the opportunity to view how the ABA Plan was operated as an aggregate

of single-employer plans.  These are but three examples of the manner with which the PBGC has attempted to "stack the deck" in its favor to support its predetermined reversal of the 1979 Determination regarding the status of the ABA Plan.  If the parties are permitted to take discovery in this case, it is likely that other examples of the PBGC's misconduct will be discovered behind the PBGC's "curtain" of the filed "administrative record."

When the PBGC's vague and non-inclusive administrative process is coupled with the PBGC's failure to include documents supportive of Sara Lee's position *that are within PBGC's own files* in its administrative record, the PBGC's actions so far in this case raise serious concerns regarding its "good faith" review process and whether the administrative record is, in fact, complete and accurate.  Based on the fact that (i) the parties were not given information about what the administrative process would entail, (ii) the parties were unable to rebut the positions taken by other parties and (iii) the PBGC itself has produced documents relevant to the 2006 Determination that were not included in its administrative record, the interests of judicial fairness demand that Sara Lee and the other aggrieved parties be granted the ability to discover all relevant information related to the 2006 Determination.  The PBGC's motion for protective order should be denied.

## SUMMARY OF THE ADMINISTRATIVE REVIEW PROCESS

The ABA Plan was originally adopted in 1961, before ERISA was enacted.  AR0865. The ABA Plan was then made up of approximately 90 different employers, whose primary intent in creating the Plan was to minimize administrative costs for small baking companies that would otherwise have been unable to offer a defined benefit pension plan, while ensuring that each employer's contributions to the Plan would be used only to pay the benefit liabilities for their own employee-participants.  AR0170-172.  This arrangement was necessary because the employers participating in the ABA Plan were competitors in the baking industry—and, none of them wanted to pay benefit liabilities for their competitors' employee-participants.  AR0175.

After ERISA was enacted in 1974, the PBGC was faced with the issue of fitting this type of benefit arrangement under ERISA's reticulated provisions.  In 1975, after reviewing the ABA

Plan's structure and administration, the PBGC determined that the ABA Plan qualified as an aggregate of single-employer pension plans. AR0001-0022. In 1978 and 1979, after further considering the ABA Plan's structure and administration—including the fact that the Plan was maintained through a single trust for all employers and that a single annual valuation was conducted for the Plan as a whole and not for each employer—the PBGC issued the 1979 Determination concluding that the Plan was an aggregate of single-employer plans. AR0158-0225.

The ABA Plan's structure as an aggregate of single-employer plans remained the same for the next 27 years. In fact, the 1979 Determination was incorporated into the ABA Plan's governing document so that there would be no confusion as to the Plan's status and structure going forward. AR 0898-0983. The ABA Plan continued to operate as an aggregate of single-employer plans without question until 2005, when Interstate Brands Corporation ("IBC")—one of the Plan's largest participating employers—began to question how the ABA Plan operated. Importantly, IBC's interest in the ABA Plan's structure coincided with its filing of a Chapter 11 bankruptcy in 2004. AR 0227. About this same time, Sara Lee was considering the transfer of some of its employee-participants in the ABA Plan to another pension plan sponsored solely by Sara Lee.[2] AR 0333-0336. Due to Sara Lee's request, the ABA Plan Trustees actuarially calculated each participating employer's interest in the ABA Plan. Effective October 1, 2004, the ABA Plan's actuary determined that Sara Lee's assets and liabilities to the Plan were significantly overfunded, and that IBC's assets and liabilities to the Plan were significantly underfunded—to the tune of approximately $60 million. AR 0661-0662.

On May 24, 2005, IBC began to send feelers to the PBGC to determine if the Corporation was interested in reviewing the ABA Plan's structure. AR 0276-0279. After several communications between IBC and the PBGC, on June 24, 2005, IBC formally requested the PBGC to revisit the issue of whether the ABA Plan was an aggregate of single-employer plans.

---

[2] Even after the transfer of certain of its employee-participants from the ABA Plan to the Sara Lee Plan, Sara Lee remains a participating employer under the ABA Plan (albeit with fewer covered employees).

IBC submitted to the PBGC that it was unaware of the amount of its underfunding, due in large part to the fact that the ABA Plan did not conduct annual valuations for each participating employer. AR 0339-0341. After considering IBC's request, in which it was acknowledged that IBC maintained significant unfunded benefit liabilities in its single-employer plan, the PBGC decided it was time to "revisit" the 1979 Determination—27 years after-the-fact. AR 0427-0428.

On November 1, 2005, the PBGC issued a very vague request that any party so desiring could submit a position statement as to the ABA Plan's structure and that the PBGC would "revisit" the issues. *Id.* Only four parties submitted position statements, and none were permitted by the vague structure of the review to rebut or comment on the positions taken by the various other parties. After taking over 8 months to consider the ABA Plan's structure, not surprisingly due to its need to assess its significant self-interest, the PBGC issued the 2006 Determination and found that the ABA Plan "is, and indeed always has been a multiple-employer plan." AR 1563-1579. Rather than allow the parties aggrieved by the 2006 Determination to seek an administrative appeal—which is how such a finding typically is challenged—the PBGC employed a little used Federal regulation—29 C.F.R. § 4003.22(b)— to cut-off administrative review and force any aggrieved party, including Sara Lee, to challenge the 2006 Determination in this Court. AR 1579.

This decision denied Sara Lee and other aggrieved parties the opportunity to rebut the PBGC's findings at the agency level and submit additional documentation and evidence supporting their positions. The PBGC now seeks to have this Court review its 2006 Determination based on a contrived administrative record, which does not include all of the documents that Sara Lee or other parties believe are supportive of their claims—including documents that the PBGC has at all relevant times had in its possession.

## ARGUMENT

In this motion, the PBGC requests this Court to block Sara Lee from engaging in discovery because it argues that a deferential standard of review should be applied, which limits the Court to reviewing only those documents considered by the PBGC in reaching the 2006

Determination. As discussed below, this Court should deny the PBGC's motion because Sara Lee's challenge to the 2006 Determination should be reviewed under a *de novo* standard of review. Even under a deferential standard of review, the Court should permit Sara Lee and other aggrieved parties to engage in discovery because the PBGC's administrative review process and its administrative record are flawed and the PBGC's has engaged in bad faith in reviewing the determination due to its substantial conflict of interest.

## I.    STANDARDS FOR MOTION FOR PROTECTIVE ORDER

The party moving for a protective order to limit or preclude discovery has the burden to establish good cause under Fed. R. Civ. P. 26(c) "by demonstrating the specific evidence of the harm that would result." *Doe v. The Dist. Of Columbia*, 230 F.R.D. 47, 50 (D.D.C. 2005) (quoting *Jennings v. Family Mgmt.*, 201 F.R.D. 272, 275 (D.D.C. 2001)). To do so, the movant must articulate specific facts to support the request and cannot rely on speculative or conclusory statements. *Id.* Courts apply a balancing test, weighing the movant's proffer of harm against the adversary's "significant interest" in preparing for trial. *Id.*

## II.    DISCOVERY SHOULD PROCEED BECAUSE THE COURT SHOULD REVIEW THE PBGC'S DETERMINATION UNDER A *DE NOVO* STANDARD

The PBGC submits that the 2006 Determination should be reviewed by this Court under the arbitrary and capricious standard as set forth in the APA. *See* PBGC Mot. at 4-5. Based on that standard of review, the PBGC then contends that discovery should not proceed in this case because this Court should look no further than the administrative record concocted by the PBGC in reviewing the propriety of the 2006 Determination. *Id.* The PBGC's argument is incorrect as a matter of law because it fails to recognize that the instant action was brought under ERISA and not the APA and, in any event, the PBGC's own misconduct and self-interest in fabricating the administrative record preclude the PBGC from raising the APA shield to deny Sara Lee and other aggrieved parties discovery in this case.

ERISA is a "comprehensive and reticulated statute, 'the product of a decade of congressional study of the Nations' private employee benefit system.'" *Mertens v. Hewitt*

*Associates*, 508 U.S. 248, 251 (1993). Courts have been reluctant to alter ERISA's enforcement scheme as the detailed nature of the scheme is strong evidence of Congressional intent. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 147 (1985). The APA provides in pertinent part that an "agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." *See* 5 U.S.C. § 704. Moreover, under the APA, a reviewing court may set aside an agency's determination upon a finding that the determination was either: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or (2) unwarranted by the facts to the extent that the facts are subject to trial *de novo* by the reviewing court. *See* 5 U.S.C. § 706. In determining whether a given set of facts are subject to trial *de novo*, the courts look to the agency's organic statute. *PBGC v. United Airlines, Inc.*, 436 F.Supp.2d 909, 918-19 (N.D. Ill. 2006). Here, ERISA is the PBGC's organic statute.

Under ERISA, Section 4003(f) provides the jurisdiction for reviewing an action by the PBGC. *See* 29 U.S.C. §1303(f). Sara Lee filed this case pursuant to ERISA § 4003(f), which provides in pertinent part that:

> any person who is a fiduciary, employer, contributing sponsor, member of a contributing sponsor's controlled group, participant, or beneficiary, and is adversely affected by any action of the [PBGC] with respect to a plan in which such person has an interest, or who is an employee organization representing such a participant or beneficiary so adversely affected for purposes of collective bargaining with respect to such plan, may bring an action against the corporation for appropriate equitable relief in the appropriate court.

29 U.S.C. § 1303(f)(1). This section of ERISA by its express terms is the exclusive means for challenging PBGC action under Title IV of ERISA. *See* ERISA § 4003(f)(4), 29 U.S.C. § 1303(f)(4). Moreover, the United States District Court for the District of Columbia is the "appropriate court" for purposes of Sara Lee's ERISA § 4003(f) challenge to the PBGC's abuses. *See* ERISA § 4003(f)(2)(C); 29 U.S.C. § 1303(f)(1)(2)(C). Indeed, as discussed below, the APA itself dictates that the instant case is to be decided under ERISA with the Court applying a *de novo* standard of review. In fact, by providing for judicial review as well as an

adequate remedy, ERISA Section 4003(f)'s express terms remove this type of action from the purview of the APA. *See e.g. United Airlines, Inc.*, 436 F.Supp.2d at 918-19.

In *United Airlines, Inc.*, the Northern District of Illinois recently reviewed a case that is analogous to this case, in that the PBGC made an *ex parte* determination as to the status of a plan. In *United Airlines, Inc.*, the PBGC decided that a pension plan was so underfunded that it needed to be involuntarily terminated. After making that determination, the PBGC filed suit in order for the court to declare its right to make the decision to terminate the plan involuntarily. In that case, the PBGC argued that its decision should be reviewed under the deferential arbitrary and capricious standard. However, the Northern District of Illinois looked to ERISA and ruled that ERISA mandates a *de novo* standard of review with respect to involuntary termination actions by the PBGC. 436 F.Supp.2d at 922.

In so ruling, the court noted that ERISA Section 4042 provides for judicial review of the Corporation's determination with respect to the involuntary termination of a pension plan under ERISA as well as an adequate remedy with respect to the same. *Id.* The court also noted that its review of whether a plan should be involuntarily terminated necessarily required the court to review issues beyond those required to be reviewed by the PBGC when making its determination. *Id.* at 919. Finally, the court found that the PBGC's interests do not necessarily align with their duties to plan participants and contributing employers. *Id.* at 921-22. After weighing these factors, the Northern District of Illinois concluded that deferential review of the PBGC's termination determination would be inconsistent with the court's role as a " substantial safeguard for the rights of parties other than PBGC" under ERISA. *Id.*; *see also Rettig v. PBGC*, 744 F.2d 133, 155 (D.C. Cir. 1984); *Ass'n. of Flight Attendants—CWA, AFL-CIO v. PBGC*, 2006 U.S. Dist. LEXIS 1318 (D.D.C. Jan. 13, 2006).

Like ERISA Section 4042, Section 4003(f) of ERISA affords aggrieved parties the right to seek redress against the PBGC in the federal courts. An aggrieved party may seek "appropriate equitable relief" under ERISA § 4003(f) to redress an inequity being suffered by the party at the hands of the PBGC through a decision or determination issued by the PBGC. It is

difficult to imagine how a reviewing court could provide "appropriate equitable relief" under Section 4003(f) if the court were shackled to the administrative record developed by the aggrieving party under an arbitrary and capricious standard of review. Indeed, the process of crafting "appropriate equitable relief" by its very nature compels a reviewing court to weigh all of the facts and circumstances of a particular case against equitable principles in fashioning the relief appropriate under the circumstances. *See, e.g., District of Columbia v. Pace*, 320 U.S. 698, 701-703 (1944). This is particularly true in this case where the inequity is the manner with which the PBGC derived its position, including the PBGC's "stacking of the deck" in developing an administrative record that excludes evidence favorable to Sara Lee and other similarly situated parties.

Like the court in *United Airlines, Inc.*, this Court is called upon to review an action taken by the PBGC to safeguard the interests of parties other than the PBGC. This is particularly important in this case because the PBGC (i) failed to provide adequate procedures for the collection of relevant information; (ii) failed to create a full and complete administrative record; (iii) failed to properly notify all parties with an interest in the Corporation's determination, namely, all Participating Employers in the ABA Plan;[3] (iv) failed to provide an administrative review procedure under which interested parties could appeal the Corporation's determination; and (v) failed to protect the interests of the Plan's participants in favor of protecting its own self-interest by reversing its 1979 Determination.

In fact, ERISA Section 4003(f) is much like ERISA Section 4042 in that 4003(f) provides both judicial review of an action by the PBGC as well as a remedy to an aggrieved party. Moreover, ERISA Section 4003(f) is the remedial provision under which an aggrieved party must seek redress against the Corporation with respect to a termination decision under ERISA Section 4042. Thus, it would be a bizarre result if a court were permitted to invoke the *de novo*

---

[3] Notably, in notifying certain parties that it intended to "revisit" the 1979 Determination on the ABA Plan's status, the PBGC failed to notify all participating employers of its intent to do so or of the opportunity to file position statements on the issue. *See* AR 0427-0428.

standard of review when reviewing a PBGC determination made under ERISA Section 4042, but not when reviewing that same determination in a challenge brought under ERISA Section 4003(f)—the remedial provision under which a party may challenge a 4042 determination. Such a result highlights the Supreme Court's position that Congressional intent is clear on the point that the remedial scheme under ERISA should not be altered in the absence of extraordinary circumstances. *Russell*, 473 U.S. at 147.

The PBGC suggests that because two courts in previous cases reviewing PBGC determinations similar to that which is currently before the Court applied the arbitrary and capricious standard of review, this court should apply such a standard. *See* PBGC Mot. at pp. 9, 10, citing *PBGC v. Artra Group, Inc.*, 1993 U.S. Dist. LEXIS 8440 (N.D. Ill. Jun. 23, 1993) and *PBGC v. Potash*, 1986 U.S. Dist. LEXIS 30987 (W.D.N.Y. 1986). However, it is unclear from the courts' opinions whether the parties in the cases cited by the PBGC challenged the courts' application of the arbitrary and capricious standard. Importantly, both the *Artra Group* and *Potash* decisions predate the decision in *United Airlines*. Moreover, in the *Artra Group* case, the PBGC afforded Artra Group an administrative appeal prior to bringing an enforcement action in the federal court—a right that the PBGC expressly denied Sara Lee and other Participating Employers and the ABA Plan in the instant case. *See* 1993 U.S. Dist. LEXIS 8440 at *2. Even so, the *Potash* court, in applying the arbitrary and capricious standard, specifically stated that "the narrow scope of review under the arbitrary and capricious standard does not shield the agency's decisions from an in-depth, searching and careful consideration by this Court or prevent reversal of such where there has been a clear error of judgment." *See Potash*, 1986 U.S. Dist. LEXIS 30987 at *7 (internal citations omitted). Therefore, even if the APA applies, as discussed in detail below, such a "clear error of judgment" is present in this case even if measured against an arbitrary and capricious standard—although a *de novo* review by this Court is appropriate under ERISA.

The PBGC's Determination should also be reviewed *de novo* because the PBGC's review of the ABA Plan's structure has not been consistent over time. As discussed above, in 1975 and

1979, after reviewing the ABA Plan's governing documents and administrative practices, the PBGC each time determined that the ABA Plan qualified as an aggregate of single-employer plans. Now, for the first time in 2006 and without any new evidence or any significant changes in the ABA Plan's administrative practices, the PBGC completely changed course and found that the ABA Plan was a multiple-employer plan. It is well established that courts should not defer to an agency's interpretation of a statute or regulation where the agency's interpretation has been inconsistent, that is, where it has flip-flopped. *Akzo Nobel Salt, Inc. v. Federal Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000); *Wise v. Ruffin*, 914 F.2d 570, 580 (4th Cir. 1990); *Advance Foundry Co. v. Kaufman*, 1996 U.S. Dist. LEXIS 22551, *18 (S.D. Ohio Mar. 25, 1996); *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1296 (D.C. Cir. 1995). Given PBGC's inconsistency, as well as its clear financial stake in its recent change of position, the Court should review the 2006 Determination *de novo*, without any deference to the PBGC's new position.

The APA was not meant to act as a shield to protect ill-advised misadventures of agencies—such as the PBGC's in this case. To the extent the APA could be used in such a fashion, ERISA's express terms override the APA. Because Congressional intent is unambiguous on this point, the Court should review Sara Lee's challenge to the PBGC's 2006 Determination under the *de novo* standard of review and, as is appropriate under such standard, allow additional discovery in this case.

**III.     DISCOVERY SHOULD PROCEED UNDER ANY STANDARD OF REVIEW BECAUSE THE PBGC HAS ACTED IN BAD FAITH AND ITS ADMINISTRATIVE RECORD IS FLAWED**

Under any standard of review, even the arbitrary and capricious standard under the APA, discovery should proceed in this case because the PBGC has acted in bad faith during the administrative review process. Specifically, the PBGC has (i) failed to give all interested parties notice of its intent to review the 1979 Determination; (ii) failed to adequately describe the process that would be followed during the administrative review process; (iii) failed to allow the parties to rebut or comment on the positions of other parties; (iv) failed to include documents

within the Corporation's files that are supportive of Sara Lee's position; (v) ignored other documents produced as exhibits to the parties' position statements; and (vi) foreclosed administrative review of its 2006 Determination in an attempt to have this Court "rubber stamp" its decision based on an administrative record limited to documents supporting its own, conflicted decision.

As the PBGC itself acknowledges, upon a *prima facie* showing of bad faith or an incomplete record, a reviewing court may go beyond the purported administrative record in reviewing an agency's decision. *See* PBGC Mot. at 6; *see also Citizens to Preserve Overton Park*, 401 U.S. 402, 420 (1971); *PBGC v. LTV Steel Corp.*, 119 F.R.D. 339, 341-343 (S.D.N.Y. 1988). However, the PBGC argues generally that Sara Lee has not alleged any wrongdoing by the PBGC, let alone produced "independent evidence of improper conduct" or "prima facie [evidence] showing that [it] will find material in the agency's possession indicative of bad faith or an incomplete record." *See* PBGC Mot. at p. 6. As shown below, the PBGC's conclusory and self-serving statement is disingenuous at best, as the PBGC clearly has acted in bad faith and has withheld material in its possession from inclusion in the administrative record. Based on the PBGC's failures, the novelty of the administrative process used and the incomplete record produced, there exists substantial evidence that the administrative review and administrative record created are severely flawed and driven solely by the PBGC's own self-interest. Therefore, the parties should be allowed to conduct discovery so that all relevant documents can be reviewed by the Court.

Motivated by its desire to avoid a potential $60 million (or greater) unfunded benefit liabilities created by IBC, the PBGC is attempting to force this liability back on the ABA Plan and Sara Lee, rather than IBC, the party who ran its business into bankruptcy and created the unfunded benefit liabilities by failing to adequately fund its single-employer plan. In doing so, the PBGC excluded from the administrative record documentation that it had in its possession that directly contradicts the PBGC's predetermined position regarding the status of the ABA Plan. Stated another way, the PBGC shaved the edges of the proverbial "square peg" in an

attempt to fit the peg in a "round hole," and is now asking this Court to declare a clean fit without permitting the parties adversely affected to present all relevant evidence bearing on the matter.

Examples of the PBGC's bad faith in the administrative review are abundant. For example, the PBGC has proclaimed that it provided all affected parties with adequate notice and an opportunity to be heard. However, this position is not supported in reality as the PBGC directly notified only a few of the Participating Employers. *See* AR 0427. Moreover, the PBGC conducted its inquiry under a cloak of ambiguity and uncertainty. Indeed, the ABA Plan notified the PBGC that the Plan was uncertain as to the scope and procedure of the PBGC's inquiry and, therefore, was not entirely certain as to what information it should provide the PBGC. *See* AR 0887.

In fact, in its submission, the ABA Plan specifically referenced that:

> In closing, *please be advised that the officials and consultants to the [ABA] Plan have substantial information and records covering the past 45 years of operations that may have some bearing on the PBGC's consideration of the issues. We are prepared to submit affidavits from each consultant on items the PBGC might view as important, **but because of the scope and procedure pertaining to this inquiry have not been formally defined, we have elected not to produce evidence in the form appropriate to a court of law**.* The foregoing information is in the nature of a proffer that we are prepared to substantiate by sworn testimony if necessary, and to supplement in any way that might be helpful.

*See* AR 0887 (emphasis added).

The PBGC ignored this proffer, and instead chose to reverse the 1979 Determination based on a flawed reading of the ABA Plan's actuarial reports without thoroughly analyzing the actual operation of the Plan. Rather than clarify the scope of inquiry and allow the few affected parties who actually received notice of the inquiry to supplement their initial responses, the PBGC chose to close the administrative review procedure altogether, without allowing Sara Lee or any other party the opportunity to rebut the "findings" made in the 2006 Determination or supplement its administrative record with evidence undercutting the PBGC's decision. *See* AR 1579. Finally, the PBGC's heavy-handed action also took away the opportunity for the affected

parties to seek an administrative appeal of the 2006 Determination and, instead, directed them to file suit in this Court in order to rebut or challenge the 2006 Determination. *See* AR 1579.

Not only was the administrative review irregular and flawed, the administrative record created by the PBGC (constituting just over 1,500 pages of documents) is equally incomplete. Notably, the majority of the administrative record's five volumes (three to be exact) are comprised of the position statements of the ABA Plan, IBC and Sara Lee. In addition, many of the other documents were not produced by the PBGC, but by IBC and other parties related to IBC's pending bankruptcy proceeding. In *LTV*, the paucity of documents created by the PBGC was one of the bases on which the court permitted discovery to proceed. *See* 119 F.R.D. at 342.

In addition, the PBGC did not include in its administrative record any documents related to other determinations on this same issue, or the standards it used to determine whether the ABA Plan was an aggregate of single-employer plans or a multiple-employer plan. In fact, the PBGC blatantly failed to include any documents *in its possession* related to the fact that most employers in the ABA Plan terminated their participation in the Plan through standard, single-employer plan terminations that were treated as such by the PBGC—specific evidence proving that the ABA Plan was, indeed, administered as an aggregate of single-employer plans and not as a multiple-employer plan.

On August 18, 2006, in order to determine what documents the PBGC had in its possession related to the ABA Plan, Sara Lee through counsel submitted a Freedom of Information Act Request ("FOIA Request") to the PBGC for certain documents in the PBGC's possession related to the ABA Plan generally and the PBGC's 2006 Determination specifically. *See* Graham Affidavit, Ex. A.[4] Over the course of eight months, the PBGC produced to Sara Lee over 3,000 pages of documents, which the PBGC admits are related to the ABA Plan and the 2006 Determination. *See* Graham Aff., Ex. B.[5]

---

[4] A copy of Sara Lee's FOIA Request to the PBGC is attached as Exhibit A to the Affidavit of Michael T. Graham ("Graham Affidavit" or "Graham Aff."), which is attached hereto as Exhibit 1.
[5] A copy of the various response letters enclosing the FOIA documents are attached as Exhibit B to the Graham Affidavit. Sara Lee's counsel have filed an administrative appeal of the PBGC's partial denial to produce certain

Importantly, included in the documents produced by the PBGC *but not contained in the PBGC's administrative record* filed with this Court are copies of documents related to numerous standard, single-employer plan terminations by former participating employers and several Form 5500 annual reports for the ABA Plan that support Sara Lee's position that the ABA Plan is, and has always been, administered as an aggregate of single-employer plans. Specifically, the PBGC produced documents to Sara Lee on the following employer terminations from the ABA Plan (which were *not* included in the PBGC's administrative record) that were *treated by PBGC as standard, single-employer plan terminations*:[6]

| Employer | Proposed Month of Termination |
|---|---|
| Lloyd J. Harris Pie Company and Flowers Industries, Inc. | December 1977[7] |
| Beaver Valley Industries, Inc. and Chef's Supply, Inc. | July 1982 |
| Fasano Pie Company | March 1983[8] |
| Boge's Bread (Division of U.S. Bakery) | August 1987 |
| Holsum Baking Company | September 1987 |
| Oven Fresh/April Hill (Grocer's Baking Company) | September 1988 |
| Community Shops, Inc. | August 2000 |

The failure of the PBGC to include in its administrative record the documents related to these standard, single-employer plan terminations is extremely troubling, in that these terminations were *handled by the PBGC as if the ABA Plan was an aggregate of single employer plans*. This fact supports the position that the PBGC knew all along that since 1979

---

documents with the PBGC's General Counsel, which remains pending, a copy of which is attached as Exhibit C to the Graham Affidavit.

[6] Copies of the documents produced by the PBGC on these various standard single-employer plan terminations are attached as Exhibits E through K to the Graham Affidavit, respectively.

[7] The termination of Flowers Industries, Inc. was accomplished through a plan to plan merger. *See* Graham Aff., Ex. F.

[8] It appears from documentation produced by the PBGC through Sara Lee's FOIA Request that the PBGC may have assumed trusteeship of the termination of the Fasano Pie Company in the ABA Plan, either through a distress or involuntary termination. *See* Graham Aff., Ex. G. Further information is necessary to determine the exact nature and circumstances of the termination, which Sara Lee will be able to request if the Court allows discovery to go forward. Should it be determined that the Fasano Pie termination was either a distress or involuntary termination where the PBGC accepted trusteeship of that single-employer plan, that fact would completely undercut the PBGC's 2006 Determination that the ABA Plan was a multiple-employer plan, as the PBGC would not and could not treat such a cessation of participation in the ABA Plan as a plan termination if the ABA Plan were a multiple-employer plan.

the ABA Plan had been administered as an aggregate of single-employer plans. Instead of including all related information in its administrative record, the PBGC chose instead to "cherry pick" the documents in its possession related to the ABA Plan's administration and limit its administrative record to those documents solely supporting its decision to reverse the 1979 Determination. Such a decision is proof positive of the PBGC's bad faith and, further, begs the question of what additional documents have not been produced to the parties and to this Court by the PBGC related to the question of whether the ABA Plan has been administered as an aggregate of single-employer plans since the 1979 Determination.

The plan termination documents are not the only documentation missing from the administrative record. Like the plan termination documents referenced above, in response to Sara Lee's FOIA requests, the PBGC produced to Sara Lee the Form 5500-C of the American Bakers Association for the 1980 plan year and the Form 5500-C/R for Gulf Coast Distributors, Inc.—a former Participating Employer in the ABA Plan. *See* Graham Aff., Ex. L.[9] Each of these Form 5500s contains a footnote explaining that the ABA Plan is an aggregate of single-employer plans for purposes of plan terminations. *Id.* Notably, the PBGC failed to include any of these Form 5500s in its administrative record, and failed to address (or even refer to) the footnotes provided by the ABA Plan in its 2006 Determination.

Moreover, in an apparent sleight of hand, the PBGC did include in the administrative record a Form 5500 for Plan Year 1983, which was submitted by the ABA Plan with its position statement, that the PBGC argues supports its 2006 determination inasmuch as the ABA Plan checked the "multiple-employer" box on the Form 5500. *See* AR 01085-1089. However, the PBGC's 2006 Determination completely fails to note that on the first page of the 1983 Form 5500, when checking the "Multiple-employer plan (other)" box on the first page of the form, the Participating Employers footnoted the box, and at the bottom of the first page included the following statement: "Individual employer contributions are available to pay benefits to all

---

[9] Copies of the 1980 and 1996 Form 5500s produced by the PBGC on Sara Lee's FOIA Request are attached as Exhibit L to the Graham Affidavit

Participants except on termination of each employer's contributions pay benefits [to] only that employer's employees" – the same footnoted statement included in the Form 5500s discussed above. *Id.*

In addition to its failure to include the termination documents and Form 5500s discussed above, the PBGC failed to include in the administrative record any additional documentation evidencing the PBGC's own audit a former participating employer's termination from the ABA Plan that was treated as a standard, single-employer plan termination. In 1998, the PBGC opened an audit of the termination of Gulf Coast Snacks, Inc. from the ABA Plan. In its FOIA response, the PBGC produced to Sara Lee almost 100 pages of documents related to its audit of Gulf Coast Snacks' termination from the ABA Plan, which was submitted as a single-employer plan termination.[10] Importantly, most of these documents were excluded in the PBGC's administrative record filed in this case.[11] This audit should have allowed the PBGC the opportunity to view how the ABA Plan was operated as an aggregate of single-employer plans. Taken together, these are but three examples of the manner with which the PBGC has attempted to "stack the deck" in its favor to support its predetermined reversal of the 1979 Determination regarding the status of the ABA Plan. If the parties are permitted to take discovery in this case, it is likely that other examples of the PBGC's misconduct will be discovered behind the PBGC's "curtain" of the filed "administrative record."

The PBGC's attempt at manipulating the administrative record to support its predetermined reversal of the 1979 Determination is placed into context when measured against its significant financial interest in achieving such a reversal. In its motion for summary judgment, the PBGC suggests that it does not suffer from any conflict because the ABA Plan remains an ongoing concern. However, that is true *only so long as* the PBGC's 2006 Determination is upheld. In that scenario, the ABA Plan would be treated as a single plan with

---

[10] Copies of the documents produced to Sara Lee related to the PBGC's termination audit of Gulf Coast Snacks, Inc. is attached as Exhibit O to the Graham Affidavit.
[11] Notably, the ABA Plan in its submission to the PBGC during administrative review included a few pages related to the PBGC's termination audit of Gulf Coast Snacks. *See* AR 1182-1186. However, the PBGC excluded mention of this termination audit in its 2006 Determination.

more than one participating employer.  As such, the termination of IBC from participation under the ABA Plan would not cause the Plan itself to terminate, but, rather, would place the burden on the ABA Plan to collect any underfunding attributable to IBC.  Moreover, to the extent the ABA Plan could not recover such unfunded benefit liabilities and any delinquent contributions, these liabilities would shift to the remaining participating employers, with Sara Lee taking the brunt of IBC's outstanding liabilities to the ABA Plan due to the fact that it will be the largest remaining Employer in the Plan.  In other words, Sara Lee is adversely affected by the 2006 Determination because it actually maintained a properly funded single-employer plan under the ABA Plan's express terms, and IBC is rewarded for failing to adequately fund its benefit liabilities for its employee-participants.  Such a result turns the parties' intent in adopting the ABA Plan—that Participating Employers would not be required to fund the benefits of other competing Participating Employers—on its head.

On the other hand, if the ABA Plan is considered an aggregate of single-employer plans, upon termination of IBC's plan, IBC would be responsible to gross up any unfunded benefit liabilities and delinquent contributions on its single-employer plan and, to the extent it could not, IBC would be forced to pursue a distress or involuntary termination with the PBGC.  At that time, based on IBC's pending bankruptcy, the PBGC would be responsible for funding benefits for IBC's employee-participants in the ABA Plan up to the PBGC's guaranteed amounts under ERISA.  By reversing the 1979 Determination, the PBGC has effectually transferred its statutory duty to "guarantee" participants' benefits to Sara Lee and the other participating employers, in contradiction of the parties' intent in adopting the ABA Plan as well as Title IV of ERISA.

Moreover, contrary to the PBGC's arguments, the approximately $60 million obligation created by IBC that the PBGC is seeking to avoid is "significant" when measured with respect to the PBGC's $18.88 billion underfunded status. *See* PBGC Annual Mgmt. Rep. (2006); *see also*, *Pilots*, 436 F.Supp. at 924.  The PBGC's self-serving proclamation aside, there exists a clear and express conflict in the PBGC's 2006 Determination.  In fact, the PBGC and its significant claim

against IBC is the proverbial "elephant in the room" in this case—the presence of which the PBGC and IBC would prefer the Court ignore.

Perhaps recognizing the folly of its "no conflict" position, the PBGC quickly retreats to a secondary position that the PBGC enjoys a presumption of "good faith" in its handling of the administrative proceeding and that, in any event, the fact that it will derive a financial benefit from the 2006 Determination does not taint that determination. *See* PBGC SJ Mot. at p.4; *see also* PBGC Mot. At p. 6. This good faith presumption that the PBGC cites may be rebutted and, due to the improprieties discussed herein, Sara Lee should have an opportunity to further develop the record in such a rebuttal. *United States v. Keystone Sanitation Co., Inc.*, 1995 U.S. Lexis 22371 at * 11 (1995). Sara Lee does not suggest that the PBGC's clear conflict of interest *de facto* reverses its 2006 Determination. Rather, Sara Lee submits that the PBGC's placement of its own financial desires over that of the affected parties impermissibly shaded the PBGC's handling of the administrative proceeding—a proceeding that is marred with irregularities and clear instances of self-interest. Due to these irregularities in the administrative proceeding, the PBGC's motion for protective order should be denied and Sara Lee as well as any other affected parties should be permitted further discovery in this case.

**CONCLUSION**

For the foregoing reasons, Sara Lee Corporation respectfully requests that the Court deny the PBGC's motion for protective order, require the PBGC to respond to Sara Lee Corporation's First Set of Requests for Production of Documents, and all subsequent discovery requests properly made pursuant to the Federal Rules of Civil Procedure, its attorneys' fees and costs suffered in responding to this motion and such other relief as the Court deems appropriate.

Dated:  May 24, 2007                           Respectfully Submitted,

                                               SARA LEE CORPORATION

                                  By:        /s/ Michael T. Graham
                                             One of Its Attorneys

M. Miller Baker (DC Bar No. 444736)
Sarah E. Hancur (DC Bar No. 480537)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005-3096
Phone: 202.756.8000
Fax:          202.756.8087
Email: mbaker@mwe.com
        shancur@mwe.com

Michael T. Graham
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois  60606
Phone: 312.372.2000
Fax:          312.984.7700
Email: mgraham@mwe.com

Attorneys for Plaintiff-Respondent
Sara Lee Corporation