IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SARA LEE CORPORATION, on its own behalf and on behalf of its employee-participants in the American Bakers Association Retirement Plan,<br>　　　　　　Plaintiff,<br><br>vs.<br><br>AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of The American Bakers Association Retirement Plan,<br><br>and<br><br>PENSION BENEFIT GUARANTY CORP. CORPORATION,<br>　　　　　　Defendants.<br><br>─────────────────────────────<br><br>AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of The American Bakers Association Retirement Plan,<br><br>　　　Third Party Plaintiffs, Counterclaimants,<br>　　　and Cross-Claimants,<br>vs.<br><br>SARA LEE CORP.,<br>　　　　　　Respondent,<br><br>PENSION BENEFIT GUARANTY CORPORATION,<br>　　　　　　Cross-Defendant,<br>　　　and<br><br>KETTERING BAKING CO.,<br>INTERSTATE BRANDS CORP.,<br>LEWIS BROS. BAKERIES, INC.,<br>HARRIS BAKING CO., INC.,<br>AMERICAN BAKERS ASSOCIATION,<br>and JENNY LEE BAKERY, INC.<br><br>　　　Third-Party Defendants. | Case No. 06-CV-0819-HHK/JMF<br>Hon. Henry H. Kennedy, Jr.<br><br>**THIRD PARTY DEFENDANT LEWIS BROS. BAKERIES, INC.'S RESPONSE AND JOINDER OF SARA LEE CORP., ABA PLAN AND ABA BOARD OF TRUSTEES' OPPOSITION TO PENSION BENEFIT GUARANTY CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |

**THIRD PARTY DEFENDANT LEWIS BROS. BAKERIES, INC.'S RESPONSE AND JOINDER IN SUPPORT OF SARA LEE CORPORATION'S AND ABA PLAN AND ABA BOARD OF TRUSTEES' OPPOSITION TO PENSION BENEFIT GUARANTY CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

The Third Party Defendant, Lewis Brothers Bakeries, Inc. ("Lewis Brothers"), by its attorneys, hereby joins and supports the pleadings filed by Sara Lee Corporation ("Sara Lee") and by American Bakers Association Retirement Plan and Board of Trustees of the American Bakers Association Retirement Plan's (the "Plan Trustees") in Opposition to the Motion filed by the Pension Benefit Guaranty Corporation ("PBGC"), pursuant to Fed. R. Civ. P. 56 and Local Rules of the U.S. District Court for the District of Columbia 7 and 56.1, seeking summary judgment.

With the exception of some minor differences, partially set forth below, Lewis Brothers adopts the legal arguments and factual assertions submitted in Sara Lee's and ABA Plan's opposition. Like Sara Lee and the Plan Trustees, Lewis Brothers contends that the PBGC's motion for summary judgment should be denied in its entirety, and that the parties should be allowed to conduct necessary discovery regarding PBGC's 2006 determination.

Alternatively, if the Court decides that the PBGC's 2006 Determination is incorrect as a matter of law, Lewis Brothers requests that the Court *sua sponte* enter judgment as a matter of law on Count I of Sara Lee's Second Amended Complaint in its favor and against the PBGC, and grant any additional relief as the Court deems appropriate.

**INTRODUCTION**

PBGC's motion for summary judgments seeks the Court's affirmation of the PBGC's decision, after 27 years, to revisit and reverse the PBGC's determination that the American Bakers Association Retirement Plan (the "Plan") was properly structured as an aggregate of

2

single-employer pension plans. It also seeks to avoid years of determinations, since 1979, in which the PBGC repeatedly treated the Plan as if it were an aggregate of single-employer pension plans. On each of these many occasions, the PBGC had the opportunity to consider and, by the circumstances in each case in which the PBGC was called upon to act, it had the obligation to consider, whether the ongoing operation of the Plan as it was then found, effectively minimized or eliminated the risk that funds attributable to the contributions of one Plan employer were or would be used to pay the benefits of another employer's employee-participants. On none of these many occasions did the PBGC so find. Instead, it was only in 2006, faced with results that would for the first time have imposed potential liability on the PBGC, that the PBGC stated that it was, in fact, wrong all along.

The PBGC holds itself out to this Court as a disinterested party. It purports to have made a well informed and thoroughly analyzed decision, after considering all sources of relevant information. In fact, as Sara Lee and the Plan Trustees have demonstrated in their opposition briefs, the PBGC's pretense does not conform with the facts of this case.

PBGC stands to benefit greatly from its August 8, 2006 decision ("2006 Determination"). If the PBGC's reversal of its longstanding decision that the ABA plan is an aggregate of single-employer plans is allowed to stand, solvent plan participants, including Lewis Bakeries and Sara Lee, not the PBGC (as the likely "guarantor" of Interstate Brands Corporation's (IBC) unpaid contributions), will be forced to contribute additional funds to the Plan or, at least, to lose the benefit of their property interests in millions of dollars in excess contributions made by Lewis Brothers for the benefit of its own employees.

Summary Judgment in favor of PBGC should be denied. There are genuine issues of material fact both as to the substantive bases for the PBGC's 2006 Letter and relating to the

process by which the PBGC reached its position in 2006. Discovery is necessary to fully unearth the real reasons for the PBGC's decisions and reversal of position.

## STATEMENT OF FACTS

Pursuant to Rule 56.1, Lewis Bakeries adopts the statements filed by Sara Lee's and the Plan Trustees, setting forth material facts as to which there exists a genuine issue. Lewis Brothers anticipates that those statements will include all appropriate references to the parts of the record relied on to support the statements.[1]

Chicago Baking Company, an Illinois Corporation and wholly-owned subsidiary of Third Party Defendant Lewis Brothers, is a Participating Employer in the ABA plan. Chicago Baking Company contributes to the ABA plan on behalf of its eligible employee-participants. As a member of the American Bakers Association ("ABA"), Chicago Baking Company is a Participating Employer in the ABA Plan. As a Participating Employer, Chicago Baking Company makes contributions to the ABA Plan for its eligible employee-participants and has been accepted for participation in the ABA Plan by the Board of Trustees.

The ABA Plan was designed with the express purpose of providing Participating Employers with the benefit, including the cost savings, of centralized administration and investment management while ensuring that each Participating Employer remained singly responsible for the benefits paid under the ABA Plan to its employee-participants. As Lewis Brothers was lead to understand, the ABA Plan operated as an aggregate of single-employer pension plans, with each Participating Employer serving as a sponsor of a separate pension plan

---

[1] As a general matter, Lewis Brothers does not believe an independent statement of genuine issues of material fact would benefit the Court. While Lewis Brothers is confident that Sara Lee's and ABA Plan's statement of genuine issues of material fact will be in accordance with the issues articulated in the briefs, it may request leave of court to supplement or modify Lewis' Brothers' adoption of those statements, as necessary, after Lewis Brothers has been afforded an opportunity to review those statements.

covering only its own employee-participants. Each Participating Employer's contributions to the ABA Plan are to be used to fund only the benefits of its own employee-participants and each separate plan is administered in an aggregate fashion by the Board of Trustees for administrative convenience.

On August 8, 2006, the PBGC issued a letter completely reversing its 1979 determination ("1979 determination") that the ABA Plan was an aggregate of single-employer pension plans under ERISA and stating its new position that the ABA Plan is, and always has been, a multiple-employer pension plan. In the 2006 Determination, the PBGC determined that, in its view, the ABA Plan has been consistently administered as a multiple employer pension plan notwithstanding the fact that the governing plan document specifically states that it is intended to be an aggregate of single-employer pension plans. The PBGC's decision to make the 2006 Determination effective immediately, essentially terminated the rights of any aggrieved party, including Lewis Brothers, to file an administrative appeal, which would permit the parties to more fully develop the factual record and for any aggrieved party to challenge the PBGC's findings administratively before having to resort to litigation in this Court. Instead, to challenge the PBGC's 2006 Determination, Lewis Brothers was left without any other recourse but to file a motion for leave to file its own cross-claim/counterclaim against the PBGC and the ABA Plan on May 7, 2007.

At all times since 1976, when the ABA Plan was amended, Lewis Brothers continued to contribute to the ABA Plan in good faith reliance upon the understanding, created by the PBGC's 1979 Determination that the structure of the ABA Plan created and constituted an aggregate of separate pension plans for purposes of Title IV of ERISA, and not a multiple-employer pension plan. But for that understanding, Lewis Brothers would have acted differently

5

and it would have exercised its discretion under the ABA Plan and ERISA to transfer funds in the possession of the Board of Trustees to another plan and another plan trustee and administrator, to ensure that funds contributed by Lewis Brothers solely for the benefit of its employees would be fully protected against distribution to persons or entities who were not employed by Lewis Brothers, either directly or indirectly.

In the 2005 Plan Asset Report, the ABA Plan's actuary reported that four of the seven active Participating Employers maintained negative balances in the ABA Trust. This meant that the four Participating Employers' investment income and contributions paid to the ABA Trust were less than their administrative expenses and the amount of benefits the Board of Trustees paid to their respective employee-participants.

In 2005, Lewis Brothers' asset balance was close to $9 million dollars. In 2004, Lewis Brothers was the only participating employer to retain a positive balance, after considering its potential liability to its own employee-participants. Lewis Brothers' 2004 asset balance was over $8 million dollars and its liability was just over $5 million dollars— leaving a net positive balance of close to $3 million dollars.

Specifically, in the 2006 Determination, the PBGC failed to consider that the ABA Plan's governing document specifically provides that each Participating Employer's contributions to the ABA Plan are to be used only to provide benefits for their own employee-participants and not for the payment of benefits for other the employee-participants of other Participating Employers. Further, the PBGC failed to recognize that since the ABA Plan's adoption, when Participating Employers ceased to contribute and thus terminated their participation in the ABA Plan, the vast majority of terminations were administered as standard single-employer plan terminations and not as withdrawals from a multiple employer plan.

The PBGC also stated in the 2006 Determination that, due to the exigencies of the matter, its determination would be effective immediately upon its date of issuance and that there is no obligation for any party aggrieved by this determination to exhaust its administrative remedies with respect to the 2006 Determination, either by seeking reconsideration by the PBGC or by filing an administrative appeal.

## ARGUMENT

### I. PBGC's Application of its Own Standards Demonstrates that its 2006 Decision is Arbitrary and Capricious.

On August 8, 2006, prompted by a request by IBC to review the PBGC's 1979 Determination Letter, described above, the PBGC issued a new letter (the "2006 PBGC Letter"), rescinding the 1979 PBGC Determination Letter, stating that, for 27 years, the PBGC had been in error. Instead, overturning the expectations of the parties, as codified in the relevant plan documents, and as acknowledged repeatedly over the years by the manner in which the PBGC treated the Plan, the PBGC determined that the Plan was, for all those years, a multiple employer plan under Title IV, instead of an aggregate of single-employer plans. The effect of the 2006 PBGC Letter was and will be to confiscate more than $3 million in excess contributions to the Plan made by Lewis Brothers for its own employees, and transfer those funds, without compensation to Lewis Brothers, to IBC, through government action taken by the PBGC, to relieve both IBC and the PBGC of a portion of the obligation owed to IBC employees that exists and that has not been funded by IBC. The effect of the 2006 PBGC Letter was and will be to do what the Plan documents prohibit, and what Lewis Brothers, through its Participation Agreement and the Plan documents, explicitly stated would not occur: the use of monies contributed by Lewis Brothers to pay obligations owed to employees of another employer, IBC. The action of the PBGC will effectively nullify the Plan documents, destroy the contractual relations that it

7

created, re-create the Plan's administration in a manner not heretofore adopted by the Plan Trustees (to the best of Lewis Brothers' knowledge), and reallocate money in the Plan in a manner *never* done by the Plan Trustees.

The PBGC's decision to reverse its 1979 Determination Letter, as reflected in the 2006 PBGC Letter, was supposedly based upon an application of standards that the PBGC asserted were adopted long ago, never varied and "consistently applied." (AR 1567). The 2006 PBGC Letter (AR 1566 – 67) recited those standards as follows:

> Our determination as to the nature of an entity—whether it is a single plan or an aggregate of single plans—is based on its structure and how it actually operates on an ongoing basis. We look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate. Such evidence may include the reasonable expectations and intent of the parties.
>
> The availability of funds held by an entity to provide benefits on an ongoing basis is a central factor in our analysis. Ongoing restrictions on the use of such funds indicate that the entity may be an aggregate of single plans...If the evidence shows that payments are effectively restricted, by whatever means, so that there is a minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants, then the entity is an aggregate of single plans.

The 2006 PBGC Letter stated that its determination in 1979 (and, presumably in 2006) "began with the premise that after 1974, the rules set forth in ERISA would treat any pre-existing pension plan as a unitary entity unless two conditions were met." Those conditions, it said, were: "First, there must be at least some evidence that the plan had been established and operated as a group of subplans, rather than a single entity," and second, "what needs to be done in the future to avoid single plan status." As to the first "condition," the PBGC said that "the test looks at the pre-ERISA plan document ... and pre-ERISA plan practice ..." As to the second "condition," the PBGC said that its "requirements ... demand that a plan effectively eliminate the risk of cost shifting among employees."

8

The PBGC must admit that the 1979 Determination Letter looked "at the pre-ERISA plan document ... and pre-ERISA plan practice ..." and determined, under the first "condition," that there was "at least some evidence" at that time "that the plan had been established and operated as a group of subplans, rather than a single entity." It must admit that the 1979 Determination Letter looked at "what need[ed] to be done in the future to avoid single plan status," and set forth a determination, based upon all of the facts, that the plan, as then constructed, "effectively eliminate[d] the risk of cost shifting among employees."

Nothing in the 2006 PBGC Letter sets forth any facts that would suggest that the standard enunciated in its body was misapplied *in 1979*, when the PBGC made its earlier determination. Indeed, nothing in the 2006 PBGC Letter sets forth anything to suggest that the facts considered in 1979 were wrong, falsely represented or in any way inaccurate, or that the PBGC was somehow mistaken or mislead at that time, as to the true set of facts about the "conditions" considered at that time. Nothing in the letter "...articulate[s] a 'rational connection between the facts found and the choice made.'" *See Bowman Transp. V. Ark.-Best Freight System*, 419 U.S. 281, 285, 42 L. Ed. 2d 447, 95 S. Ct. 438 (1975) (quoting from *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962)).

Instead, the 2006 PBGC Letter either employed an entirely new standard in considering the facts, or employed the same standard in a different, unexpected and unsupported manner without even a single sentence to justify its sudden change. The PBGC's reversal of position is not only arbitrary and capricious behavior but, as demonstrated by the pleadings filed by both Sara Lee and the Plan Trustees, is also wrong as a matter of law.

**A. Operation of the Plan on an Ongoing Basis**

The standard, according to the PBGC, requires the PBGC to inspect the Plan's "structure and how it actually operates on an ongoing basis." The PBGC says that, in looking at the structure and operation of a plan, it first must "look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate." Such evidence, the PBGC standard states, "may include the reasonable expectations and intent of the parties."

Nothing in the 2006 PBGC Letter quotes or discusses those sections of the Plan documents that explicitly set forth "the reasonable expectations and intent of the parties," that is, sections 13.01 and 13.02 of the Plan documents, although the Letter merely mentions those paragraphs without elaboration. *See* AR 1570.

The 2006 PBGC Letter claims that "in practice," the Plan was somehow operated in a manner inconsistent with the explicit prohibition of liability shifting contained in these paragraphs, and against the use of contributions made by one employer to pay for the benefits due employees of another employer. The 2006 PBGC Letter fails, however, to describe any fact about the operation of the Plan that was *not* known to the PBGC *in 1979*, or any fact (other than routine operation of the Plan in accordance with its terms) that has changed since 1979. It fails to cite a single instance when the contributions of *any* employer were actually used to pay benefits to the employees of another Plan participant. And, it fails to discuss the actual "restrictions on the use of ... funds" placed in the hands of the Plan Trustees, that clearly "indicate that the entity [is] an aggregate of single plans.."[2]

---

[2] The PBGC was well aware, at least as early as 1979, that the Plan Trustees intended to commingle funds contributed by its several employer participants in a single account, for the purposes set forth in the Plan documents. In 1979, knowing this fact, the PBGC still concluded that the plan was an "aggregate of single plans" and not a multiple employer plan. (AR 214; *see also* AR 6 (PBGC memorandum states Plan informed PBGC in 1975 that: "Assets are pooled, but there is no separate accounting for each employer as far as his share of the assets and

10

Instead, the 2006 PBGC Letter refers specifically to the Plan's submissions to the IRS, DOL and PBGC as evidence of its operation as a multiple employer plan, pointing out that the multiple employer box on an IRS Form 5500 was checked. The Letter continues to state that the actuarial attachments to these Form 5500s addressed the Plan as a whole. (AR 1574-75).

Further, the PBGC letter points to a statement made in 1992 by an attorney and actuary to James Kettering, one of the parties that provoked the 2006 PBGC Letter (AR 1575), as if those statements by an actuary constitute some form of evidence that the Plan operated on an ongoing basis in a manner that created more than a "minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants."

Nothing in the 2006 PBGC Letter makes any effort, however, to articulate a "rational connection" between these supposedly found facts and the choice made by the PBGC to reverse its 1979 Determination Letter.

There is, in fact, *no* rational connection between the filing of Form 5500s, as described by the PBGC, or as more properly and fully described by Sara Lee in its pleadings, and a finding that the Plan was, in fact, operated in any manner inconsistent with its terms, or in a manner that allowed (contrary to the Plan documents) the use of funds attributable to the contributions of one

---

liabilities."); AR 83, 161, 167, 171 (Plan informed PBGC in 1975 and 1978 that actuarial study is made to assure terminating employers made up under-funding)).

Moreover, it was well aware, from the outset, that the Plan Trustees intended to avoid the substantial administrative cost, each year, of providing an actuarial calculation unique to each of its participating employers. The purpose of creating the Plan, for some 90 or more employers, was, in no significant part, to avoid that very expense.

The PBGC has set forth no facts to indicate that in 2006 it was somehow "surprised" by a "revelation" that such commingling of funds in a single account had occurred, or that it was somehow "surprised" by a "revelation" that the Plan Trustees had not incurred the substantial administrative cost, each year, of providing an actuarial calculation unique to each of its participating employers but, instead, left the choice whether or not to pay for such an employer-specific actuarial calculation to each of the participating employers.

11

employer to pay the benefits of another employer's employee-participants. Whether or not those IRS Form 5500s were or were not filed in the manner that they were, or checked off a box (with a significant qualifying letter attached) that read "multiple employer," simply because many employers participated in the Plan, provides no evidence that the Plan, in fact, operated as a unitary entity, instead of an aggregate of single-employer plans.

Nor is there any rational connection between the statements made by the actuaries, quoted in the 2006 PBGC Letter and a finding, explicit or implicit in the PBGC's 2006 reversal of position, that the Plan was contemplated at its inception, and operated all along, for the last 27 years, as a unitary entity, instead of an aggregate of single employer plans. Instead, those statements, which corroborate the assertion that the Plan functioned as it was described in 1979, and as it has been described in the pleadings filed by Sara Lee and the Plan Trustees, support, rather than undermine, the position consistently taken by the Plan Trustees that the use of a single account, into which all employers' contributions were aggregated for the purposes described in the Plan documents, along with the other mechanisms put in place under the Plan documents, including annual actuarial adjustments, effectively minimized or eliminated the risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants.

Moreover, the PBGC has failed to articulate *any* reason for its failure or refusal to consider the many documents, identified in the submission by Sara Lee, that were in the possession of the PBGC but *not* included in its "record" in this case. Lewis Brothers submits that, absent some discussion of those materials, which the PBGC itself produced in response to a FOIA request, the Court cannot find that there is no genuine dispute as to any fact material to this case: the documents that were produced by the PBGC create a dispute about the rationality

12

of the PBGC's connection of the few "facts" it identified in its 2006 Letter and its determination that the long-existing standards quoted in the letter, "consistently applied," compel the conclusion that the Plan has not, in fact, been operated in accordance with the explicitly stated intentions of its participants, and has, instead, been operated in a manner that created more than a "minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants," let alone a conclusion that the Plan has, in fact, been operated in a manner that actually used "the contributions of one employer being used to pay the benefits of another employer's employee-participants."

### B. The Effects of the PBGC's Change of Position

As noted above, the 2006 PBGC Letter either evinces a change in the standards applied by the PBGC or a change in the manner in which the existing standard has been or will be interpreted and applied. The very fact that the PBGC has stated that its 1979 Determination Letter was wrong provides significant proof that such a change has occurred.

The same change in position may or may not have been applied to other plans. Lewis Brothers and the others involved in this case are entitled to know whether the PBGC is *now* being consistent in its application of the standard. If, as Lewis Brothers believes, the PBGC has only applied its "standard" in this case, either as a new standard or as a new interpretation of an existing standard, then that *sui generis* application of the standard is substantial evidence that the 2006 PBGC Letter contains an arbitrary and capricious determination. Only full discovery will ferret out the true facts about the PBGC's current and past practices, both with respect to the Plan and with respect to other plans.

### II. The Process Used by the PBGC in Reaching its 2006 Redetermination Was Unfair and Deprived Lewis Brothers of Procedural Due Process.

Lewis Bakeries, an interested party in this matter, was not given *any* notice directly by the PBGC of its potential reversal and retroactive elimination of its 1979 Letter Determination. Instead, the clear evidence reveals that, on November 2, 2005, the PBGC wrote others, including IBC, Sara Lee's counsel, Kettering, and counsel to the Plan Trustees, to advise them that the Plan "intends to revisit its 1979 determination that the Plan is an aggregate of single employer plans for purposes of Title IV of ERISA." (AR 0427). It requested that "the Board for the Plan forward a copy of [the PBGC's November 2, 2005 letter] to counsel for, or an appropriate official of, each participating employer not identified [in the PBGC's November 2, 2005 letter] as an addressee of this letter." The PBGC's November 2, 2005 letter required "that each interested party submit to PBGC ... on or before **Friday, November 18, 2005,** any written statement or documents that you would like PBGC to consider in its decision-making process." (AR 0427, bold in original).

There can be no doubt that the PBGC knew the names and addresses of each of the participating employers, including Lewis Brothers. It could easily have sent a notice to Lewis Brothers. It did not.

Moreover, there was *no* pressing need, after 27 years, to make a decision in less than three weeks, or to engage in a process that cut-off the ability of interested parties, such as Lewis Bakeries, to submit documents, to take depositions, to pose questions, to receive submissions of other parties, to reply to those submissions, and, in general, to engage in a process that would be considered objectively fair.

Instead, the PBGC relied upon the Plan Trustees to notify other participants, including Lewis Brothers, of the PBGC's intention "to revisit its 1979 determination," and to submit to the PBGC a single document, without any opportunity to respond to others, or even to know what

communications had been made by others in advance that obviously provoked the writing of the November 2, 2005 letter, on behalf of *all* plan participating employers. Time was not adequate to allow a coordination of responses by the several employers, let alone consideration of what evidence might be available to support the argument that all of them, except perhaps IBC, should have wanted to make.

After receiving these submissions from some of the interested parties, PBGC took over eight months to consider the ABA Plan's structure, in accordance with its "informal adjudicative process." PBGC did not inform any of the parties as to the process it would employ to review the submissions, whether a record was being maintained, or whether each party would be allowed to review other parties' submissions. There was no requirement that any of the parties serve others or be served. Further, it is believed that extensive *ex parte* communications took place between PBGC and other interested parties throughout the process. Interested parties were completely deprived of the opportunity to review any agency record, cross-examine or confront witnesses, examine any other party's evidence, or join an interested party, if it so chose.

When the decision was finally rendered in June 2006, PBGC cut-off administrative review, denying parties an opportunity to rebut its findings or make any supplementation of the administrative record. This action effectively denied affected parties an "opportunity to be heard" and forced aggrieved parties, including Lewis Bakeries, to challenge the 2006 Determination in this Court.

The process employed by the PBGC clearly violated the rights to procedural due process that should be ensured to Lewis Brothers, under the United States Constitution and otherwise. The property of Lewis Brothers, in the form of contributions that it has already made to the Plan in excess of what actually will be due to Lewis Brothers' employees, will be confiscated by

15

application of the PBGC's 2006 Letter. Lewis Brothers has standing to protect those property interests, and it was due a fair and impartial decision-making process, before more than $3 million of its contributed assets are taken to benefit the employees of IBC, in contravention of Plan terms and conditions. If allowed to stand, PBGC's 2006 Determination will effect an unconstitutional taking of property rightfully belonging to Lewis Brothers, without due process of law.

As noted above, in furtherance of its capricious decision making process, PBGC failed to consider a multitude of relevant facts. Lewis Bakeries and other interested parties are completely without facts to explain the PBGC's failure to consider the many documents that are in its possession, and which were obtained by Sara Lee through a FOIA request, but not made a part of the PBGC "record" and not even mentioned in the PBGC's 2006 Letter. Those documents, unmentioned in the 2006 PBGC Letter, must be presumed never to have been considered by the PBGC. The failure to consider such relevant evidence, already in its possession, is also evidence that the PBGC has violated common notions of fairness and due process.

And, as noted above, there is no discussion in the 2006 PBGC Letter of the impact of that reversal of the PBGC's 1979 position, either on the participating employers in the Plan, the employees of such participants, or on decisions and determinations made in other cases. Questions are raised as to whether other, prior PBGC decisions are now also subject to retroactive reversal. How many other times has PBGC reversed longstanding decisions of this nature? How many cases have been reexamined in light of PBGC's reversal of longstanding policy determinations? How many other people and plans could be affected by a decision of this nature? How can companies prepare business plans knowing that the PBGC can and may

16

change its methods of operating pension plans after 27 years? Answers to each of these questions, which can be revealed through full discovery, will demonstrate the failure of PBGC to abide by common notions of fairness and due process.

## **CONCLUSION**

For the reasons set forth above, and for the reasons stated in the pleadings filed by Sara Lee and the Plan Trustees in opposition to the PBGC's Motion for Summary Judgment, Lewis Brothers respectfully submits that there are genuine issues of material fact, relating both to the bases for the PBGC's 2006 reversal of its 27-year long position that the ABA Plan is an aggregate of single employer plans, and to the process employed by the PBGC in making its 2006 decision. Lewis Brothers submits that the 2006 PBGC Letter is arbitrary and capricious, and without factual basis under any standard of review, and that the PBGC is not entitled to judgment as a matter of law. The PBGC's Motion for Summary Judgment must therefore be denied.

Lewis Brothers respectfully submits that, under the circumstances, the Court should permit the parties to conduct necessary discovery on all issues that arise from the pleadings in this case, and that this case should be set for trial, or for further summary proceedings, after a full and complete record is made upon which the Court can enter a decision.

Dated: May 24, 2007                                   Respectfully submitted,

                                                      LEWIS BROTHERS BAKERIES, INC.


                                    By:     /s/ D. Christopher Ohly
                                              One of Its Attorneys

D. Christopher Ohly
Roger Pascal
Schiff Hardin LLP
1666 K Street, N.W.
Washington, D.C. 20006
(202) 778-6458
(202) 778-6460 (facsimile)
dcohly@schiffhardin.com