**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARA LEE CORPORATION, on its own behalf and on behalf of its employee-participants in the American Bakers Association Retirement Plan, )<br><br>Plaintiff, )<br><br>v. )<br><br>AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan; and PENSION BENEFIT GUARANTY CORPORATION, )<br><br>Defendants. )<br>―――――――――――――――――――――<br>AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan, )<br><br>Third Party Plaintiffs, Counterclaimants, and Cross-Claimants, )<br><br>v. )<br><br>SARA LEE CORPORATION, )<br><br>Respondent, )<br><br>PENSION BENEFIT GUARANTY CORPORATION, )<br><br>Cross-Defendant, and )<br><br>KETTERING BAKING COMPANY, INTERSTATE BRANDS CORPORATION, LEWIS BROS. BAKERIES, INC. HARRIS BAKING CO., INC., AMERICAN BAKERS ASSOCIATION, and JENNY LEE BAKERY, INC., )<br><br>Third-Party Defendants. ) | Case No. 06-CV-0819 (HHK/JMF)<br><br>Hon. Henry H. Kennedy, Jr.<br>Magistrate Judge John M. Facciola<br><br>**CROSS-CLAIMANTS AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN'S AND BOARD OF TRUSTEES' MEMORANDUM IN OPPOSITION TO PBGC'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

**CROSS-CLAIMANTS AMERICAN BAKERS ASSOCIATION
RETIREMENT PLAN'S AND BOARD OF TRUSTEES'
MEMORANDUM IN OPPOSITION TO
<u>PBGC'S MOTION FOR SUMMARY JUDGMENT</u>**

STEPTOE & JOHNSON LLP
Paul J. Ondrasik, Jr. (D.C. Bar # 261388)
Edward R. Mackiewicz (D.C. Bar # 944884)
Ryan T. Jenny (D.C. Bar # 495863)
1330 Connecticut Avenue, N.W.
Washington, DC  20036-1795
Tel:  (202) 429-3000
Fax: (202) 429-3902

LAW OFFICE OF ANNE H. S. FRASER, P.C.
Anne H. S. Fraser (D.C. Bar # 349472)
1320 19th Street, N.W., Suite 200
Washington, DC  20036-1637
Tel:  (202) 466-4009
Fax: (202) 466-4010

**Counsel for Defendants/Third Party Plaintiffs/
Counterclaimants/Cross-Claimants,
American Bakers Association Retirement Plan
and Board of Trustees of the American Bakers
Association Retirement Plan**

May 24, 2007

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 4

    A.    Nature of the Plan and the 1979 PBGC Letter .................................... 4

    B.    The 2006 PBGC Letter ........................................................................ 7

    C.    The Present Lawsuit ........................................................................... 10

ARGUMENT ......................................................................................................... 11

    A.    Standard of Review for a Motion for Summary Judgment ................ 11

    B.    Standard of Review of PBGC's 2006 Informal Administrative Adjudication ..... 13

        1.    *De novo* review is appropriate in this case .............................. 13

        2.    The arbitrary and capricious standard of review requires an in-depth searching and careful consideration of an agency's decision ......... 14

    C.    Standards for Assessing a Plan's Status as a Multiple Employer Plan or Aggregate of Single Employer Plans ................................ 16

    D.    Issues of Fact Preclude Summary Judgment for PBGC ................... 17

        1.    Whether the record submitted by PBGC is complete is an issue of fact ...... 17

        2.    Issues of material fact unanswerable in the submitted record, and in genuine dispute, include how the Plan was administered, what PBGC considered, and whether differing considerations in other cases render its 2006 decision arbitrary and capricious .......................... 20

        3.    PBGC's flawed procedures preclude summary judgment ...................... 22

    E.    PBGC's 2006 Letter is Arbitrary and Capricious ............................. 26

        1.    The Plan is an aggregate of single employer plans under the terms of the Plan document .................................. 26

        2.    Holding the Plan's assets in a single trust and keeping actuarial records for the commingled trust does not render the plan a multiple employer plan .................................. 27

        3.    Retroactive application of the 2006 Letter is arbitrary and capricious .................................. 28

        4.    Representations of the Plan's nature do not transform it into a multiple employer plan .................................. 29

        5.    The Plan's funding practices were consistent with aggregate status ....... 30

        6.    The 2006 Letter is arbitrary and capricious due to PBGC's process ....... 33

CONCLUSION .................................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Advance Foundry Co. v. Kaufman,*
  No. C-3-94-205, 1996 U.S. Dist. LEXIS 22551 (S.D. Ohio Mar. 25, 1996) ................... 13, 33

*Akzo Nobel Salt, Inc. v. Federal Mine Safety & Health Review Comm'n,*
  212 F.3d 1301 (D.C. Cir. 2000) ............................................................................. 13

*Americable Int'l, Inc. v. Dep't of Navy,*
  129 F.3d 1271 (D.C. Cir. 1997) ............................................................................. 12

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................................. 12

*ANR Pipeline Co. v. FERC,*
  71 F.3d 897 (D.C. Cir. 1995) ................................................................................ 16

*Ass'n of Flight Attendants-CWA v. PBGC,*
  No. 05-1036(ESH), 2006 U.S. Dist. LEXIS 1318 (D.D.C. Jan. 13, 2006) ........................... 15

*Bowman Transp. v. Ark.-Best Freight System,*
  419 U.S. 281, 42 L. Ed. 2d 447, 95 S. Ct. 438 (1975) ........................................................ 15

*Burlington Truck Lines v. United States,*
  371 U.S. 156, 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962) ........................................................ 15

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ......................................................................................... 11, 12

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) ................................................................................. 14, 15, 18, 24

*Connolly v. Pension Benefit Guar. Corp.,*
  581 F.2d 729 (9th Cir. 1978), cert. denied, 440 U.S. 935, 59 L. Ed. 2d 492, 99 S. Ct.
  1278 (1979) ...................................................................................................... 15

*Cook v. PBGC,*
  652 F. Supp. 1085 (S.D.N.Y. 1987) ........................................................................ 33

*County of L.A. v. Shalala,*
  192 F.3d 1005 (D.C. Cir. 1999) ............................................................................. 15

*Czekalski v. Peters,*
  475 F.3d 360 (D.C. Cir. 2007) ............................................................................ 11, 12

*Diamond v. Atwood,*
    43 F.3d 1538 (D.C. Cir. 1995) ................................................................. 11

*Dickens v. Whole Foods Market Group, Inc.,*
    Civ. No. 01-1054, 2003 U.S. Dist. LEXIS 11791, 2003 WL 21486821 (D.D.C. Mar.
    18, 2003) ................................................................................................. 12

*Dopico v. Goldschmidt,*
    687 F.2d 644 (2d Cir. 1982) ...................................................................... 19

*Environmental Defense Fund, Inc. v. Blum,*
    458 F. Supp. 650 (D.D.C. 1978) ................................................................ 18

*Esch v. Yeutter,*
    876 F.2d 976 (D.C. Cir. 1989) ................................................................... 22

*First Chicago, Int'l v. United Exchange Co., Ltd.,*
    836 F.2d 1375 (D.C. Cir. 1988) ................................................................. 12

*Florida Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985) .................................................................................. 24

*Fund for Animals v. Williams,*
    391 F. Supp. 2d 191 (D.D.C. 2005) ........................................................... 22

*Harrisonville Tel. Co. v. Ill. Commerce Comm'n,*
    472 F. Supp. 2d 1071 (S.D. Ill. 2006) ....................................................... 19

*I.N.S. v. Cardoza-Fonseca,*
    480 U.S. 421 (1987) .................................................................................. 13

*Int'l Longshoremen's Ass'n v. Nat'l Mediation Bd.,*
    2006 U.S. Dist. LEXIS 4080 (D.D.C. Jan. 25, 2006) ...............................17, 20

*International Union, United Auto., etc. v. Keystone Consol. Industries, Inc.,*
    793 F.2d 810 (7th Cir. 1986) ..................................................................... 25

*Khan v. Parsons Global Servs. Ltd.,*
    428 F.3d 1079 (D.C. Cir. 2005) ................................................................ 12

*Manhattan Ctr. Studios, Inc. v. NLRB,*
    452 F.3d 813 (D.C. Cir. 2006) ................................................................... 16

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) .................................................................................. 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,*
    463 U.S. 29 (1983) .................................................................................... 15

*Natural Res. Def. Council, Inc. v. Train*,
   519 F.2d 287 (D.C. Cir. 1975) ..................................................................................18, 20

*Neighborhood TV Co. v. FCC*,
   742 F.2d 629 (D.C. Cir. 1984) ................................................................................ 16

*Nowell v. Central Serv. Ass'n*,
   106 F. Supp. 2d 888 (S.D. Miss. 2000) ................................................................16, 17, 27

*Occidental Petroleum Corp. v. SEC*,
   873 F.2d 325 (D.C. Cir. 1989) ................................................................................14, 24, 25

*Pac. Shores Subdivision Cal. Water Dist. v. United States Army Corps of Eng'rs*,
   448 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................ 22

*Pacific Architects and Engineers, Inc. v. United States Dept. of State*,
   906 F.2d 1345 (9th Cir. 1990) ................................................................................ 14

*PBGC v. Artra Group, Inc.*,
   972 F.2d 771 (7th Cir. 1992) ..................................................................................1, 16, 26, 29

*PBGC v. Artra Group, Inc.*,
   No. 90 C 5358, 1993 U.S. Dist. LEXIS 8440 (N.D. Ill. June 22, 1993) ("*Artra II*")..16, 29, 32

*PBGC v. LTV Corp.*,
   496 U.S. 633 (1990) ................................................................................................ 25

*PBGC v. LTV Steel Corp.*,
   119 F.R.D. 339 (S.D.N.Y. 1988) ............................................................................18, 19, 25

*PBGC v. Potash*, Civ.-79-130B(E),
   1986 U.S. Dist. LEXIS 30987 (W.D.N.Y. Mar. 28, 1986)............................14-17, 24, 27, 33

*Propert v. D.C.*,
   948 F.2d 1327 (D.C. Cir. 1991) .............................................................................. 25

*Ramaprakash v. FAA*,
   346 F.3d 1121 (D.C. Cir. 2003) .............................................................................. 33

*S.G. Loewendick & Sons, Inc. v. Reich*,
   70 F.3d 1291 (D.C. Cir. 1995) ................................................................................13, 29

*Soeken v. Herman*,
   35 F. Supp. 2d 99 (D.D.C. 1999)............................................................................ 25

*Stella v. Mineta*,
   284 F.3d 135 (D.C. Cir. 2002) ................................................................................ 13

*Vermont Yankee Nuclear Power Corp. v. NDRC*,
 435 U.S. 519 (1978)..................................................................................... 24

*Wise v. Ruffin*,
 914 F.2d 570 (4th Cir. 1990) .................................................................13, 33

## AGENCY PROCEEDINGS

PBGC Board of Appeals Opinion Letter, 90-172 (Dec. 6, 1990) ........................... 1, 16

PBGC Op. Ltrs. 84-2, 1984 PBGC LEXIS 8 (Jan. 17, 1984)...............................27, 29

PBGC Op. Ltrs. 85-2, 1985 PBGC LEXIS 31 (Jan. 14, 1985)...........................26, 28

## STATUTES

5 U.S.C. § 551 *et seq.* ....................................................................................... 18

5 U.S.C. § 706 ..................................................................................................... 18

5 U.S.C. § 706(2)................................................................................................. 15

26 U.S.C. § 1 *et seq.* ............................................................................................ 4

29 U.S.C. § 1001 *et seq.* ...................................................................................... 1

29 U.S.C. § 1132(a)(3) ....................................................................................... 10

## RULES

Fed. R. Civ. P. 56 ............................................................................................... 11

Fed. R. Civ. P. 56(c)........................................................................................... 11

Fed. R. Civ. P. 56(f) ........................................................................................... 12

Local Civil Rule 7(f) ........................................................................................... 11

Local R. 56.1 ....................................................................................................... 11

**REGULATIONS**

29 C.F.R. § 4001.2 ................................................................................. 1, 13, 16, 33

42 Fed. Reg. 59285, 59286 (1977) ............................................................................ 27

## INTRODUCTION

The American Bakers Association Retirement Plan ("Plan" or "ABA Plan") and its Board of Trustees ("Board") (collectively, "Cross-Claimants") respectfully submit this memorandum of law in opposition to the motion of the Pension Benefit Guaranty Corporation ("PBGC") seeking summary judgment on Counts I and II of Cross-Claimants' Third-Party Complaint for Declaratory and Injunctive Relief, Counterclaim and Cross-Claim ("TPC") (Doc. 19).

The Plan is a defined benefit pension plan under the Employee Retirement Income Security Act of 1974, *as amended*, 29 U.S.C. § 1001 *et seq.* ("ERISA"), to which several participating employers, including Plaintiff Sara Lee Corporation ("Sara Lee") and the several third-party defendants, contribute. Since ERISA became effective in 1976, the Plan has been operated and regarded by the Board and participating employers as a single plan for purposes of Titles I and II of the statute. The question in this case is whether the Plan is a multiple employer plan (*i.e.*, a single plan) or an aggregate of single employer plans (*i.e.*, several plans) (hereinafter referred to as "aggregate") for PBGC plan termination and premium purposes under Title IV. By PBGC regulation, the Plan is the former if "all plan assets are available to pay benefits to all plan participants and beneficiaries." 29 C.F.R. § 4001.2. The Plan, in contrast, is an aggregate of single employer plans if "the contributions of individual employers [a]re not available to satisfy the benefit liabilities of other employers." *PBGC v. Artra Group, Inc.*, 972 F.2d 771, 773 (7th Cir. 1992) (*citing* PBGC Board of Appeals Opinion Letter, 90-172 at 2 (Dec. 6, 1990)).

In 1979, after three to four years of internal debate, PBGC issued an opinion ("1979 PBGC Letter") that the Plan was an aggregate of single employer plans. For 27 years, Cross-Claimants and the employers relied on the 1979 PBGC Letter, and the Plan's terms were in fact amended to incorporate that Letter. In 2006, PBGC flip-flopped on the Plan's status when

PBGC discovered that if the Plan is an "aggregate" as it had previously ruled, it risked inheriting benefits obligations of one of the Plan's participating employers, Interstate Brands Corp. ("IBC"), which is in bankruptcy.  On August 8, 2006, on request for review of the 1979 PBGC Letter brought by IBC, PBGC issued a new letter ("2006 PBGC Letter") in which it revoked the 1979 Letter and concluded for the first time that the Plan is and always has been a multiple employer plan under Title IV.[1]  The PBGC's "about face" has the effect of shifting potential liability for IBC's (and to a lesser extent, other employers') unfunded benefits obligations from itself to other participating employers in the Plan, and, in particular, Sara Lee.  In this action, Sara Lee seeks reversal of the 2006 PBGC Letter and Cross-Claimants likewise seek review of that decision, which they submit was not only wrong, but issued on the basis of erroneous and incomplete factual findings and a procedurally flawed inquiry.

Summary judgment to PBGC should be denied.  First, the administrative record compiled and submitted by PBGC shows there are genuine issues of material fact and discovery is warranted prior to consideration of the motion.  The issues include (i) how, in fact, the Plan actually operated over the years; (ii) what PBGC considered in reaching its 2006 decision, in order of importance, and how that information differed, if at all, from that which it considered in reaching its prior determination; (iii) what decisions PBGC reached in similar cases and how it applied its standards there; and (iv) whether the administrative record submitted to this Court is complete or excludes documents or other information that the agency either considered or should have considered, including materials that were in the agency's own files.

Second, in reaching its 2006 decision, PBGC employed an utterly deficient informal

---

[1] To the extent PBGC may be attempting to define the Plan's status as a multiple employer plan or aggregate of single employer plans beyond Title IV purposes, it lacks jurisdiction to do so.

review process in which it did not explain to the parties either the factors it would use in making its determination or the data it would need, did not allow the parties to submit information beyond an initial submission, and did not give them access to other parties' submissions nor an opportunity to rebut. PBGC also engaged in *ex parte* communications with the parties. The process violated the parties' procedural due process rights and caused PBGC to assemble a deficient administrative record upon which this Court cannot rely.

Third, regardless of whether the Court reviews the Plan's Title IV status *de novo* or under the arbitrary and capricious standard, it should reverse the 2006 PBGC Letter. The facts demonstrate that the Plan is designed and operated as an aggregate of single employer plans, with employers ultimately responsible for their own employee-participants' benefits. Facts that PBGC alleges undercut "aggregate" status, such as the absence of separate actuarial records for each employer, were disclosed to, and expressly considered by PBGC when it issued its 1979 Letter, and are not a legitimate basis for its 2006 "flip-flop." PBGC's determination that the Plan held itself out as a multiple employer plan for Title IV purposes is simply wrong and therefore a fact in dispute. While there is no dispute that Cross Claimants considered the Plan a "hybrid," with characteristics of a multiple employer plan for Titles I and II purposes, they consistently represented it as an "aggregate" under Title IV. Further, as long as the Plan was over-funded, there was no issue regarding whether an employer was paying benefits for another's employees. If at all, this only arguably became an issue after 2000, following a substantial fall in the financial markets and IBC's "dump" of new benefit obligations on the Plan. In any event, as will be explained below, the Plan's "true-up" provisions, requiring employers to make up their under-funding when they left the Plan, and demands for ongoing contributions effectively ensured employer-by-employer funding, and thus the Plan's "aggregate" status, even after 2000.

The retrospective application of the 2006 PBGC Letter also merits reversal, and demonstrates the agency's bias. PBGC does not blame its new position on alleged misrepresentations – instead it candidly admits that it believes *it* erred in 1979. Rather than applying its new decision prospectively, PBGC attempts to force employers who relied on its prior decision to bear the costs of its alleged error. This is patently unfair, and the result of the agency's own financial interest in dumping some employers' benefits obligations on other employers rather than fulfilling its Congressionally-mandated role under the Title IV insurance program.

## FACTUAL BACKGROUND

### A.    <u>Nature of the Plan and the 1979 PBGC Letter.</u>

The Plan is a defined benefit pension plan that was established in 1961 to provide retirement benefits for certain employees of various unrelated employer members of the American Bakers Association ("ABA"), including Sara Lee and the third-party defendants. (TPC ¶¶ 9, 12-18, 20, 22; PBGC TPC Answer (Doc. 43) ¶¶ 9, 12-18, 20, 22). The Plan is governed by, *inter alia,* ERISA and the Internal Revenue Code of 1986, as amended, 26 U.S.C. § 1 *et seq.* (*See, e.g.,* ABA Plan[2] at 1976 Preface, ¶¶ 2.05, 2.06, 12.05; Second Amended Complaint ("SAC") (Doc. 12) ¶ 7; PBGC SAC Answer (Doc. 42) ¶ 7). The Board is the Plan's named fiduciary, "and as such [has] the full authority and responsibility under and in accordance with the Plan to control and manage the operation and administration of the Plan, and under and in accordance with the [American Bakers Association Retirement] Trust [(the "Retirement

---

[2] The ABA Plan document, entitled American Bakers Association Retirement Plan 2002 Restatement, and the 1979 PBGC Letter which is attached as Exhibit A thereto, are attached to the SAC at Exhibit 1 and included in the submitted record at AR 897-983. (SAC ¶¶ 11, 14). The 1979 PBGC Letter is also found in the submitted record at AR 212-219.

Trust")],[3] to manage and control the assets of the Fund."  (ABA Plan ¶ 2.01; TPC ¶ 10; PBGC

TPC Answer ¶10).  The Board is currently composed of representatives from IBC, Sara Lee and

the ABA.  (TPC ¶ 22).

The dispute in this lawsuit involves the nature of the Plan for PBGC plan termination and

premium purposes (Title IV of ERISA).  In 1979 the Plan secured a determination from the

PBGC that the Plan was an aggregation of single employer plans and not a multiple employer

plan for plan termination and PBGC premium purposes.  (AR 212-219, 1564;[4] TPC ¶¶ 24, 73;

PBGC TPC Answer ¶¶ 24, 73; SAC ¶¶ 14, 38; PBGC SAC Answer ¶¶ 14, 38).  After the 1979

PBGC Letter, the Plan has consistently been administered as an aggregate of single employer

plans for PBGC termination purposes but as a single plan for other purposes.  (See, e.g., ABA

Plan at 1976 Preface, ¶¶ 5.05, 11.01, 11.02, 13.01, 13.02; TPC ¶¶ 23-30; SAC ¶¶ 7, 10, 11, 13,

14).  The Plan's documents were amended to incorporate this principle, and the 1979 PBGC

Letter was attached to the Plan as Exhibit A.  (See, e.g., ABA Plan ¶ 13.01 & its Ex. A; TPC

¶ 25; PBGC TPC Answer ¶ 25).  Article XIII of the Plan describes the nature of the Plan as

follows:

> 13.01  Association of Single Employer Plans.  This Plan constitutes an
> association of single employer plans designed to give the cost savings and
> other benefits of a tax-qualified prototype plan, the administration in common
> of all the associated plans (including, but not limited to, actuarial, legal,
> accounting, and computerized record-keeping services) and the handling of
> the receipt, investment and distribution of their funds through the medium of a
> single trust and the use of investment managers or advisers and pension
> consultants.  That the Plan is, and is to be treated as, "an aggregate of separate
> plans rather than a single pension plan" is recognized by the Pension Benefit
> Guaranty Corporation for plan termination purposes (see Exhibit A attached

---

[3] The Retirement Trust, entitled Amendment and Restatement of the American Bakers Association Retirement Trust, is attached at Exhibit 4 to the SAC.  (SAC ¶ 48).

[4] Cross-Claimants cite to the pages of PBGC's submitted administrative record as "AR [page number]."

hereto).

> 13.02  <u>Each Single Employer Plan to Provide Funds For Its Participants.</u>
> Subject to the Plan's actuarial assumptions that the stated contribution
> amounts will produce the stated benefit amounts, it is the fundamental concept
> and intent of this Plan that the contributions of each separate employer will be
> used only to provide benefits for Participants (and Beneficiaries thereof) by
> reason of such Participants' employment by such employer; and only
> contributions by such employer will be used to provide benefits for such
> Participants (and Beneficiaries).

So integral to the Plan was its "aggregate" status that the Plan expressly provides:

"Notice is also hereby given that if any governmental agency will not permit the concept and

provisions of Article XIII and the opinion in Exhibit A to remain substantially as set forth

therein, this Plan *will have been so radically altered that it will have to be terminated or*

*substantially revised*." (ABA Plan at 1976 Preface, emphasis added).  Moreover, Participation

Agreements executed by participating employers also describe the plan as an association of

single employer plans.  (AR 1012 at ¶ 13; SAC ¶ 16; PBGC SAC Answer ¶ 16).  To effectuate

this "separate employer" intent, the Plan includes "true-up" provisions upon an employer's

withdrawal from the Plan.  Pursuant to Article XI, Sections 11.01 and 11.02 of the Plan, when an

employer terminates its participation under the Plan, a separate actuarial study of the employer's

contribution history is made and the employer is required to cover any additional costs for

benefits for its employee-participants that have not been funded adequately by its past

contributions and investment earnings thereon.  (ABA Plan ¶¶ 11.01, 11.02; TPC ¶ 27).  If the

employer has contributed excess funds, the surplus assets revert to the terminating employer after

the benefits are paid. (*Id.*)

In June 2005 it was determined that when the Plan's financial condition was examined

on a "separate account" (*i.e.*, a separate employer) basis, five of the seven remaining

participating employers, including IBC,[5] had "negative account balances." (TPC ¶ 44; *see also* SAC ¶¶ 26, 27). On the same separate employer basis, it was determined that Sara Lee had the largest positive balance of any contributing employer to the Plan. (SAC ¶ 28; TPC ¶ 44). Sara Lee decided to transfer certain of its employees covered by the Plan to a separate pension plan that it sponsored – the Consolidated Sara Lee Bakery Group Hourly Employees' Pension Plan (the "Sara Lee Bakery Plan") – together with accrued benefits and assets associated with those employees. (SAC ¶¶ 20, 23, 37; PBGC SAC Answer ¶ 37; AR 1572). Under the "Transfer Agreement,"[6] dated August 30, 2005, the Board initially transferred $71 million to the Sara Lee Bakery Plan, an amount calculated (for purposes of the Transfer Agreement only, and agreed upon by the parties) as if the ABA Plan were a multiple employer plan. (AR 360; SAC ¶ 23; TPC ¶¶ 47, 48). Additional assets of approximately $27 million – representing assets attributable to Sara Lee if the ABA Plan were treated as an aggregate of single employer plans – would remain in the Plan pending the PBGC determination requested by IBC. (AR 344-57, 360, 1565 at n.2; TPC ¶ 47; *see also* AR 339-41).

### B.    The 2006 PBGC Letter.

In late June 2005, IBC made a formal request to the PBGC that the agency reconsider its 1979 determination that the Plan is an aggregation of single employer plans for PBGC plan termination purposes. (AR 339-41, 1563-64, 1573; TPC ¶ 45; PBGC TPC Answer ¶ 45; SAC ¶ 30; PBGC SAC Answer ¶ 30). In its request, IBC argued that the Plan should be treated as a multiple employer plan for all purposes. (AR 339-41, 1563-64, 1573). In response to this

---

[5] IBC has been in bankruptcy proceedings since September 22, 2004. (TPC ¶ 33; PBGC TPC Answer ¶ 33; AR 1572).

[6] The Transfer Agreement, entitled American Bakers Association Retirement Plan Transfer Agreement, is attached at Exhibit 2 to the SAC and is in the submitted record at AR 358-65. (SAC ¶ 23).

reconsideration request, the Plan, Sara Lee, IBC, and Kettering Baking Co. provided to the agency submissions stating their respective positions.  (AR 429-1439, 1566; SAC ¶ 31; PBGC SAC Answer ¶ 31).  The Plan and Sara Lee argued that the Plan is an aggregation of single employer plans for plan termination purposes and has operated as such in accordance with the 1979 PBGC Letter.  (AR 863-1439; *see* also AR 1563-79).

PBGC permitted the parties to be involved in its review of the 1979 Letter only through this single submission.  (TPC ¶ 51; *see also* Declaration of Anne H.S. Fraser, Esq. ("Fraser Decl."), Ex. A at 26-27 (PBGC Counsel Mark Blank states that PBGC on December 29, 2005 was still "looking at whether we have the obligation . . . under the Administrative Procedure Act to afford a second round of briefing . . . so that each interested party could respond to those filings that were made earlier by the respective parties.").  PBGC did not inform the parties what process it would employ to review the submissions, whether a record was being maintained, or whether each submitter would be permitted to review what the other parties had submitted.  (TPC ¶ 52).  Parties who submitted written documents were not required to serve, and were not identified to other interested parties in any formal way.  (TPC ¶ 53).  There were extensive *ex parte* communications between PBGC and some of the interested parties, and in particular between PBGC and IBC.  (TPC ¶ 54; Fraser Decl. ¶ 4).  The submitters participating in the process had no formal opportunity to review the submissions of other submitters, or to make any second-round or rebuttal submissions.  (TPC ¶ 55; Fraser Decl. Ex. A at 26-27).  The submitters had no opportunity to review any agency record before or during the process prior to issuance of a decision, including material that is now only in retrospect known to have been considered material to PBGC's decision (such as information about plan terminations) despite efforts to obtain such records through the Freedom of Information Act.  (TPC ¶ 56).  Representatives of

the Plan had no opportunity to cross-examine or confront any witness, examine any other party's evidence, join any other interested party, discern who would be the decision-maker, evaluate whether the agency was acting within its jurisdiction and whether any decision-maker was impartial, or review or object to any proposed decision prior to the issuance of the determination. (TPC ¶ 57; Fraser Decl. Ex. A at 27-28 (PBGC counsel Mark Blank states PBGC's decision would be made "simply on papers" without a hearing)).  In this manner, PBGC conducted an "informal administrative adjudication to determine whether the ABA Plan is a multiple employer plan."  (PBGC TPC Answer ¶¶ 52-53, 55-57).

On August 8, 2006, PBGC issued its determination.[7]  (AR 1563-79; TPC ¶¶ 58, 73; PBGC TPC Answer ¶¶ 58, 73; SAC ¶¶ 32, 38; PBGC SAC Answer ¶¶ 32, 38).  PBGC reversed its prior position, concluding the Plan is, and has always been, a multiple employer plan and not an aggregation of single employer plans for plan termination and PBGC premium purposes.  (AR 1563-79; TPC ¶ 73; PBGC TPC Answer ¶¶ 62-64, 68, 73; SAC ¶ 38; PBGC SAC Answer ¶ 38).  PBGC made its determination effective immediately upon the date of its issuance.  (AR 1579; SAC ¶ 34; PBGC SAC Answer ¶ 34).

The effect of this 2006 PBGC Letter is that the second payment of Plan assets to the Sara Lee Bakery Plan contemplated under the Transfer Agreement has not been completed because arguably the assets now must be used to fund the benefits of all Plan participants, and not just those employed by Sara Lee.  (TPC ¶ 47; SAC ¶¶ 42, 63; *see also* AR 360-62 at ¶¶ 2(v), 6; SAC ¶¶ 21-25).  If the Plan is a multiple employer plan, the $27 million claimed by Sara Lee would be used to make up for other employers' under-funding, and an additional $16.9 million would be required of the seven participating employers collectively to pay for the liabilities caused by the

---

[7] The 2006 PBGC Letter is attached at Exhibit 3 to the SAC, and included in the submitted record at AR 1563-1579.  (SAC ¶ 32).

under-funding of five of the employers, including the bankrupt IBC which itself has unfunded or under-funded liability of approximately $60.7 million.  (TPC ¶¶ 60, 63, 64).

###   C.    The Present Lawsuit.

On May 3, 2006, Sara Lee filed this action against the Plan and Board, and on May 10, 2006, filed its First Amended Complaint (Doc. 4).  On September 29, 2006, Sara Lee filed its SAC (Doc. 12).  The SAC added PBGC as a defendant in a new Count I which seeks "to reverse and enjoin the PBGC's August 8, 2006 determination that the ABA Plan is a multiple employer pension plan and not an aggregate of single-employer pension plans."  (SAC ¶ 1; *see also* ¶¶ 37-45).  PBGC answered the SAC on February 7, 2007.  (Doc. 42).  Sara Lee also asserts in Counts II and III claims under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), against the Plan and Board concerning administration of the Plan.  (SAC ¶¶ 47, 55).  The Plan and Board have moved to dismiss Counts II and III, which motion is pending.  (Doc. 16).

On November 30, 2006, the Plan and Board filed their Third-Party Complaint for Declaratory and Injunctive Relief, Counterclaim and Cross-Claim.  (Doc. 19).  Count I – asserted against PBGC, Sara Lee and the other participating employers named as third-party defendants – seeks a determination on whether the Plan is a multiple employer plan pursuant to the 2006 PBGC Letter, or whether it is instead an aggregation of single employer plans pursuant to the 1979 PBGC Letter and the terms of the Plan documents.  (TPC ¶¶ 2, 4, 69, 71, Prayer for Relief ¶ 1).  Count II – asserted against PBGC – seeks review of the 2006 PBGC Letter or its rescission because it was issued on the basis of erroneous and incomplete facts, and was the result of a procedurally flawed inquiry violating Cross-Claimants' procedural due process rights under the Fifth Amendment of the Constitution.  (TPC ¶¶ 3, 5, 76, Prayer for Relief ¶¶ 1, 2).

Answers to the TPC were filed by PBGC (Doc. 43), Sara Lee (Doc. 21), Interstate Brands

Corp. (Doc. 30), Lewis Brothers, Inc. (Doc. 35), Harris Baking Co., Inc. (Doc. 36), and American Bakers Association (Doc. 38). On April 4, 2007, PBGC moved for summary judgment on the claims asserted against it by Sara Lee and Cross-Claimants and filed its administrative record. (Doc. 45, 46). On April 23, 2007, Interstate Brands Corporation filed a brief in support of PBGC's motion.[8] (Doc. 54). For the reasons stated herein, PBGC's motion for summary judgment against the Plan's and Board's cross claims should be denied.[9]

## ARGUMENT

### A.    Standard of Review for a Motion for Summary Judgment.

Summary judgment is appropriate only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 322. "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' . . . and a moving party is entitled to judgment as a matter of law only if the nonmoving party 'fails to make a

---

[8] IBC's brief, styled "Third Party Defendant Interstate Brands Corporation's Joinder in Support of the Pension Benefit Guaranty Corporation's Motion for Summary Judgment," should be disregarded. IBC is a party to this litigation, not amicus curiae, and has no standing to join in a motion for summary judgment of claims asserted against PBGC. PBGC is ably represented in this litigation without the need for IBC's assistance. Moreover, PBGC's motion did not seek summary judgment for IBC, and IBC's "joinder" brief does not qualify as a motion for summary judgment on its own behalf under Fed. R. Civ. P. 56 or Local R. 56.1.

[9] Pursuant to Local Civil Rule 7(f), Cross Claimants respectfully request an oral hearing with respect to their opposition to PBGC's motion for summary judgment.

showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial.'" *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), *and Celotex*, 477 U.S. at 322). In ruling on a motion for summary judgment, the court must "view the evidence in the light most favorable to the nonmoving party . . ., draw all reasonable inferences in [the nonmoving party's] favor, and eschew making credibility determinations or weighing the evidence." *Czekalski*, 475 F.3d at 363.

Summary judgment "ordinarily is proper only after the plaintiff has been given adequate time for discovery." *Americable Int'l, Inc. v. Dep't of Navy*, 129 F.3d 1271, 1274 (D.C. Cir. 1997) (citation and punctuation omitted); *see also Khan v. Parsons Global Servs. Ltd.*, 428 F.3d 1079, 1087 (D.C. Cir. 2005) (a "party opposing summary judgment needs a 'reasonable opportunity' to complete discovery before responding to a summary judgment motion and . . . 'insufficient time or opportunity to engage in discovery' is cause to defer decision on the motion.") (citations omitted). "Under Rule 56(f), the district court may defer ruling on a summary judgment motion and permit further discovery so that the nonmoving party may obtain the information necessary to show an issue of material fact in dispute." *First Chicago, Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988); Fed. R. Civ. P. 56(f).[10] The arguments and issued raised in this opposition brief, as well as the statement of genuine issues of material fact, Sara Lee's outstanding discovery requests to PBGC, and the oppositions to PBGC's motion for a protective order, clearly demonstrate the need for discovery under Rule

---

[10] "[T]he purpose of Rule 56(f) is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery." *Dickens v. Whole Foods Market Group, Inc.*, Civ. No. 01-1054, 2003 U.S. Dist. LEXIS 11791, 2003 WL 21486821, at *7 n.5 (D.D.C. Mar. 18, 2003) (*citing Celotex Corp.*, 477 U.S. at 326).

56(f). *First Chicago*, 836 F.2d at 1380-81 ("We find that the combination of FCI's opposition to dismissal on the merits, the accompanying Statement of Material Issues, and the outstanding discovery requests served as an adequate substitute for a Rule 56(f) affidavit."). A district court has discretion in determining whether it should permit additional discovery before the motion for summary judgment is resolved. *Stella v. Mineta,* 284 F.3d 135, 147 (D.C. Cir. 2002).

**B.    Standard of Review of PBGC's 2006 Informal Administrative Adjudication.**

1.    *De novo* review is appropriate in this case.

It is well established that courts should not defer to an agency's interpretation of a statute or regulation where the agency's interpretation has been inconsistent, that is, where it has flip-flopped. *Akzo Nobel Salt, Inc. v. Federal Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000) (finding deference to Secretary's interpretation of regulation unwarranted given "the flip-flops [in] the Secretary's position"); *Wise v. Ruffin*, 914 F.2d 570, 580 (4th Cir. 1990) (where "the PBGC has changed its position," court held "that the PBGC is not entitled to deference") (citing *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("an agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view")); *Advance Foundry Co. v. Kaufman*, No. C-3-94-205, 1996 U.S. Dist. LEXIS 22551, at *18 (S.D. Ohio Mar. 25, 1996) ("The PBGC has upon three occasions taken different positions on the question . . . [t]herefore, the PBGC's [most recent] Interpretation is entitled to less deference than it would have been had it been a re-affirmation of a consistently held view."); *cf. S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1296 (D.C. Cir. 1995) (no deference given to agency interpretation of its regulation where, *inter alia*, interpretation was inconsistent with prior agency statements in other cases). Here, PBGC's application of its regulation, 29 C.F.R.

§ 4001.2, to the facts in 1979 and 2006 was inconsistent, and Cross-Claimants are entitled to discovery to discern (a) what standards the PBGC has utilized for determining whether a plan is a "multiple employer plan" in this and other cases; (b) how those standards have been applied; and (c) whether they have been applied consistently. Given PBGC's inconsistency, and its clear financial stake in its recent flip-flop, the Plan's Title IV status should be reviewed by the Court *de novo* without deference to the agency's new position.

In addition, "if it finds that the agency factfinding procedures are inadequate, the reviewing court may engage in *de novo* review." *Occidental Petroleum Corp. v. SEC*, 873 F.2d 325, 338 (D.C. Cir. 1989) (internal punctuation and citations omitted) (*citing Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415 (1971)); *accord Pacific Architects and Engineers, Inc. v. United States Dept. of State*, 906 F.2d 1345, 1348 (9th Cir. 1990). *De novo* review is warranted here because what process, if any, PBGC used in its informal adjudicatory factfinding was woefully inadequate. As has been noted, PBGC did not allow the parties access to other parties' submissions, an opportunity to rebut, an opportunity to cross-examine or confront witnesses, and the agency engaged in substantive *ex parte* communications with the parties. The Court should therefore not defer to the decision PBGC made based on a deficient, selective factual record that is untested by cross-examination or any form of contradiction, impeachment or rebuttal.

> 2.    The arbitrary and capricious standard of review requires an in-depth, searching and careful consideration of an agency's decision.

Even if the Court applies the arbitrary and capricious standard of review to the 2006 PBGC Letter, as PBGC urges, such review is more demanding than the agency represents. In *PBGC v. Potash*, cited by PBGC in its motion papers and one of the few decisions to address the

same issues before this Court, the court overturned PBGC's determination that a plan was an

aggregate of single employer plans, applying the following standard of review:

> PBGC's determination regarding the availability vel non of all Fund assets
> to pay all participants' benefits on an ongoing basis is subject to
> examination by this Court under the arbitrary and capricious standard of
> review. See 5 U.S.C. § 706(2). PBGC's decision is entitled to great
> deference in the construction and application of ERISA -- see *Connolly v.
> Pension Benefit Guar. Corp.*, 581 F.2d 729, 730 (9th Cir. 1978), cert.
> denied, 440 U.S. 935, 59 L. Ed. 2d 492, 99 S. Ct. 1278 (1979) --, its
> factual determinations are entitled to due deference and a presumption of
> regularity and this Court is not empowered to substitute its judgment for
> that of PBGC. However, **the narrow scope of review under the
> arbitrary and capricious standard does not shield the agency's
> decision from an in-depth, searching and careful consideration by this
> Court** -- see *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402,
> 415, 28 L. Ed. 2d 136, 91 S. Ct. 814 (1971) -- **or prevent reversal of such
> where there has been a clear error of judgment**. See *Bowman Transp.
> v. Ark.-Best Freight System*, 419 U.S. 281, 285, 42 L. Ed. 2d 447, 95 S. Ct.
> 438 (1975). **The agency's determination "must articulate a 'rational
> connection between the facts found and the choice made.'"** Ibid.
> (quoting from *Burlington Truck Lines v. United States*, 371 U.S. 156, 168,
> 9 L. Ed. 2d 207, 83 S. Ct. 239 (1962)).

*PBGC v. Potash*, Civ.-79-130B(E), 1986 U.S. Dist. LEXIS 30987, at *7-8 (W.D.N.Y. Mar. 28,

1986) (emphasis added).

   *Potash* states the correct standard.  The Supreme Court has explained that an agency

decision is arbitrary and capricious if it is not "based on a consideration of the relevant factors

[or] there has been a clear error of judgment." *Overton Park*, 401 U.S. at 416.  That Court has

further explained that agency action must be overturned if it "has relied on factors which

Congress has not intended it to consider, entirely failed to consider an important aspect of the

problem, offered an explanation for its decision that runs counter to the evidence before the

agency, or is so implausible that it could not be ascribed to a difference in view or the product of

agency expertise."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29,

43 (1983); *see also County of L.A. v. Shalala*, 192 F.3d 1005, 1021 (D.C. Cir. 1999) ("Where the

agency has failed to provide a reasoned explanation, or where the record belies the agency's

conclusion, [the court] must undo its action."). PBGC "must provide some basis in the record to

conclude that the agency considered the matter in a detailed and reasoned fashion." *Ass'n of*

*Flight Attendants-CWA v. PBGC*, No. 05-1036(ESH), 2006 U.S. Dist. LEXIS 1318, *20-21

(D.D.C. Jan. 13, 2006) (internal punctuation and citations omitted).

"[W]here an agency departs from established precedent without a reasoned explanation,

its decision will be vacated as arbitrary and capricious." *Manhattan Ctr. Studios, Inc. v. NLRB*,

452 F.3d 813, 816 (D.C. Cir. 2006) (*quoting ANR Pipeline Co. v. FERC*, 71 F.3d 897, 901 (D.C.

Cir. 1995)). PBGC's departure from its 1979 Letter is unreasonable and should thus be vacated.

This Court is not required to "rubber-stamp" PBGC's deficient 2006 Letter even under the

arbitrary and capricious standard. *Neighborhood TV Co. v. FCC*, 742 F.2d 629, 639 (D.C. Cir.

1984) (under arbitrary and capricious standard of review, "a reviewing court's task is not merely

to rubber-stamp an agency decision"). As in *Potash*, the Court should hold PBGC's latest

determination erroneous and adopt the agency's earlier decision. *Potash*, 1986 U.S. Dist. LEXIS

30987, at *25-26 (court adopts earlier PBGC decision and disregards later contrary decision "in

the interest of finally resolving this matter").

C.    **Standards for Assessing a Plan's Status as a Multiple Employer Plan or
      Aggregate of Single Employer Plans.**

The Plan is a multiple employer plan if "all plan assets are available to pay benefits to all

plan participants and beneficiaries." 29 C.F.R. § 4001.2; *see also Nowell v. Central Serv. Ass'n*,

106 F. Supp. 2d 888, 894 (S.D. Miss. 2000); *Potash*, 1986 U.S. Dist. LEXIS 30987, at *3-5.

The Plan is an aggregate of single employer plans if "the contributions of individual

employers [a]re not available to satisfy the benefit liabilities of other employers." *PBGC v.*

*Artra Group, Inc.*, 972 F.2d 771, 773 (7th Cir. 1992) ("*Artra I*") (citing PBGC Board of Appeals

Opinion Letter, 90-172 at 2 (Dec. 6, 1990)); *PBGC v. Artra Group, Inc.*, No. 90 C 5358, 1993 U.S. Dist. LEXIS 8440, at *3-4 (N.D. Ill. June 22, 1993) ("*Artra II*") ("The parties agree that the determination whether the UE Plan was an aggregate of single-employer plans, or one multiple-employer plan, hinges upon whether the contributions of the individual employers were available to satisfy the benefit liabilities of other employers. If the contributions of the individual employers were not available to satisfy the benefit liabilities of other employers, the UE Plan is an aggregate of single-employer plans").  Put another way, "more than one plan exists if, on a going concern basis, a portion of the assets is not available to pay some of the benefits, irrespective of whether each plan has the same benefit structure or plan document or if all or part of the assets are involved in one trust."  *Nowell*, 106 F. Supp. 2d at 894 (quoting PBGC administrative decision); *Potash*, 1986 U.S. Dist. LEXIS 30987, at *5 (same).  While there is no disagreement as to the applicable standard, there is disagreement as to whether a plan can be, as this Plan evidently was, classified as a multiple employer plan for ongoing purposes and a group of single employer plans for termination (Title IV) purposes.  The 1979 Letter clearly recognized and permitted the ongoing Plan to maintain a single trust and actuarial valuation (Schedule B) while disaggregating into separate employer accounts on termination.  The new determination does not countenance any possibility that the Plan could operate lawfully under more than one classification, but cites no legal authority that it cannot do so.

       **D.**      **Issues of Fact Preclude Summary Judgment for PBGC.**

          1.      <u>Whether the record submitted by PBGC is complete is an issue of fact.</u>

"[I]t is incumbent upon the Court to ensure that it has a complete administrative record before it undertakes a review of an administrative decision."  *Int'l Longshoremen's Ass'n v. Nat'l Mediation Bd.,* 2006 U.S. Dist. LEXIS 4080, at *14 (D.D.C. Jan. 25, 2006).  A complete administrative record "'consists of all documents and materials *directly or indirectly* considered

by the agency decision-makers and includes evidence contrary to the agency's position.'" *Id.* at *7-8 (citations omitted, emphasis added).  An agency is not entitled to "skew the 'record' for review in its favor" by excluding information in its files pertinent to the proceeding in question. *Environmental Defense Fund, Inc. v. Blum*, 458 F. Supp. 650, 661 (D.D.C. 1978).  Discovery is therefore warranted where an agency submits a "partial and truncated [administrative] record" for review.  *Natural Res. Def. Council, Inc. v. Train*, 519 F.2d 287, 291-92 (D.C. Cir. 1975); *see also* 5 U.S.C. § 706 (in reviewing an agency action under the APA[11] "the court shall review the whole record or those parts of it cited by a party"); *Overton Park*, 401 U.S. at 419-20 (remanding the case for review "to be based on the full administrative record that was before the Secretary at the time he made his decision"); *PBGC v. LTV Steel Corp.*, 119 F.R.D. 339, 342 (S.D.N.Y. 1988) (allowing additional discovery to ensure that the record is complete because "[a] full and complete administrative record is essential to meaningful judicial review").

PBGC's motion must be denied because this Court cannot determine whether the record submitted constitutes the complete administrative record, and PBGC's process of gathering information, and what information it based its 2006 decision upon, are central, material issues to Cross Claimants' claims.  In reaching its 2006 decision, PBGC engaged in an "informal administrative adjudication" (PBGC TPC Answer ¶¶ 52-53, 55-57) rather than a formal proceeding.  In the absence of a formal proceeding, courts have held that discovery is necessarily warranted, even absent identification of specific documents excluded from the record, because the agency's fact-finding process itself is a fact issue in the case.  For example, in *PBGC v. LTV Steel Corp.*, PBGC made the same arguments that it makes here, *i.e.*, that the district court should review its decision under the arbitrary and capricious standard based only on a 1592 page

---

[11] *See* Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA").

administrative record compiled by PBGC.  119 F.R.D. at 340.  But, like here, the absence of a

formal proceeding placed the agency's informational base at issue, requiring discovery.  *Id.* at

342 ("'determining what constitutes an agency's informational base . . . may itself present a

disputed issue of fact when there has been no formal administrative proceeding.'") (*quoting*

*Dopico v. Goldschmidt,* 687 F.2d 644, 654 (2d Cir. 1982)).  Even though LTV's allegations

regarding the completeness of the record were "unspecific," the court found discovery necessary

to ensure that all matters considered by PBGC were before the court.  *Id.* at 342.  And, of

particular importance here, the court explained: "regardless of what is ultimately determined to

be the standard for judicial review of the PBGC's action, at minimum the adequacy of the

PBGC's deliberations, in terms of process if not substance, will be at issue. A full and complete

administrative record is essential to meaningful judicial review of that issue." *Id.*  Since the

adequacy of PBGC's deliberations is the very issue raised in Cross Claimants' Count II

procedural due process claim, discovery is required here under *LTV.  See also Harrisonville Tel.*

*Co. v. Ill. Commerce Comm'n*, 472 F. Supp. 2d 1071, 1075 (S.D. Ill. 2006) (allowing discovery

where agency did not allow evidentiary hearing or discovery, noting: "The threshold for

permitting limited discovery in administrative review proceedings is not high.").

　　　　Even aside from the necessity of discovery due to the procedural questions raised,

discovery is also warranted because the record submitted by PBGC on its face appears

incomplete, specific classes of documents being absent from it.  For example, while PBGC now

relies upon its opinion letters in other cases (PBGC Mem. at 3-4, 14 (Doc. 46); AR 1567), the

submitted record excludes them as well as related documents from those proceedings that speak

to the PBGC's procedures in assessing the Title IV status of a plan.  And the publicly available

opinion letters PBGC has cited are more than twenty years old – discovery is needed to identify

what other, more recent, decisions were considered in formulating PBGC's procedures and its recent flip-flop in this case. In short, Cross Claimants have no way of knowing how PBGC's prior decisions and decision-making processes in these cases impacted PBGC's 2006 decision and process without some discovery.

Furthermore, Cross Claimants' TPC asserts that PBGC engaged in *ex parte* communications and relied on these communications in its 2006 decision-making process. PBGC has not submitted any evidence attempting to resolve the issue. Cross Claimants should be allowed discovery to determine whether records of such communications, absent from the submitted record, exist, *e.g.*, records of telephone conversations or face-to-face meetings. In summary, whether PBGC considered documents and information outside the submitted record is a fact issue here; summary judgment should be denied and discovery allowed to commence. *Train*, 519 F.2d 292 (holding "plaintiffs are entitled to an opportunity to determine, by limited discovery, whether any other documents which are properly part of the administrative record have been withheld"); *Int'l Longshoremen's Ass'n*, 2006 U.S. Dist. LEXIS 4080, at *11 (denying agency's motion to dismiss or for summary judgment because fact issue existed whether handwritten notes taken during investigation should be part of administrative record).

>    2. <u>Issues of material fact unanswerable in the submitted record, and in genuine dispute, include how the Plan was administered, what PBGC considered, and whether differing considerations in other cases render its 2006 decision arbitrary and capricious.</u>

The administrative record submitted by PBGC demonstrates the presence of several genuine issues of material fact that preclude summary judgment for PBGC, including:

- The accuracy of the records maintained by the Plan. PBGC argues that the system of accounts and records were insufficient to maintain separate plans. Cross Claimants argue that the records were sufficient, and that the Plan in fact successfully recreated single employer accounts when called upon to do so.

- Whether the Plan was represented as a multiple employer plan or aggregate of single employer plans in submissions to governmental agencies such as the IRS, DOL and PBGC, as well as to other persons such as Plan participants and participating employers. While some of these records are found in the submitted record, the issue has not been fully developed.

- Whether Sara Lee or other participating employers have subsidized the benefits of IBC employees, or whether IBC's contributions have been sufficient to present to pay such benefits.

- Whether the obligations of employers who have ceased participating in the Plan have been shouldered by the remaining participating employers, or funded by the departing employers, PBGC, and/or with assets that have been abandoned to the Plan.

- How the Plan's true-up provision and termination of employer participation worked. The parties take differing positions as to what these provisions required and whether the terms of the Plan were followed. The parties' practical construction of the Plan's terms is in factual dispute.

- Whether surcharges and the true-up provisions sufficiently assured employers were not called on to fund the benefits of employees of other employers.

- What the agency looked at, in order of importance. Especially in view of how the agency treated other aggregates differently, and how it treated the Plan differently based on the same facts in 1979, Cross Claimants require discovery to understand what the agency considered important in 2006 and why its decision differs from precedent in its 1979 Letter and other decisions.

- How PBGC has applied its standards in other cases, and how its prior precedent was used to overturn the 1979 PBGC Letter. While PBGC has cited a handful of opinion letters in its summary judgment brief, the record has yet to be developed to what extent documents from those and other proceedings assessing plans' Title IV status informed its 2006 decision here. PBGC has taken the position that its standards have justifiably changed over time (*see, e.g.*, PBGC Mem. at 1, 17-18 (contenting PBGC erred in 1979 but since then has "continued its efforts to interpret ERISA") (internal punctuation omitted); AR 1570 (alleging its 1979 decision was "simply wrong")), yet it only cites opinion letters from the 1970s to mid-1980s to give any explanation of its standards. Cross Claimants have no way of knowing how PBGC's standards have changed, and how it has applied these standards in recent years since the agency determined a change was necessary. To the extent PBGC's prior precedent contradicts its 2006 Letter, this information will be crucial to showing the 2006 Letter was arbitrary and capricious.

- The sufficiency of PBGC's fact-finding process. The parties dispute many issues such as whether PBGC allowed the parties access to other parties'

submissions and an opportunity for rebuttal, and whether PBGC entered into *ex parte* communications with the parties.

The Court is not bound to rely solely upon the administrative record as currently submitted by PBGC *or* to the extent it may be supplemented by documents PBGC improperly excluded.[12] Consideration of extra-record information is appropriate where, as here, simply reviewing the administrative record is not enough to resolve the case. *Pac. Shores Subdivision Cal. Water Dist. v. United States Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (*citing Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).[13]

3.    PBGC's flawed procedures preclude summary judgment.

The Court does not have the information required to decide, as Count I requests, whether the Plan is an aggregate of single employer plans or a multiple employer plan because PBGC's

---

[12] The issue of supplementation of the record addressed in Section D.1, *supra*, is a different issue from review of extra-record evidence. This Court recently explained that supplementing the record is "adding to the volume of the administrative record with documents the agency considered," while in contrast allowing the review of extra-record evidence is "viewing evidence outside of or in addition to the administrative record that was not necessarily considered by the agency." *Pac. Shores Subdivision Cal. Water Dist. v. United States Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 6 (D.D.C. 2006).

[13] It is well established that extra-record review is appropriate where:

(1) when agency action is not adequately explained in the record before the court;

(2) when the agency failed to consider factors which are relevant to its final decision;

(3) when an agency considered evidence which it failed to include in the record;

(4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly;

(5) in cases where evidence arising after the agency action shows whether the decision was correct or not;

(6) in cases where agencies are sued for a failure to take action;

(7) in cases arising under the National Environmental Policy Act; and

(8) in cases where relief is at issue, especially at the preliminary injunction stage.

*Fund for Animals v. Williams*, 391 F. Supp. 2d 191, 197-98 (D.D.C. 2005) (*citing Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (identifying the eight exceptions)).

flawed informal adjudicative procedure denied Cross Claimants a meaningful opportunity to be heard, rendering the submitted record deficient. These same procedural deficiencies violated Cross Claimants' due process rights, as alleged in Count II. The Court should deny PBGC's motion for summary judgment and conduct a *de novo* review.

PBGC did not inform Cross Claimants what facts it deemed important to reach its 2006 decision, and it gave only the barest identification of legal issues, telling Cross Claimants to review the 1979 PBGC Letter, which PBGC now states was legally erroneous (AR 1570), and citing to two district court cases. (AR 427-28). Despite requests for guidance, PBGC left Cross Claimants in the dark. In making their best attempt to guess what PBGC deemed important and submit useful information to the agency, Cross Claimants explained to PBGC:

> [P]lease be advised that the officials and consultants to the Plan have *substantial additional information and records* covering the past 45 years of operations that may have some bearing on the PBGC's consideration of the issues. We are prepared to submit affidavits from each consultant on items that PBGC might view as important, *but because the scope and procedure pertaining to this inquiry have not been formally defined*, we have elected not to produce evidence in the form appropriate to a court of law. The foregoing information is in the nature of a proffer that we are prepared to substantiate by sworn testimony if necessary, *and to supplement in any way that might be helpful.*

(AR 887) (emphasis added); *see also* AR 342.[14] Despite this statement, PBGC chose to rely on a single submission from Cross Claimants, and made no attempt to clarify its process or seek additional information. The factors PBGC considered most relevant were only made known to Cross Claimants in the 2006 PBGC Letter, and because PBGC made its decision effective immediately without the usual opportunity for appeal or reconsideration (AR 1579), Cross Claimants have not have an opportunity to fully address PBGC's concerns. PBGC also denied

---

[14] Plan counsel again asked PBGC on April 10, 2006: "whether there are or will be any additional points on which PBGC is seeking additional input from the parties?" (AR 1511).

Cross Claimants the opportunity to receive and rebut IBC's and Kettering's submissions prior to the agency's issuance of its 2006 Letter. For these reasons, the Court cannot rely on PBGC's faulty investigation to render an informed decision.

In *Occidental Petroleum*, this Circuit ordered remand back to an agency whose procedures were similarly faulty, producing a deficient administrative record. 873 F.2d at 347. Occidental Petroleum, like Cross Claimants here, was not given notice of an important issue, or a meaningful opportunity to address it:

> Thus, the question of public availability was apparently brought to Occidental's attention for the first time when the General Counsel issued his final decision. In effect, then, as the district court found, the General Counsel ruled on a ground of which Occidental had no prior notice and to which it had had no opportunity to respond.

*Id.* at 342. The same problem is evident here, as PBGC argues Cross Claimants must make their case based on a deficient record that does not contain information Cross Claimants would have submitted had they notice of what grounds PBGC would rest its decision upon. *De novo* review,[15] or alternatively remand,[16] is therefore warranted to allow Cross Claimants a meaningful

---

[15] *Occidental Petroleum*, 873 F.2d at 338 ("if it finds that 'the agency factfinding procedures are inadequate,' the reviewing court may engage in *de novo* review.") (*quoting Overton Park*, 401 U.S. at 415). In deciding whether to remand or conduct a *de novo* review, "the reviewing court 'should consider which method will prove the most expeditious so that full review may be had as soon as possible.'" *Id.* (*quoting Overton Park*, 401 U.S. at 421); *cf. Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("[I]f the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation").

[16] *Occidental Petroleum*, 873 F.2d at 338, 347 ("[W]e see nothing in *Vermont Yankee*, or in any other case, to suggest that a court must abandon its reviewing function when it believes that the reason for the agency's failure to produce an adequate record is traceable to the procedures it followed. The proper course in a case with an inadequate record is to vacate the agency's decision and to remand the matter to the agency for further proceedings.") (*citing Vermont Yankee Nuclear Power Corp. v. NDRC*, 435 U.S. 519 (1978)); *see also Potash*, 1986 U.S. Dist. LEXIS 30987, at *3 (court remanded action to PBGC when it found the agency had not properly applied the standard for distinguishing between a multiple employer plan and an

opportunity to present their evidence.[17]

PBGC's brief argument (PBGC Mem. at 11-12) that Cross Claimants do not have a constitutionally protected interest allowing them to state their Count II due process claim is also without merit. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). To establish an actionable due process claim, the plaintiff must show (1) it has a constitutionally protected life, liberty or property interest and (2) the procedures employed deprived the plaintiff of that interest without constitutionally adequate procedure. *See Propert v. D.C.*, 948 F.2d 1327, 1331 (D.C. Cir. 1991); *Soeken v. Herman*, 35 F. Supp. 2d 99, 104-05 (D.D.C. 1999). Cross Claimants have constitutionally protected interests in the contracts they have entered into, which govern contributions to the Plan and use of Plan assets.[18] *See International Union, United Auto., etc. v. Keystone Consol. Industries, Inc.*, 793 F.2d 810, 815-17 (7th Cir. 1986) (union's contractual right to an annual pension plan contribution from an employer requires IRS's informal determination procedure to meet Fifth Amendment due process guarantees if IRS determination could nullify union's contract rights). Cross Claimants were entitled to due process because a PBGC finding that the Plan is a multiple employer plan threatened their right

_____

aggregate of single employer plans).

[17] PBGC's reliance on *PBGC v. LTV Corp.*, 496 U.S. 633 (1990), is inapposite, because in that case there was no "suggest[ion] that the administrative record was inadequate to enable the court to fulfill its duties." *Id.* at 655. Here, that is precisely the problem. Moreover, unlike the court of appeals decision reversed in *LTV*, Cross Claimants do not ask this Court to impose any "specific procedural requirements" on PBGC, but simply to allow supplementation of the record, as the *Occidental Petroleum* Court found appropriate.

[18] Such contractual obligations are found in the Transfer Agreement, Participation Agreements, and the Plan and Trust documents. The parties' inability to rely on these contracts following the 2006 PBGC Letter has led to the present uncertainty and costly litigation, and threatens further litigation should PBGC or the Court fail to reverse that Letter.

to contract, their contractual rights to seek monetary contributions from participating employers, and their rights to assets held in the Plan's trust.

### E.    PBGC's 2006 Letter is Arbitrary and Capricious

#### 1.    The Plan is an aggregate of single employer plans under the terms of the Plan document.

PBGC based its 2006 determination of the Plan's multiple employer plan status on evidence outside the Plan document – there is no dispute that the Plan document indicates the Plan is and is intended to be an aggregate of single employer plans.  (*See, e.g.*, AR 1570; ABA Plan at 1976 Preface, ¶¶ 13.01, 13.02; *see also id.* ¶¶ 5.05, 11.01, 11.02).[19]  PBGC's reliance on evidence outside the plan document to argue for multiple employer plan status, where as here the plan on its face is an "aggregate," is arbitrary and capricious.  PBGC has explained: "Where the plan document is clear as to the intent of the parties, we will generally be guided by such express intent."  PBGC Op. Ltrs. 85-2, 1985 PBGC LEXIS 31, at *2-3, 7 (Jan. 14, 1985) (finding aggregate status because "the restated plan that was adopted by all contributing employers in 1977 clearly established that Association and the contributing employers intended that Plan thereafter be treated as an aggregate of single plans"); *see also Artra I*, 972 F.2d at 773 (PBGC Board of Appeals "concluded that the terms of the documents [that governed Artra's participation in the plan] alone were sufficient evidence of single-employer status," but also "supported [its] conclusion by reference to . . . the accounting practices of the UE Plan and the manner in which other employers who withdrew from the UE Plan were treated.").  Even where facts outside the plan document contradict a plan's intended Title IV status, PBGC has credited

---

[19] In their Participation Agreements, the participating employers also expressly "acknowledge[] and accept[] that for purposes of Pension Benefit Guaranty Corporation termination and premium rules the ABA Plan is treated as an association of single employer plans."  *See* IBC Participation Agreement, signed by IBC on January 10, 2002, AR 1012 at ¶ 13.

the terms of the plan.  PBGC Op. Ltrs. 85-2, 1985 PBGC LEXIS 31, at *8-9 (PBGC states:

"While, by itself, this funding procedure [reported in Form 5500] is indicative of a single plan, in

view of the express intent of the plan document, we conclude that the funding method employed

is not determinative of Plan's structure.").  Because the Plan, by its terms, indicates it is an

aggregate of single employer plans, this Court need look no further and should reverse the 2006

PBGC Letter.

> 2.    <u>Holding the Plan's assets in a single trust and keeping actuarial records for
> the commingled trust does not render a plan a multiple employer plan.</u>

Even if the Court looks outside the Plan's express terms, PBGC's 2006 Letter should be

reversed.  PBGC argues that maintenance of Plan assets in a single Trust makes the Plan a

multiple employer plan.  But PBGC knew all the participating employers' contributions were

held in a commingled trust account at the time the agency held the Plan was an "aggregate" in

1979.  (AR 214; *see also* AR 171).  Likewise, in other cases, PBGC has taken the position that

even if "all o[r] part of the assets are involved in one trust," a plan is still an aggregate of single

employer plans if a portion of the assets are not available to pay some of the benefits.  PBGC Op.

Ltrs. 84-2, 1984 PBGC LEXIS 8, at *5 (Jan. 17, 1984) (*citing* 42 Fed. Reg. 59285, 59286

(1977)); *see also Nowell*, 106 F. Supp. 2d at 894; *Potash*, 1986 U.S. Dist. LEXIS 30987, at *5.

PBGC's reversal of its 1979 Letter on this basis is thus arbitrary and capricious.

PBGC also erred in finding that the Plan's failure to keep separate actuarial records

renders it a multiple employer plan.  PBGC was informed of this fact before issuing its 1979

Letter, and nonetheless held the Plan to be an "aggregate" plan at that time.  (AR 214, 1569-70;

*see also* AR 6 (PBGC memorandum states Plan informed PBGC in 1975 that: "Assets are

pooled, but there is no separate accounting for each employer as far as his share of the assets and

liabilities."); AR 83, 161, 167 (Plan informed PBGC in 1975 and 1978 that actuarial study is

made to assure terminating employers make up under-funding)). PBGC's 1979 decision was correct, and its reversal in 2006 on the same information is arbitrary and capricious.

A primary rationale for PBGC's change in position is that the Plan was not amended after 1979 to transform it into an aggregate plan as allegedly required in the 1979 PBGC Letter. (AR 1566). PBGC makes this up from whole cloth. The 1979 Letter did not give instructions for the Trustees to make the Plan an aggregate in the future – it expressly found that the Plan was an aggregate of single employer plans as constituted. The 1979 Letter, as well as other PBGC decisions, explains a plan may "by *whatever means*" assure employers fund only their own employees' benefits. (AR 213; PBGC Op. Ltrs. 85-2, 1985 PBGC LEXIS 31, at *2 (Jan. 14, 1985)). In 1979, PBGC gave its blessing to the Plan's means of maintaining aggregate status. To now hold there is only one means of assuring aggregate status, *i.e.*, through maintenance of separate employer accounts or actuarial valuations, is an arbitrary and capricious change in position contradicted by prior PBGC precedent here in 1979 and in other cases.

3.    Retroactive application of the 2006 Letter is arbitrary and capricious.

Moreover, PBGC candidly admits that its change in position is due to error in its 1979 Letter. (AR 1570 (PBGC states: "In retrospect, PBGC's application of the legal standard was simply wrong.")). Even if PBGC's 1979 decision were erroneous, which it was not,[20] the agency's retroactive application of the Plan's multiple employer status is arbitrary and capricious, punishing Cross Claimants and some participating employers for an error made by PBGC, and further evidencing the agency's bias in rendering a decision that relieves the agency of a potential obligation to insure benefits. There is simply no reason for retroactive application of the 2006 Letter other than to off-load PBGC's obligations on Sara Lee and other employers.

---

[20] PBGC in fact only made the 1979 decision after three to four years of internal debate. *See, e.g.*, AR 4-24, 64-69, 74-75, 80-86, 157-211.

"Congress and the courts require that agency action reflect clear, rational decisionmaking that gives regulated members of the public adequate notice of their obligations." *S.G. Loewendick & Sons, Inc. v. Reich*, 70 F.3d 1291, 1297 (D.C. Cir. 1995). If, as PBGC claims, it erred in 1979, it failed to meet this duty to the detriment of the Cross Claimants and participating employers who relied on its 1979 Letter for 27 years.

4.    Representations of the Plan's nature do not transform it into a multiple employer plan.

PBGC also notes the multiple employer plan box is checked in the Plan's Form 5500s and the Forms' actuarial attachments addressed the Plan as a whole. (AR 1574-75). But this is not dispositive of such status, particularly because there was no box for "aggregate of single employer plans" on that Form. (AR 1092). And the Form 5500s *do* in fact reflect the aggregate nature of the Plan, as from 1976 to 1999 each participating employer filed a separate Form 5500, and since 2000 a single Form 5500 filed on behalf of the Plan included separate Schedule T demonstrations for each employer. (AR 875; *see also* AR 884). Furthermore, the Form 5500s are insufficient evidence to rebut the Plan's aggregate nature. In *Artra*, the court, at PBGC's urging, held that erroneously reporting to the IRS that a plan is a multiple employer plan and paying PBGC premiums as such a plan is insufficient to overcome evidence that a plan is an aggregate of single employer plans. *Artra II*, 1993 U.S. Dist. LEXIS 8440, at *8; *cf.* PBGC Op. Ltrs. 84-2, 1984 PBGC LEXIS 8, at *13 n.4 (PBGC opines that the use of "consolidated government reports does not demonstrate whether all of the plan assets were available on an ongoing basis to pay benefits to all participants, and accordingly, is not significant to our analysis"). Likewise here, there is ample evidence of the Plan's aggregate status, including many representations to the IRS and PBGC that the Plan was such a plan.

The Plan has repeatedly explained its aggregate status to the IRS, and to PBGC

specifically when individual employers sought termination of their plans and PBGC conducted audits in connection with terminations. (*See, e.g.*, AR 874, 880, 1033-47, 1188-1212, 1577). PBGC has closed the audits without any adverse findings (*see, e.g.*, AR 880, 1182-86) and processed terminations of single employer plans, recognizing the aggregate nature of the Plan (*see, e.g.*, AR 270-75 (Fasano Pie Company plan termination in 1985); *see also* Fraser Decl. Ex. B (records of correspondence regarding numerous terminations of single employer plans within the Plan)). The Plan also files PBGC Form 1 and pays PBGC premiums at the *single employer rate* (and currently at the variable rate level). (AR 880, 1174-78). Following a PBGC premium audit, closed in November 2000, PBGC did not question the structure of the Plan as an aggregation of single employer plans or the appropriateness of the application of single employer rules to the Plan. (AR 881). And, most notably, IRS determination letters are sought on an individual employer basis. (AR 874).

Nor does the letter of the Plan's counsel (*see* AR 1572, 1575-76) indicate that the Plan is a multiple employer plan for Title IV purposes. PBGC has recognized that Cross Claimants consider the Plan a "hybrid" plan, that is, a multiple employer plan for purposes of Titles I and II of ERISA and an aggregate of single employer plans for purposes of Title IV. (AR 1570-71; *cf.* IBC Participation Agreement, AR 1012 at ¶ 13 (acknowledging hybrid nature of Plan)). Counsel's letter is consistent with the Plan's explicit goal to achieve efficiencies and cost savings by providing common management to all the participating employers' plans in accordance with multiple employer plan treatment under Titles I and II.[21]

     5.       The Plan's funding practices were consistent with aggregate status.

---

[21] Furthermore, in requiring Kettering to make the contributions at issue in counsel's letter, the Plan was able to avoid keeping separate actuarial records while assuring that each participating employer paid for its own employees' benefits – a means of achieving aggregate status that PBGC approved in its 1979 Letter.

Even assuming they occurred, rare instances of negative account balances also do not render the Plan a multiple employer plan. Because, as PBGC allowed in its 1979 Letter, the Plan does not keep separate actuarial records on an on-going basis,[22] it is not unreasonable that under-funding of a single plan may occur occasionally[23] – the important fact is that the Plan has a means of correcting shortfalls and requiring employers to fund their own employees' benefits. As PBGC admits, the Plan has a true-up provision (AR 1571) which assures employers ultimately pay their own employees' benefits. (*See also* AR 868 (explaining additional contributions may be required of employers on an ongoing basis or on termination), 882-83; ABA Plan ¶¶ 11.01, 11.02). Pursuant to Article XI, Sections 11.01 and 11.02 of the Plan, when an employer terminates its participation under the Plan, a separate actuarial study is made and the employer is required to cover any additional costs for benefits for its employee-participants that have not been adequately funded by its past contributions. (ABA Plan ¶¶ 11.01, 11.02; TPC ¶ 27). If the employer has contributed excess funds, the surplus assets revert to the terminating employer after the benefits are paid. (*Id.*) The Article XI provisions, consistent with Article XIII, thus assure that only assets attributable to each terminating employer may be used to pay benefits for that employer's employees. While most terminating employers have had sufficient assets in the Plan to avoid further demands, the Plan has called on some to make additional contributions pursuant to these provisions. (AR 880). And aside from corrections on individual employer terminations, differences between employer groups are also addressed through the medium of the surcharge, which is set according to the characteristics of an individual

---

[22] As Cross Claimants explained to PBGC, the Plan does keep adequate records to "permit reconstruction at any time of each employer's 'account.'" (AR 870; *see also* AR 876, 882, 1219, 1227-85).

[23] PBGC was aware of this possibility in 1978, prior to its issuance of its finding in 1979 that the Plan is an aggregate of single employer plans. (AR 169).

employer's group.  (AR 872, 875-76).

Where the normal practice, and the practice required by the Plan document, is to assess liability on the terminating employer, limited instances of payment by a plan of a terminating employer's liabilities is insufficient to show the plan is a multiple employer plan.  As the *Artra II* court noted:  "Isolated transactions would not indicate a pattern of intermingling employer accounts."  *Artra II*, 1993 U.S. Dist. LEXIS 8440, at *7.  The record shows that in almost all incidents of termination of employer participation where the individual employer's plan was under-funded, the Plan assessed and received further contributions from the employers to fund future benefits of their employees.  (AR 879-80).  And, in the rare exceptions where the company has vanished, benefits were paid out of abandoned assets, not assets of current employers.  (AR 880, 1571).

Further, as long as the Plan was over-funded, there was no issue regarding assets available to pay benefits of other employers' employees – this only arguably became an issue after 2000 and IBC's "employee dump." (AR 1571 (noting Plan as a whole was nearly fully funded through the late 1990s); AR 883 (explaining funding problems IBC created by enrolling unionized employees with high average ages in the Plan and shortly thereafter closing their plants)).  It is in any event not clear even after 2000 that Sara Lee or other employers' monies were ever used for IBC's employees.  Furthermore, in recent years, disappointing investment performance, a challenging economy, and interest rate declines created what The Segal Company has called "The Perfect Storm" for pension plans – creating under-funding in many healthy pension plans that does not indicate any structural deficiency in the ABA Plan if it is under-funded.  *See* Fraser Decl. Ex. C; *see also* AR 491, 1572.  In its 2001 survey, Segal reported that 83 percent of multiemployer defined benefit pension plans were fully funded for their vested

benefits.  Fraser Decl. Ex. C.  In 2002, the percentage of fully funded plans dropped to 67

percent.  In 2003, it dropped to 31 percent; in 2004 to 17 percent; in 2005 to 11 percent.  *Id.*[24]

       6.     <u>The 2006 Letter is arbitrary and capricious due to PBGC's process.</u>

Finally, PBGC bases its 2006 Letter on its observation that the Trustees and Sara Lee

"did not rebut most of the specific facts identified in the Kettering-Interstate filings."  (AR

1566).  But, as has been explained, Cross Claimants and Sara Lee were not given access to such

submissions or an opportunity to respond.  For this reason as well, PBGC's 2006 decision is

arbitrary and capricious.[25]

**CONCLUSION**

The *Potash* court overturned PBGC's assessment of a plan's Title IV status, observing:

> Although PBGC's decision properly set forth the applicable standards, the
> determination does not set forth or rely on any legitimate evidence in
> reaching its final conclusion. Rather, the decision appears to be an ad hoc
> determination geared towards reaching a given result in spite of the
> absence of support for such.

*Potash*, 1986 U.S. Dist. LEXIS 30987, at *6-7; *accord Ramaprakash v. FAA*, 346 F.3d 1121,

1130 (D.C. Cir. 2003) ("'the core concern underlying the prohibition of arbitrary or capricious

---

[24] The surveys are available at http://www.segalco.com/taft/pub-taft.cfm?Subcategory=Survey.

[25] *Cook v. PBGC*, 652 F. Supp. 1085 (S.D.N.Y. 1987), is irrelevant to the present motion, addressing none of the issues here.  Cross Claimants have not asserted an estoppel claim, the claim at issue in *Cook*, and the dispute here is whether the Plan is a *multiple employer plan* under 29 C.F.R. § 4001.2, not whether it is a *multi-employer plan* as in *Cook*.  *Id.* at 1086-87, 1089. Nor may PBGC make light of its 1979 Letter, by analogy to *Cook*, because the facts are distinguishable.  In *Cook*, PBGC's earlier determination was conditional – the agency "defer[red] a final decision pending the receipt of more information" – and the agency continued to investigate the plan's Title IV status for three years, at which time it reversed itself.  *Id.* at 1087-89.  Here, PBGC did not continue its investigation following the final decision made in its 1979 Letter but only revisited the issue 27 years later when asked to do so by IBC.  *Cook* does not rebut the arbitrary and capricious nature of PBGC's 2006 flip-flop, and other cases show the Court should not defer to PBGC's more recent decision.  *See, e.g.*, *Potash*, 1986 U.S. Dist. LEXIS 30987; *Wise*, 914 F.2d at 580; *Advance Foundry*, 1996 U.S. Dist. LEXIS 22551, at *18.

agency action' is that agency 'ad hocery' is impermissible").  History repeats itself.  For the

reasons stated herein, the Court should deny PBGC's motion for summary judgment and allow

the Cross Claimants and participating employers access to a fair forum in which they may finally

develop a complete factual record and present their arguments before a disinterested arbiter.


Dated: May 24, 2007                         Respectfully submitted,

                                            STEPTOE & JOHNSON LLP

                                            /s/ Paul J. Ondrasik, Jr.
                                            Paul J. Ondrasik, Jr. (D.C. Bar # 261388)
                                            Edward R. Mackiewicz (D.C. Bar # 944884)
                                            Ryan T. Jenny (D.C. Bar # 495863)
                                            1330 Connecticut Avenue, N.W.
                                            Washington, DC  20036-1795
                                            Tel:  (202) 429-3000
                                            Fax: (202) 429-3902

                                            LAW OFFICE OF ANNE H.S. FRASER, P.C.
                                            Anne H.S. Fraser (D.C. Bar # 349472)
                                            1320 19th Street, N.W., Suite 200
                                            Washington, DC  20036-1637
                                            Tel:  (202) 466-4009
                                            Fax: (202) 466-4010

                                            **Counsel for Defendants/Third Party Plaintiffs/**
                                            **Counterclaimants/Cross-Claimants,**
                                            **American Bakers Association Retirement Plan**
                                            **and Board of Trustees of the American Bakers**
                                            **Association Retirement Plan**

## <u>CERTIFICATE OF SERVICE</u>

I, Edward R. Mackiewicz, hereby certify that a true and exact copy of the foregoing **Cross-Claimants American Bakers Association Retirement Plan's and Board of Trustees' Memorandum in Opposition to PBGC's Motion for Summary Judgment**, **Cross-Claimants American Bakers Association Retirement Plan's and Board of Trustees' Statement of Genuine Issues of Material Fact in Opposition to PBGC's Motion for Summary Judgment**, **Declaration of Anne H.S. Fraser, Esq.**, and **Proposed Order**, have been served on the following parties this 24th day of May, 2007, as indicated below:

*VIA ELECTRONIC FILING:*

M. Miller Baker
Sarah E. Hancur
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005-3096
(202) 756-8233

Michael T. Graham
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, IL  60606
(312) 984-3606

**Attorneys for Plaintiff Sara Lee Corp.**

Edward J. Meehan
David E. Carney
Skadden, Arps, Slate, Meagher & Flom LLP
1440 New York Ave., NW
Washington, DC 20005
(202) 371-7000

Amanda S. Williamson
Skadden, Arps, Slate, Meagher & Flom LLP
333 West Wacker Drive
Suite 2100
Chicago, IL 60606
(312) 407-0700

Carol Connor Flowe
Arent Fox, LLP
1050 Connecticut Ave., NW
Washington, DC  20036
(202) 857-6054

**On behalf of Third-Party Defendant Interstate Brands Corporation**

James Hamilton
Bingham McCutchen
2020 K Street, NW
Washington, DC 20006
(202) 373-6026

**On behalf of Third-Party Defendant American Bakers Association**

D. Christopher Ohly
Roger Pascal
Schiff Hardin LLP
1666 K Street, NW Suite 300
Washington, DC 20006
(202) 778-6400

Sonia Macias Steele
Schiff Hardin LLP
6600 Sears Tower
Chicago, IL 60606
(312) 258-5500

**On behalf of Third-Party Defendant Lewis Brothers Bakery**

Lonie A. Hassel
Groom Law Group
1701 Pennsylvania Ave., NW
Washington, DC 20006
(202) 857-0620

**On behalf of Third-Party Defendant Harris Baking Co.**

Israel Goldowitz, Chief Counsel
Charles Finke, Deputy Chief Counsel
Michael Mora, Assistant Chief Counsel
Paula Connelly, Assistant Chief Counsel
Marc Pfeuffer, Attorney
Mark Blank, Attorney
PENSION BENEFIT GUARANTY CORPORATION
1200 K Street, N.W.
Washington, DC 20005

**On behalf of Defendant Pension Benefit Guaranty Corporation**

*The following individuals have been served VIA FIRST CLASS MAIL:*

James R. Kettering, Jr.
President
Kettering Baking Co.
729 Coleman Avenue
Fairmont, WV  26554

**On behalf of Third-Party Defendant Kettering Baking Co.**

Bernard Baker
President
Jenny Lee Bakery, Inc.
620 Island Avenue
McKees Rock, PA  15136

**On behalf of Third-Party Defendant Jenny Lee Bakery, Inc.**

/s/ Edward R. Mackiewicz_____
Edward R. Mackiewicz
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Tel:  (202) 429-3000
Fax: (202) 429-3902