# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARA LEE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06–CV–0819–HHK/JMF |
| | ) | |
| AMERICAN BAKERS ASSOCIATION | ) | |
| RETIREMENT PLAN; and BOARD OF | ) | |
| TRUSTEES OF THE AMERICAN BAKERS | ) | |
| ASSOCIATION RETIREMENT PLAN; | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENSION BENEFIT GUARANTY | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## PBGC'S REPLY MEMORANDUM IN SUPPORT OF
## ITS MOTION FOR SUMMARY JUDGMENT

ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
Chief Counsel
CHARLES L. FINKE
Deputy Chief Counsel
MICHAEL P. MORA
PAULA J. CONNELLY (D.C. Bar No. 389055)
Assistant Chief Counsels
MARK BLANK (D.C. Bar No. 968388)
MARC S. PFEUFFER (D.C. Bar No. 484209)

PENSION BENEFIT GUARANTY CORP.
Office of the Chief Counsel
1200 K Street, N.W.
Washington, D.C.  20005
Tel. No. (202) 326-4020, ext. 4903
Fax No. (202) 326-4112
E-mail: pfeuffer.marc@pbgc.gov and efile@pbgc.gov

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.  THIS COURT SHOULD GRANT PBGC'S MOTION FOR
        SUMMARY JUDGMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.  THE ARBITRARY AND CAPRICIOUS STANDARD APPLIES. . . . . . . . . . . . 2

      B.  THE PROCEDURES PBGC UTILIZED IN THIS INFORMAL
          ADJUDICATION WERE ENTIRELY SUFFICIENT. . . . . . . . . . . . . . . . . . . . . 6

      C.  THE ADMINISTRATIVE RECORD IS COMPLETE. . . . . . . . . . . . . . . . . . . . 11

      D.  PBGC DID NOT HAVE AN IMPROPER FINANCIAL MOTIVE. . . . . . . . . . 15

      E.  PBGC'S DETERMINATION IS NOT ARBITRARY AND CAPRICIOUS. . . . 18

          1.  The 2006 Letter is not contrary to law or to the
              operation of the Plan. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          2.  The Plan document and the intent of the parties are not
              controlling factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

          3.  The Opposing Parties' remaining contentions are
              unsupportable and present no obstacle to summary judgment.. . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## Cases Cited

*Ackerman v. United States*,
324 F. Supp. 2d 1 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*AFL-CIO v. Donovan*,
757 F.2d 330 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Agomo v. Fenty*,
2007 WL 265897 (D.C. Cir. Feb. 1, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Alaska Dep't. of Envtl. Conservation v. EPA*,
540 U.S. 461 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*American Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry.*,
387 U.S. 397 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Azko Nobel Salt Inc. V. FMSHRC*,
212 F.3d 1301 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4-5

*BG&E v. NRDC*,
462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*,
419 U.S. 281 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Califano v. Sanders*,
430 U.S. 99 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Caf. & Rest. Workers Union v. McElroy*,
367 U.S. 886 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Camp v. Pitts*,
411 U.S. 138 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Capital Area Immigrant's Rights Coal. v. U.S. Dept. of Justice*,
264 F. Supp. 2d 14 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Cases primarily relied upon are marked with an asterisk.*

*Citrosuco Paulista v. United States*,
    704 F. Supp. 1075 (C.I.T. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Collins v. PBGC*,
    No. 88-3406-AER (D.D.C. Apr. 23, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

\*Doolin Sec. Savs. Bank v. FDIC,
    53 F.3d 1395 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Dumas v. PBGC*,
    2007 WL 1099542 (N.D. Ind. Apr. 9, 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Entergy Servs. v. FERC*,
    391 F.3d 1240 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Evangelical Lutheran Church in Am. v. INS*,
    288 F. Supp. 2d 32 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Florida Power & Light v. Lorion*,
    470 U.S. 729 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Frisch v. Comm'r of Int. Rev.*,
    1986 WL 22038 (U.S. Tax Ct. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Fund for Animals v. Williams*,
    245 F. Supp. 2d 49 (D.D.C. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Gray Panthers v. Schweiker*,
    652 F.2d 146 (D.C. Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hall v. Standard Ins. Co.*,
    2005 WL 348266 (W.D. Va. Feb. 10, 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Interstate Bakeries Corp.*,
    No. 04-45814-jwv (Bankr. W.D. Mo. June 27, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Krupp Stahl A.G. v. United States*,
    822 F. Supp. 789 (C.I.T. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Legal Tender Cases*,
    79 U.S. 457 (1870). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

-iii-

*Lomanno v. Comm'r of Int. Rev.*,
    1994 WL 456803 (U.S. Tax Ct. 1994).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Manhattan Ctr. Studios, Inc. v. NLRB*,
    452 F.3d 813 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*McClain v. Barnhart*,
    299 F. Supp. 2d 309 (S.D.N.Y. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*O'Bannon v. Town Court Nursing Ctr.*,
    447 U.S. 773 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Office of Foreign Assets Control v. Voices in Wilderness*,
    382 F. Supp. 2d 54 (D.D.C. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

*Pacific Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Engineers*,
    448 F. Supp. 2d 1 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 14-15

*PBGC v. Artra Group*,
    1993 WL 225370 (N.D. Ill. June 23, 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 24

*PBGC v. LTV Corp.*,
    496 U.S. 633 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

*PBGC v. Potash*,
    1986 WL 3809 (W.D.N.Y. Mar. 26, 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*PBGC v. United Airlines, Inc.*,
    436 F. Supp. 2d 909 (N.D. Ill. 2006)
    *aff'd sub nom. In re UAL Corp.*, 468 F.3d 444 (7th Cir. 2006). . . . . . . . . . . . . . . . . . 4

*Propert v. District of Columbia*,
    948 F.2d 1327 (D.C. Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11

*Ramaprakash v. FAA*,
    346 F.3d 1121 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*San Luis Obispo Mothers for Peace v. NRC*,
    751 F.2d 1287 (D.C. Cir. 1984),
    *vacated in part*, 760 F.2d 1320 (D.C. Cir. 1985),
      *aff'd*, 789 F.2d 26 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Spartan Radiocasting Co. v. FCC*,
    619 F.2d 314 (4th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*\*Southwest Center for Biological Diversity v. Babbitt*,
    131 F. Supp. 2d 1 (D.D.C. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

*United States v. An Article of Drug Neo-Terramycin Soluble Powder Concentrate*,
    540 F. Supp. 363 (N.D. Tex. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Bean*,
    537 U.S. 71 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Morgan*,
    313 U.S. 409 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*West Virginia v. Thompson*,
    475 F.3d 204 (4th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Wisconsin Valley Improvement v. FERC*,
    236 F.3d 738 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## United States Codes Cited

Title 5
    Section 554(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 554(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 554(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 555. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 557(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    Section 557(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Title 29
    Section 1301(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    Section 1303(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
    Section 1303(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 1322(c)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    Section 1342(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    Section 1363. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Section 1364.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## Other Authorities Cited

29 C.F.R.
Section 4001.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**INTRODUCTION**

In seeking to avoid summary judgment, Sara Lee, the Trustees, and Lewis Brothers ("the Opposing Parties") use every conceivable adjective to pillory PBGC and its decision in the 2006 Letter.[1]  But this colorful rhetoric does not change the principles guiding the Court's review in this case, or its outcome.  The "arbitrary and capricious" standard of the Administrative Procedure Act applies, and review is limited to the administrative record.  Discovery is not permitted, and the arguments to the contrary, however vehement, must be rejected.[2]

As the Opposing Parties concede, Sara Lee has already propounded extensive document requests to PBGC under the Freedom of Information Act that are *virtually identical* to the document requests currently pending before Judge Facciola, and PBGC has produced over 3,000 pages of documents in response.[3]  These documents are either cumulative of those already included in the administrative record, or irrelevant to the determination in the 2006 letter.  The

---

[1]  *See, e.g.,* Sara Lee Opp. SJ at 10, 16 (PBGC "stacked the deck"); *id.* at 13 (PBGC's "ill-advised misadventure"); *id.* at 15 (inquiry conducted under "cloak of ambiguity and uncertainty"); *id.* at 7, 16 (administrative record was a "curtain" to "hide behind"); *id.* at 14 (PBGC's position was "predetermined" and "reverse-engineered"); Trustees Opp. SJ at 1, 3, 14, 33 (PBGC "flip-flopped"); *id.* at 2 ("about face"); Lewis Bros. Opp. SJ at 3 ("PBGC's pretense").

[2]  Although Sara Lee has sought discovery against PBGC, and the Trustees have indicated that they intend to do so, PBGC has moved for a protective order.  That motion is fully briefed and pending before Judge Facciola.  Accordingly, Sara Lee's arguments to this Court that it "should allow the parties to engage in discovery" (Sara Lee Opp. SJ at 14, 16, and 17) are wholly inappropriate.

[3]  Sara Lee filed copies of its FOIA request, as well as many of the 3,000 pages PBGC produced, in three volumes of exhibits to its opposition to PBGC's motion for summary judgment.  *See* Sara Lee's Exhibits to its Opp. SJ, Exhibit 2-A (FOIA request); *Id*. at Exhibits E through O (PBGC's response).  *Compare* Exhibit A to PBGC's Statement of Points and Authorities in Support of its Motion for Protective Order (docket #55) (Sara Lee's First Request for Production of Documents).

Opposing Parties nevertheless cite them as obstacles to summary judgment and grounds to

continue to fish endlessly through agency files.  To the contrary, after conducting limited review

under well-established principles, the Court should find that PBGC's determination was not

arbitrary and capricious, and grant PBGC's motion for summary judgment.

**ARGUMENT**

I.     **THIS COURT SHOULD GRANT PBGC'S MOTION FOR
       SUMMARY JUDGMENT.**

       **A.  THE ARBITRARY AND CAPRICIOUS STANDARD APPLIES.**

       At the outset, Sara Lee argues that the *de novo* standard of review applies to this action

because it was "brought under ERISA and not the APA."[4]  This argument is groundless and

illogical.  Indeed, the court rejected nearly the identical contention in *Southwest Center for*

*Biological Diversity v. Babbitt*.[5]  In that case, the plaintiffs argued that limited judicial review of

an agency's action did not apply because they had brought suit under the Endangered Species

Act, and not the APA.[6]  The court soundly rejected that reasoning, stating:

> the Supreme Court held in *United States v. Carlo Bianchi & Co.*, 373 U.S. 709,
> 715 (1963), that, if Congress permits judicial review of an agency's determination,
> expressly or implicitly, but has not set forth the standards by which that review is
> to be conducted, the courts limit review to the record before that agency.[7]

---

[4]  Sara Lee Opp. SJ at 8.

[5]  131 F. Supp. 2d 1, 4 (D.D.C. 2001).

[6]  *Id.* at 5.

[7]  *Id.*

The Supreme Court has reiterated several times subsequently that where an agency's organic statute does not specify a standard of review, the arbitrary and capricious standard applies.[8]

Accordingly, Sara Lee's assertion that Title IV of ERISA's jurisdictional provision, 29 U.S.C. § 1303(f)(1), somehow dictates a *de novo* standard of review simply fails. That section permits a specified list of parties to "bring an action against [PBGC] for appropriate equitable relief in the appropriate court." But since it does not address the standard of review, the arbitrary and capricious standard applies.[9]

Under Sara Lee's logic, *every* suit brought against PBGC under section 1303(f) would be adjudicated under a *de novo* standard. Courts would be holding *de novo* trials in every challenge to PBGC's calculation of pension benefits, as such cases routinely are brought under section 1303(f).[10] Of course, such a result must be rejected. Like both of the other courts that have addressed PBGC determinations similar to this one, this Court should apply the arbitrary and capricious standard and limit its review to the administrative record, precluding discovery.[11]

_____

[8] *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-97 (2004); *United States v. Bean*, 537 U.S. 71, 77 (2002). *See also Califano v. Sanders*, 430 U.S. 99, 105-06 (1977) (the APA is not an independent source of jurisdiction to review agency action).

[9] Indeed, Congress knew how to establish a standard of review in Title IV of ERISA when it wanted to. *See* 29 U.S.C. § 1322(c)(4) ("Determinations under this subsection shall be binding unless shown by clear and convincing evidence to be unreasonable.").

[10] *See, e.g., Dumas v. PBGC*, 2007 WL 1099542 (N.D. Ind. Apr. 9, 2007) (challenge to PBGC benefit determination resolved on summary judgment based on the administrative record).

[11] *See PBGC v. Artra Group*, 1993 WL 225370 (N.D. Ill. June 23, 1993); *PBGC v. Potash*, 1986 WL 3809 (W.D.N.Y. Mar. 26, 1986). Of course, whether or not the parties in those cases litigated over the applicable standard of review is hardly dispositive. *See* Sara Lee Opp. SJ at 12.

Sara Lee's lengthy and misplaced reliance on *PBGC v. United Airlines* is easily addressed.[12] That case involved an entirely different provision of ERISA, 29 U.S.C. § 1342(c), which requires PBGC in certain circumstances to "apply to the appropriate United States district court for a decree adjudicating that [a] plan must be terminated in order to protect the interests of the participants or to avoid any unreasonable deterioration of the financial condition of the plan or any unreasonable increase in the liability of the fund." The court in *United* concluded that "[s]ection 1342(c) gives the resolution of that question to the judiciary."[13] But whether or not *de novo* review is appropriate under that provision has *no* bearing on the standard of review under 29 U.S.C. § 1303(f), which provides only that a party may bring an action against PBGC.

Sara Lee and the Trustees also argue that *de novo* review is appropriate because PBGC changed its position on whether the Plan is an aggregate of single-employer plans or a multiple-employer plan between 1979 and 2006 based on its discovery that mechanisms to avoid cost-shifting were not sufficiently implemented.[14] But a change in agency position does not mandate a change in the standard of judicial review. Indeed, in the case that both the Trustees and Sara Lee cite for such a proposition, *Azko Nobel Salt*, the court held that "because the Secretary's interpretation of [the regulation] has vacillated over time," it would remand the case to the agency to secure an authoritative interpretation "and to resolve the case applying standard

---

[12] *See* Sara Lee Opp. SJ at 9-11, discussing *PBGC v. United Airlines, Inc.*, 436 F. Supp. 2d 909 (N.D. Ill. 2006). Oddly, Sara Lee does not mention the Seventh Circuit's affirmance of that decision, published at 468 F.3d 444 (7th Cir. 2006).

[13] 468 F.3d at 451.

[14] PBGC's attention was drawn to the Plan by IBC, one of the participating employers, after the Plan's actuaries announced that the Plan was severely underfunded and Sara Lee announced its intention to withdraw most of its employees — and Plan assets — from the Plan.

deference principles to that interpretation."[15] And the D.C. Circuit subsequently has applied the arbitrary and capricious standard repeatedly to cases involving changed agency position.[16]

It is well-established that an agency, "faced with new developments or in light of reconsideration of the relevant facts and its mandate, may alter its past interpretation and overturn past administrative rulings and practice."[17] Indeed, an agency "is not obligated to follow prior decisions if new arguments or facts are presented that support a different conclusion."[18] In order to avoid absurd results, "[a]gencies must be allowed to reconsider positions in the event of changed circumstances or new information."[19] In fact, an agency's failure to reevaluate its position as new facts come to light may be unreasonable.[20]

---

[15] 212 F.3d 1301, 1305 (D.C. Cir. 2000).

[16] *See, e.g., Entergy Servs. v. FERC*, 391 F.3d 1240, 1251 (D.C. Cir. 2004); *Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003); *Wisconsin Valley Improvement v. FERC*, 236 F.3d 738, 748-49 (D.C. Cir. 2001). Moreover, it is clear that, contrary to Lewis Brothers' contention (Opp. at 13), an agency may announce and apply a new standard or new interpretation of an existing standard in an adjudication. *See, e.g., West Virginia v. Thompson*, 475 F.3d 204, 210 (4th Cir. 2007).

[17] *American Trucking Ass'n v. Atchison, Topeka & Santa Fe Ry.*, 387 U.S. 397, 416 (1967). *Accord AFL-CIO v. Donovan*, 757 F.2d 330, 343 (D.C. Cir. 1985); *Spartan Radiocasting Co. v. FCC*, 619 F.2d 314, 322 (4th Cir. 1980); *United States v. An Article of Drug Neo-Terramycin Soluble Powder Concentrate*, 540 F. Supp. 363 (N.D. Tex. 1982).

[18] *Krupp Stahl A.G. v. United States*, 822 F. Supp. 789 (C.I.T. 1993). *Accord Citrosuco Paulista v. United States*, 704 F. Supp. 1075, 1088 (C.I.T. 1988).

[19] *Capital Area Immigrant's Rights Coal. v. U.S. Dept. of Justice*, 264 F. Supp. 2d 14, 28 (D.D.C. 2003).

[20] *See Lomanno v. Comm'r of Int. Rev.*, T.C. Memo. 1994-426, 1994 WL 456803 (U.S. Tax Ct. 1994); *Frisch v. Comm'r of Int. Rev.*, 1986 WL 22038 (U.S. Tax Ct. 1986).

As the D.C. Circuit made clear in a case the Trustees themselves cited, *Manhattan Center Studios, Inc. v. NLRB*,  what an agency *must* do if it changes position is explain the reason for the change, and if it "departs from established precedent without a reasoned explanation," a court will find the decision to be *arbitrary and capricious* and remand the case to the agency so that it may do so, as the court did in that case.[21]  PBGC's 17-page explanation in the 2006 Letter does not suffer from this deficiency.

In short, the well-established arbitrary and capricious standard of review applies to the 2006 Letter.

### B.    THE PROCEDURES PBGC UTILIZED IN THIS INFORMAL ADJUDICATION WERE ENTIRELY SUFFICIENT.

The Opposing Parties argue that a litany of alleged procedural defects in PBGC's decision-making process necessitates discovery and precludes summary judgment.  Indeed, the Trustees appear to argue that discovery is warranted in *every* informal adjudication, asserting that "[i]n the absence of a formal agency proceeding, courts have held that discovery is necessarily warranted, even absent identification of specific documents excluded from the record, because the agency's fact-finding process itself is a fact issue in the case."[22]  If this really were the law, the government would come to a screeching halt as agency staff scrambled to respond to the many and varied discovery requests it undoubtedly would face.  In fact, discovery is permitted only in limited circumstances.  As the court noted in *Office of Foreign Assets Control v. Voices*

---

[21]  452 F.3d 813, 816 (D.C. Cir. 2006).  *Accord Evangelical Lutheran Church in Am. v. INS*, 288 F. Supp. 2d 32, 48 (D.D.C. 2003) (Kennedy, J.).

[22]  Trustees Opp. SJ at 18.

*in Wilderness*, "were the rule otherwise, every challenge to administrative action would turn into a fishing expedition into the motives of the defendant agency."[23]

The Supreme Court explained in *PBGC v. LTV Corp.* that certain agency decisions are required to be issued through "formal adjudication" under "the trial-type procedures set forth in §§ 5, 7 and 8 of the APA, 5 U.S.C. §§ 554, 556-557," but these provisions apply only where the agency's governing statute mandates that the matter be "determined on the record after opportunity for an agency hearing."[24] In such formal adjudications, parties must be given notice of "the matters of fact and law asserted," an opportunity for "the submission and consideration of facts [and] arguments," and an opportunity to submit "proposed findings and conclusions" or "exceptions."[25]

In contrast, the Supreme Court emphasized that other agency decisions — the 2006 Letter is an example — may "lawfully [be] made by informal adjudication," to which only the "minimal requirements" of 5 U.S.C. § 555 apply.[26] These require only that the agency conclude the matter within a reasonable time and give prompt notice and a brief statement of the grounds for a denial of any application or request. PBGC far surpassed these minimal requirements, giving all affected parties an opportunity to provide input, carefully considering the hundreds of pages they submitted, and issuing a comprehensive decision.

-----

[23]  382 F. Supp. 2d 54, 63 (D.D.C. 2005).

[24]  496 U.S. 633, 655 (1990); *see* 5 U.S.C. § 554(a).

[25]  496 U.S. at 655, citing 5 U.S.C. §§ 554(b)(3), 554(c)(1), 557(c)(1), and 557(c)(2).

[26]  *Id*.

In the *LTV* case, the Supreme Court reversed a Second Circuit decision that would have imposed procedural requirements on PBGC's decision-making process such as "appris[ing] LTV of the material on which [PBGC] was to base its decision, [giving] LTV an adequate opportunity to offer contrary evidence, proceed[ing] in accordance with ascertainable standards, [and] provid[ing] LTV a statement showing [PBGC's] reasoning in applying those standards."[27] These are *exactly* the sorts of requirements that the Opposing Parties desire here, arguing that PBGC's "failure" to provide them justifies overturning the 2006 Letter.

The Opposing Parties argue that they should have been apprised of the "scope and procedure of the PBGC's inquiry"; told "what the agency looked at, in order of importance"; allowed to "supplement their initial responses"; given an "opportunity to review [the] agency record before or during the process prior to issuance of a decision"; given an "opportunity to rebut [PBGC's] 'findings' made in the 2006 Determination"; allowed to "cross-examine or confront witnesses"; and permitted to rebut other parties' submissions.[28] As the Supreme Court made clear in *LTV*, there is simply no basis in the law for these requirements, and their absence assuredly creates no factual dispute or other ground for denying summary judgment.[29]

---

[27] 496 U.S. at 653.

[28] *See* Sara Lee Opp. SJ at 5, 15, 33, Trustees Opp. SJ at 8, 21; Lewis Brothers Opp. SJ at 14, 15. Sara Lee's complaint that it was not permitted to "rebut or comment on the positions taken by the various other parties" (Opp. at 5) is particularly disingenuous, since it alone refused to provide to other parties a copy of its submission to PBGC. *See* AR 1448.

[29] Although Sara Lee argues that PBGC "directly" notified "only a few" of the participating employers of its intent to review the 1979 Determination (Opp. at 15), PBGC asked the Trustees, as the officials with the most current contact information, to forward the notice to all participating employers. AR 427. And no participating employer has come forward to complain that it was not notified. Indeed, Lewis Brothers admits that "PBGC provided the ABA Plan and any Participating Employer in the ABA Plan [which includes Lewis Brothers] the

Similarly, PBGC's decision to make its determination in the 2006 Letter "immediately effective," thus obviating the need for any party to appeal to or seek reconsideration from PBGC before challenging the determination in court, forms no basis for denying summary judgment.[30] At that time, there were several ongoing lawsuits involving the Plan's status and Sara Lee's concomitant ability to withdraw funds. PBGC explained to the bankruptcy court adjudicating one of those suits that "particularly in exigencies like this, where there's pending litigation that may be affected," PBGC may make its determination immediately effective.[31] Thus, PBGC's effort to issue a final determination was entirely reasonable, and the Court should summarily reject Sara Lee's suggestion that PBGC was attempting "to deny Sara Lee and other parties the chance to [submit more information]."[32]

The Trustees and Lewis Brothers also allege, based on "information and belief," that PBGC "engaged in *ex parte* communications with the parties and relied on these

opportunity to submit a position statement on the issue whether the ABA Plan is a multiple employer pension plan or an aggregate of single-employer pension plans." Lewis Bros. Cross-Claim against PBGC (docket no. 57) at ¶ 29. Lewis Brothers now asserts (Opp. at 14-15) that it "was not given any notice directly by the PBGC," and that "[t]ime was not adequate to allow a coordination of responses by the several employers," but does *not* assert that it did not receive notice from the Trustees.

[30] In the 2006 Letter, PBGC stated that, "[i]n light of the exigencies of this matter," "there is no obligation for any party aggrieved by this determination to exhaust its administrative remedies with respect to this determination, either by seeking reconsideration by PBGC, or by filing an administrative appeal." AR 1579.

[31] *In re Interstate Bakeries Corp.*, No. 04-45814-jwv, Transcript of Motion Hearing (Bankr. W.D. Mo. June 27, 2006) at 72, excerpt attached hereto as Exhibit 1.

[32] Sara Lee Opp. SJ at 6.

communications in its 2006 decision-making process."[33]  Such bare assertions are exactly the sort

of charges that the D.C. Circuit has dismissed because they are easily made but, if allowed to

stand, generate an "inordinate burden" to resolve.[34]  The Court should do so here as well.  In

short, PBGC's informal adjudication was entirely appropriate, and the procedural measures that

the Opposing Parties desire form no ground for denying summary judgment.

Finally, the Trustees and Lewis Brothers assert that PBGC's decision-making process

violated their Fifth Amendment right to procedural due process.  But the 2006 Letter is not self-

enforcing, and does not compel any party to take any particular action.  And as the Supreme

Court held in *O'Bannon v. Town Court Nursing Center*, "the due process provision of the Fifth

Amendment does not apply to the indirect adverse effects of government action," but "only to a

direct appropriation";  "consequential injuries resulting from the exercise of lawful power" do

not give rise to due process claims.[35]  Even if the due process clause did apply, however, its

requirements were met here.  As the D.C. Circuit explained in a case the Trustees cite, *Propert v.*

*District of Columbia*, "the contours of due process are flexible and vary depending upon the

---

[33]  Trustees Opp. SJ at 3, 8, 14, 20, 22; Third Party Complaint at ¶ 54 ("On information and belief, there were extensive *ex parte* communications between PBGC and some of the interested parties."); Lewis Bros. Opp. SJ at 15 ("it is believed that extensive *ex parte* communications took place between PBGC and other interested parties throughout the process").  *See also* Decl. of Anne H.S. Fraser in support of Trustees Opp. SJ at ¶ 4 (describing a telephone call on Sept. 1, 2005 — before PBGC even invited the parties to make submissions on November 1, 2005, *see* AR 427 — in which she allegedly was told about still earlier telephone contacts).

[34]  *San Luis Obispo Mothers for Peace v. NRC*, 751 F.2d 1287, 1327-1329 (D.C. Cir. 1984), *vacated in part*, 760 F.2d 1320 (D.C. Cir. 1985), *aff'd*, 789 F.2d 26 (D.C. Cir. 1986).

[35]  447 U.S. 773, 789 (1980), *quoting Legal Tender Cases*, 79 U.S. 457, 551 (1870).

circumstances of a given case."[36]  The "core requirements" of due process are "adequate

notice . . . and a genuine opportunity to explain."[37]  Those requirements clearly were met here.[38]

In sum, nothing about PBGC's decision-making process precludes the Court from

granting summary judgment holding that the 2006 Letter is not arbitrary and capricious.

### C.    THE ADMINISTRATIVE RECORD IS COMPLETE.

The Opposing Parties assert that summary judgment must be denied because PBGC's

administrative record is incomplete, in that it does not include four categories of documents.

Because this claim is baseless, it must be rejected.

As this Court has made clear, judicial review of agency action is "limited to the

administrative record that was before the [agency] at the time the decision was made; the court

cannot go fishing about for more evidence."[39]  Moreover, "[c]ommon sense dictates that the

*agency* determines what constitutes the 'whole' administrative record because it is the agency

that did the 'considering,' and that therefore is in a position to indicate initially which of the

---

[36]  948 F.2d 1327, 1332 (D.C. Cir. 1991).  *See also Caf. & Rest. Workers Union v. McElroy*, 367 U.S. 886, 894-95 (1961).

[37] 948 F.2d at 1332 (ellipses in original), *quoting Gray Panthers v. Schweiker,* 652 F.2d 146, 165 (D.C. Cir. 1980).

[38]  Sara Lee's and the Trustees' extensive submissions are in the administrative record, and Lewis Brothers, while reciting that PBGC provided all participating employers the opportunity to participate (*see* n.29, *supra*), did not provide any submission.

[39]  *Ackerman v. United States*, 324 F. Supp. 2d 1, 5 (D.D.C. 2004) (Kennedy, J.), *citing Florida Power & Light v. Lorion*, 470 U.S. 729, 743-44 (1985), and *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

materials were 'before' it — namely, were 'directly or indirectly considered.'"[40]  And the agency "is not obligated to include every potentially relevant document existing within its agency.  Only those documents that were directly or indirectly considered by the [agency's] decisionmaker(s) should be included in the administrative record."[41]

Sara Lee and the Trustees nevertheless contend that four categories of documents are improperly missing from the administrative record:

1.    documents evidencing that over the years, PBGC treated the Plan as an aggregate of single-employer plans by processing "standard" terminations of the "plans" maintained by certain bakery employers;

2.     certain Form 5500's submitted by the Plan;

3.    documents regarding PBGC's 1998 audit of the standard termination of the Gulf Coast Snacks plan; and

4.    PBGC's opinion letters in other cases and documents "that speak to the PBGC's procedures in assessing the Title IV status of a plan."[42]

As to the first category, PBGC freely acknowledges that it treated the Plan as an aggregate of single-employer plans, consistent with the 1979 Letter in which the agency erroneously determined the Plan to *be* an aggregate of single-employer plans.  It was utterly consistent with the 1979 Letter for the agency to process terminations of the "plans" of participating employers within the Plan.  In issuing the 2006 Letter, it was not necessary for

---

[40]  *Pacific Shores Subdivision, Cal. Water Dist. v. United States Army Corps of Eng'rs*, 448 F. Supp. 2d 1, 5 (D.D.C. 2006), quoting *Fund for Animals v. Williams*, 245 F. Supp. 2d 49, 57 (D.D.C. 2003) (internal quotations omitted) (emphasis added).

[41]  *Id.* at 7.

[42]  *See* Sara Lee Opp. SJ at 15-16; Trustees Opp. SJ at 19.  Lewis Brothers cites only documents "which were obtained by Sara Lee through a FOIA request."  Lewis Bros. Opp. at 16.

PBGC to review the documentation evidencing this treatment, and PBGC did not do so.  As the

court made clear in *Pacific Shores*, a party challenging an agency's administrative record:

> cannot meet its burden simply by asserting that the [additional] documents are
> relevant, were before or in front of the [agency] at the time it made its decision,
> and were inadequately considered.  This is pure speculation.  Rather, [the
> challenger] must identify reasonable, non-speculative grounds for its belief that
> the documents *were considered by the agency* and not included in the record.[43]

In any event, some of these standard termination materials *are* in the record, as well as the

Opposing Parties' arguments about them.[44]  Both Sara Lee and the Trustees emphasized in their

submissions to PBGC that several of the Plan's participating employers had terminated their

plans under "PBGC's standard termination rules."[45]  The fact that the agency did not include

hundreds of pages of additional, cumulative documentation does not make the record incomplete

or create a material factual dispute.[46]

As to the second category, Sara Lee complains that two Form 5500's, from the years 1980

and 1996, are "missing" from the administrative record.  These forms are important, according to

Sara Lee, because they contain a footnote "explaining that the ABA Plan is an aggregate of

single-employer plans for Title IV purposes."[47]  But as Sara Lee concedes, the administrative

---

[43]  448 F. Supp. 2d at 6 (emphasis added).

[44]  *See* AR 1305 (Sara Lee letter at 6); AR 298 (Plan letter of Jun. 6, 2005 at 2); AR 879 to 880 (Plan letter of Dec. 2, 2005 at 17-18); AR 1188-1212 (Gulf Coast Snacks standard termination materials).

[45]  *See* AR 879-880; AR 298; AR 1305.

[46]  Indeed, the vast majority of Sara Lee's exhibits are cumulative examples of plan terminations in this category.

[47]  Sara Lee Opp. SJ at 35.

record already includes the Plan's 1983 Form 5500, which contains *the identical footnote*, as well as the Trustees' specific argument about it.[48]

As to the third category, once again, documents regarding the Gulf Coast standard termination audit are in the administrative record, along with the Trustees' arguments about it.[49] Sara Lee acknowledges this fact in its opposition to PBGC's motion for a protective order, but apparently would like "almost 100 [additional] pages of documents" related to the audit to be included as well.[50] Once again, this contention hardly creates a material factual dispute sufficient to prevent summary judgment.

As to the fourth category, of course, published opinion letters need not be included in the administrative record when they are easily available.[51] PBGC's opening brief, which the Trustees cite, contains the publicly accessible cites for the opinion letters. And the Trustees' desire for documents "that speak to the PBGC's procedures in assessing the Title IV status of a plan" is baseless; as demonstrated above, the agency's procedures were entirely adequate, and provided more than the law's minimal requirements.

In sum, as the court made clear in *Pacific Shores*, an agency's designation of the record is "entitled to a strong presumption of regularity," which cannot be rebutted 'simply by asserting that [certain] documents are relevant, were before or in front of the [agency] at the time it made

---

[48] *See* Sara Lee Opp. SJ at 35-36; AR 1085, 875.

[49] *See* AR 880, 1182-1205.

[50] *See* Sara Lee Opp. Prot. Order (docket #64) at 19 and n.11.

[51] Although the Trustees assert that PBGC "now" relies upon its opinion letters in other cases, citing PBGC's protective order brief (Trustees Opp. SJ at 19), PBGC cited the very same opinion letters in the 2006 Letter.  AR 1567.

its decision, and were inadequately considered."[52]  But in the event that this Court finds the administrative record to be incomplete, the appropriate remedy is neither *de novo* review nor discovery, but remand to the decision-maker for consideration of the complete record.[53]

### D.    PBGC DID NOT HAVE AN IMPROPER FINANCIAL MOTIVE.

In resisting summary judgment, the Opposing Parties also argue that in issuing the 2006 Letter, PBGC was improperly motivated by a desire to avoid liability for more than $60 million in unfunded benefits.[54]  This accusation is groundless.  The Plan was not terminating at the time of PBGC's determination, and thus no liability was owed to PBGC.  Nor is it terminating now.  And there is simply no support in the administrative record for this specious allegation.

To the contrary, the record shows that PBGC was properly motivated by IBC's request for a ruling under Title IV of ERISA, the federal insurance program that PBGC administers, on the Plan's status.  And that  request was prompted *not* by any improper action PBGC took, but largely by actions Sara Lee took when its contribution obligation dramatically spiked in 2004 due to several years of Plan investment losses and other factors.[55]

---

[52]  448 F. Supp. 2d at 6.  *See also Collins v. PBGC*, No. 88-3406-AER (D.D.C. Apr. 23, 1993) (rejecting discovery request based on very similar charge of selective inclusion of documents in an administrative record), attached hereto as Exhibit 2.

[53]  *See Southwest Ctr.*, 131 F. Supp. 2d at 8; *Hall v. Standard Ins. Co.*, 2005 WL 348266, *3 (W.D. Va. Feb. 10, 2005) ("if the court determines that the administrative record was somehow incomplete, the remedy is not additional discovery but remand to the defendant for a new review and determination");  *McClain v. Barnhart*, 299 F. Supp. 2d 309, 328-29 (S.D.N.Y. 2004) ("[r]eversal and remand to the Commissioner for further proceedings is the usual remedy where an administrative record is incomplete").

[54]  Sara Lee Opp. SJ at 14; Trustees Opp. SJ at 2, 4, 14; Lewis Brothers Opp. SJ at 3, 7.

[55]  *See* AR 1564, 1572 (2006 Letter at 2, 10); AR 491 (Plan actuary's Nov. 4, 2004 letter describing funding crisis and upcoming required quarterly contributions from all participating

-15-

At that time, Sara Lee was by far the largest participating employer in the ABA Plan, and was due to bear the brunt of the funding shortfall:  approximately 4,600 of the 6,500 Plan participants were current or former employees of Sara Lee.[56]  In November 2004, the Plan actuary projected that anywhere from 62% to 76% of the $31.6 million in contribution obligations due in 2005 would be allocated to Sara Lee.  Thus, the Plan actuary estimated that Sara Lee's contribution assessment due to the funding crisis would be $4.9 million to $5.9 million per quarter.[57]  To avoid having to pay those substantially increased pension contributions going forward, Sara Lee opted to withdraw nearly 80% of its current and former employees from the Plan — 3,600 out of 4,600 — by spinning off the Plan assets and liabilities attributable to those employees to a stand-alone pension plan sponsored solely by Sara Lee.[58]

Clearly, then, the ramifications of a determination of the Plan's status are complex.  First, as PBGC has made clear from the start, the Plan's status affects whether a significant portion of Plan assets — approximately $27 million — will be transferred to Sara Lee's stand-alone pension plan.[59]  Moreover, as PBGC also made clear, the Plan's status dictates the applicable termination liability scheme that will apply if the Plan should terminate, and the liability that may

_____

employers).

    [56]  *See* AR 683 (Plan actuary's calculation of Plan assets and benefit liabilities by employer, showing Sara Lee "headcount" of 993 and 3,582 Plan participants, for a subtotal of 4,575 out of the total population of 6,557 Plan participants).

    [57]  AR 491-495.

    [58]  AR 1572 (2006 Letter at 10); AR 1496 (Plan's request for IRS waiver, Dec. 15, 2005).

    [59]  AR 1564 (2006 Letter at 2).  According to the Plan actuary's calculations, Sara Lee would get a $98 million transfer if the Plan is an aggregate of separate pension plans, and $71 million if it is a multiple-employer plan.  *Id.*

arise upon the withdrawal of any "substantial employer."[60]  In addition, all withdrawing

employers, substantial or not, remain liable for a share of the Plan's underfunding if it terminates

within five years, in amounts proportional to their respective shares of the Plan's contributions

during that period.[61]

But the fact that the statutory termination insurance program may derive a financial

benefit as a consequence of this administrative determination does not taint the decision.[62]  And

the well-established presumption of governmental good faith applies to administrative

proceedings.[63]  Moreover, as the Supreme Court emphasized long ago:

> Cabinet officers charged by Congress with adjudicatory functions are not assumed
> to be flabby creatures any more than judges are.  Both may have an underlying
> philosophy in approaching a specific case.  But both are assumed to be men of

---

[60]  2006 Letter at 2.  "Substantial employers" who withdraw from an underfunded
multiple employer plan may be required to post a bond or other security to cover a share of the
plan's benefit liabilities if the plan terminates within five years.  29 U.S.C. § 1363.  Sara Lee is a
"substantial employer" because it is and was responsible for more than 10% of required employer
contributions at all relevant times.  29 U.S.C. § 1301(a)(2).

[61]  29 U.S.C. § 1364.

[62]  *See Doolin Sec. Savs. Bank v. FDIC*, 53 F.3d 1395, 1407 (4th Cir. 1995) ("Presumably
all agencies inherently have some level of 'institutional bias,' but such an interest does not render
all agencies incapable of adjudicating disputes within their own proceedings given the strong
public interest in effective, and expert decisionmaking in the administrative setting"); *Agomo v.
Fenty*, 2007 WL 265897 (D.C. Cir. Feb. 1, 2007) ("Appellants' argument is tantamount to
arguing that all judges employed by the District are biased in civil suits in which the District is a
party, simply over concern that the District may fall into a budget deficit.  Appellants have not
suggested, nor is there any evidence that the salaries of the individual hearing examiners or
judges are contingent upon findings of liability, or that their salaries are directly affected in any
way by the state of the District's budget.").

[63]  *See* PBGC's opening brief at 18 n.70.

conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.[64]

In sum, the Opposing Parties' unsupported attacks on PBGC's motivation in responding to IBC's request for a ruling present no obstacle to summary judgment.

### E.    PBGC'S DETERMINATION IS NOT ARBITRARY AND CAPRICIOUS.

Under the arbitrary and capricious standard of review, "a court is not to substitute its judgment for that of the agency."[65]  Rather, the court must determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made.[66]  The 2006 Letter fully meets this standard.

As PBGC there explained, its regulation explicitly defines "multiple-employer plan" as a "single-employer plan maintained by two or more contributing sponsors . . . under which all plan assets are available to pay benefits to all plan participants and beneficiaries."[67]  Although there is no codified definition of an "aggregate of single-employer plans," PBGC and the courts have uniformly applied a fact-specific standard to distinguish this relatively rare type of arrangement from the more common multiple-employer plan.  Under this standard, the central, dispositive factor is the way the plan is structured and actually operates on an ongoing basis, and the critical inquiry is whether all plan assets are available to pay benefits to any participant or beneficiary.[68]

---

[64] *United States v. Morgan*, 313 U.S. 409, 421 (1941).

[65] *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[66] *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 285-86 (1974).

[67] AR 1567 (2006 Letter at 5); 29 C.F.R. § 4001.2.

[68] *See* PBGC's opening brief at 13-14 & nn. 48, 49.

The intent and expectations of the parties — even if incorporated within the plan documents — while taken into account, are not controlling.

Although the Opposing Parties allege that the 2006 Letter is arbitrary and capricious for a host of reasons, none of these arguments presents an obstacle to summary judgment.

### 1.    The 2006 Letter is not contrary to law or to the operation of the Plan.

The 2006 Letter is completely consistent with the governing legal standard and the undisputed evidence of the Plan's operational history.  A careful reading of the 2006 Letter alone demonstrates the rationality of PBGC's determination.

Under the applicable standard, there is but one dispositive factor:  how a plan has operated and continues to operate on an ongoing basis.  Thus, if a plan fails to minimize the risk of "cost shifting" — *i.e.*, paying benefits to one employer's participants using the contributions of another employer — it *cannot be* an aggregate of single-employer plans, regardless of what the parties intended, what the plan documents state, or how the plan has been treated in the past.  Contrary to the Trustees' allegation (Opp. at 27), a plan's lack of separate accounts is not alone dispositive, and PBGC has never said that it is.  Rather, the controlling question is whether the plan has, "by whatever means," minimized the risk of cost shifting.[69]

The 2006 Letter details the cost shifting that has occurred and continues to occur under the Plan.  According to the Plan actuary's October 2004 calculations, at least four of the Plan's seven active participating employers carry *negative* asset balances.[70]  This means that benefit payments and administrative expenses with respect to those employers have exceeded their

---

[69]  AR 1567 (2006 Letter at 5).

[70]  AR 662.

contributions plus investment gains.[71]  Simple arithmetic dictates that in order for the Plan to

continue to issue benefit checks to the participants of these assetless employers, it must draw

upon the contributions and investment income of other participating employers.

The Trustees respond that "it is not unreasonable that underfunding of a single plan may

occur occasionally," and that "the Plan has a means of correcting shortfalls [so that] employers

[are] fund[ing] their own employees' benefits."[72]  But these four negative account balances are

not mere instances of garden-variety plan underfunding or "shortfalls"; rather, they show that if

this is an aggregate of separate plans, there are *no assets* attributable to four of the Plan's seven

active employers.  That is, the Plan, on an ongoing basis, is paying benefits to the employees of

*more than half* of the Plan's participating employers using assets attributable to other

participating employers.

And in fact, Sara Lee alleges in its Second Amended Complaint at paragraph 51 that

"Defendants ABA Plan and the Board of Trustees have violated the terms of Section 13.02 of the

ABA Plan by using Sara Lee's contributions (and the contributions of two other Participating

Employers maintaining positive ABA Trust balances) in the ABA Trust to pay the benefits and

administrative expenses for employee-participants of other Participating Employers that maintain

negative balances in the ABA Trust."[73]

---

[71]  AR 1572 (2006 Letter at 10).

[72]  Trustees Opp. SJ at 31.

[73]  *See also* Sara Lee's Second Amended Complaint at ¶ 29 ("By permitting the four Participating Employers to maintain a negative ABA Trust balance as of October 1, 2004, the Board of Trustees used ABA Trust funds attributable to Sara Lee contributions (as well as the contributions of two other Participating Employers) to make benefit payments for the employee-participants of the four Participating Employers maintaining negative balances.").

Although certain Plan mechanisms, described to PBGC before it issued the 1979 Letter, were supposed to eliminate the risk of cost shifting, the 2006 Letter describes how these failed in the ensuing 27 years. According to the Plan actuary, the Plan's accountants did not keep asset or liability records by employer.[74] The Plan's system of actuarial surcharges was ineffective; in operation, a superficial calculation was done based merely on the average age of the relevant group of participants.[75] The Plan did not and could not use these surcharges to fine-tune contributions and prevent cost shifting, because no attempt was made to track employer-by-employer account balances. Separate actuarial valuations of the Plan's assets and liabilities attributable to a particular employer were performed only when an employer terminated participation in the Plan, or upon an employer's request.[76] Indeed, the Trustees never deemed it necessary to perform separate valuations of the Plan assets and liabilities allegedly attributable to each of the participating employers until late 2004, in the aftermath of the Plan's funding crisis, the substantial increase in required employer contributions to reduce the Plan's deficit, and Sara Lee's race to the exit in response.[77] And the Plan failed to consistently collect the shortfall when

---

[74] AR 733 (IBC Submission at Exhibit 19) (Letter of ABA Plan actuary Robert Krinsky to John P. Hendrickson (Nov. 3, 2003)).

[75] In a 1978 meeting, when PBGC raised the possibility of negative employer account balances as evidence that the Plan is one unitary plan, the Trustees' counsel explained that, although negative account balances were "theoretically possible," the actuarial surcharge system was designed to eliminate the risk of cost shifting. *See* AR 169 (Memorandum of ABA Plan counsel William C. Childs to Trustees (July 6, 1978)).

[76] AR 1373 (Article 11.02 of current Plan document); AR 1012 (Participation Agreement, ¶ 13).

[77] *See* AR 863, 876-77.

a participating employer ceased operations and its plan was nominally terminated, but rather, continued to pay pensions to participants out of assets in the Plan's commingled pool.[78]

Accordingly, despite the Trustees' allegation that the 2006 Letter reverses the 1979 Letter on "the same grounds" on which it was issued 27 years ago,[79] the 2006 Letter's specific explanations cite extensive evidence that was not available to PBGC in the 1970s — evidence of ongoing plan operation. Far from relying only on "representations of the Plan's nature" made by Plan professionals in letters and filings,[80] PBGC considered a panoply of evidence of the Plan's actual operation.

In sum, the law is that a plan to which more than one employer contributes is one plan unless it effectively prevents cost shifting among the employers. Because cost shifting has occurred and continues to occur in the Plan, the 2006 Letter is squarely in line with the law and the evidence of the Plan's operation.

---

[78] *See* AR 1571 (2006 Letter at 9).

[79] Trustees Opp. SJ at 28.

[80] Trustees Opp. SJ at 29.

2.    **The Plan document and the intent of the parties are not controlling factors.**

Because there was insufficient evidence of how the Plan actually operated in 1979, the Plan document and the participation agreements signed by employers played an important role in PBGC's original determination.  Although PBGC fully considered the pertinent sections of those documents in the 2006 Letter,[81] they played a much less important role because there was abundant evidence of the Plan's operation over the ensuing 27 years.  Accordingly, the Opposing Parties' dogged reliance on these factors is simply misplaced.[82]

In any event, the 2006 Letter is not contrary to the Plan documents and participation agreements.  The cited provisions are either conclusory, or mere expressions and restatements of the parties' intent.  For instance, Plan sections 13.01 and 13.02, relied on by Sara Lee (Opp. at 21), simply state that the Plan "constitutes an association of single employer plans," and that "the fundamental *concept and intent* of [the ABA] Plan [is] that the contributions of each separate employer will only be used to provide benefits for Participants . . . by reason of such Participants' employment by such employer."  Likewise, the excerpt from the participation agreement quoted by Sara Lee simply "acknowledges" the Plan's wish.  These provisions do nothing to minimize the risk of cost shifting among contributing employers, but only state that it is the Plan's wish to avoid this potential.  And, as Sara Lee maintains in its Second Amended Complaint, these provisions were not followed.[83]

---

[81]  AR 1570, 1571 (2006 Letter at 8, 9).

[82]  Trustees Opp. SJ at 26-27; Sara Lee Opp. SJ at 20-26; Lewis Bros. Opp. SJ at 6.

[83]  *See* p. 20, *supra*.

-23-

While statements of intent like these carry some weight when there is little evidence of plan operation, they are not the controlling factors the Opposing Parties claim. Rather, they simply characterize the viewpoint of the plan settlors. Reality may be something entirely different. As PBGC concluded in the 2006 Letter, "The only sure guide to intent is conduct."[84]

Sara Lee highlights a seemingly contradictory view that PBGC advanced in *Artra Group,* asserting that the language of the governing plan documents should be controlling.[85] But the plan documents at issue in that case are easily distinguishable from the Plan, in that they did not merely express the plan's intent to operate as an aggregate of single-employer plans; rather, they established *actual separate accounts* for each contributing employer and *expressly barred commingling of employer assets* — almost indisputable evidence of the existence of more than one pension plan under the legal standard.[86]

> ### 3. The Opposing Parties' remaining contentions are unsupportable and present no obstacle to summary judgment.

The Opposing Parties argue that the 2006 Letter is arbitrary and capricious because PBGC historically has treated the Plan as an aggregate of single-employer plans by processing "standard" terminations of certain participating employers' plans.[87] PBGC addresses this above at pp. 12-13. In short, PBGC's routine processing in accordance with the now-revoked 1979

---

[84] AR 1578 (2006 Letter at 16).

[85] Sara Lee Opp. at 21; Graham Aff., Ex. D at 7.

[86] *See id.* at 9 ("The Parties . . . shall have their funds separate and intact from that of any other group of participants . . . in the [group pension plan] and shall not have these funds commingled or pooled.")

[87] *See, e.g.*, Sara Lee Opp. SJ at 29-31.

Letter, which PBGC subsequently stated was "simply wrong,"[88] is not evidence of the Plan's status, and cannot make the 2006 Letter arbitrary and capricious.

Finally, the Opposing Parties complain that the "retroactive application" of the 2006 Letter is arbitrary and capricious, and that it "punish[es]" the Plan and its participating employers.[89]  "[I]f the 2006 [Letter] is upheld," Sara Lee asserts, "long-settled employer plan terminations would have to be re-opened, reverted assets would have to be recovered, public financial statements would have to be restated, tax liabilities would have to be recomputed, and tax documents refiled."[90]

Not only are these contentions irrelevant to the legal standard that establishes the Plan's status, but they are also completely speculative.  The 2006 Letter is not self-enforcing, and does not purport to compel any party to take any specific action.  The questions presented by retroactive application of the 2006 Letter were not within the scope of the informal adjudication and thus, are yet to be determined, either by PBGC or other pertinent government agencies.  Like the Opposing Parties' other contentions, they present no obstacle to summary judgment.

## CONCLUSION

As the Supreme Court has emphasized, "it is not [the reviewing court's] task to determine what decision we, as Commissioners, would have reached."[91]  For the reasons demonstrated above, the Court should grant PBGC's motion for summary judgment.

---

[88]  AR 1573 (2006 Letter at 11).

[89]  Trustees Opp. SJ at 28; *see also* Sara Lee Opp. SJ at 40-42.

[90]  Sara Lee Opp. SJ at 42.

[91]  *BG&E v. NRDC*, 462 U.S. 87, 105 (1983).

Date:  June 8, 2007                              Respectfully submitted,


                                                 /s/ Marc S. Pfeuffer
                                                 ISRAEL GOLDOWITZ (D.C. Bar No. 291120)
                                                 Chief Counsel
                                                 CHARLES L. FINKE
                                                 Deputy Chief Counsel
                                                 MICHAEL P. MORA
                                                 PAULA J. CONNELLY (D.C. Bar No. 389055)
                                                 Assistant Chief Counsels
                                                 MARK BLANK (D.C. Bar No. 968388)
                                                 MARC S. PFEUFFER (D.C. Bar No. 484209)

                                                 PENSION BENEFIT GUARANTY CORP.
                                                 Office of the Chief Counsel
                                                 1200 K Street, N.W.
                                                 Washington, D.C.  20005
                                                 Tel. No. (202) 326-4020, ext. 4903
                                                 Fax No. (202) 326-4112
                                                 E-mail: pfeuffer.marc@pbgc.gov and
                                                 efile@pbgc.gov

                                                 Attorneys for Pension Benefit Guaranty Corp.

-26-