# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SARA LEE CORPORATION,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action 06-00819  (HHK)** |
| **AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OPINION AND ORDER

Sara Lee Corporation files this action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001 *et seq.,* challenging certain acts and practices of American Bakers Association Retirement Plan and its Board of Trustees (collectively, the "ABA Plan"), and seeking judicial review of a determination of the Pension Benefit Guaranty Corporation. ("PBGC").  Before the court is PBGC's motion for summary judgment on Counts I and II of Sara Lee's second amended complaint [#46].[1]  Upon consideration of the motion, the opposition thereto, and the record of this case, the court shall hold its decision on PBGC's motion in abeyance until after it is determined whether the administrative record**,** upon which the court's decision will be based, is complete.

---

[1]  A motion by the ABA Plan to dismiss Counts II and III of this complaint is resolved in a separate memorandum opinion and order docketed this same day.

## II.  BACKGROUND

**A.    Regulatory Background**

PBGC is a federal agency and wholly-owned corporation of the U.S. Government which administers the nation's pension plan insurance program established by ERISA.   PBGC's purpose is to ensure that retirees receive pension benefits they have earned, even if their employer has terminated their pension plan or is otherwise unwilling or unable to pay.  *Mead Corp. v. Tilley*, 490 U.S. 714, 717–18 (1989).  When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes trustee of the plan and pays participants their benefits, up to statutory limits.  *See* 29 U.S.C. §§ 1321-1322, 1361.

Under ERISA, employers are permitted to join together to provide pension benefits to their employees.  There are two types of such plans: (1) a "multiple employer plan," which is a plan "maintained by two or more contributing sponsors [employers] . . . under which all plan assets are available to pay benefits to all plan participants and beneficiaries," 29 C.F.R. § 4001.2; and (2) an "aggregate of single-employer plans," which is an association of separate plans where each employer's contributions are maintained in separate accounts or effectively restricted so that the funds of each account are only used to pay the benefits of employees of that particular sponsor, and not the benefits of another sponsor's employees, *see  PBGC v. Artra Grp.*, 972 F.2d 771, 773 (7th Cir. 1992); *PBGC v. Potash*, 1986 WL 3809, at *1–2 (W.D.N.Y. Mar. 26, 1986). Essentially, an aggregate plan is operated as a collection of separate plans sharing administrative costs, while a multiple-employer plan is operated as a single plan sharing all assets and liabilities.

The distinction is relevant, *inter alia*, to determining an employer's liability when it terminates a plan with insufficient funds to pay its benefits. *Artra Grp.*, 972 F.2d at 772. If the plan is a multiple-employer plan, an employer is generally only liable for underfunding if it is a "substantial employer" within the meaning of ERISA, 29 U.S.C. § 1301(a)(2), or has made contributions to the plan within the five years preceding the termination of the plan as a whole, *id.* §§ 1363, 1364. Otherwise, the obligation for that liability falls to the other contributors to the fund. *See id.* § 1301(a)(2). In an aggregate plan, however, the employer must make up the missing contributions or seek to qualify for a "distressed" or "involuntary" termination by PBGC, which then is liable for that plan's obligations. *See Artra Grp.*, 972 F.2d at 772–73; 29 U.S.C. § 1322. The distinction is also relevant in determining the type of insurance coverage PBGC will provide when a particular plan terminates with insufficient funds to pay its benefits. In an aggregate plan, PBGC will assume that employer's liabilities, while in a multiple-employer plan, the liabilities may fall to the remaining employers in the plan.

**B.    Factual Background**

The ABA Plan is a defined-benefit pension plan to which several employers, including Sara Lee, contribute on behalf of their current and former employees. The Plan was founded in 1961 and was subsequently covered by ERISA, which was enacted in 1974.

In 1979, PBGC determined that, for purposes of ERISA, the ABA Plan was an "aggregate of single-employer plans." *See* AR 216–17 (1979 Letter). PBGC explained that in making such a determination, it focused on the pension plan's structure and how the plan actually operated on an ongoing basis. The 1979 Letter further stressed that a "central factor" in PBGC's analysis was the availability of funds to pay the benefits of employees of various employers. *Id.* at 217.

3

In 2005, a dispute arose among the ABA Plan participants regarding their contribution obligations.[2] Two participants — Kettering Baking Company and Interstate Bakeries Corp. ("IBC") — requested that PBGC revisit its determination, set forth in the 1979 Letter, that the ABA Plan was an aggregate plan. PBGC indicates that it notified all interested parties that it intended to revisit its determination and requested that they submit any written statement or documents that they would like PBGC to consider in the agency's decision-making process. PBGC received materials from the ABA Plan, Sara Lee, IBC, and Kettering.

After considering the materials submitted, PBGC issued its determination letter on August 8, 2006 (the "2006 Letter"), explaining that the agency's application of the legal standard in its 1979 Letter was "simply wrong," and concluding that the ABA Plan "is, and indeed always has been, a multiple-employer plan." AR 1563–70 (2006 Letter). PBGC found that since 1979, the assets in the Plan have been available, and had been used, to pay benefits to all Plan participants regardless of their employers. PBGC relied on the following findings: (1) the ABA Plan had never maintained the system of accounts and records that would have been required to maintain separate plans for each employer; (2) the Trustees and their advisors had regularly filed documents with the Department of Labor and the Internal Revenue Service stating, expressly, that the ABA Plan was a multiple-employer plan; (3) documents were also distributed to

---

[2] Sara Lee sought to terminate its participation in the Plan and to withdraw its assets, estimated at $110.9 million, which constituted more than 90 percent of the fund's balance. Compl. ¶ 22, 28. An assessment of the Plan's assets indicated that seven participating employers had negative balances in the Plan's accounts. *Id.* ¶ 27. A "negative balance" can occur when the Plan pays out benefits to employees whose employers have not made their full contribution to the fund. In its suit against the ABA Plan, Sara Lee alleges that, by permitting employers to maintain negative balances, the ABA Plan effectively used Sara Lee's contributions to fund the benefits of other employers and thereby violated its fiduciary duties and the terms of the Plan agreement.

contributing employers and plan participants (including the Summary Plan Description) indicating that there were no separate accounts maintained for each employer's contributions; and (4) correspondence by the ABA Plan's legal counsel and actuaries, as well as filings and accounting records, repeatedly stated that the ABA Plan operated as a multiple-employer plan, citing the financial and administrative advantages of doing so.

PBGC notified the parties that it had reversed its 1979 determination and, in light of the "exigencies" of the matter, made the determination effective immediately upon issuance, dispensing with the obligation to exhaust administrative remedies prior to initiating suit in federal court. *See* 29 C.F.R. § 4003.22(b).

On May 3, 2006, Sara Lee filed this action against the ABA Plan and subsequently added PBGC as a defendant.[3]  As relevant here, Sara Lee asserts that PBGC's determination in the 2006 Letter that the ABA Plan is a multiple-employer pension plan is arbitrary and capricious and seeks to enjoin PBGC from enforcing the 2006 Letter and from rescinding the 1979 Letter.

---

[3]    The ABA Plan has filed a counterclaim against Sara Lee, a cross-claim against PBGC, and a third-party complaint against the American Bakers Association and the other participants in the ABA Plan, seeking declaratory relief resolving the contradiction between the 1979 PBGC Letter and 2006 PBGC Letter.

# I. ANALYSIS

## A.    Motion for Summary Judgment

The submissions of the parties and their oral argument on PBGC's motion for summary judgment and the submissions regarding PBGC's motion for a protective order [#56] reveal disagreement regarding two threshold issues that are critical to this court's decision on the instant motion.  These issues are (1) the appropriate standard of review which the court should employ and (2) if the standard of review is a deferential one that is confined to the administrative record, whether the administrative record as filed is complete.  These threshold issues shall be addressed in turn below.

### 1.    Standard of Review

The applicable provision of ERISA provides that certain parties who are "adversely affected by any action of the corporation with respect to a plan . . . may bring an action against the corporation for appropriate equitable relief in the appropriate court."  *See* 29 U.S.C. § 1303(f)(1).  PBGC contends that § 1303 does not set forth a specific standard of review and thus the Administrative Procedure Act's ("APA") deferential standard for review of agency action must apply.  Sara Lee argues to the contrary that the court should apply a *de novo* standard because (1) § 1303's provision for "equitable relief" necessarily presumes a *de novo* standard of review; and (2) a *de novo* standard applies, rather than the APA's deferential standard, when due process concerns are raised.

In general, where an act of Congress does not specify a standard for judicial review, the court must apply the familiar deferential standard of the APA and ask whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." *See* 5 U.S.C. § 706(2)(A)*; see also Alaska Dept. of Envtl. Conservation v. E.P.A.*, 540

U.S. 461, 496–97 (2004). The agency's "legal determinations are reviewed *de novo*, according

substantial deference to the agency's interpretation of the statutes and regulations it administers."

*EEX Corp. v. U.S. Dep't of Interior*, 111 F. Supp. 2d 24, 30 (D.D.C. 2000) (internal quotation

marks and alterations omitted). An agency decision will be reversed only if "the agency has

relied on factors which Congress has not intended it to consider, entirely failed to consider an

important aspect of the problem, offered an explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm  Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983).

Where an agency has acted in an area in which it has "special expertise," the court must

be particularly deferential to its determinations. *Bldg. & Const. Trades Dep't, AFL-CIO v.*

*Brock*, 838 F.2d 1258, 1266 (D.C. Cir. 1988). Even in matters of agency expertise, however, the

degree of deference a court should pay a particular determination depends on the "thoroughness,

validity, and consistency of an agency's reasoning." *FEC v. Democratic Senatorial Campaign*

*Comm.*, 454 U.S. 27, 37 (1981). An agency may alter or reverse its policies and positions as long

as it supplies a "reasoned analysis indicating that prior policies and standards are being

deliberately changed." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir.

1970).

The court agrees with PBGC that § 1303 merely provides jurisdiction and a cause of

action but does not supply the appropriate standard of review for the dispute regarding the 2006

Letter. Sara Lee's contentions to the contrary are not persuasive. Sara Lee relies for support

primarily on *In re United Airlines Corp.*, 468 F.3d 444, 450 (7th Cir. 2006) (holding that PBGC

is not entitled to deference when it acts as a litigant under § 1342).  The provision at issue in

*United Airlines*, however, actually interprets a different provision of ERISA, 29 U.S.C. §1342,

which pertains to lawsuits initiated by PBGC, where PBGC acts as an ordinary litigant, as

opposed to actions, such as this one, that challenge the agency's determinations pursuant to

§ 1303.

　　　　Moreover, several other courts have applied the arbitrary and capricious standard to

PBGC's plan classifications, notwithstanding the language to which Sara Lee points.  *See*

*Saramar Aluminum Co. v. Pension Plan for Employees of Aluminum Ind.*, 782 F.2d 577, 583 (6th

Cir. 1986)*; PBGC v. Potash*, 1986 WL 3809, *1–2 (W.D.N.Y. Mar. 26, 1986); *PBGC v. Artra*

*Group, Inc.*, 1993 WL 225370 (N.D. Ill. June 23, 1993); *see also PBGC v. LTV Corp.*, 496 U.S.

633, 647–51 (1990) (holding that the agency receives *Chevron*-style deference).  As this is an

area in which PBGC has authority and expertise, the court sees no reason why it should not apply

the deferential standard of the APA.

　　　　Sara Lee also contends that the APA's standard of review is not applicable where due

process concerns are implicated and thus the court should employ a *de novo* standard.  The court

agrees with the uncontroversial statement that the court should review *de novo* the legal question

of whether procedural due process was properly afforded: Generally speaking, the court reviews

*de novo* those legal questions not committed to an agency's discretion, and it is the province of

the court to determine whether an agency has afforded the appropriate notice and opportunity to

be heard to satisfy due process requirements.  *See Pub. Serv. Comm'n v. Fed. Energy Reg.*

*Comm'n*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) (declining to defer to agency where it "violated

due process" by failing to provide adequate notice of rate change); *Coal. for Fair and Equitable Regulation of Docks on Lake of the Ozarks v. Fed. Energy Reg. Comm'n*, 297 F.3d 771, 778 (8th Cir. 2002) (reviewing *de novo* due process claim regarding agency determination).

To the extent that Sara Lee argues that the court should conduct its own independent factual inquiry, however, and that it should substitute its judgment for that of PBGC regarding the merits of the 2006 Letter, the court disagrees. Under the APA, the court "presumes the validity of agency action" and "cannot substitute its judgment for that of an agency." *LaRouche's Comm. for a New Bretton Woods v. Fed. Elec. Comm'n*, 439 F.3d 733, 737 (D.C. Cir. 2006) (internal quotation marks and citations omitted). Accordingly, the court will employ the deferential standard of review of the APA with respect to the 2006 Letter and shall base its decision on a review of the administrative record.

**2.    Administrative Record**

Having determined that its decision with respect to the instant motion will be based on the administrative record, the court is confronted with the parties' dispute regarding that record. Sara Lee contends that the record as submitted by PBGC is incomplete and inadequate and has served requests for the production of documents on PBGC. PBGC, on the other hand, asserts that the record is complete and has filed a motion for a protective order to bar the requests.

Ordinarily, courts confine their review of agency determinations to the administrative record as submitted by the agency. *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). A complete administrative record includes all materials before the agency at the time the decision was made, *id.*, as well as "all materials that might have influenced the agency's decision, and not merely those on which the agency relied in its final decision," *Amfac Resorts,*

*L.L.C. v. Dep't of the Interior*, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (internal quotation marks and citations omitted). Where the administrative record as produced by the agency is not complete, a plaintiff may be entitled to discovery to identify materials that are properly part of the administrative record. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

Based on the submissions before it, the court is unable to determine whether the administrative record as submitted by PBGC is complete. Therefore, the court's decision on the instant motion will be held in abeyance until the comprehensiveness of the administrative record is settled.

### III. CONCLUSION

For the foregoing reasons, it is, this 11th day of September, 2007, hereby

**ORDERED,** that the parties shall confer to determine whether agreement may be reached regarding the administrative record and /or to narrow the issues pertinent to the administrative record and shall submit a joint status report regarding their effort in this regard by no later than September 28, 2007; and it is further

**ORDERED** that should the parties not be able to reach agreement regarding the administrative record, by no later than October 5, 2007, they shall jointly propose a scheduling order setting the deadlines for briefing on any motion to supplement the administrative record or for discovery regarding materials that are properly part of the administrative record; and it is further

**ORDERED** that if the parties are not able to agree each side shall submit its own proposed briefing schedule; and it is further

**ORDERED** that this court's order of May 3, 2007, referring  PBGC's motion for a protective order [#55] to Magistrate Judge Facciola for his determination is **VACATED**; and it is further

**ORDERED** that  PBGC's motion for summary judgment [#46] and for a protective order [#55] are held in abeyance pending a resolution of any issues pertaining to the administrative record.

Henry H. Kennedy, Jr.
United States District Judge