IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SARA LEE CORPORATION, on its own behalf and on behalf of its employee-participants in the American Bakers Association Retirement Plan, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 06-CV-0819-HHK |
| AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan; and PENSION BENEFIT GUARANTY CORPORATION, | ) ) ) ) ) ) ) ) | Judge Henry H. Kennedy, Jr. Magistrate Judge John M. Facciola |
| Defendants. | ) ) | |
| AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN; and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN, as Administrator of the American Bakers Association Retirement Plan, | ) ) ) ) ) ) | MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR LEAVE TO SERVE DISCOVERY AND TO SUPPLEMENT THE ADMINISTRATIVE |
| Third Party Plaintiffs, Counterclaimants, and Cross-Claimants, | ) ) ) ) | RECORD OF SARA LEE CORPORATION, LEWIS BROS. |
| v. | ) ) | BAKERIES, INC., AMERICAN BAKERS |
| SARA LEE CORPORATION, | ) ) | ASSOCIATION RETIREMENT PLAN, AND |
| Respondent, | ) ) | BOARD OF TRUSTEES OF THE AMERICAN BAKERS |
| PENSION BENEFIT GUARANTY CORPORATION, | ) ) | ASSOCIATION RETIREMENT PLAN |
| Cross-Defendant, and | ) ) | |
| KETTERING BAKING COMPANY, INTERSTATE BRANDS CORPORATION, LEWIS BROS. BAKERIES, INC., HARRIS BAKING COMPANY, INC., AMERICAN BAKERS ASSOCIATION, and JENNY LEE BAKERY, INC., | ) ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

Plaintiff-Respondent Sara Lee Corporation ("Sara Lee"), Third Party Defendant Lewis

Brothers Bakeries, Inc. ("Lewis Brothers"), and Defendants-Third Party Plaintiffs American

1

Bakers Association Retirement Plan ("ABA Plan") and Board of Trustees of the ABA Plan

("ABA Plan Trustees") (collectively, the "Movants"), by their respective attorneys, submit this

memorandum of law in support of their motion for leave to serve discovery and to supplement

the administrative record, and in support state as follows:

## INTRODUCTION

In its September 11, 2007 Memorandum Opinion and Order (Docket No. 80), the Court

found that it is unable to determine whether the administrative record submitted by the PBGC in

this case is complete. Movants believe that the administrative record submitted by the PBGC in

its initial filing *is not complete* and some discovery is required to ensure that the record is

completed. Following the Court's opinion, the parties conferred in a good faith effort to reach

agreement about the contents of the administrative record. As the correspondence already

submitted to the Court reveals, the PBGC has agreed to supplement the initially submitted record

with (1) all exhibits attached by Movants to their respective summary judgment opposition

briefs, (2) three PBGC filings in the Interstate Bakeries Corp. ("IBC") bankruptcy action, and

(3) those documents from PBGC's prior FOIA production to Sara Lee that are not currently in

the record.

Movants informally requested limited discovery from the PBGC, in their post-opinion

correspondence, addressed to items that should have been included in the record and should have

been considered by the PBGC in reaching its 2006 Determination (AR 1563-79 in the submitted

record).[1] In particular, Movants requested that the PBGC produce:

> ... all documents in its possession that have not already been included in the
> administrative record on the following issues: (i) any determinations, documents, records
> or files reviewed or relied on by PBGC in making a determination for all pension plans,
> other than the ABA Plan, that the plan was either a multiple-employer pension plan or an
> aggregate of single-employer pension plans; (ii) all records, documents or files in
> PBGC's possession related to the ABA Plan, terminations of participating employers

---

[1] References to "AR [no.]" are to the administrative record submitted by the PBGC in support of its motion for
summary judgment in April 2007.

under the ABA Plan and any documents required to be filed under ERISA by or on behalf of the ABA Plan as well as any audits performed by PBGC of the ABA Plan or of any current or former participating employer in the ABA Plan; and (iii) all documents, records, files and electronic messages related to communications by PBGC with outside parties, including other governmental agencies and current or former ABA Plan participating employers, related to the ABA Plan's administration or structure, including but not limited to communications related to the August 8, 2006 determination.

*See* Docket No. 81-2, Ex. B at p. 5.[2]

The PBGC summarily rejected Movants' discovery requests, claiming, among other things, that the discovery rules set forth in the Federal Rules of Civil Procedure do not apply in this case. The fact that the PBGC has provided some additional documents, since the Court's opinion, and has agreed to add to the record documents disclosed only as a result of Sara Lee's FOIA request, provides a strong basis for Movants' good faith belief that additional documents that were considered by the PBGC in reaching the 2006 Determination—or that should have been considered—exist within the PBGC, have not yet been produced and should be made part of the record before this Court.[3]

In the 2006 Determination, the PBGC changed or deviated from the legal standard used in its 1979 Determination (AR 212-19), and described in subsequent PBGC pronouncements and decisions. Specifically, in 1979, the PBGC applied the following standard to distinguish between an aggregate of single-employer plans and a multiple employer plan:

> Our determination as to the nature of an entity—whether it is a single plan or an aggregate of single plans—is based on its structure and how it actually operates on an ongoing basis. We look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate. Such evidence may include the reasonable expectations and intent of the parties.

---

[2] These requests were divided into more specific subparts corresponding to Sara Lee's prior discovery requests, with the exception of those prior requests that were withdrawn. *See* Docket No. 81-2, Ex. B at pp. 5-7.

[3] If documents were considered and have been withheld, for any reason other than a legitimate assertion of privilege, they should be included in the administrative record before the Court. If documents *should have been considered*, but were not, for any reason, the Court should be made aware of such documents, because their consideration *vel non* may well bear upon the Court's determination whether the 2006 Determination was arbitrary and capricious. Such documents should also be made a part of the record before the Court.

> The availability of funds held by an entity to provide benefits is a central factor in our analysis. Restrictions on the use of such funds indicate that the entity may be an aggregate of single plans...If the evidence shows that payments are effectively restricted, *by whatever means, so that there is a minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants*, then the entity is an aggregate of single plans.

*See* 1979 Determination, at AR 212-13 (emphasis supplied). In 1979, the ABA Plan met, and presumably could still meet, this standard.

In its 2006 Determination, the PBGC changed this standard and required that the ABA Plan must "effectively eliminate" the risk of cost-shifting among employers. *See* AR 1568. The PBGC also changed its standard from one allowing minimization of the risk of cost-shifting "by whatever means" to one allowing only "one means," namely, the creation and maintenance of separate accounts for each employer's contributions. It did so in 2006, although the PBGC *knew* in 1979 and continually thereafter that the ABA Plan did not maintain such separate accounts. Nothing in the 2006 Determination reconciles the PBGC's actual knowledge, from 1979 forward, with application of a *new* standard in 2006, which was applied retroactively through a "revocation" of the 1979 Determination.[4]

While applicable case law requires the PBGC to give interested parties notice of such new rulemaking, the PBGC never provided Movants with any notice that the standards by which the ABA Plan's structure would be reconsidered would change. In fact, the PBGC represented in its 2006 Determination that the standard did *not* change, although standards were created for elimination of risk of cost-shifting. The discovery requested by Movants is necessary to determine what standards were in fact applied by the PBGC, whether those standards were applied in a manner that is reconcilable with the PBGC's knowledge from 1979 forward, and the specific factual bases and whether new information existed that allegedly supported the PBGC's new standard for the 2006 Determination.

---

[4] Movants submit that under either standard applied by the PBGC, the ABA Plan qualifies as an aggregate of single-employer pension plans and not a multiple-employer plan.

In addition, as noted by the Court during the July 2, 2007 oral argument, by its plain terms, the 2006 Determination applies retroactively. The 2006 Determination states that the ABA Plan "is, *and indeed always has been*, a multiple-employer plan," and it expressly *revokes* PBGC's prior 1979 Determination, as if the 1979 Determination *never existed. See* AR 1563, 1566. During the July 2 argument, the PBGC's counsel nevertheless represented that the 2006 Determination was "simply that this plan is a multiple-employer plan for purposes of ... Title 4 of ERISA," and that there was *"no decision as to the retroactive effect,"* of the Determination and *"no record before the Court"* on that issue. The PBGC's counsel concluded by arguing that retroactive application of the 2006 Determination *"has not been decided."* These statements are inconsistent and directly contradictory.

The PBGC's 2006 Determination may not be retroactively applied as a matter of law. In fact, chaos will result if the 2006 Determination is given retroactive effect. As noted in Movants' summary judgment opposition briefs, retroactive application of the PBGC's decision will result in the following:

- A forfeiture of assets contributed by participating employers with the expressed intention that such contributions were being made to pay only for their own employee-participants' benefits;
- A resulting windfall for participating employers with the unfunded benefit liabilities—like IBC's unfunded liability of approximately $60 million;
- To the extent other Plan participating employers are not in bankruptcy proceedings, each would be liable, upon plan termination or withdrawal, for a proportionate share of the "single" Plan liability to all employee-participants, including those of IBC;
- Long-settled employer plan terminations would need to be re-opened to determine if the employer or their successors are entitled to additional monies or must repay monies to the ABA Plan on a multiple-employer plan withdrawal basis;
- Reverted assets would have to be recovered from participating employers who terminated their participation with overfunded plans in accordance with the ABA Plan and PBGC regulations for single employer plan terminations;
- The Plan's and participating employers' public financial statements would have to be restated; and
- Tax liabilities for employers and employee-participants would have to be recomputed and tax documents refiled.

Although these potential results of revocation of the 1979 Determination were brought to the PBGC's attention, there is nothing in the 2006 Determination or the record before the Court that suggests that the PBGC ever considered, let alone weighed, any of these potential impacts of revocation. Nor is there any evidence to suggest that the PBGC ever provided *notice* to the ABA Plan or any participating employer that the 1979 Determination would be *retroactively* revoked, despite reliance on that Determination by the ABA Plan and participating employers for more than 27 years.

The PBGC's deviation from legal standards set forth in the 1979 Determination (as well as later opinions on other plans and a preamble to the PBGC's 1980 regulations) may have transformed an act of purported adjudication into an act of rulemaking. In either case, it is well-settled that the PBGC was required to provide all interested parties with *notice* and *an opportunity to be heard* on any new standard, on any new "interpretation" of the previously adopted standard, and on retroactive application of any change. It cannot be disputed that the PBGC failed to provide any such notice to Movants (or any other party) that it would adopt a new standard in 2006, change its "interpretation" of previously announced standards or retroactively apply any such changes. Discovery is required to ensure that the administrative record is complete on the issue of retroactivity, so that the Court may assess whether the 2006 Determination should be viewed as a form of "rule-making" or a form of "adjudication." Without such discovery, Movants and the Court will be left to speculate on the exact standards applied in, and the factual bases for, the PBGC's 2006 Determination. Simply put, the incomplete record will remain incomplete. Movants respectfully request that the Court allow supplementation of the administrative record by addition of the materials described above, and permit the Movants to engage in limited discovery under the Federal Rules of Civil Procedure to ensure that the record is complete.

## ARGUMENT

I. **Limited Discovery and Supplementation of the Administrative Record Are Necessary Because the PBGC Continues to Withhold Documents and Information the Agency May Have Considered or Should Have Considered in Making Its 2006 Determination, and Because PBGC Did Not Clearly Explain the Bases for the 2006 Reversal of Its Earlier 1979 Determination**

The PBGC's 2006 Determination revoked the PBGC's 27-year old determination that the ABA Plan is an aggregate of single-employer plans. The PBGC's bases for its 2006 Determination are, to say the least, unclear.

First, the PBGC has not explained whether its reversal in position resulted from a deliberate change in its prior policies and rules. Second, it is unclear whether the PBGC reversed its earlier 1979 position based on a purported change in the facts. If so, it is also unclear what facts were considered and weighed by the PBGC, let alone how they were weighed, in reaching a decision to revoke the 1979 Determination.

Movants request discovery, in the form of requests for production of documents and requests for admissions, that should shed light on these issues and eliminate the uncertainties that continue to exist as a result of the PBGC's failure to explain its retroactive revocation of the 1979 Determination. If any new information or documents exist responsive to the requests, such documents should be included in the administrative record.

The PBGC has simply ignored or refused to respond to Movants' limited discovery requests. It has only produced three filings in IBC's pending bankruptcy case, while agreeing to supplement the record with additional relevant documents produced by the PBGC in response to Sara Lee's August 2006 Freedom of Information Act request ("Sara Lee FOIA Request") that were, for an unexplained reason *omitted* from the record initially submitted to the Court. Otherwise, the PBGC has simply stood by its initially submitted administrative record.

The PBGC previously certified its submitted record to be complete, but it now effectively admits that the submitted record was in fact not complete. Moreover, the PBGC's administrative record will not be complete, even with the few additions to which the PBGC has now agreed.

Discovery is required, under the Federal Rules of Civil Procedure's discovery rules, to determine with certainty whether there are additional relevant documents in the PBGC's possession.

### A.    Standards for Permitting Discovery and Supplementation of the Record

"Where the administrative record as produced by the agency is not complete, a [party] may be entitled to discovery to identify materials that are properly part of the administrative record." *Sara Lee Corp. v. Am. Bakers Ass'n Ret. Plan*, 2007 U.S. Dist. LEXIS 66758, *17 (D.D.C. Sept. 11, 2007) (citing *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989)).  Upon a *prima facie* showing of bad faith or an incomplete record, a reviewing court may go beyond the purported administrative record in reviewing a PBGC decision.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *PBGC v. LTV Steel Corp.*, 119 F.R.D. 339, 341-343 (S.D.N.Y. 1988).  Moreover, the PBGC may not exclude from the administrative record evidence that is contradictory to the agency's position but, rather, the agency must "take account of contradictory evidence" in rendering its decision. *Carpenters and Millwrights Local 2471 v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007) (quoting *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962 (D.C. Cir. 2003)).  Stated another way, in determining whether the record as a whole substantially supports the PBGC's decision "the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

### B.    The PBGC's Policies and Standards Applied in its 2006 Determination Are Unclear.

The PBGC's 1979 Determination set forth the agency's policy and standard for finding a pension plan to be an aggregate of single-employer plans:  "If the evidence shows that payments are *effectively restricted, by whatever means*, so that there *is a minimal risk* of funds attributable to the contributions of one employer being used to pay the benefits of another employer's

employee-participants, then the entity is an aggregate of single plans." *See* AR 213 (emphasis added).[5]

In 1979, after extensive fact-finding and discussion with ABA Plan representatives, the PBGC determined that the ABA Plan's practices would effectively result in such a minimal risk, going forward, of cost-shifting, and therefore found the ABA Plan to be an aggregate of single-employer plans. Specifically, the PBGC explained that the ABA Plan met its test because the "separate actuarial valuations made with regard to each employer and the system of surcharges . . . effectively minimize the risk that one employer's contributions will be used to fund the benefits of another employer's employees." *See* AR 215.

While one method of creating an aggregate of single-employer plans is to maintain separate asset accounts for each participating employer's contributions (*see* 45 Fed. Reg. 55636, 55637 n.2 (1980); AR 213), the PBGC was informed before the 1979 Determination that the ABA Plan *did not* maintain separate accounts, and instead had a commingled trust. *See* AR 214; *see also* AR 171. Rather than requiring the ABA Plan to create separate accounts, the PBGC agreed that the ABA Plan's system of surcharges and valuations at plan termination was an acceptable alternative means of minimizing the risks of cost-shifting (allowable because a plan could use "whatever means" and is not limited to separate accounts).[6] However, in its 2006 Determination, the PBGC reversed itself and revoked the 1979 Determination, claiming that the 1979 Determination was "simply wrong" and that, from 1979 forward through the present, the

---

[5] The PBGC has also asserted this "by whatever means/minimal risk" standard in a preamble to its regulations and in other opinion letters. *See* 45 Fed. Reg. 55636, 55637 n.2 (1980); PBGC Op. Ltrs. 85-2, 1985 PBGC LEXIS 31, at *2 (Jan. 14, 1985); PBGC Op. Ltrs. 84-2, 1984 PBGC LEXIS 8, at *6 (Jan. 17, 1984); PBGC Op. Ltrs. 79-14, 1979 PBGC LEXIS 4, at *2 (Oct. 17, 1979); PBGC Op. Ltrs. 79-3, 1979 PBGC LEXIS 15, at *2 (Feb. 12, 1979).

[6] In other cases, the PBGC has taken the position that even if "all o[r] part of the assets are involved in one trust," a plan is still an aggregate of single-employer plans if a portion of the assets are not available to pay some of the benefits. PBGC Op. Ltrs. 84-2, 1984 PBGC LEXIS 8, at *5 (Jan. 17, 1984) (*citing* 42 Fed. Reg. 59285, 59286 (1977)); *see also Nowell v. Central Serv. Ass'n*, 106 F. Supp. 2d 888, 894 (S.D. Miss. 2000); *PBGC v. Potash*, 1986 U.S. Dist. LEXIS 30987, at *5 (W.D.N.Y. 1986).

ABA Plan was and always has been a multiple-employer plan, and *not* an aggregate of single-employer plans. *See* AR 1570. This reversal begs the question—what changed?

Perhaps the legal standard applied by the agency changed. If the PBGC has changed the standard, then it has supplied no "'reasoned analysis indicating that prior policies and standards are being deliberately changed.'" *Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *13 (quoting *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

In the 2006 Determination, the PBGC apparently abandoned the "minimal risk" standard and adopted a different standard that requires that any risk be "effectively eliminated."[7] The standard applied in 1979 recognized that there may be some risk of cost-shifting; that is, it was a *forward-looking* standard under which a pension plan would be deemed an aggregate of single-employer plans if the future risk of cost-shifting was "*minimal*."[8] In contrast, the 2006 Determination that the ABA Plan was *always* a multiple-employer pension plan, is allegedly based on evidence that some cost-shifting occurred *after 1979* when some former participating employers left the ABA Plan, and it requires that *all* risk of cost-shifting *be* eliminated.[9] *See* AR 1578. Any alleged cost-shifting that the PBGC contends occurred after 1979 does not automatically mean that the PBGC's 1979 Determination of "minimal" risk was "simply wrong," as the agency now contends.[10]

---

[7] While the PBGC pays "lip service" to the "minimal risk" standard, quoting its 1979 Determination and claiming the factors "have not changed since 1979" (*see* AR 1566-67), it also urges that its test "demand[s] that a plan *effectively eliminate* the risk of cost shifting among employers." *See* AR 1568 (emphasis added).

[8] Prior to 1979, the PBGC was specifically informed that cost-shifting was a theoretical possibility under the Plan (AR 169; *see also* AR 6-7); yet the agency concluded in its 1979 Letter that the risk was minimal and that the Plan was therefore an aggregate.

[9] The new "elimination of risk" standard is incompatible with, and at least substantially different from, the prior "minimal risk" standard. To the best of Movants' knowledge, the "elimination of risk" standard is nonexistent in the PBGC's prior pronouncements. It is certainly not a standard of which the ABA Plan had notice in 1979, or in 2006, or at any time in between.

[10] The PBGC has a significant financial interest in the retroactive application of its 2006 Determination. In furtherance of this self-interest and based on post-1979 facts and 20/20 hindsight, the PBGC has deviated from its prior forward-looking standard of assessment.

Similarly, in its 2006 Determination, the PBGC also appears to require that aggregate plans now create separate trust accounts for each participating employer's contributions. The 1979 Determination (and the opinions and preamble, cited above, that have issued since 1979) imposed no such requirement; instead, since 1979 the PBGC has allowed plans to effectively restrict payments "by whatever means." In the 1979 Determination, the PBGC credited the different means used by the ABA Plan, and found that those means satisfied the "minimal risk" standard because they "effectively restricted" payments "by whatever means." If the PBGC changed the standard, it has supplied no "reasoned analysis" to justify the change.

On the other hand, the PBGC might continue to claim that it has *not* changed the 1979 standard, and that it has somehow discovered new information that rendered its 1979 Determination "simply wrong." If PBGC applied the 1979 standard in its 2006 Determination, the agency has failed to explain why its forward-looking assessment of "minimal risk" was incorrect in 1979, based on evidence before the agency at that time, and is now incorrect, based on *the same facts*. It has failed to identify any facts that existed in 1979 that were unknown to the PBGC *at that time*, which would justify revocation of the 1979 Determination. It has failed to identify any facts that came into existence *after* 1979 that would define a specific moment when, contrary to all of the participants' intentions, the ABA Plan was transformed from an aggregate of single-employer plans into a unitary multiple-employer plan.

The lack of clarity in the PBGC's 2006 Determination makes it impossible to be certain whether the PBGC actually changed the standard described in the 1979 Determination, a change that would amount to "rule-making," or whether the PBGC determined that some *new* facts justified a change in the status of the ABA Plan *at some defined time when those new facts first appeared*, that *might* amount to a form of "adjudication." Even if the PBGC intends the 2006 Determination to apply only prospectively, the standard it applied is still unclear: is an "elimination of *all future risk*" of cost-shifting required? Or is it still sufficient "that payments are effectively restricted, by whatever means, *so that there is a minimal risk of funds attributable*

*to the contributions of one employer being used to pay the benefits of another employer's employee-participants*"?

It is simply impossible to tell what rules standard the PBGC has applied in the 2006 Determination. This lack of clarity, by itself, draws into question the consistency, validity, thoroughness and change of policy issues that this Court described in its recent Memorandum Opinion and Order. *Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *13 (citing *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S. Ct. 38, 70 L. Ed. 2d 23 (1981); *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852 (D.C. Cir. 1970)).

For this Court to assess whether the PBGC's 2006 Determination is arbitrary and capricious, more information is required than is presently in the administrative record. More is required than will be in the administrative record even if the few additions the PBGC has agreed to are included. Fair but limited discovery is necessary to ferret out the true state of facts.

> **C.**     **The Facts upon Which the PBGC Relied in Making Its 2006 Determination, and What Weight It Gave Them, Are Also Unclear.**

In addition to the questions raised above concerning the legal standard the PBGC applied, there are questions as to the factual bases on which the agency allegedly based its 2006 Determination. In its recent Opinion, the Court listed the following factual bases on which the PBGC allegedly relied:

> PBGC relied on the following findings: (1) the ABA Plan had never maintained the system of accounts and records that would have been required to maintain separate plans for each employer; (2) the Trustees and their advisors had regularly filed documents with the Department of Labor and the Internal Revenue Service stating, expressly, that the ABA Plan was a multiple-employer plan; (3) documents were also distributed to contributing employers and plan participants (including the Summary Plan Description) indicating that there were no separate accounts maintained for each employer's contributions; and (4) correspondence by the ABA Plan's legal counsel and actuaries, as well as filings and accounting records, repeatedly stated that the ABA Plan operated as a multiple-employer plan, citing the financial and administrative advantages of doing so.

*Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *9-10.

### 1.    Basis 1:  ABA Plan Allegedly Did Not Maintain Separate Accounts

It is indisputable that, prior to issuing the 1979 Determination, the PBGC actually knew that the ABA Plan did not maintain separate accounts for each participating employer.[11] In the 2006 Determination, the PBGC reached several conclusions and made several broad statements about the ABA Plan's administration.  There is **no** factual recitation of what, specifically, in the ABA Plan's accounting and actuarial processes was found by the PBGC to have **changed** since the 1979 Determination, or what facts that existed in 1979 were unknown to the PBGC at that time.  The PBGC has not explained what in the ABA Plan's accounting and actuarial processes before and after 1979 exposed each employer's plan to more than minimal risk that contributions for its employees would be used to pay benefits for employees of another participating employer.

The PBGC elsewhere relies on a chart (AR 1219) that it claims demonstrates the ABA Plan maintained records sufficient to recreate sub-accounts for each participating employer, but does not explain whether the agency took this alleged fact into account in reversing its determination, or what weight it gave to this fact.  *See* AR 1578.  Notably, the PBGC never contacted the ABA Plan or any other party (that Movants are aware of) to determine if the

---

[11] In 1978, prior to the issuance of the 1979 Determination, the PBGC *knew* and considered a number of specific "elements" that indicated that the plans sponsored by each of the participating employers were separate plans, including: (a)  the existence of separate participation agreements with differing rates of contribution and differing classes of participants, for each of the participating employers; (b) the separate requests for and issuance of IRS determination letters; (c) separate actuarial assessment of each new employer and each employer who increases its contribution rates, to determine whether a surcharge must be applied to meet plan assumptions; (d) actuarial studies upon withdrawal of each participating employer to determine whether an additional contribution might be necessary to eliminate any plan insufficiency; (e) "no participating employer had any intention of having his contribution used to pay for the benefits of the [employees] of any other participating employer."  *See* Memorandum concerning Conference at PBGC, April 25, 1978, AR-0165, at AR0166 to -0168.  It also knew and considered, among other things, that (f) no separate account was kept for each employer; (g) all contributions were, on an ongoing basis, paid into a "common pot," and all distributions were paid out of that "common pot"; and (h) a "negative asset balance for a participating employer was theoretically possible."  *Id.*, at AR-0168 to -0170.

Knowing these facts and others, *see* 1979 Determination, the PBGC determined in 1979 that the ABA Plan was an aggregate of single employer plans. *Id.*

Nothing in the PBGC's 2006 Letter Determination describes how *any* of these facts changed between 1979 and 2006.

agency's interpretation of this document was correct or even reasonable; rather, it placed its subjective interpretation ahead of proper fact-finding.

>        **2.    Bases 2 & 4:   ABA Plan Documents and Filed Reports That Allegedly State That the ABA Plan Held Itself Out as a Multiple-Employer Plan**

Failing to consider an important aspect of this issue, the PBGC fails to explain whether the ABA Plan's representations in letters and documents filed with the Department of Labor and Internal Revenue Service that the Plan was a multiple-employer plan were only for purposes under ERISA Titles I and/or II, rather than for Title IV purposes.  Furthermore, there is nothing in the 2006 Determination to indicate what weight the PBGC gave to such representations.  *See*, *e.g.*, AR 1012 at ¶ 13 (IBC's Participation Agreement, acknowledging aggregate nature of ABA Plan).  Nor does the PBGC explain how it weighed such representations against its treatment of the ABA Plan as an aggregate consistently from 1979 to the issuance of the 2006 Determination.

>        **3. Basis 3: Documents Allegedly Stating There Was No Separate Accounting**

The PBGC was informed by the ABA Plan's representatives before the issuance of its 1979 Determination that no separate accounts were maintained under the ABA Plan's trust. How does the ABA Plan's supposed *later* disclosure of this fact *to others* (contributing employers and plan participants) serve as a basis for the PBGC's 2006 revocation of the 1979 Determination and reversal of its position?  Did the PBGC's legal standard applicable to the review change?  How did the PBGC weigh such representations against explicit disclosures to and agreements with participating employers and/or Plan participants that the Plan is an aggregate for Title IV purposes?  It is impossible to answer any of these questions simply by reading the 2006 Determination.[12]

As this Court has explained, if an agency "entirely failed to consider an important aspect of the problem" or "offered an explanation for its decision that runs counter to the evidence

---

[12] *See* Charles H. Koch, Jr., *Administrative Law and Practice*, § 5.67[4] (2007)(dealing with precedent and consistency, and stating that "Courts should not attempt to supply a reasoned basis for the agency action that the agency itself has not given.").

before the agency," its decision will be reversed. *Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *13 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).  In order to address the questions set forth above, Movants respectfully request that they be permitted to engage in limited discovery, both through additional production of documents by the PBGC and in the form of requests for admissions, to ensure that the administrative record is complete, and to enable the Court and all of the litigants to understand fully the "evidence before the agency" and the legal standards the PBGC actually considered and applied in rendering the 2006 Determination.

> **D.      The PBGC's Submitted Record Is Admittedly Incomplete, and the Agency Rejected Movants' Request for the Limited Discovery to Complete the Administrative Record.**

The PBGC's submitted administrative record now before the Court is, by the PBGC's own admission, incomplete.  A partial supplementation of the record, by addition of materials produced in response to the Sara Lee FOIA Request, has been agreed to by PBGC.  *See* Docket No. 81-3, Ex. E at p. 7.[13]  The PBGC's agreement effectively admits that there were additional information and documents in the PBGC's possession that it did not consider in reaching its 2006 Determination.[14]  In addition, the PBGC has produced to Movants and agreed to supplement the record with three of its filings in *In re: Interstate Bakeries Corp., et al.*, Case No. 04-45814 (JWV) (Bankr. W.D. Mo.), which state, *inter alia*, the PBGC's belief as of March 17, 2005 that the ABA Plan "is an aggregate of separate, single-employer defined benefit pension plans covered by Title IV of ERISA."  *See* Docket No. 81-2, Ex. C at pp. 10, 17, 22, 27; Docket

---

[13] On September 28, 2007, pursuant to this Court's September 11, 2007 order, the parties filed their Joint Status Report.  *See* Docket No. 81-1.  Exhibits A through E to the Joint Status Report are communications regarding the parties' efforts to reach agreement regarding the administrative record and/or to narrow the issues pertinent to the administrative record.  *See* Docket No. 81-2, 81-3.

[14] The PBGC produced over 3,000 pages of documents in response to the Sara Lee FOIA Request.  *See* Docket No. 81-2, Ex. B at p. 4; Doc. 81-2, Ex. C at p. 10.  The PBGC's administrative record submitted to the Court in this action consists of only 1,579 pages.  *See* AR 1579.  The PBGC's omission of roughly 1,500 pages of documents from its submitted record is significant, and supports Movants' good faith belief that additional relevant documents may exist and should be sought in formal discovery.

No. 81-3,  Ex. E at p. 7.  The PBGC has further agreed to supplement the administrative record with documents that were submitted with Movants' briefs opposing PBGC's pending summary judgment motion.  *See* Docket No. 81-2, Ex. C at p. 11.  Movants maintain a good faith belief that there are additional materials and information relevant to the 2006 Determination that PBGC has *still* not produced for review by this Court.  That is, even with the supplementation that has been agreed to, the submitted record is still not complete.

As noted above, since this Court's September 11, 2007 Order, Movants have requested limited discovery and these discovery requests have been summarily rejected by the PBGC.  *See* Docket No. 81.  With regard to the first request made by the Movants, the PBGC has only produced some documents related to the *Artra Group* case.  The PBGC contends that it possesses *no additional records relating to that case, or other cases and opinion letters for which Movants have requested documents*, including:  PBGC Opinion Letters 78-16, 78-27, 79-3, 79-14, 84-2, and 85-2; *PBGC v. Potash*, Civ.-79-130B(E), 1986 U.S. Dist. LEXIS 30987 (W.D.N.Y. Mar. 28, 1986); and *Nowell v. Central Serv. Ass'n*, 106 F. Supp. 2d 888 (S.D. Miss. 2000).  *See* Docket No. 81-3, Ex. D at p. 3.  While Movants find these admissions by the PBGC to be somewhat startling, they will accept the PBGC's implicit representation that it has conducted a diligent search of all of its records, electronic and paper, and that no such documents exist.

With regard to the second request for "records, documents or files in PBGC's possession related to the ABA Plan, terminations of participating employers under the ABA Plan and any documents required to be filed under ERISA by or on behalf of the ABA Plan as well as any audits performed by PBGC of the ABA Plan or of any current or former participating employer in the ABA Plan," Movants accept the PBGC's representation that it has conducted a diligent search of all of its records and that all relevant documents were produced in response to Sara Lee's FOIA Request.  However, Movants have sought a privilege log from the PBGC, describing approximately 80 pages of documents that the PBGC has withheld on grounds of privilege and confidentiality (*see* Docket No. 81-2, Ex. C at pp. 10,  12-14).  The PBGC has refused to produce such a log.  *See* Docket No. 81-3, Ex. E at p. 7.  There is no dispute that these documents *are*

relevant to this action, but the PBGC refuses to produce a log because "[t]he documents that PBGC provided in response to the FOIA request are not governed by the discovery rules in the Federal Rules of Civil Procedure." *See* Docket No. 81-3, Ex. E at p. 7. In this litigation, Movants must be permitted to assess the propriety and reasonableness of the PBGC's claim of privilege, as required by Fed. R. Civ. P. 26. The PBGC should not be permitted to claim privilege as to certain documents, and then attempt to shield them from Movants by arguing only that the Federal Rules do not apply. Movants therefore request that discovery be permitted under the Federal Rules of Civil Procedure, to address these claims of privilege and confidentiality.[15]

With regard to the third request,[16] Movants primarily seek relevant e-mails and other electronic communications or documents maintained by the PBGC's staff who participated in the 2006 Determination. Other than Mr. Mark Blank's e-mails, the PBGC has not produced the e-mails or electronically stored documents of any other agency personnel. Other personnel, including Mr. Terrence M. Deneen, the PBGC Chief Insurance Programs Officer who signed the 2006 Determination, and others who assisted him, are substantially likely to have produced or received such emails and electronic documents. *See* AR 1579. The PBGC even refuses to certify that it conducted any e-mail account and electronic database searches in response to Movants' request. *See* Docket No. 81-3, Ex. E at p. 7. Movants also seek any *ex parte* communications the PBGC may have had with the parties to the 2006 review, and any communications the PBGC may have had with other governmental agencies related to the ABA Plans' administration or structure, or its 2006 Determination. Once again, given the nature of this matter and its history before the PBGC, it is substantially likely that such communications

---

[15] Movants have informed the PBGC: "For those documents that are not privileged but merely confidential, we would be willing to stipulate to the entry of an appropriate and reasonable Protective Order to eliminate any confidentiality concerns the PBGC may have." *See* Docket No. 81-3, Ex. D at p. 3. The PBGC has not responded to this request.

[16] The third request was for "documents, records, files and electronic messages related to communications by PBGC with outside parties, including other governmental agencies and current or former ABA Plan participating employers, related to the ABA Plan's administration or structure, including but not limited to communications related to the August 8, 2006 determination."

occurred and that *some* record of those communications exists.[17]  Movants respectfully request

an order from the Court compelling the PBGC to produce any documents in its possession that

are responsive to these limited requests.

Finally, Movants seek to serve on the PBGC requests for admissions under Fed. R. Civ.

P. 36.  These requests are targeted—seeking admissions regarding the following specific issues:

- the policies and standards the PBGC may have applied in making its 2006 Determination;

- the PBGC's considerations, if any, concerning the retroactivity of its 2006 Determination;

- the PBGC's knowledge, assessment and consideration of specific facts and issues, such as the unitary nature of the ABA Plan's trust and commingling of assets, trust accounting and actuarial practices of the Plan;

- representations concerning the ABA Plan's Title IV status, and the ABA Plan's ability to recreate separate employer accounts;

- the content and interpretation of the PBGC's 1979 Determination and 2006 Determination;

- the questions the PBGC asked, information it solicited, received and relied upon, and notifications it issued in connection with its 2006 Determination;

- the impact of the 2006 Determination on the ABA Plan and its participating employers;

- the ABA Plan's and its participating employers' reliance on the 1979 Determination;

- the PBGC's processing of terminations of participating employers' plans under the ABA Plan and the agency's audits since the issuance of the 1979 Determination; and

- the PBGC's representations and conclusions over the years concerning the Plan's Title IV status.[18]

The PBGC's responses to these requests are clearly relevant to the matters before the Court, and

will assist the Court by narrowing the issues to be determined.  To the extent the parties may

agree on material facts, the requests may streamline issues for the Court's review.  To the extent

there is no agreement, the requests will define any need for further discovery, either through

---

[17] A separate question exists, of course, if documentation of such communications existed at one time, and is no longer available, or if such documentation was, outside of ordinary practices, never created in the first place.

[18] A copy of the substance of the proposed requests for admissions that Movants intend to serve on the PBGC is attached as Exhibit 1.

depositions, interrogatories or other requests for production, to resolve any outstanding issues that may become apparent as a result of the PBGC's responses.

In sum, the PBGC has effectively ignored Movants' limited requests for production of documents and information under the Federal Rules of Civil Procedure. It has asserted that the only thing that matters is the allegedly "complete" administrative record that they initially submitted to the Court. The PBGC's prior certification of the record's "completeness" has proved wrong. For all the reasons stated above, Movants believe that the requested discovery and supplementation are necessary for the Court to be assured that it has a truly complete record, and for the Movants to demonstrate that PBGC's 2006 Determination was arbitrary and capricious.

## II.    Discovery and Supplementation of the Administrative Record is Necessary Because the PBGC Never Specifically Notified the Parties That Its 2006 Determination Could Be Applied Retroactively

At oral argument on July 2, the Court identified two questions for the parties to address related to the 2006 Determination: (1) what standard of review should be applied to the PBGC's 2006 Determination; and (2) whether the 2006 Determination could or should be applied retroactively from August 8, 2006—the date the 2006 Determination was issued.

On the first question, in its September 11, 2007 Order, the Court found that review of the PBGC's 2006 Determination should occur under a deferential standard. *See Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *16.[19] With respect to the Court's second question, Movants submit that the PBGC not only failed to give the parties notice that the agency would possibly apply its decision retroactively, they note that the PBGC has admitted that it did not create any

---

[19] However, as this Court explained, "the degree of deference a court should pay a particular determination depends on the 'thoroughness, validity, and consistency of an agency's reasoning.'" *Sara Lee Corp.*, 2007 U.S. Dist. LEXIS 66758, at *13 (quoting *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S. Ct. 38, 70 L. Ed. 2d 23 (1981)). Because the Court has not ruled upon the thoroughness, validity, and consistency of PBGC's reasoning, the degree of deference it will accord PBGC's determination remains undetermined. Movants require discovery to assess PBGC's "thoroughness, validity, and consistency" here, and make their arguments for a less deferential review. Furthermore, the Court agreed that it "should review *de novo* the legal question of whether procedural due process was properly afforded." *Id.* at *15.

record for its decision that the ABA Plan "is *and always has been* a multiple-employer plan." The PBGC has admitted, by its conduct, that the initially submitted administrative record was not "complete." Movants require additional discovery in order to determine what documents and other information were considered by the PBGC before deciding that the ABA Plan "is *and always has been* a multiple-employer plan," and that the 1979 Determination should be *revoked*, as if it never existed. Such discovery is necessary to ensure the record before the Court contains all relevant information necessary to determine whether the 2006 Determination as a whole, or any part of it, including any part that may apply *retroactively*, is arbitrary and capricious.

    A.    **The PBGC's Administrative Review Process Was Flawed and Never Provided the Parties Notice That Any Determination Could or Would Apply Retroactively**

As discussed at length in Movants' opposition briefs to the PBGC's summary judgment motion, the PBGC's administrative process was flawed, the PBGC failed to provide adequate notice and the 2006 Determination was the result of arbitrary and capricious decision-making. The flaws in the administrative process are especially apparent in the PBGC's specific decision to revoke the 1979 Determination and apply the 2006 Determination retroactively from August 6, 2006—as if the 1979 Determination never occurred. As discussed below, these procedural flaws require that Movants be permitted to engage in discovery with PBGC, and to supplement the current administrative record both with the documents already agreed to and with those uncovered in discovery.

As discussed above, after extensive fact-finding and discussions with ABA Plan representatives, in 1979 the PBGC issued a Determination that the ABA Plan qualified as an aggregate of single-employer pension plans. *See* AR 158-225. The ABA Plan's structure as an aggregate remained the same for the next 27 years. In fact, the 1979 Determination was incorporated into the ABA Plan's governing document so that there would be no confusion as to the ABA Plan's status and structure going forward. AR 898-983. The ABA Plan continued to

operate as an aggregate of single-employer plans without question until 2005, when IBC—one of the Plan's largest participating employers—began to question how the ABA Plan operated.

Notably, IBC's interest in the ABA Plan's structure coincided with its filing of a Chapter 11 bankruptcy in 2004. AR 0277. About this same time, Sara Lee was considering the transfer of some of its employee-participants in the ABA Plan to another pension plan sponsored solely by Sara Lee.[20] AR 0333-0336. Due to Sara Lee's request, the ABA Plan Trustees actuarially calculated each participating employer's interest in the ABA Plan. Effective October 1, 2004, the ABA Plan's actuary determined that the assets and liabilities of Sara Lee and Lewis Brothers in the Plan were significantly overfunded, and that IBC's assets and liabilities to the Plan were significantly underfunded—to the tune of approximately $60 million. AR 0661-0662.

On May 24, 2005, IBC began to send feelers to the PBGC to determine if the agency was interested in reviewing the ABA Plan's structure. AR 0276-0279. After several communications between IBC and the PBGC, on June 24, 2005, IBC formally requested the PBGC to revisit the issue of whether the ABA Plan was an aggregate of single-employer plans. IBC submitted to the PBGC that it was unaware of the amount of its underfunding, due in large part to the fact that the ABA Plan did not conduct annual valuations for each participating employer. AR 0339-0341. After considering IBC's request, in which it was acknowledged that IBC maintained significant unfunded benefit liabilities in its single-employer plan, the PBGC decided it was time to "revisit" the 1979 Determination—27 years after the fact. AR 0427-0428.

On November 2, 2005, the PBGC wrote counsel for the ABA Plan, Sara Lee, Interstate Bakeries and others (but not Lewis Brothers) to advise them that the PBGC "intends to revisit its 1979 determination that the Plan is an aggregate of single employer plans for purpose of Title IV or ERISA." *See* AR-0427. The PBGC's November 2 letter required that interested parties submit "any written statement or documents that [they] would like PBGC to consider in its

---

[20] Even after the transfer of certain of its employee-participants from the ABA Plan to the Sara Lee Plan, Sara Lee remains a participating employer under the ABA Plan (albeit with fewer covered employees).

decision making process," on or before November 18, 2005.  The letter asked each of the recipients specifically to "address the applicable legal standard for determining whether a given plan is a single plan or and aggregate of separate plans, as set forth in PBGC's original 1979 determination regarding the Plan ... ." *Id.*

Nothing in the PBGC's November 2, 2005 letter disclosed any intention by the PBGC to consider whether the Plan "always has been ... a unitary multiple employer plan."  *See* AR 427, 1563.  Nothing in the November 2 letter asked any party for any comment on whether, for any reason, funds previously contributed by Sara Lee or Lewis Brothers (or any other participating employer) for the benefit of each of their own employees should be used to pay benefits that might be due to employees of IBC or any other participating employer—the prohibition of which was a fundamental intent behind the ABA Plan's creation as an aggregate plan.  In fact, the PBGC never afforded Movants any opportunity to be heard on those issues.

In response to the PBGC's request, only four parties submitted position statements, and none were permitted by the vague structure of the review process to rebut or comment on the positions taken by other parties.  While the PBGC never notified the parties of any chance that the 1979 Determination could be reversed retroactively—as if that Determination never occurred—some of the parties noted the chaos that could result if the Plan was determined to be a multiple-employer plan.  Specifically, in the ABA Plan's December 2, 2005 submission, counsel for the ABA Plan stated specific concern over the impact a recharacterization of the ABA Plan's structure would have on 27 years of ABA Plan administration as an aggregate:

> Recharacterization of the existing Plan would amount to a forfeiture of assets contributed by sponsors intending to pay for their own participants and would create a windfall for employers with the largest benefit liabilities—exactly the concern in 1975 when the Plan approached PBGC concerning Sanitary Baking Company.  To the extent other Plan employers are not in bankruptcy proceedings, each would be liable for an appropriately determined share of the "single" Plan liability to all participants, including those of IBC, the largest liability of all. Long-settled employer plan terminations would have to be re-opened, reverted assets would have to be recovered, public financial statements would have to be restated, tax liabilities would have to be recomputed and tax documents refilled, and most, if not all of the Plan's remaining employers, would not be able to fund

22

Plan liabilities other than their own. In the race for the exit, PBGC itself would likely end up with the benefit obligations of all employers, whose incentive to honor existing obligations to fund the Plan would cease to exist.

*See* AR 886-67 (footnote omitted). The ABA Plan specifically placed the PBGC on notice that the ABA Plan possessed substantial additional information and records concerning the Plan's 45 years of operations that may have some bearing on the PBGC's consideration of the issues. *Id.* Notably, the PBGC never requested any additional information and never asked any questions of the ABA Plan's Trustees or service providers before rendering its 2006 Determination that the ABA Plan "is and always has been a multiple-employer plan."

In addition, in its submission to the PBGC, Sara Lee noted the prejudice that it and other participating employers would suffer if the PBGC overruled its 1979 Determination: "Considering the participating employers' extensive and prolonged reliance on the 1979 Letter, [Sara Lee] will be prejudiced by a PBGC determination that the ABA Plan is no longer an aggregate of single plans for purposes of PBGC termination and funding rules. Any shift of assets from the [Sara Lee] plan to fund the IBC plan's deficit would be fundamentally unfair to [Sara Lee]." *See* AR 1305.[21] Again, like the ABA Plan, Sara Lee never received any response to its suggestion that retroactive application of a determination would unfairly prejudice the ABA Plan and its participating employers. No other notice was given to the ABA Plan, Sara Lee or Lewis Brothers that the PBGC would consider whether the Plan "always has been ... a unitary multiple employer plan," or that the PBGC would consider its own prior "application of the legal standard" to the facts as they existed in 1979, to be "simply wrong."[22]

On August 8, 2006, after more than 8 months of "consideration" the PBGC issued its 2006 Determination and found that the ABA Plan "is, and indeed always has been a multiple-

---

[21] Notably, aside from mentioning this argument in the 2006 Determination, the PBGC never addressed its reasons supporting the decision to apply the 2006 Determination retroactively. AR 1564.

[22] In the course of discussions that lead to issuance of the 1979 Determination, it was made clear to the PBGC that the ABA Plan was a "hybrid plan." *See* AR 170 (Memorandum concerning Conference at PBGC held on April 25, 1978). The assertion that the ABA Plan is a "hybrid" plan is not something that was revealed for the first time in proceedings that led to the 2006 Determination, as the PBGC implies. *See* AR 1563-1579.

employer plan." AR 1563-1579. Rather than allow the parties aggrieved by the 2006
Determination to seek an administrative appeal—which is how such a determination typically is
challenged—the PBGC employed a little used federal regulation, 29 C.F.R. § 4003.22(b), to cut-
off administrative review and force any aggrieved party to challenge the 2006 Determination in
this Court. AR 1579.

The PBGC's reason for cutting off review is tied directly to IBC's pending bankruptcy.
As the 2006 Determination states: "In light of the exigencies of this matter, the agency has
further decided to make this determination effective immediately upon its date of issuance ...
there is no obligation for any party aggrieved by this determination to exhaust its administrative
remedies ... either by seeking reconsideration ... or by filing an administrative appeal." *See* AR
1579. The only "exigencies" ever cited or existing in this case have been IBC's need for a quick
resolution due to its pending bankruptcy filing obligations.[23] The PBGC's decision "to make this
determination effective immediately upon its date of issuance," was obviously made without
*prior* notice to any of the parties.

In similar circumstances, courts have been critical of agencies that have relied upon an
"imminence of a deadline or the 'urgent need for action,'" as a justification for avoiding the
administrative processes provided under the APA. *See, e.g., Natural Res. Def. Council v. U.S.
Envtl. Prot. Agency*, 683 F.2d 752, 764, 765 (3d Cir. 1982) ("the imminence of a deadline or the
'urgent need for action,' is not sufficient to constitute 'good cause' within the meaning of the
APA, where it would have been possible to comply with both the APA and with the statutory
deadline," *citing* other cases).

Here, the apparent partnership between PBGC and IBC in defending the 2006
Determination, without allowance of an administrative appeal and under supposed "exigent"

---

[23] The *only* "exigent" circumstance that was cited by the PBGC in the 2006 Determination was the IBC bankruptcy.
There was *no other crisis*. This *private* need for an "exigent" determination by the PBGC was not sufficient reason
for a *public* agency to avoid full and complete consideration, with *proper* notice to all of the parties and complete
opportunity to be heard on *all* issues. The time elapsed since the issuance of the 2006 Determination has made clear
that those alleged *private* "exigencies" were illusory.

circumstances, begs the question: what other communications occurred between the PBGC and IBC prior to the issuance of the 2006 Determination?  As discussed above, to answer this question, and to discover the potential impact that such communications may have had on the process by which the 2006 Determination was rendered, as well as its substance, Movants have requested documents from PBGC related to any *ex parte* communications between PBGC and any other party, including IBC.

The PBGC's decision to cut-off administrative review denied Movants the opportunity to rebut the PBGC's findings at the agency level and submit additional documentation and evidence supporting their positions.  As noted above, the ABA Plan notified the PBGC that it possessed numerous documents relevant to the ABA Plan's administration.  Its requests to provide such documents fell on deaf ears, and were ignored by the PBGC.  In fact, to the Movants' knowledge, the PBGC never conducted any fact-finding with respect to its request and never asked any questions of any of Movants' representatives regarding the ABA Plan's administration before deciding to reverse over 27 years of Plan administration as an aggregate of single employer plans.

Even in the face of these administrative flaws, the PBGC argues that this Court should review its 2006 Determination based only on a limited, contrived administrative record, initially submitted and certified by the PBGC as "complete," in support of the PBGC's summary judgment motion.  As discussed below, the 2006 Determination should not be permitted to be applied retroactively.  Movants should be permitted to engage in limited discovery, at a minimum to ensure that the administrative record is in fact "complete," and to ensure the Court has all relevant information related to the PBGC's decision to revoke the 1979 Determination and retroactively apply a new and different standard.

B.    **The PBGC's Reversal of Its 1979 Determination Was Agency Rulemaking that Cannot Be Retroactively Applied**

Not only was the procedural process used by the PBGC in reviewing the ABA Plan's structure flawed, the background for and consideration given by the PBGC to its decision that the

ABA Plan is and always has been a multiple-employer pension plan and not an aggregate of single-employer plans is equally flawed and uncertain. Consequently, Movants seek discovery from the PBGC, or at minimum supplementation of the PBGC's administrative record, to address the issues that were or should have been considered prior to any retroactive application of the 2006 Determination.

### 1. The PBGC's 2006 Determination By Its Terms Is To Apply Retroactively

In the 2006 Determination, the PBGC concluded that the ABA Plan "is, and indeed always has been, a multiple-employer plan." *See* AR 1563. The PBGC also concluded that "PBGC is compelled to revoke the 1979 Determination," claiming that the "record, as a whole, establishes that the [ABA] Plan is, and always has been, a unitary multiple-employer plan." *See* AR 1566. In the 1979 Determination, the PBGC determined, after extensive fact-finding, that the ABA Plan did qualify as an aggregate of single-employer pension plans and was *not* a multiple-employer pension plan. *See* AR 0980-0983. By revoking the 1979 Determination and concluding that the ABA Plan is, and always has been, a multiple-employer plan, the 2006 Determination unambiguously states that it would be applied retroactively—as if the 1979 Determination was never issued (because it has been revoked).

Notably, in responding to the concerns expressed by the Court at the July 2 argument, the PBGC's counsel changed course and argued that the 2006 Determination *did not* apply retroactively. Specifically, the PBGC's counsel argued:

> PBGC's determination was simply that this plan is a multiple-employer plan for purposes of the pension plan, termination and insurance program under Title 4 of ERISA. *There was no decision as to the retroactive effect, if any, under Title 4 of ERISA, which we have jurisdiction to decide, so there's nothing for the Court to review as to whether and how this decision may have retroactive effect. There's no record before the Court on that; that has not been decided.*
>
> Now, that being said, as Your Honor pointed out, in the *real world* this is an ongoing pension plan, two of the largest competitors in the baking industry are here before you today because they both have significant interest at stake involving this pension plan. And the resolution of those issues as to whether this has retroactive effect could ultimately involve not just the PBGC, but the

other ERISA regulatory agencies that regulate ongoing pension plans. That includes the Internal Revenue Service, which administers and has jurisdiction over the tax provisions of ERISA, and the Department of Labor, which has jurisdiction over the fiduciary responsibility provisions of ERISA, among others, and, frankly, by the parties themselves in attempting or trying to resolve their differences over the effect of this ruling.

*So there's no record, no decision has been made other than what kind of plan it is. There's no record before the Court to review, and there was no question before PBGC as to what, if any, retroactive effect our decision would have. And it wasn't decided.*

*See* Transcript of July 2, 2007 argument at pp. 16-17 (emphasis added).[24]

Based on the PBGC's oral argument, it appears that the PBGC is completely confused as to whether the ABA Plan was a multiple-employer plan *prior* to August 8, 2006, or whether the ABA Plan only became a multiple-employer plan on August 8, 2006 and prospectively thereafter. As discussed below, the PBGC's 2006 Determination qualifies as a form of "rulemaking" and should not be applied retroactively. Even if the 2006 Determination is regarded as a form of "adjudication," it should not be applied retroactively. Based on the uncertainty created by the PBGC's divergent positions on retroactivity, as noted above, Movants believe that some discovery is required.

The PBGC chose to proceed by "adjudication," but in reality exercised "rulemaking" powers in a manner that blurred the distinction between the two. Had the PBGC sought to accomplish its goal of revoking the 1979 Determination through the exercise of its rulemaking power and declare a new policy and legal standard that would be prospective only, it should have proceeded through the proper rulemaking procedures set forth in the Administrative Procedures Act ("APA"). Instead, PBGC chose to avoid the APA's requirements on retroactive determinations and sought to proceed through adjudication. The PBGC failed to undertake and explain the deliberative process it used to assess how its decision would be applied retroactively, which it was required by law to do. Based on this failure, Movants contend that some discovery

---

[24] A copy of the relevant pages of the oral argument transcript from the July 2, 2007, hearing is attached hereto as Exhibit 2.

is required to establish a record for the Court to consider, when determining whether the PBGC's decision to "revoke" the 1979 Determination, and retroactively apply the 2006 Determination, was arbitrary and capricious. That record is not now before the Court.

### 2.    The 2006 Determination Should Qualify as Agency Rulemaking That Should Not Be Applied Retroactively

The D.C. Circuit has stated that "an interpretation of a legislative rule 'cannot be modified without the notice and comment procedure that would be required to change the underlying regulation—otherwise, an agency could easily evade notice and comment requirements by amending a rule under the guise of reinterpreting it.'" *Environmental Integrity Project v. EPA*, 425 F.3d 992, 995 (D.C. Cir. 2005) (internal quotations and citations omitted); *see also Alaska Prof. Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1034 (D.C. Cir. 1999) ("When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment.") (internal quotations and citations omitted).

The facts of *Alaska Prof. Hunters Ass'n* illustrate the application of this rule. In 1963, the Civil Aeronautics Board ("CAB") issued an order in a case involving a private pilot who was transporting hunters to remote areas of Alaska. The CAB ruled that the transportation of hunters was "merely incidental" to the pilot's business of being a registered Alaskan hunting and fishing guide. Accordingly, the FAA's regulations applicable to commercial operators, who carry persons or property by aircraft for hire, would not apply to such a pilot guide transporting hunters. For more than 30 years, the Alaska Region of the FAA consistently interpreted the 1963 CAB decision as meaning that the FAA's commercial operator regulations did not apply to pilot guides in Alaska, and an entire industry of pilot guides and hunting lodge operators acted in accordance with and relied upon this interpretation.

In 1998, the FAA published a "Notice to Operators" aimed at Alaskan hunting and fishing guides who pilot aircraft as part of their guiding service, requiring the pilot guides to comply with the FAA's commercial operator regulations. The D.C. Circuit invalidated this

Notice to Operators, because it was not issued pursuant to proper notice and comment procedures. In so doing, the D.C. Circuit held that this change in "interpretation" was, in essence, a form of rulemaking:

> Those regulated by an administrative agency are entitled to "know the rules by which the game will be played." *See* Holmes, *Holdsworth's English Law,* 25 LAW QUARTERLY REV. 414 (1909). Alaskan guide pilots and lodge operators relied on the advice FAA officials imparted to them-they opened lodges and built up businesses dependent on aircraft, believing their flights were subject to part 91's requirements only. *Cf. Paralyzed Veterans,* 117 F.3d at 587. That advice *became an authoritative departmental interpretation, an administrative common law* applicable to Alaskan guide pilots. The FAA's current doubts about the wisdom of the regulatory system followed in Alaska for more than thirty years does not justify disregarding the requisite procedures for changing that system. Throughout this period, guide pilots and lodge operators had *no opportunity to participate in the development of the part 135 regulations* and to argue in favor of special rules for their operations. Air transportation regulations have evolved considerably since 1963 and part 135 has been the subject of numerous rule making proceedings. *Had guides and lodge operators been able to comment on the resulting amendments and modifications to part 135, they could have suggested changes or exceptions* that would have accommodated the unique circumstances of Alaskan air carriage.

*Id.*, 177 F.3d at 1035.

The case against the retroactive application of the 2006 Determination is stronger here than the case against the FAA in *Alaska Prof. Hunters Ass'n.* In that case, the determination at issue was even less formal than the PBGC's 1979 Determination in this case. The PBGC made its 1979 Determination after significant discussion with the ABA Plan's representatives and fact-finding related specifically to the ABA Plan. Here, just as in *Alaska Prof. Hunters Ass'n*, the agency engaged in a form of rulemaking. Before revoking the 1979 Determination, and before changing the "rules" or the "administrative common law" by which all of the parties had governed their conduct for more than 27 years, the PBGC should have given proper notice and allowed comment from affected parties – specifically, the ABA Plan Trustees and the Plan's participating employers – through formal rulemaking procedures. Here, no party had notice that the PBGC's decision to "revisit" the structure of the ABA Plan could possibly result in a retroactive finding that the ABA Plan was a multiple-employer plan. Because the PBGC clearly

did not comply with the required procedures for seeking retroactive application of its new determination—by its own admission, the 2006 Determination should apply, if at all, only prospectively.

In reversing its 1979 Determination, the PBGC attempted to bypass the procedural requirements inherent in agency rulemaking, by implementing a fundamental reversal of position, purportedly through "adjudication." The PBGC also seeks to apply that reversal retroactively, while refusing to explain the justification for, the full reach of, or the balance of the inequities attendant to such a retroactive application. As a result, the 2006 Determination should not be applied retroactively under any standard.

Courts have recognized that administrative agencies, like PBGC, are generally "under an obligation to follow their own regulations, procedures and precedents." *American Fed. of Gov't Empl. v. Fed. Labor Rel. Auth.*, 777 F.2d 751, 759 (D.C. Cir. 1985). If an agency reverses a prior statutory interpretation or administrative decision, its most recent expression may be afforded less deference that a consistently maintained position. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987). Courts have determined that "[s]harp changes of agency course constitute 'danger signals' to which a reviewing court must be alert." *West v. Bowen*, 879 F.2d 1122, 1127 (3d Cir. 1989) (quoting *Natural Res. Def. Council v. U.S. Envtl. Prot. Agency*, 683 F.2d 752, 760 (3d Cir. 1982)). An agency that changes its position must supply a persuasively reasoned explanation for the change. *See American Fed. of Gov't Empl.*, 777 F.2d at 759; *see also LeMoyne-Owen College v. NLRB*, 357 F.3d 55, 60-61 (D.C. Cir. 2004) (agency cannot ignore its own prior precedent, but must give a "reasoned explanation" when it departs from its own precedent and explain why it is not controlling). If an agency departs from its established precedent without announcing a principled reason for such a reversal, its decision is arbitrary and capricious. *Brock v. Dun-Par Engineered Form Co.*, 843 F.2d 1135, 1137-38 (8th Cir. 1988).[25]

---

[25] *See, also*, *Harrington v. Chao*, 280 F.3d 50, 58 (1st Cir. 2002)(deviation from prior precedent without sufficient explanation may be considered arbitrary and capricious and therefore subject to judicial reversal, *citing* other cases); *Congreso de Uniones Industriales, etc. v. N.L.R.B.*, 966 F.2d 36, 39 (1st Cir. 1992)("Whatever the ground for

(continued…)

Generally, rulemaking by an agency is intended to be prospective only. In fact, long ago in *SEC v. Chenery Corp.*, 322 U.S. 194 (1947), the Supreme Court declared that:

> If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive. In other words, "we must know what a decision means before the duty become ours to say whether it is right or wrong."

322 U.S. at 196-97 (citations omitted).

In this case, it is not clear which authority—rulemaking or adjudication—the PBGC was attempting to exercise when reversing its 1979 Determination that the ABA Plan was an aggregate of single employer plans. In *Motion Picture Ass'n v. Oman*, 969 F.2d 1154 (D.C. Cir. 1992), the D.C. Circuit succinctly described the difference between rulemaking and adjudication: "In adjudication, retroactivity is the norm; in legislation it is the exception. In rulemaking, the administrative analogue to legislation, exceptions are fewer still. Agency power is derived from statutes. If Congress has not conferred retroactive rulemaking power on an agency, the agency has none to exercise." 969 F.2d at 1155.

The PBGC might, through proper adjudication, give retroactive effect to its 2006 Determination that the ABA Plan is a multiple-employer plan *so long as* the resulting inequities are counterbalanced by sufficiently significant statutory interest. *Chadmoore Communications, Inc. v. FCC*, 113 F.3d 235, 240 (D.C. Cir. 1997). But, if exercising the rulemaking authority to have prospective effect only, the PBGC cannot significantly change its position, cannot flip-flop,

---

departure from prior norms, ... it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate..."); *Ramaprakash v. F.A.A.,* 346 F.3d 1121, 1125 (D.C. Cir. 2003)(an agency's "failure to come to grips with conflicting precedent constitutes 'an inexcusable departure from the essential requirements of reasoned decision making.'"); *Long Island Head Start Child Dev. Serv. v. N.L.R.B.*, 460 F.3d 254, 257-58 (2d Cir. 2006). "[T]he thoroughness, validity, and consistency of an agency's reasoning are factors that bear upon the amount of deference to be given an agency's [interpretation] ... ." *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981).

even between two interpretive rules, without prior notice and comment. *Transportation Workers Union v. TSA*, 492 F.3d 471 (D.C. Cir. 2007).

Here, the PBGC's 2006 Determination appears more like "rulemaking" than "adjudication." As noted above, the PBGC appears to have changed the standard from one requiring "minimal risk" of cost-shifting, to a new standard that requires that such risk be "effectively eliminated." It appears to have changed the standard from one that recognizes a plan as an aggregate of single-employer plans if it effectively restrict payments "by whatever means," to a standard that only holds a plan to be an aggregate if it maintains "separate accounts." By changing these "rules," even if they were only "administrative common law," the PBGC engaged in a form of rulemaking. Notice and opportunity to be heard, under the APA's procedures for rulemaking, was required but was not given. Had the ABA Plan and its Trustees, Sara Lee or Lewis Brothers Bakeries been provided adequate notice that such changes would occur, and if they had been afforded an adequate opportunity to comment on those changes, they would have done so. They would have sought, in particular, to ensure that the new "rules" are only applied prospectively, and not retroactively.

Moreover, the PBGC's decision to focus on the ABA Plan's pattern and practice of administration over the ABA Plan's unambiguous terms also deviated from its 1979 standard for determining that a plan is an aggregate of single-employer plans rather than a unitary multiple-employer plan. As Movants argued in their summary judgment opposition briefs, the PBGC's standard for determining whether a plan qualifies as an aggregate of single employer plans or a multiple-employer plan depends first and foremost on the terms of the governing plan document. *See PBGC v. Artra Group*, 972 F.2d 771, 773, 775 (7th Cir. 1992) (court holding that "the terms of the plan documents alone were sufficient evidence of single [plan] status"); *see also* PBGC Op. Ltr. 85-2 (finding that "[w]here the plan document is clear as to intent of the parties, we will generally be guided by such express intent"). In the 2006 Determination, the PBGC completely disregarded the ABA Plan's unambiguous terms that the Plan "constitutes an association of single employer plans." *See* AR 1378. Instead, the PBGC allegedly relied solely on annual

reports filed with the Department of Labor, informal statements from the ABA Plan's counsel and actuary and other informal evidence of plan administration to support its position.

Such divergences from the legal standard applied by PBGC in 1979 and other cases (and a complete reversal from the PBGC's 1979 Determination) to the new standard in 2006 makes the 2006 Determination appear much more like an exercise of its rulemaking, rather than adjudicatory, authority. When an agency, like the PBGC, has given a regulation or rule a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment. *See Transportation Workers Union*, 492 F.3d at 475 ("an agency cannot significantly change its position, cannot flip-flop, even between two interpretive rules, without prior notice and comment.") (internal quotations and citations omitted); *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000) ("It is well-established that an agency may not escape the notice and comment requirements for applying a new rule retroactively . . . by labeling a major substantive legal addition to a rule a mere interpretation. We must still look to whether the interpretation itself carries the force and effect of law, . . . or whether it spells out a duty fairly encompassed within the regulation that the interpretation purports to construe").

Here, the PBGC engaged in a form of rulemaking. Notice should have been provided to the ABA Plan, Sara Lee and Lewis Brothers Bakeries, as well as other ABA Plan participants (and, perhaps, others). Each should have been afforded an opportunity to be heard. The failure to provide such notice and opportunity to be heard raises questions that are not answered in the record now before the Court. Discovery should be permitted to ensure that the Court has complete record, answering all of these questions.

### 3. To Apply the 2006 Determination Retroactively as Its Terms Expressly Provide, the PBGC Was Required to Justify the Retroactive Application

As discussed above, despite the plain language used in the 2006 Determination that the ABA Plan is and always has been a multiple-employer plan, the PBGC changed course at oral argument and stated that there is no record before the Court on retroactive application of the

2006 Determination. In the "real world," however, as the PBGC itself recognized at oral argument, the 2006 Determination that the Plan "is, and always has been, a multiple employer plan" (*see* 2006 Determination, at AR 1563, 1566), and that the 1979 Determination should be "revoked," *is* a decision with retroactive effects.[26] For the 2006 Determination to be upheld, the PBGC was required to justify its retroactive application of the determination *in the Determination*. The PBGC admits that the record contains no such justification.

In deciding whether to grant or deny retroactive force to a newly adopted administrative determination, the D.C. Circuit has set forth the following test: "Retroactivity must be balanced against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *See Retail, Wholesale, and Dep't Store Union v. NLRB*, 466 F.2d 380, 389-90 (D.C. Cir. 1972); *see also Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 30 (D.C. Cir. 2005) (*subseq. proc.* at 2007 U.S. Dist. LEXIS 64704 (D.D.C. Sept. 4, 2007)). It is a question of law for the Court to decide which side of this balance preponderates. *Id.* In deciding such a legal question, a reviewing court has no overriding obligation of deference to the agency decision, and courts have frequently declined to enforce administrative orders when in their view the inequity of retroactive application has not been counterbalanced by sufficiently significant statutory interests. *Id.*

To determine whether a determination should be applied retroactively, the D.C. Circuit has developed a five-factor balancing test: (i) whether the case is one of first impression;

---

[26] Indeed, in the 2006 Determination, the PBGC recognizes that, as a consequence of that decision, Sara Lee will not be entitled to a distribution of some $98 million in monies that it *previously* contributed for the benefit of Sara Lee employees, *see* AR 1564, 1572-73, and IBC, in bankruptcy, will be able to transfer to others, including both Sara Lee and Lewis Brothers, its liability for its $60 million or more in deficiencies in contributions for the benefit of IBC employees. *See* AR 1565, 1572-73. Though not stated in the 2006 Determination, Lewis Brothers Bakeries has a *surplus* of contributions made for the benefit of Lewis Brothers employees, amounting to more than $3 million. In the "real world," the effect of the 2006 Determination *is* retroactive, and will result in the taking of all or part of the surplus *past* contributions made by each of Sara Lee and Lewis Brothers for the benefit of their own employees, and will require that those *past* contributions be used to pay benefits due to IBC employees.

(ii) whether the new rule is an abrupt departure from well-established practice or merely an attempt to fill a void in an unsettled area of law; (iii) whether and to what extent the party against whom the new rule is applied relied on the former rule; (iv) whether and to what extent the retroactive order imposes a burden on a party; and (v) whether and to what extent there is a statutory interest in applying a new rule despite reliance of a party on an old standard. *See Retail, Wholesale*, 466 F.2d at 389-90. Here, the PBGC's administrative record lacks any information concerning whether the PBGC considered any of these five factors. In fact, counsel for the PBGC admitted at oral argument that the PBGC had not, and need not, consider the retroactive application of the agency's reversal of position because that issue was not before the PBGC and is not supported in its administrative record filed with the Court. *See* Ex. 2 at pp. 16-17.

As the D.C. Circuit has held, "in many instances, a retroactive change in policy is perfectly appropriate; however, the law requires that an agency explain why it has decided to take this rather extraordinary step." *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746-47 (D.C. Cir. 1986). Following this standard, to apply the 2006 Determination retroactively, the PBGC was required to explain how it determined that the balancing of the harms and benefits favors giving the reversal of the 1979 Determination retroactive application. Only if the PBGC explains its rationale for retroactively changing its prior determination can this Court determine whether that decision is a product of rational analysis.

The *Yakima Valley Cablevision* decision is instructive. In that case, the court found that the FCC failed to consider an obvious and less drastic alternative to a retroactive change in enforcement policy—the prospective only application of a new policy. The court determined that this failure to consider such an important alternative was arbitrary and capricious under the settled law of this Circuit. *Id.* The court then held that the FCC could not avoid its obligation to justify retroactive rulemaking by relying on its counsel's *post hoc* attempt to recast the nature of the agency's action. *Id.*

As in *Yakima Valley Cablevision*, here the PBGC admits that its administrative record is devoid of any discussion related to the reasons for retroactive application of the 2006 Determination.  In addition, the PBGC also admits that its administrative record does not include any documents or other information related to whether the PBGC considered the effects or other issues that will result for the ABA Plan and its Participating employers *if* the 2006 Determination is applied retroactively.

Based on these failures and the discrepancy between the 2006 Determination and the PBGC's counsel's representations to the Court, Movants should be permitted to engage in discovery to determine what information and documents, if any, were considered by the PBGC in deciding that the ABA Plan is and always has been a multiple-employer plan.  Documents produced in the course of such discovery should be added to the administrative record.  Further, Movants should be permitted to take discovery on whether the PBGC addressed or considered any of the myriad of issues and effects that retroactive application of the 2006 Determination will have on the ABA Plan's administration and on the current and former participating employers in the Plan.  Without further information on these issues, under the applicable law in this Circuit, the PBGC's 2006 Determination cannot be applied retroactively and the 2006 Determination that expressly states that the ABA Plan "is, and always has been a multiple-employer plan" should be deemed arbitrary and capricious as a matter of law.

C.    **Movants Seek Discovery On Whether the PBGC's Reversal of Its 1979 Determination Is Consistent With Its Prior Determinations**

The PBGC's failure in the 2006 Determination to disclose the agency's reasoning in retroactive application of the Determination impacts the procedural due process provided in its administrative review, and creates manifest injustice for similarly-situated participating employers in the ABA Plan, depending upon when an employer terminated its participation in the Plan.  If the 2006 Determination is applied retroactively, it will result in similarly-situated

employers being treated differently under the Plan's terms in determining liabilities at the time of a termination under Title IV of ERISA.

It is well-settled in this Circuit that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *Transactive Corp. v. U.S.*, 91 F.3d 232, 237 (D.C. Cir. 1996). Stated another way, as "a matter of simple fairness and equal protection (if nothing else)" an agency of the federal government must hold similarly situated claimants to the same standards. *Former Emples. of IBM v. U.S. Sec'y of Labor*, 483 F. Supp. 2d 1284, 1304 (Ct. Int'l Trade 2007).

As indicated above, the record is devoid of any evidence that the PBGC considered the mischief and harm that retroactive application of its 2006 Determination would create. The PBGC's failure to consider the issues that will be created by retroactive application of its 2006 Determination highlights the arbitrary nature of that Determination. Indeed, had the PBGC given thought to the implications of its determination that the Plan "is, and indeed always has been, a multiple-employer plan" prior to putting such decision to paper, it may have realized the inequities its new position will create. Had the ABA Plan's participating employers known that the Plan's structure could be changed by the PBGC retroactively to that of a multiple-employer plan at any time without notice, the Plan most likely would have terminated because it was one of the Plan's fundamental purposes was for employers to pay only for the benefits of their own employee-participants and not for the employee-participants of their competitors.

Contrary to the parties' clear intent, if the ABA Plan is now deemed a multiple-employer plan, those participating employers who owe the ABA Plan money—specifically IBC, which remains in bankruptcy—will succeed in shifting the liability for their own separate unfunded benefit liabilities to the ABA Plan and competing participating employers, like Sara Lee and Lewis Brothers upon plan termination. For example, if the ABA Plan is a multiple-employer plan, IBC will be able to avoid paying for the benefit liabilities it created by its own failed business decisions. Instead, the amount of IBC's unfunded benefit liabilities—at last tally approximately $60 million, but possibly more—will, upon plan termination, pass on to Sara Lee,

Lewis Brothers and other participating employers in the ABA Plan that presently have positive account balances and whose financial conditions are not clouded by bankruptcy.

In essence, IBC's liabilities will amount to a forfeiture of assets contributed by participating employers like Sara Lee and Lewis Brothers, and will serve to defeat one of the ABA Plan's fundamental purposes—that employers would only pay the benefit liabilities for their own employee-participants and not for those of their competitors. Put another way, participating employers, like Sara Lee and Lewis Brothers, that have properly fulfilled their contribution obligations to the ABA Plan and that have not dumped unfunded benefit liabilities into the Plan will not get the benefit of the bargain they made when executing their Participation Agreements—that their contributions to the ABA Plan would only be used to pay the benefits of *their own* employee-participants. In addition, employers like IBC will receive a windfall because they will not be required to live up to their own contractual obligations to gross-up the ABA Plan for the amount of its own unfunded benefit liabilities.

Significantly, the potential for paying the benefit liabilities of a competitor's employees was not felt by participating employers who terminated their participation in the ABA Plan prior to the 2006 Determination. Indeed, as documented in Movants' summary judgment responses, there have been numerous terminations by participating employers prior to the 2006 Determination, and each of these terminations was treated *by the PBGC* as standard, single-employer plan terminations under ERISA. *See* AR 0886-0887. As such, the employer terminating its single-employer plan was entitled to a reversion in the event of a surplus attributable to that employer's contributions. Likewise, in the event of underfunding, the withdrawing employer was required to fund fully its benefit liabilities and contribution obligations under the Plan in order to effect a standard single-employer plan termination. Applying the 2006 Determination retroactively will clearly result in similarly-situated participating employers being treated differently by the PBGC, with no explanation as to the difference in treatment or why such a difference is appropriate.

38

As discussed above, if the Court gives the 2006 Determination retroactive effect, many different prior acts and parties will be impacted, as the ABA Plan's treatment as an aggregate of single-employer plans since the 1979 Determination is not consistent with how a multiple-employer plan is administered, especially for purposes of withdrawing or terminating employers. In addition to a consideration of the unequal treatment prospective application of the 2006 Determination would create as well as the problems retroactive application would exact on the participating employers, there is an open question as to whether the PBGC has reviewed the status of other similarly-situated plans in the absence of a clearly articulated reason for applying a different standard to the ABA Plan. As discussed herein, the D.C. Circuit has held that "an agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently." *Transactive Corp.*, 91 F.3d at 237. Therefore, the parties should have an opportunity through discovery to determine the rationale for the PBGC's departure from its prior precedence and its treatment of the ABA Plan differently from prior claimants, as well as the extent to which PBGC considered the retroactive effect of its decision.

## <u>CONCLUSION</u>

For the foregoing reasons, Movants respectfully request that the Court require supplementation of the existing administrative record by addition of the categories of documents

described in this memorandum, and that the Court permit limited discovery, under the Federal Rules of Civil Procedure, to resolve the issues described in this memorandum and to ensure that the record before this Court is, in fact, "complete."

Dated:  November 2, 2007                 Respectfully submitted,

                                         **SARA LEE CORPORATION**

                             By:     /s/ Michael T. Graham_____

M. Miller Baker (DC Bar No. 444736)
James Napoli (DC Bar No. 496369)
Sarah E. Hancur (DC Bar No. 480537)
McDermott Will & Emery LLP
600 13th Street, N.W.
Washington, DC  20005-3096
Phone: 202.756.8000
Fax:    202.756.8087
Email:  mbaker@mwe.com
        jnapoli@mwe.com
        shancur@mwe.com

Michael T. Graham
McDermott Will & Emery LLP
227 West Monroe Street
Chicago, Illinois  60606
Phone: 312.372.2000
Fax:    312.984.7700
Email:  mgraham@mwe.com


                                         **LEWIS BROTHERS BAKERIES, INC.**

                             By:     /s/ D. Christopher Ohly_____

D. Christopher Ohly (DC Bar No. 486370)
SCHIFF HARDIN, LLP
1666 K Street, NW
Suite 300
Washington, DC 20006
Phone:  202.778.6458
Email: dcohly@schiffhardin.com

**AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN and BOARD OF TRUSTEES OF THE AMERICAN BAKERS ASSOCIATION RETIREMENT PLAN**

By:     /s/ Paul J. Ondrasik, Jr._____

Paul J. Ondrasik, Jr. (DC Bar No. 261388)
Edward R. Mackiewicz (DC Bar No. 944884)
STEPTOE & JOHNSON, LLP
1330 Connecticut Avenue
Washington, DC 20036
Phone: 202.429.6412
Fax:   202.429.3902
Email: pondrasik@steptoe.com
        emackiewicz@steptoe.com

Anne H. S. Fraser (DC Bar No. 349472)
ANNE H. S. FRASER, PC
1320 19th Street, NW
Suite 200
Washington, DC 20036
Phone:  202.466.4009
Fax: (202) 466.4010
Email: ahsfraser@aol.com

41