**EXHIBIT 1**

## EXHIBIT 1 -- REQUESTS FOR ADMISSIONS TO PBGC

1. PBGC determined in its 1979 Letter that the Plan was an "aggregate of separate plans," that is, an aggregate of single-employer pension plans and not a multiple-employer pension plan for plan termination purposes under Title IV of ERISA.

2. The standard for determining whether a pension plan is an aggregate of single-employer pension plans as set forth in the PBGC's 1979 Letter is correct.

3. The standard for determining whether a pension plan is an aggregate of single-employer plans as set forth in the PBGC's 1979 Letter has been applied by the PBGC for all pension plans since the issuance of the 1979 Letter.

4. The standard for determining whether a pension plan is an aggregate of single-employer pension plans as set forth in the PBGC's 1979 Letter has not been applied by the PBGC since the issuance of the 1979 Letter.

5. As reflected in the 1979 Letter, at the time of and prior to issuance of the PBGC's 1979 Letter, the PBGC knew and fully considered the fact that, on an ongoing basis, all participating employers' contributions to the Plan were and would in the future be commingled and held in a single Plan trust.

6. As reflected in the 1979 Letter, at the time of and prior to issuance of the PBGC's 1979 Letter, the PBGC knew and fully considered the fact that on an ongoing basis, all Plan benefit distributions were and would in the future be paid from commingled assets that were previously contributed to the Plan and held by the Plan in a single Plan trust.

7. At the time of and prior to issuance of the PBGC's 1979 Letter, the PBGC knew of and fully considered the Plan's practice of not maintaining on an ongoing basis separate actuarial valuations for each participating employer in the Plan's trust.

8. At the time of and prior to issuance of the PBGC's 1979 Letter, the PBGC asked all questions considered by the PBGC to be material to its 1979 Letter determination, concerning the Plan's trust accounting and actuarial practices at that time.

9. At the time of and prior to issuance of the PBGC's 1979 Letter, the PBGC had an opportunity to ask all questions considered by the PBGC to be material and relevant to its 1979 Letter determination, concerning the Plan's trust accounting and actuarial practices at that time.

10. The PBGC's finding, in its 1979 Letter, that the Plan is an aggregate of single-employer pension plans, was not contingent on any action by the Plan after the date of that letter.

11. The PBGC's finding, in its 1979 Letter, that the Plan is an aggregate of single-employer pension plans, was not contingent on any change in the Plan's trust accounting practices after the date of that letter.

12. The PBGC's finding, in its 1979 Letter, that the Plan is an aggregate of single-employer pension plans, was not contingent on the creation of separate trust accounts for the contributions of each employer participating in the Plan.

13. The trust accounting and actuarial practices of the Plan that are material to a determination whether a plan is an aggregate of single-employer plans or a multiple-employer plan have not changed since the issuance of the PBGC's 1979 Letter.

14. The trust accounting and actuarial practices of the Plan that are material to a determination whether a plan is an aggregate of single-employer plans or a multiple-employer plan have changed since the issuance of the PBGC's 1979 Letter.

15. From the date of the PBGC's 1979 Letter to the date of its 2006 Determination, the PBGC regarded the Plan as an aggregate of single-employer pension plans and not a multiple-employer plan.

16. In its filing with the United States Bankruptcy Court for the Western District of Missouri, entitled "Statement of the Pension Benefit Guaranty Corporation in Support of its Claim for Minimum Funding Contributions to the American Bakers Association Retirement Plan," dated March 17, 2005, in the case of *In re: Interstate Bakeries Corp., et al.*, Case No. 04-45814 (JWV), PBGC stated: "Upon information and belief, the American Bakers Association Retirement Plan is an aggregate of separate, single-employer defined benefit pension plans covered by Title IV of ERISA."

17. In its filing with the United States Bankruptcy Court for the Western District of Missouri, entitled "Statement of the Pension Benefit Guaranty Corporation in Support of its Claim for Unfunded Benefit Liabilities of the American Bakers Association Retirement Plan," dated March 17, 2005, in the case of *In re: Interstate Bakeries Corp., et al.*, Case No. 04-45814 (JWV), PBGC stated: "Upon information and belief, the American Bakers Association Retirement Plan is an aggregate of separate, single-employer defined benefit pension plans covered by Title IV of ERISA."

18. In its filing with the United States Bankruptcy Court for the Western District of Missouri, entitled "Statement of the Pension Benefit Guaranty Corporation in Support of its Claim for Pension Insurance Premiums for the American Bakers Association Retirement Plan," dated March 17, 2005, in the case of *In re: Interstate Bakeries Corp., et al.*, Case No. 04-45814 (JWV), PBGC stated: "Upon information and belief, the American Bakers Association Retirement Plan is an aggregate of separate, single-employer defined benefit pension plans covered by Title IV of ERISA."

19. At the time that the PBGC filed the pleadings described in paragraphs 16, 17 and 18 above, the PBGC possessed information based upon which it found in 1979 and subsequently that the Plan was administered as an aggregate of single-employer pension plans for plan termination purposes under Title IV of ERISA.

20. At the time that the PBGC filed the pleadings described in paragraphs 16, 17 and 18 above, the Plan was, in fact, administered as an aggregate of single-employer pension plans for plan termination purposes under Title IV of ERISA.

21. In reaching its 2006 Determination that the Plan "is, and always has been, a unitary multiple-employer plan," the PBGC should have applied the same rules and standards it applied to the Plan in its 1979 Letter.

22. In reaching its 2006 Determination that the Plan "is, and always has been, a unitary multiple-employer plan," the PBGC found that "its application of the legal standard [in 1979] was simply wrong."

23. The Plan has repeatedly explained its status as an aggregate of single-employer pension plans in qualification letter requests to the Internal Revenue Service.

24. The Plan has repeatedly explained its status as an aggregate of single-employer pension plan to the PBGC when participating employers under the Plan sought termination of their plans and the PBGC conducted audits of such single-employer plans administered by the Plan, at the time of such plan terminations.

25. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, the PBGC required the terminations to occur as single-employer plan terminations under Title IV of ERISA and not as withdrawals from a multiple-employer pension plan.

26. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC has processed the terminations of such single employer plans, without any contention that the Plan was a multiple-employer plan.

27. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC has processed the terminations of such single employer plans, without any contention that there was anything more than a minimal risk that funds attributable to the contributions of one employer would be used to pay the benefits of another employer's employee-participants.

28. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC has processed the terminations of such single employer plans, without any contention that funds attributable to the contributions of one employer were used to pay the benefits of another employer's employee-participants.

29. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC has processed the terminations of such single employer plans, without any contention that payments from the Plan were not effectively restricted, by whatever means, to avoid anything more than a minimal risk that funds attributable to the contributions of one employer would be used to pay the benefits of another employer's employee-participants.

30. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC has had an opportunity to ask all questions considered by the PBGC to be material to its determination, concerning the Plan's trust accounting and actuarial practices at the time of such terminations.

31. On all occasions prior to the 2006 Determination, when participating employers in the Plan sought to terminate their participation in the Plan and PBGC reviewed such termination requests, PBGC asked all questions considered by the PBGC to be material to its 1979 Letter determination, concerning the Plan's trust accounting and actuarial practices at the time of such terminations.

32. At the time of a PBGC premium audit that closed in November 2000, and a plan termination audit that closed in May 1999, the PBGC had the opportunity to ask all material questions and request all material information concerning the structure of the Plan as an aggregate of single-employer pension plans or the appropriateness of the application of single-employer pension plan rules to the Plan.

33. Prior to its initiation of the administrative proceedings leading to the issuance of the 2006 Determination, the PBGC took no action and made no statement to any of the participating employers in the ABA Plan or the Plan's Trustees that led any party to believe that the Plan was *not* an aggregate of single-employer pension plans but instead a multiple-employer pension plan for plan termination purposes under Title IV of ERISA.

34. Prior to the 2006 Determination, each of the participating employers in the ABA Plan, including Sara Lee and Lewis Brothers Bakeries, relied on the PBGC's 1979 Letter, that the Plan was an aggregate of single-employer pension plans and not a multiple-employer pension plan for purposes of plan terminations under Title IV of ERISA.

35. In its 2006 Determination, the PBGC concluded that the Plan is a multiple-employer pension plan because cost shifting amongst participating employers allegedly occurred.

36. The PBGC relied on the chart in the Administrative Record (Bates-stamped AR 1219) in making the factual finding expressed in the second paragraph of page 16 of its 2006 Determination.

37. In reaching its 2006 Determination, the PBGC based its determination, in whole or in part, on an inconsistent treatment of plan terminations under the ABA Plan; in other words, not all employers terminating their participation were required to "true-up" their contributions and any deficit under the ABA Plan.

38. In reaching its 2006 Determination, the PBGC never asked the Plan's Trustees to explain the calculations and other information contained in the chart at AR 1219.

39. Prior to issuing the 2006 Determination, the PBGC never asked the Plan's Trustees for an explanation of how the Plan's system of accounts and records were maintained and operated in the Plan's trust

4

40. Prior to issuing the 2006 Determination, the PBGC never notified the Plan that the PBGC believed the Plan's system of accounts and records or its actuarial practices were insufficient to qualify it as an aggregate of single-employer pension plans.

41. The Plan has been able to produce single employer accounts whenever requested.

42. In reaching its 2006 Determination, the PBGC did not consider the impact of retroactive application of its Determination on former or current participating employers, including Sara Lee and Lewis Brothers Bakeries, and their potential liability on plan termination.

43. At oral argument on July 2, 2007, the PBGC admitted that it did not consider any of the effects that applying the 2006 Determination retroactively would have on the Plan, former or current participating employers or former or current employee-participants.

44. In reaching its 2006 Determination, the PBGC never gave notice to the Plan's Trustees, ABA, Sara Lee or Lewis Brothers Bakeries to address the impact that the retroactive application of a determination that the Plan is a multiple-employer pension plan would have on the Plan, current participating employers or former participating employers who terminated their participation in the Plan through single-employer plan terminations under Title IV of ERISA.

45. Prior to the issuance of the 2006 Determination, neither the Plan, Sara Lee nor Lewis Brothers Bakeries had the opportunity to present documents or testimonial evidence to the PBGC concerning the question whether a determination by the PBGC that the Plan is and always was a multiple employer plan for all purposes under Title IV of ERISA could or should be retroactively applied.

46. The effect of the 2006 Determination, that the Plan has never been an "aggregate of separate plans," that is, an aggregate of single-employer plans and, instead, has always been a multiple employer plan for all purposes under Title IV of ERISA, if applied, will be to impose upon the Plan Trustees the obligation to pay a portion of past contributions made to the Plan by Sara Lee on behalf of its employee-participants, to pay benefits for employee-participants of another participating employer.

47. The effect of the 2006 Determination, that the Plan has never been an "aggregate of separate plans," that is, an aggregate of single-employer plans and, instead, has always been a multiple employer plan for all purposes under Title IV of ERISA, if applied, will be to impose upon the Plan Trustees the obligation to pay a portion of past contributions made to the Plan by Lewis Brothers Bakeries on behalf of its employee-participants, to pay benefits for employee-participants of another participating employer.

48. If, as a result of the 2006 Determination, the Plan Trustees are required to pay a portion of past contributions made to the Plan by Sara Lee or Lewis Brothers Bakeries on behalf of their own employee-participants, to pay benefits for employee-participants of another participating employer, the 2006 Determination that the Plan has never been an "aggregate of separate plans," that is, an aggregate of single-employer plans and, instead,

has always been a multiple employer plan for all purposes under Title IV of ERISA, will be retroactively applied.

49. In reaching its 2006 Determination, other than the position statements submitted by the Plan, IBC, Sara Lee and Kettering Bakeries, the PBGC never asked any participating employer in the Plan for further information regarding any facts or documents relevant to the findings made and conclusions reached by the PBGC in its 2006 Determination.