**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SARA LEE CORPORATION,<br><br>　　　　　Plaintiff,<br><br>　　　v.<br><br>AMERICAN BAKERS ASSOCIATION<br>RETIREMENT PLAN, et al.,<br><br>　　　　　Defendants. | Civil Action 06-00819  (HHK) |

**MEMORANDUM OPINION**

Sara Lee Corporation ("Sara Lee") brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, seeking reversal of a 2006 determination of the Pension Benefit Guaranty Corporation ("PBGC") that the American Bakers Association Retirement Plan ("ABA Plan" or "Plan") is a multiple-employer pension plan.  Sara Lee is a participating employer in the ABA Plan; the Plan, its Board of Trustees, and other participating employers are also parties to this suit.  Before the Court is PBGC's motion for summary judgment [#46], which the Court held in abeyance pending an assessment of the completeness of the administrative record and which is now ripe for decision.  Upon consideration of the motion, the opposition thereto, and the record of this case, the Court concludes that the motion shall be granted.

# I. BACKGROUND

## A. Regulatory Background

PBGC is a federal agency and wholly-owned corporation of the U.S. Government that administers the pension plan insurance program established by Title IV of ERISA.  29 U.S.C. §§ 1301-1371.  PBGC exists to ensure that retirees receive pension benefits they have earned even if their employer has terminated its pension plan or is otherwise unwilling or unable to pay.  *Mead Corp. v. Tilley*, 490 U.S. 714, 717-18 (1989).  When a pension plan covered by Title IV terminates without sufficient assets to pay all of its promised benefits, PBGC typically becomes trustee of the plan and pays participants their benefits, up to statutory limits.  *See* 29 U.S.C. §§ 1321-1322, 1361.

Under ERISA, groups of employers may form joint pension plans.  There are two types of joint plans for employees whose pensions are not maintained pursuant to collective bargaining agreements.  A "multiple[-]employer plan" is a plan "maintained by two or more contributing [employers] . . . under which all plan assets are available to pay benefits to all plan participants and beneficiaries."  29 C.F.R. § 4001.2.  An "aggregate of single-employer plans" is an association of separate plans in which each employer's contributions are maintained in separate accounts or otherwise effectively restricted so that the funds of each employer are used only to pay the benefits of that employer's employees.  *See Pension Benefit Guar. Corp. v. Artra Grp.*, 972 F.2d 771, 773 (7th Cir. 1992) (adopting PBGC's definition of an aggregate of single-employer plans); *Pension Benefit Guar. Corp. v. Potash*, 1986 WL 3809, at *2-3 (W.D.N.Y. Mar. 26, 1986) (same).

The distinction is relevant, *inter alia*, to determining an employer's liability when it terminates a plan with insufficient funds to pay benefits due to retirees.  *Artra Grp.*, 972 F.2d at 772.  In a multiple-employer plan, an employer is generally only liable for underfunding if it is a "substantial employer" within the meaning of ERISA, 29 U.S.C. § 1301(a)(2), or has made contributions to the plan within the five years preceding the termination of the plan as a whole, *id.* §§ 1363, 1364.  Otherwise, the obligation for that liability falls to the other contributors to the fund.  *See id.* § 1301(a)(2).  In an aggregate plan, however, the employer must make up the missing contributions or seek to qualify for a "distressed" or "involuntary" termination by PBGC, in which case PBGC becomes liable for that plan's obligations.  *See Artra Grp.*, 972 F.2d at 772-73; 29 U.S.C. § 1322.

**B. Factual Background**

The ABA Plan is a defined-benefit pension plan to which seven employers, including Sara Lee, currently contribute on behalf of their current and former employees.  The Plan was founded in 1961 and has been covered by ERISA since that statute's enactment in 1974.

**1. 1979 Determination**

On June 21, 1979, PBGC sent a letter to the American Bakers Association ("1979 Letter") stating that it had "concluded that the [ABA Plan] constitutes an aggregate of separate pension plans."  Administrative Record ("AR") 212.  PBGC described the standard for making such a determination:

> Our determination as to the nature of an entity—whether it is a single plan or an aggregate of single plans—is based on its structure and how it actually operates on an ongoing basis.  We look to the documents governing the entity and to relevant evidence of how it has operated and continues to operate.  Such evidence may include the reasonable expectations and intent of the parties.

3

The availability of funds held by an entity to provide benefits is a central factor in our analysis.  Restrictions on the use of such funds indicate that the entity may be an aggregate of single plans.  For example, if separate accounts are maintained for each contributing employer, it may be possible to restrict the use of assets from each separate account to pay only the benefits of the employee-participants of the employer maintaining the account.  If the evidence shows that payments are effectively restricted, by whatever means, so that there is a minimal risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants, then the entity is an aggregate of single plans.

AR 212-13.

PBGC's letter then discussed certain aspects of the functioning of the Plan.  Any employer entering the Plan, or any employer changing its contribution rates, was required to sign a participation agreement that set rates of coverage and "state[d] that the employer's participation in the Fund is only with respect to its own employees"; to be the subject of an actuarial evaluation to determine whether a surcharge is necessary to "avoid any actuarial deficiency"; to apply to the Internal Revenue Service for a determination that its plan met certain requirements; and to be aware of the intent, expressed in a document titled "Summary Plan Description," that each employer provide the funds to pay its employees' benefits.  AR 213-14.

The 1979 Letter acknowledged that "all contributions are paid into and all distributions are paid from the commingled trust" and "on an ongoing basis the [Plan] only maintains separate accounting per employer for purposes of cost allocation."  AR 214.  But it also noted that upon termination of a participating employer's plan, the Plan had the requisite information to "historically re-create separate accounts" so that, pursuant to a 1976 amendment to the Plan, "any amount attributable to [the employer's] contributions that prove to be in excess of the accrued pensions of its employees" could revert to that employer.  AR 214-15.  PBGC thus concluded

that "[i]n this case the separate actuarial valuations made with regard to each employer and the system of surcharges . . . effectively minimize the risk that one employer's contributions will be used to fund the benefits of another employer's employees."  AR 215.

### 2. 2006 determination

In 2005, an assessment of the Plan's finances revealed that several participating employers carried negative balances in the Plan, meaning that the benefits owed to the employer's retirees, along with administrative expenses, were greater than the contributions and investment income in the Plan's account attributable to that employer.  Compl. ¶ 27.[1]  Sara Lee, which had a positive balance in the Plan's account, sought to withdraw its funds to establish an independent pension plan exclusively for Sara Lee employees.  *See* AR 287; Compl. ¶ 28. Meanwhile, Interstate Brands Corporation ("IBC"),[2] a participating employer in the ABA Plan with a negative balance, had filed for bankruptcy.  *See* AR 1572.

In June 2005, IBC asked PBGC to reconsider its 1979 determination that the ABA Plan was an aggregate of single-employer plans rather than a multiple-employer plan.  AR 339.  As noted, this distinction controls which entity is liable for IBC's negative balance: if the Plan was properly categorized as an aggregate of single-employer plans, PBGC would be largely responsible for the deficit; if instead the Plan is multiple-employer plan, Sara Lee and other

---

[1]     All citations herein to the complaint refer to Sara Lee's Second Amended Complaint.

[2]     Several documents and filings refer to this party as Interstate Bakeries Corporation.  The party refers to itself, and is listed on the docket of this case, as Interstate Brands Corporation.

participating employers would be obligated to cover the costs of paying benefits to IBC's former employees.[3]

In November 2005, PBGC notified the ABA Plan, as well as participating employers Sara Lee, IBC, and Kettering Baking Company ("Kettering Baking"), that it intended to revisit its 1979 determination. AR 427-28. PBGC requested that these "interested parties" submit "any written statement or documents that you would like PBGC to consider in its decision-making process." AR 427. PBGC received materials from the ABA Plan, Sara Lee, IBC, and Kettering Baking.

On August 8, 2006, PBGC issued a seventeen-page determination letter ("2006 Letter") in which it concluded that the agency's application of the relevant legal standard in its 1979 Letter was "simply wrong" and that the ABA Plan "is, and indeed always has been, a multiple-employer plan." AR 1563, 1570. The letter began by explaining the factual background related here as well as Sara Lee's and IBC's financial interests in the outcomes they each supported. *See* AR 1564-66. PBGC next recited the standard "consistently applied" for distinguishing between multiple-employer plans and aggregates of single-employer plans: as stated in the 1979 Letter, the analysis "is based on [a plan's] structure and how it actually operates on an ongoing basis" and includes "look[ing] to the documents governing the entity and to relevant evidence of how it has operated and continues to operate." AR 1566-67.

---

[3]       Because of the consequences of the determination on Sara Lee's liability for IBC's negative balance, when Sara Lee sought to transfer assets from the ABA Plan to its new pension plan, the Plan held $27 million of Sara Lee's funds pending the PBGC's outcome. AR 356-60, 1565 n.2. IBC also has an interest in the determination: apparently its share of Plan liabilities would be reduced from $69 million to $40 million if the Plan is reclassified as a multiple-employer plan. AR 1564-65. The cost to PBGC of assuming liability for the negative balance is approximately $60 million. *See* Pl. Sara Lee's Opp'n to Def.'s Mot. for Summ. J. at 17.

The 2006 Letter went on to describe the Plan's historical functioning.  PBGC noted that from the Plan's inception, "benefit costs were not segregated on an employer-by-employer basis, so cost shifting could occur."  AR 1568.  According to the 2006 Letter, when PBGC reviewed the Plan's practices in 1979, it relied on the Trustees' representations of their intent to ensure that each employer fully funded the benefits for its employees, but this reliance was misplaced.  AR 1569-70.  In particular, PBGC reasoned that the Plan's requirement that a terminating employer cover its liabilities at the time it exited the Plan signified that an employer could have a negative balance, and "a negative balance was proof positive that cost shifting had occurred before the employer had withdrawn from the Plan."  AR 1570.  Turning to the operation of the Plan since 1979, PBGC wrote that although the Plan itself states that it is an aggregate of separate plans, several factors suggest the opposite is true: the Plan is governed identically for all participating employers; its "assets are pooled in a single trust and one custodial account"; "separate actuarial valuations of the Plan assets and liabilities attributable to a particular employer were to be performed only when an employer terminated participation in the Plan" or upon request; and an accounting in 2004 revealed that several employers had negative balances.  AR 1570-73.

In the final section of the 2006 Letter, labeled "Legal Analysis," PBGC described evidence submitted by IBC on which it relied to determine that the ABA Plan was a multiple-employer plan.  AR 1573.  PBGC discussed five categories of evidence.

First, it noted that a box indicating status as a multiple-employer plan was checked on the Plan's Form 5500s, an ERISA reporting form submitted to the Internal Revenue Service and the Department of Labor each year.  AR 1574.  PBGC rejected the Trustees' explanation that the forms do not have an alternative box for an aggregate of single-employer plans, reasoning that the IRS requires separate Form 5500s for each single plan.  *Id.*

Second, PBGC explained that the Schedule B attachments to the Form 5500s, signed by an actuary, "stated that the Plan had one funding standard account and one pool of assets and benefit liabilities," meaning that the participating employers' funds were "commingled and identified as contributions to the [ABA] Plan, not to any individual [employer's plan]." *Id.*  The letter stated that PBGC "regard[s] this unbroken chain of reports as persuasive evidence that the Plan always operated [on an] ongoing basis as one, multiple-employer plan in which all plan assets have been available to pay all plan benefits." AR 1575.

Third, PBGC quoted two communications, one from the Plan's attorney to James Kettering, the president of Kettering Baking, and the other from the Plan's actuary to Kettering, as examples of statements describing the Plan's operation in a manner consistent with the functioning of a multiple-employer plan.  The attorney rejected Kettering's request to provide benefits to former Kettering Baking employees at a different rate than that used by other participating employers because "[t]o the extent the experience of each employer were separately determined, the Plan would effectively be 'deconstituted' into a group of single employer plans." *Id.*  The actuary described the Plan's system of requiring surcharges for certain new participating employers, noting that the system "was never intended to come up with the same contribution rates that would have resulted from full actuarial valuations for each employer." AR 1576.

Fourth, PBGC stated that the Plan's required certified financial statements for the years ending September 30, 2003 and September 30, 2004 "fail[] to account for any of the Plan assets and liabilities on an employer-by-employer basis" or to "even mention the segregation of employer assets and liabilities required for aggregate of single-employer plan status." AR 1577.

Fifth, PBGC explained that the representations on which the 1979 Letter was based—that employers might pay surcharges upon entering the Plan and would correct for any funding deficiency or surplus upon exiting it—had in practice not been fully implemented, and "the measures the Plan did take did not effectively prevent cost shifting among participating employers on an ongoing basis." AR 1577-78. The system of surcharges was "a perfunctory calculation" rather than a method of tracking "employer-by-employer account balances on an ongoing basis." AR 1578. Furthermore, "the Plan has not consistently treated the withdrawal of a participating employer as a plan termination or retroactively created a separate account for each such employer and trued up any funding deficiency or surplus," instead allowing "inactive" employers to "abandon[] their attributable assets and allocable liabilities to the Plan." *Id.*

In light of the "exigencies" of the matter, PBGC made its determination that the ABA Plan was a multiple-employer plan effective immediately upon issuance, dispensing with the obligation to exhaust administrative remedies prior to initiating a suit in federal court. AR 1579; *see also* 29 C.F.R. § 4003.22(b).

**C. Procedural History**

Sara Lee filed this action against the ABA Plan and its Board of Trustees on May 3, 2006 and subsequently added PBGC as a defendant. Relevant to the motion before the Court are Sara Lee's requests for reversal of PBGC's determination in the 2006 Letter that the ABA Plan is a multiple-employer pension plan and to enjoin PBGC from enforcing the 2006 Letter or rescinding the 1979 Letter.[4] In November 2006, the ABA Plan and its Trustees filed a

_____

[4]      Sara Lee makes these demands for relief in Count I of its complaint. The Court previously dismissed Counts II and III of the complaint, which alleged that the ABA Plan and its Board of Trustees violated its fiduciary duties and the terms of the Plan agreement by permitting

counterclaim against Sara Lee, a cross-claim against PBGC, and a third-party complaint against the American Bakers Association and the other participants in the Plan—Kettering Baking, IBC, Lewis Brothers Bakeries, Inc. ("Lewis Brothers"),[5] Harris Baking Company, Inc., and Jenny Lee Bakery, Inc.—seeking declaratory relief resolving the contradiction between the 1979 Letter and 2006 Letter.

PBGC moved for summary judgment in April 2007.[6]  The Court has already issued an opinion resolving some of the issues raised by PBGC's motion.  *Sara Lee Corp. v. Am. Bakers Ass'n Retirement Plan*, 512 F. Supp. 2d 32 (D.D.C. 2007).  The Court rejected an argument by Sara Lee that the appropriate standard of review of PBGC's determination is *de novo*.  *Id.* at 37-38.  Instead, the Court determined that application of the deferential standard of the Administrative Procedure Act ("APA")—considering whether an action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(a)—is appropriate.  *Id.*  In response to Sara Lee's contention that discovery was necessary to address inadequacies in PBGC's record, the Court ruled that it could not determine whether the administrative record before it was complete and would hold the motion for summary judgment in abeyance pending resolution of that issue.  *Id.* at 38-39.

---

employers to have negative balances in the Plan account.  *See Sara Lee Corp. v. Am. Bakers Ass'n Retirement Plan*, 512 F. Supp. 2d 39, 43 (D.D.C. 2007).

[5]     Lewis Brothers is the named party, although Chicago Baking Company—a wholly-owned subsidiary of Lewis Brothers—is the participating employer.

[6]     The motion seeks summary judgment as to Counts I and II of Sara Lee's Second Amended Complaint, of which only Count I now remains, and as both of the two counts of the ABA Plan's Third-Party Complaint.

In accordance with the Court's opinion and order, the parties turned to addressing the question of whether materials should be added to the administrative record submitted to the Court by PBGC.  Sara Lee filed a motion for leave to serve discovery and supplement the administrative record, which the Court referred to United States Magistrate Judge John M. Facciola.  Judge Facciola denied the motion but noted that there were three categories of documents PBGC had already agreed to add to the record.  As described by the parties, those three categories were: (1) exhibits attached to the oppositions to PBGC's motion for summary judgment filed by Sara Lee, Lewis Brothers, and the ABA Plan and its Trustees; (2) filings PBGC submitted in the IBC bankruptcy proceeding; and (3) documents PBGC provided to Sara Lee in response to a FOIA request.  These materials are now before the Court as part of the administrative record.

With the issues of discovery and completeness of the record resolved, the Court can now assess whether the PBGC's 2006 determination was arbitrary and capricious.

## II. LEGAL STANDARDS

### A. APA Review

As noted, the Court has concluded that it must review Sara Lee's claim according to the APA's deferential standard.  In conducting its review, the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2).  The Supreme Court has written:

> [A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation of its decision that

> runs counter to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In other

words, as long as an agency considers relevant factors and can articulate a "rational connection

between the facts found and the choice made," then its decision will be upheld.  *See State Farm*,

463 U.S. at 42-43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))

(internal quotation marks omitted); *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)

(holding that agency action will not be reversed under the "arbitrary and capricious" standard of

review absent a clear error of judgment).  An agency may alter or reverse its policies and

positions as long as it supplies a "reasoned analysis indicating that prior policies and standards

are being deliberately changed."  *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 852

(D.C. Cir. 1970).

Despite this deferential standard, a court must conduct a "searching and careful" review

of the record to establish that the agency's decision is rational and based on consideration of all

relevant factors.  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).  A

court's review is limited to the administrative record and the grounds for decision invoked by the

agency.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *SEC v. Chenery Corp.*, 332 U.S. 194, 196

(1947).

**B. Summary Judgment**

Summary judgment is the proper mechanism for deciding, as a matter of law, whether an

agency action is supported by the administrative record and consistent with the APA standard of

review.  *Stuttering Found. of Am. v. Springer*, 498 F. Supp. 2d 203, 207 (D.D.C. 2007) (citing

*Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir.1977)).   Courts are not to apply typical

summary judgment standards, however, when reviewing a final action of an administrative

agency under the APA:

> Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is
> appropriate when the pleadings and the evidence demonstrate that "there is no
> genuine issue as to any material fact and that the moving party is entitled to
> judgment as a matter of law." Fed. R. Civ. P. 56(c).  In a case involving review of
> a final agency action under the [APA], however, the standard set forth in Rule
> 56(c) does not apply because of the limited role of a court in reviewing the
> administrative record.  *See Sierra Club v. Mainella*, 459 F.Supp.2d 76, 89-90
> (D.D.C. 2006).  Under the APA, it is the role of the agency to resolve factual
> issues to arrive at a decision that is supported by the administrative record,
> whereas "the function of the district court is to determine whether or not as a
> matter of law the evidence in the administrative record permitted the agency to
> make the decision it did."  *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769-70
> (9th Cir.1985); *see also Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d
> 1468, 1472 (9th Cir.1994) ( "[T]his case involves review of a final agency
> determination under the [APA]; therefore, resolution of th[e] matter does not
> require fact finding on behalf of this court. Rather, the court's review is limited to
> the administrative record.").

*Stuttering Foundation*, 498 F. Supp. 2d at 207.  Accordingly, in reviewing PBGC's motion, the

Court evaluates whether the evidence in the administrative record permitted PBGC to determine

that the ABA Plan is a multiple-employer plan rather than an aggregate of single-employer plans.

### III. ANALYSIS

PBGC argues that it is entitled to summary judgment because its 2006 Letter constitutes a

detailed, thoroughly reasoned analysis of the appropriate classification of the ABA Plan.  The

agency asserts that it correctly stated the relevant legal issue and its outcome is supported by

evidence in the administrative record.  PBGC reiterates that the "central factor" in determinating

whether a plan is a multiple-employer plan or an aggregate of single-employer plans "is the

availability of all plan assets to pay benefits to any participant or beneficiary," and that "the way

that the plan is structured and actually operates on an ongoing basis is dispositive." Def.'s Mot. for Summ. J. at 13-14. PBGC therefore argues that it was appropriate to conclude that because the Plan has not prevented cost-shifting between employers—in other words, because the Plan holds all employers' assets in one account and has no mechanism for ensuring that each employer funds only the benefits of its own employees—it "*cannot be* an aggregate of single-employer plans, regardless of what the parties intended, what the plan documents state, or how the plan has been treated in the past." Def.'s Reply at 19.

Sara Lee, the ABA Plan, and Lewis Brothers have all filed oppositions to PBGC's motion. Each argues that PBGC's 2006 determination was arbitrary and capricious.[7] None of

---

[7]   Each also argues that PBGC's procedures in making the 2006 determination violated due process and other procedural rights. Because these arguments largely rely on the need for, and seek as redress, discovery and supplementation of the record, they have been resolved by Judge Facciola's order denying discovery and the parties' agreement to add certain documents to the record. Insofar as the arguments focus on PBGC's method of requesting input before issuing the 2006 Letter, they also fail. No party has explained what procedure was necessary, but not provided, to comply with constitutional due process requirements. Nor has any party disputed PBGC's contention that the letter was an informal adjudication subject to the minimal procedural requirements of 5 U.S.C. § 555 or argued that PBGC's process failed to meet those requirements. Therefore there is no basis for the Court to conclude that any procedural violations occurred. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655-56 (1990) (noting that informal adjudication does not call for the procedures, such as notice and the opportunity to submit facts, arguments, and proposed findings, necessary for formal adjudications and holding that "failure to provide [such procedures] where the Due Process Clause itself does not require them (which has not been asserted here) is therefore not unlawful"); *see also* 5 U.S.C. § 555 (requiring only that "[p]rompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with any agency proceeding" and "the notice shall be accompanied by a brief statement of the grounds for denial"); *Zotos Int'l, Inc. v. Young*, 830 F.2d 350, 353 (D.C. Cir. 1987) (noting that informal adjudication is "a category for which no procedures are specified"). Consequently, the Court agrees with PBGC's assertion that PBGC is entitled to summary judgment as to Count II of the Plan's Third-Party Complaint, which alleges a due process violation.

these parties refutes PBGC's statement of the applicable standard; instead, they take issue with PBGC's interpretation of the facts before it.

The Court concludes, upon consideration of the 2006 Letter as a whole, that PBGC's decision was "based on a consideration of the relevant factors," does not reflect "a clear error of judgment," and is therefore not arbitrary or capricious. *Marsh*, 490 U.S. at 378. The letter reflects consideration of the history of the Plan and the 1979 determination as well as evidence of the Plan's operation over time. PBGC places most emphasis on the absence of restrictions on the use of employers' funds, and the Court believes the logic of that focus stands up to the deferential standard of review it is bound to apply. For the reasons explained below, the opposing parties' arguments fail to persuade the Court otherwise.

**A.   PBGC's Consideration of Evidence Beyond the Plan Documents Does Not Render the 2006 Determination Arbitrary and Capricious**

Sara Lee argues that PBGC should have looked to the Plan's governing documents, which express the intent to be an aggregate of single-employer plans,[8] and no further. The ABA Plan and its Trustees also argue that PBGC should not have considered evidence beyond the Plan's governing documents "where as here the plan on its face is an 'aggregate.'" Cross-Claimant ABA Plan's Opp'n to Def.'s Mot. for Summ. J. at 26 ("Plan Opp'n").

PBGC acknowledges that the Plan documents are evidence of intent to create an aggregate of single-employer plans. But it contends that the relevant provisions of those

---

[8]      Specifically, Article XIII of the Plan states that "[t]his Plan constitutes an association of single employer plans" and that "it is the fundamental concept and intent of this Plan that the contributions of each separate employer will be used only to provide benefits for Participants (and Beneficiaries thereof) by reason of such Participants' employment by such employers; and only contributions by such employer will be used to provide benefits for such Participants (and Beneficiaries)." AR 1378.

documents merely state that intent rather than implementing it; the language itself "do[es] nothing to minimize the risk of cost shifting among contributing employers." Def.'s Reply at 23. Furthermore, PBGC argues, plan documents are not controlling when there is contradictory evidence of a plan's actual operation.

PBGC has the better argument. Although its 2006 Letter clearly concedes that the Plan's foundational documents present the Plan as an aggregate of separate plans, AR 1570, it was appropriate—probably even necessary—for PBGC to look beyond that language to assess whether the actual operation of the Plan conformed to it. The standard articulated in the 1979 and 2006 Letters calls for looking to the operation of a plan, and there is no reason why PBGC should not do so. The few cases which shed light on this issue, including cases Sara Lee cites to support its argument, do not provide support for the proposition that looking at evidence beyond plan documents is improper. *See Pension Benefit Guar. Corp. v. Artra Group, Inc.*, 1993 WL 225370, at *2 (N.D. Ill. June 23, 1993) (affirming the conclusion of the PBGC Board of Appeals that a plan was an aggregate of single-employer plans and conducting the review by asking, after accepting the Board's conclusion that the plan documents "ensure that the contributions of each employer will go to its employees and to no one else," "whether the [plan] was actually operated in such a manner as to indicate a different result"); *Nowell v. Cent. Serv. Assoc.*, 106 F. Supp. 2d 888, 894-95 (S.D. Miss. 2000) (concluding that a plan was a multiple-employer plan where the plan documents described it as such and "[t]here is nothing in the record to indicate that the Plan [was] administered other than as recited therein"). Therefore, the Court will not reverse the 2006 determination on this basis.

**B.      The Reasoning in the 2006 Letter Does Not Lead to the Conclusion that the Determination Was Arbitrary and Capricious**

The parties opposing PBGC's motion for summary judgment make a variety of arguments disputing PBGC's analysis of evidence beyond the Plan documents.  Several of these arguments are beside the point; disagreements between PBGC and the other parties regarding how the Plan has presented itself to governmental agencies[9] are not relevant to a determination of how the Plan has operated.[10]  Like the Plan documents, evidence of how the Plan presented itself in tax filings and the like is not as meaningful as evidence of management of the Plan's account where the "central factor" in distinguishing between types of plans is "the availability of funds held by an entity to provide benefits."  Two arguments related to the Plan's operation merit more discussion.

### 1. The ABA Plan's single account

First, Sara Lee takes issue with PBGC's focus on the ABA Plan's practice of keeping all employers' funds in a single account.  Sara Lee argues that the Plan made clear to PBGC prior to its 1979 determination that it did not have separate accounts "and the PBGC determined that the ABA Plan qualified as an aggregate of single-employer pension plans anyway."  Sara Lee Opp'n

---

[9]      In particular, the Court refers to arguments regarding representations on Form 5500s submitted to the IRS and in the two letters, written by a Plan attorney and actuary, respectively, referenced in the 2006 Letter.  The same reasoning applies to Sara Lee's argument that language in employers' Participation Agreements is significant.

[10]      Although the Court acknowledges that PBGC discussed these factors in the 2006 Letter, it does not appear that the PBGC rested its conclusion on them.  Courts do not require perfection in agency decisionmaking.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 ("'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'  We will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting *Chenery Corp.*, 332 U.S. at 196; *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974))).  Accordingly, the Court does not believe that mention of factors other than those most significant to an agency determination requires reversing an otherwise reasonable decision.

at 39.[11]  The ABA Plan and its Trustees make a similar argument, reasoning that it is arbitrary and capricious for PBGC to reach a different conclusion in 2006 than in 1979 based on the same information regarding the Plan's commingled account.

PBGC replies that it has "never said" that "a plan's lack of separate accounts is . . . alone dispositive" of the proper categorization of a plan.  Def.'s Reply at 19.  Instead it contends that the 2006 Letter relies not on the same information available in 1979 but on new evidence of "ongoing plan operation," revealing that employers' funds have been used to pay benefits to other employers' employees, that informed its decision.  Id. at 20-22.

PBGC's position is not unreasonable and the Court will therefore defer to it.  According to PBGC's standard for distinguishing between multiple-employer plans and aggregates of single-employer plans, because the Plan's funds were held in a single account, "[r]estrictions on the use of such funds indicate that the entity may be an aggregate of single plans."  AR 1567. Sara Lee and the ABA Plan have not pointed to any evidence demonstrating that such restrictions exist.[12]  On the other hand, PBGC has pointed to evidence of a lack of restrictions.  This evidence

---

[11]      Sara Lee asserts in this section of its filing, as elsewhere, that PBGC's concern about its own liability motivated PBGC's determination and constitutes a conflict of interest. Other than requesting discovery—which, as explained above, is no longer a pending issue before the Court—Sara Lee requests no particular relief to remedy its concern.  The Court sees no reason, or appropriate manner, to act upon Sara Lee's contention.  Cf. Doolin Sec. Sav. Bank, F.S.B. v. Fed. Deposit Ins. Corp., 53 F.3d 1395, 1407 (4th Cir. 1995) (holding, in response to an argument the Federal Deposit Insurance Corporation was biased in making a particular assessment because of its pecuniary interest in the outcome, that "finding [the agency] biased in this case would seriously undermine the ability of agencies in general to adjudicate disputes that affect their official policies").

[12]      Lewis Brothers contends that "annual actuarial adjustments[] effectively minimized or eliminated the risk of funds attributable to the contributions of one employer being used to pay the benefits of another employer's employee-participants."  Third-Party Def. Lewis Bros.' Opp'n to Def.'s Mot. for Summ. J. at 12.  But Lewis Brothers points to no evidence that

includes a statement by the Plan's actuary that the Plan does not calculate individual employers'

assets and liabilities on an ongoing basis, AR 773; *see also* AR 487,[13] and a calculation that

several employers had negative balances in the Plan account in 2004, AR 662.  In light of this

evidence, the Court cannot conclude that there is no "rational connection between the facts found

and the choice made."  *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at

168) (internal quotation marks omitted).[14]

### 2. Employer terminations

Sara Lee also asserts that the manner in which terminations of participating employers

have occurred demonstrates the Plan's status as an aggregate of single-employer plans.  In

particular, Sara Lee notes that terminating employers submitted termination documents to PBGC,

the Plan intended to have no liability for the employees of that employer, and, most significantly,

PBGC treated the terminations as single-employer terminations.[15]  The Plan and its Trustees

make a related argument focused on the requirement that a terminating employer correct any

---

annual adjustments occurred, nor does it dispute the validity of PBGC's evidence that they did
not.

[13]     AR 487 is a page from a document titled Summary Plan Description, apparently
distributed by the Plan to employees who will receive benefits from the Plan, *see* AR 468, which
contains the statement that "there is . . . no separate annual valuation for each Employer's
contributions."

[14]     Furthermore, insofar as this new information is consistent with the Plan's
representations of how it would operate going forward from 1979, PBGC is permitted to correct
a prior, erroneous conclusion.  *See Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 417 (1993)
("[A]n administrative agency is not disqualified from changing its mind."  (quoting *NLRB v. Iron
Workers*, 434 U.S. 335, 351 (1978))).

[15]      Sara Lee sought to supplement the administrative record with documents relating
to several of these terminations.  The record now includes these additional materials.

shortfall caused by a negative balance at the time of termination, arguing that this rule "assure[s] that only assets attributable to each terminating employer may be used to pay benefits for that employer's employees."  Plan Opp'n at 31.

PBGC responds, regarding Sara Lee's argument, that its "routine processing [of employer terminations] in accordance with the now-revoked 1979 Letter . . . is not evidence of the Plan's status."  Def.'s Reply at 24-25.  As to the ABA Plan's assertion, PBGC argues that the significance of calculations of terminating employers' assets and liabilities lies in the resulting demonstrations that various participating employers had negative balances in the Plan account at the time of their terminations.[16]

Again, PBGC's reasoning passes muster under the deferential standard of review the Court must apply.  First, it is consistent with PBGC's 1979 determination that the Plan, participating employers, and PBGC treated terminations as single-employer terminations.  The 1979 Letter itself indicates that as a result of the conclusion it announces, "an employer's cessation of participation constitutes a plan termination."  AR 212.  It is not error for PBGC to reason that adherence to its original determination is not determinative of the appropriate categorization of the Plan.  Second, the Court finds reasonable PBGC's view that calculations revealing some employers' negative balances are relevant to a determination of whether employer funds were available to pay benefits to other employers' employees.  Because the Plan does not regularly calculate the balances of individual employers, it is far from clear error to treat

---

[16]     The 2006 Letter does not cite to the evidence in the record demonstrating that terminating employers had negative balances, but the ABA Plan itself has stated that "in several cases terminating employers have been called upon to contribute additional assets in order to make the Plan sufficient for termination purposes."  AR 880.

information gathered when terminations occurred as evidence of the Plan's operation.

Furthermore, at least one other court has held that the opposite conclusion was erroneous.  In

*Pension Benefit Guaranty Corp. v. Potash*, 1986 WL 3809 (W.D.N.Y. Mar. 26, 1986), the court

rejected PBGC's reliance on a plan's "reconstruction of . . . financial statements . . . to include

allocation of assets by employer" to support a conclusion that a plan was an aggregation of

single-employer plans:

> [T]he reconstruction of separate asset accounts . . . cannot demonstrate a
> restriction upon the availability of assets on an ongoing basis at the time of [a
> participating employer's] withdrawal.  The need for such retroactive measures is
> in fact an admission that assets had not been segregated, allocated or restricted per
> employer during the relevant period.  Indeed the record contains evidence that
> actual asset allocations had been performed prior to [the date of the
> reconstruction] only upon the withdrawal of an employer, further indicating that,
> on an ongoing basis, assets had been generally available.

*Id.* at *6.  The 2006 determination is consistent with this logic.  The Court does not believe that

PBGC's reasoning in the 2006 Letter regarding terminations reflects a reversible "clear error of

judgment."  *Marsh*, 490 U.S. at 378.

Because the Court concludes that the 2006 determination is not arbitrary and capricious,

PBGC is entitled to summary judgment as to claims that the determination should be reversed.[17]

---

[17]     Sara Lee and the ABA Plan also make arguments regarding harm that will arise
from the retroactive nature of the 2006 Letter.  PBGC responds that the 2006 Letter does not
address the retroactive application of its conclusion, making the opposing parties' arguments
"completely speculative."  Def.'s Reply at 25.  Because the 2006 Letter states that it is "effective
immediately," not that it is retroactive, the Court need not address these arguments.

**IV. CONCLUSION**

For the foregoing reasons, the Court concludes that PBGC's motion for summary

judgment [#46] shall be granted as to all remaining counts of Sara Lee's Second Amended

Complaint and the ABA Plan's Third-Party Complaint.  An appropriate order accompanies this

memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge
